IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: SHARONN E. THOMAS-POPE
Debtor

Chapter 13

Bankruptcy No.: 18-17430-elf

---

### BRIEF IN RESPONSE TO ORDER OF APRIL 15, 2019 AND MAY 21, 2019 RE: FED.R. BANKR.P. 9011(B)(3)

---

This pleading is being submitted in response to the court's orders of April 15, 2019 and May 21, 2019. This is to further the record against a finding of a violation of Fed.R. Bankr.P. 9011(b)(3). The rule specifically states in relevant part that, "By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery…" Based on what was stated at the hearing on April 14, 2019 as well as below, the violation should not be found.

The primary issues brought up at the hearing can be broken down into a few parts. Part 1 is the schedules themselves and how they were prepared, part 2 is to why the case was filed when

it was and part 3 can essentially be to describe the actions regarding the New Jersey Appellate case for the underlying issue of Brown v. Pope.

As to part 1, there are now schedules that were filed by new counsel on May 31, 2019, that can be compared to. The primary issues with the schedules, that the court focused on at the hearing were some properties that were missing, the values of those properties essentially matching the prior amounts, and the income of debtor's husband not being included in the schedules. Further, the issue under part 1 was when the pleadings were discussed with debtor. As to the pleadings themselves, a review of Schedule A form the 12/10/18 pleadings, as compared to Schedule A of the 5/31/19 pleadings will show a difference of $1,704,808.00 vs. 1,334,000.00. When the debtor's mother's house, valued at $542,397.00 which was added in as an admitted error in the earlier pleadings is removed, that drops the amount to $1,162,411.00. This means there is a difference of approximately 10-15% overall, with some of the houses actually being valued lower, while others increased in value. Further, had the houses that were left off accidentally between debtor's first filing in 2017 and the 2018 filing, this brings the difference in value closer to between 5-10% difference total. While this is a marked difference between December, 2018 and May, 2019, this still does not show the values used in the December, 2018 pleading to be inaccurate. Said another way, when this was discussed with the debtor, and it was agreed that, based on her perception, the values had not changed, substantially, then this shows that was accurate at the time, and there was no substantial "cover up" or bad faith in the values presented in the 2018 pleading.

As to the income differences between the 12/10/18 pleadings, as compared to the 5/31/19 pleadings, the total income was $2,830.47.00 vs. $14,700.00 for the debtor. This may seems like a substantial difference, but this clearly is now showing the debtor's income from her business, rather than what she was "paying herself". As the debtor's counsel showed this as the profit and

losses that were requested from the court and submitted as quickly as possible after the court asked,

this should be considered an attempt to "cover-up" income, but rather simply a different reporting

choice. Debtor has now chosen to take the safer route, given the courts findings, of presenting her

total business income as her own income. Of note, it is still the  case that debtor's husband, or non-

filing spouse, is still reporting zero income. As such, this should be considered "improper" or bad

faith on the part of debtor's prior counsel, as this continues to be the posting in the schedules.

     Finally, as to the specific meeting times with debtor and debtor's prior counsel. After a

review of debtor's prior counsel's email and phone log, debtor and debtor's counsel spoke

specifically about the bankruptcy on November 8, 2010, November 15, 2018, November 20, 2018

and then met in person on December 6, 2018 to do a final review of the paperwork. Further, much

of the information to fill in and update the schedules came on November 15, 2018 as well. As such,

those were the specific times that these were discussed at length. There were numerous text

messages as well that discussed various questions, including the bankruptcy and Brown matter,

but those specific dates were when the bankruptcy was discussed.

     As for part 2, the case was filed because several tenants were receiving notices to

specifically pay their funds to Brown. He was attempting to collect on the improperly acquired

judgment in the Philadelphia matter which as previously stated, Mr. Brown, through his attorney,

filed paperwork in Philadelphia at docket number 180601743. The bankruptcy court chose, for

reasons unknown, to essentially ignore this fact when it was discussed at the hearing and said it

could be discussed later.  However, it is most relevant now, as to why this case was filed at the

time it was. It is worth noting again that at **no time** did Brown attempt to serve debtor in that

matter. Rather than serving debtor, as would be required, several interrogatories were sent out to

the various financial institutions debtor banks with and the notices were allegedly sent to tenants,

which alerted them in the first place . Many of these resulted in judgments and writs of execution against debtor's accounts, where thousands of dollars were improperly removed from debtor's accounts. All of these actions took place with no notice to debtor whatsoever while the appeal was pending.

That was in bad faith for multiple reasons. First, and most obviously, there was no service even attempted on debtor and second, these actions were a clear violation of rules in place to avoid these exact actions from occurring. Pa.R.C.P. rule 236(a)(2) states, "any other order or judgment to each party's attorney of record or, if unrepresented, to each party. The notice shall include a copy of the order or judgment." Further, Pa.R.C.P. 2958.1(a) states, "A written notice substantially in the form prescribed by Rule 2964 shall be served on the defendant at least thirty days prior to the filing of the praecipe for a writ of execution."

Additionally a "foreign judgment" is defined in the Act as "any judgment, decree, or order of a court of the United States or of any other court requiring the payment of money which is entitled to full faith and credit in this Commonwealth." 42 Pa.C.S. § 4306(f). A foreign judgment is entitled to full faith and credit in Pennsylvania so long as "there was jurisdiction by the court which originally awarded the judgment, *see Stambaugh v. Stambaugh,* 458 Pa. 147, 329 A.2d 483 (1974), **and the defendant had an opportunity to appear and defend**, *see Morris Lapidus Associates v. Airportels, Inc.,* 240 Pa.Super. 80, 361 A.2d 660 (1976)." *Everson v. Everson,* 494 Pa. 348, 361, 431 A.2d 889, 895-896 (1981**). The courts in Pennsylvania will refuse to give full faith and credit to a foreign judgment if it was obtained in derogation of a basic, due process right of the defendant.** *Hanson v. Denckla,* 357 U.S. 235, 255, 78 S. Ct. 1228, 1240, 2 L. Ed. 2d 1283, 1298 (1958).

Pursuant to 42 Pa.C.S. § 4306(c)(1), "at the time of the filing of the foreign judgment, the judgment creditor or his attorney shall make and file with the office of the clerk of the court of common pleas an affidavit setting forth the name and last known post office address of the judgment debtor, and the judgment creditor. In addition, such affidavit shall include a statement that the foreign judgment is valid, enforceable and unsatisfied." Pursuant to 42 Pa.C.S. § 4306(d) **"if the judgment debtor shows the court of common pleas that an appeal from the foreign judgment is pending or will be taken,** … **the court shall stay enforcement of the foreign judgment until the appeal is concluded**".

In this case, these rules were flagrantly violated. There was **no** attempt to serve debtor in this matter. At **no time** was debtor sent any of this paperwork or even the complaint. Instead the only "notice" she got was when the money was removed from her account, and when various tenants were being harassed by Mr. Brown and/or his associates regarding the judgments; essentially telling them not to pay debtor. It was those actions that essentially resulted in this new case being file when it was. Since the court wanted to know why it was filed as an emergency, the aforementioned clearly explain why. Again, it is unclear why the court did not want to get into this matter, which is clearly at the heart of the entire bankruptcy.

Finally, part 3 is important to note all of the actions regarding the New Jersey Appellate case for the underlying issue of Brown v. Pope, and the actions taken that lead up to that. The appeal itself, contrary to what movant is attempting to show, was essentially complete. We had filed for extended time on this appeal and it had been granted, then the appellate brief was filed on October 22, 2018. (See Exhibit A – Appellant brief and appendix.) That same day, a deficiency letter was sent out asking for some standard corrections. (See Exhibit B – deficiency letter). the deficiency letter consisted of very minor changes to the brief headers itself and then changes to the

appendix. All of these were straightforward fixes that were essentially done at the time, but, since the bankruptcy was being filed, it was not submitted to make sure there were no unintentional violations of the stay on the part of the debtor. Further, this was merely two days after the due date for the deficiency notice and if the bankruptcy was not going to be filed, the updates would have been submitted that day. In fact, debtor's prior counsel had been speaking with the appellate division at that time, and they were aware of the corrections being made and even discussing the matter to make sure another deficiency letter would not have to be issued.

The appeal was only necessary, because of various other actions that were taken. There was an order signed on September 25, 2017 and docketed on September 29, 2017 that we requested be immediately vacated, as it was entered improperly. Further, debtor's prior counsel  submitted an appeal of the arbitration and a request for a De Novo Trial on September 24, 2017. Then, an order to strike our answer was entered, without even giving notice of a hearing on September 29, 2017 after the trial De Novo request. Then for reasons completely unknown, weeks later, the clerk improperly stated as follows: "DEFICIENCY NOTICE: re: REQUEST FOR DE NOVO TRIAL LCV2017241491 -Other: The court has entered an order striking the filed answer in this matter therefore, the Trial De Novo is rejected." This was improperly entered, as the Request was submitted well before the order being entered improperly. This is all what led to the appeal being needed in the first place.

Further, a motion to reinstate the appeal was actually filed as well. (See Exhibit C). This was done after the court granted relief regarding the appeal, stating the order was affirmed. Debtor's prior counsel took this to mean that we could now move to reinstate the appeal, otherwise there would be substantial bias against debtor by stating that the dismissal was affirmed, but not permitting the debtor to move to reinstate the appeal. However, that was made clear to be the case,

and as such, upon the  court's suggestion, the motion was withdrawn. (See Exhibit D). Nonetheless,

the motion is still valid and should be permitted to be filed once relief is granted to do so.


     For all of the aforementioned reasons, we state that the violations should not be found.


By:   /s/ Joshua L. Thomas
      Joshua L. Thomas, Esq.
      Bar ID 312476
      Joshua L. Thomas & Associates
      225 Wilmington-West Chester Pike
      Suite 200
      Chadds Ford, PA 19317
      Phone: 215-806-1733
      Fax: (888) 314-8910
      Email: JoshuaLThomas@gmail.com

# EXHIBIT A

Joshua L. Thomas Esq.
Attorney for Appellant
Supreme Court ID No. 003992012
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone: (215) 806-1733
Fax: (888) 314-8910
Email: JoshuaLThomas@gmail.com
Collatéral Account: 145289

| | |
|---|---|
| MARTIN BROWN AND BROWN AND THOMAS, LLC<br><br>Plaintiff, Appellee<br><br>v.<br><br>SHARONN THOMAS POPE<br>Defendant, Appellant | SUPERIOR COURT OF NEW JERSEY<br>APPELLATE DIVISION<br>DOCKET NO.: A-003453-17<br><br>TRIAL COURT DOCKET NO.:<br>CAM-L-2368-16<br><br>Trial Judge: Hon. Michael J. Kassel, J.S.C.<br>Camden County Law Division<br><br>*Civil Action*<br><br>**APPELLATE BRIEF** |

BRIEF AND APPENDIX ON BEHALF OF DEFENDANT/APPELLANT

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................... iii

TABLE OF JUDGMENTS, ORDERS AND RULINGS BEING APPEALED ..................... iv

APPENDIX TABLE OF CONTENTS ............................................................. iv

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY ..................................................................................... 2

STATEMENT OF FACTS ..................................................................................... 3

ISSUES PRESENTED ........................................................................................... 5

LEGAL ARGUMENT ............................................................................................ 6

A. SUMMARY JUDGMENT NEVER SHOULD HAVE BEEN GRANTED (A48) …. 6

    I. BAD FAITH, CONVERSION  AND FRAUD (A18) ........................... 8

    II. BREACH OF CONTRACT (A18) ..................................................... 12

B. THE MOTION TO RECONSIDER SHOULD HAVE BEEN GRANTED (A50) 14

    I.   THE CASE SHOULD HAVE REMAINED DISMISSED,
       AS PLAINTIFF'S SECOND ATTEMPT TO ENTER JUDGMENT
       WAS IMPROPER AS THE CASE IS DISMISSED (A18)………  14
    II.  THE DEFENDANT WAS ENTITLED TO SUMMARY JUDGMENT
       AS OPPOSED TO PLAINTIFF (A18).............................................  14

C. CONCLUSION ........................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

### Cases

<u>Brill v. Guardian Life Ins. Co. of America</u>,

    142 N.J. 520, 528 (1995).................................................. 7,8

<u>D'Atria v. D'Atria</u>, 242 N.J. Super. 392, 401 (Ch. Div. 1990).15

<u>Davis v. Connolly</u>, No. 09-cv-4629 (D.N.J. Feb. 11, 2010) ............ 11

<u>First National Bank v. North Jersey Trust Co.</u>

    18 N.J. Misc. 449, 14 A.2d 765, 767 (N.J. 1940) ........................ 11

<u>Friedman v. Tappan Development Corp.</u>, 22 *N.J.* 523, 531 (1956) 13

<u>Gennari v. Weichert Co. Realtors</u>,

    691 A.2d 350, 148 N.J. 582, 610 (N.J. 1997)........................ 11

<u>Kuzian v. Electrolux Home Prods.</u>,

    Inc., 937 F. Supp. 2d 599, 614-615 (D.N.J. 2013)........................ 11

<u>Leitner v. Braen</u>, 51 N.J. Super. *31, 38-39* (App. Div. 1958).. 13

<u>Marsellis-Warner Corp. v. Rabens</u>,

    51 F. Supp. 2d 508, 525 (D.N.J. 1999) .......................... 10, 11

<u>Mueller v. Technical Devices Corp.</u>,

    8 N.J. 201, 207, 84 A.2d 620 (N.J. 1951)............................ 10

<u>Weichert Co. Realtors v. Tyan</u>, 128 *N.J.* 427, 435 (1992) ............ 13

<u>West Caldwell v. Caldwell</u>, 26 *N.J.* 9, 24-25 (1958)............................ 13

### Rules

*N.J.R.* 11:5-4.1 ...................................................................... 8, 9, 10

N.J.R. 4:21A-6........................................................... 14, 15, 18

N.J.R. 4:42-11(b)........................................................... 15

N.J.R. 4:46-2 ................................................................... 7, 18

N.J.R. 4:49 ... ...................................................................... 16

N.J.R. 4:49-2 ......................................................................... 15

N.J.R. 4:50-1 ................................................................................................ 16, 17

### TABLE OF JUDGMENTS, ORDERS AND RULINGS BEING APPEALED

A. January 19, 2018 order (A174)

B. March 16, 2018 order (A200)

### APPENDIX TABLE OF CONTENTS

A1        Answer

A12       Arbitration Award

A14       Request For De Novo Trial

A 15      Letter To The Court Re Bankruptcy

A 18      First Opposition To Summary Judgment

A 34      Second Opposition To Summary Judgment

A 172     January 18, 2018 Letter To The  Court

A 174     January 19, 2018 Order

A 174     March 16, 2018 Transcript

A 200     March 16, 2018 Order

A 201     2006 Operating Agreement

A 208     2011 Operating Agreement

A213      Brown Deposition Transcript

Joshua L. Thomas Esq.
Attorney for Appellant
Supreme Court ID No. 003992012
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone: (215) 806-1733
Fax: (888) 314-8910
Email: JoshuaLThomas@gmail.com
Collatéral Account: 145289

| | |
|---|---|
| MARTIN BROWN AND BROWN AND THOMAS, LLC | SUPERIOR COURT OF NEW JERSEY APPELLATE DIVISION DOCKET NO.: A-003453-17 |
| Plaintiff, Appellee | TRIAL COURT DOCKET NO.: CAM-L-2368-16 |
| v. | Trial Judge: Hon. Michael J. Kassel, J.S.C. |
| SHARONN THOMAS POPE Defendant, Appellant | Camden County Law Division |
| | *Civil Action* |
| | **APPELLATE BRIEF** |

## I.   <u>PRELIMINARY STATEMENT</u>

This matter involves a suit where Plaintiff/appellee received an outrageous judgment in their favor, have now enforced that judgment without the proper ability to do so, and frankly caused defendant substantially more damages then she ever caused him, through a combination of deceitful actions on the party of the Plaintiff/appellee, his attorney misrepresenting facts and taking full advantage of the confusion regarding an arbitration to force through a judgment that he knew he was not entitled to anyway. By forcing this judgment

1

through,        Plaintiff/appellee        essentially        ruining

Defendant/Appellant's  life  because  she  dared  to  leave  his

business  and  have  a  successful  business  on  her  own.  This is  a

horrific  misuse  of  the  civil  process  and  needs  to  be  undone

immediately  before  further  irreparable  harm  is  done  to  the

Defendant/Appellant  in  this  matter.

## PROCEDURAL HISTORY

The  answer  in  this  matter  was  filed  on  October  26,  2016.

(See  A1).  Then,  an  arbitration  moved  forward  improperly,

without  Defendant's  knowledge,  and  the  court  refused  to  vacate

the  arbitration,  even  though  it  proceeded  without  the  proper

notice.)(See  A12  –  letter  to  court  regarding  arbitration).

Further,  the  arbitration  was,  in  fact,  properly  rejected  and

appealed,  but  the  court  chose  to  ignore  this  fact.  (See  A16  –

arbitration  letter).  There  was  a  substantial  amount  of

discovery  in  this  matter,  and  even  though  Plaintiff  attempted

to  short  circuit  the  process  by  filing  a  motion  for  summary

judgment  prematurely,  but  it  was  opposed  and  denied.  (See  A18  –

First  opposition  to  summary  judgment).  Ultimately  the  second

motion  for  summary  judgment  was  granted  improperly,  as  the

judge  admitted  to  not  reviewing  Defendant's  paperwork,  even

though  the  reason  he  claimed  to  not  have  to  review  was  not

accurate.  (See  A35  –  opposition  and  A46  letter  to  the  court  and

A48  January  19,  2018  order).  Further,  the  judge  stated  we  can

merely file a "motion to reconsider" which we did, and was promptly denied on March 16, 2018 and essentially simply ignored our arguments, choosing to simply to accept all facts presented by Plaintiff without seriously considering the facts asserted by Defendant. (See A50 transcript and A76 order). As such, those two orders are now being appealed.

## II.  STATEMENT OF FACTS

Plaintiff had been with Brown and Pope Realtors since it's inception. (See A77 2006 Operating Agreement). Both Defendant and Mr. Brown put up 50 percent each to start the company. Even though they were initially equal equity partners, Defendant never was permitted to review the books, see how much the gross income of the company was or have any say over any significant financial matters. Further, she never received any of the proceeds from the transactions that took place in the office, contrary to what the agreement called for. During that time, she was only was paid on the transactions that she personally worked on, contrary to what was called for in the agreement.

Additionally, what she was paid would 100 percent of the commission, she still had the transaction fees taken out. She paid a $1,500.00 monthly fee which was paid directly to Mr. Brown. Once the business improved with the bank owned properties (REO), Mr. Brown made my client the offer to take a 33% commission split on those, even though they were still supposed

3

to be equal equity partners plus for Wells Fargo she had to pay $115 per property. Defendant agreed but ultimately, the work on the REOs consumed all of her time and she was unable to do any other work. That was around the time Mr. Brown stopped taking the $1,500.00 monthly fee because she was working only on REOs.

This situation again changed to the point where my client's share was increased to 40% but she was then continued to pay the $115.00 per property fee that the bank charged per property. (See A86 2011 Operating Agreement). Defendant's commissions were 40% minus $115.00 and this put her on equal footing with every other agent in the company, even though she was supposed to be a partner. As a partner in the company, my client never saw a profit or received any additional money for her share of ownership, even though the company was certainly profitable for Mr. Brown.

My client also took out a personal loan when things were not going well for Brown and Pope and as of May 12, 2016 the loan was valued at $17,216.96. Mr. Brown would not make timely payments and let the loan fall 3 to 4 months behind on the payments, forcing Defendant to pay 3 to 4 months from her own personal funds to keep her personal property from going into foreclosure. This caused great hardship for my client.

Further, at no time was Defendant ever treated like a true partner, often mistreated and spoken down to by Defendant.

Defendant was entitled to a portion of the Commissions on properties sold from at least 12/17/2009 through 03/06/15 valuing at least $957,450 but received none of that amount. Mr Brown charged $150.00 fee payable to Brown and Pope realtors which was paid by co-operating realtors on sold transactions. Plus there was also a charge which the agents were  forced to charge buyers and sellers $300 on all sold homes. In January 2016 the fee was increased to $400.00 which Mr. Brown kept all funds.

A review of the 2011 operating agreement in regards to terminating the LLC and the insurance information will show material defects. Specifically, the version attached to the complaint has significant changes that were clearly fabricated to the benefit of the Plaintiff. These fabrications cannot be allowed to considered part of the original documents as they are blatant fraud. They were simply forged by Plaintiff, never signed by Defendant and done so in order to proceed with this litigation. Additionally, Plaintiff is guilty of breach of contract.

## IV. <u>ISSUES PRESENTED</u>

1. Whether the trial court erred by granting the January 19, 2018 order?

**Suggested answer: Yes.**

2. Whether the trial court erred by granting the March 16, 2018
order?

**Suggested answer: Yes.**

## V. <u>LEGAL ARGUMENT</u>

### A. <u>SUMMARY JUDGMENT NEVER SHOULD HAVE BEEN GRANTED</u>

Plaintiff failed to show sufficient facts that would have
led to a summary judgment, merely forcing through, unchallenged
extremely questionable facts at an arbitration that was held
without proper notice

Further, because Plaintiff has failed to show that it is
entitled to judgment as a matter of law, this Court should not
only deny Plaintiff's Motion for Summary Judgment but grant
Defendant's Motion for Summary Judgment as all evidence
presented clearly show Plaintiff was the one who was in
violation of the agreement, failed to actually perform his
duties required and nothing was actually shown that Defendant
did anything wrong or improper. It is well settled that in New
Jersey, courts will only grant summary judgment when there is no
issue of material fact and when it is abundantly clear that the
moving party is entitled to judgment as a matter of law.
Because Defendant demonstrates that Plaintiff is not entitled to
judgment as a matter of law, this Court should deny Plaintiff's
Motion and Grant Defendant's, as Plaintiff cannot succeed in
showing any of the asserted claims in his complaint. .

Pursuant to R. 4:46-2, a court should grant summary judgment only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and the moving party is entitled to a judgment or order as a matter of law." New Jersey courts have interpreted this to mean that if, after granting all favorable inferences to the non-moving party, the movant can show that there remains no issue of material fact, then, and only then, will a court grant summary judgment.

To succeed on a motion for summary judgment, New Jersey courts require that "the moving party […] establish that there is no genuine issue of material fact that the moving party is entitled to judgment as a matter of law" Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 528 (1995). "A court should deny a summary judgment motion only where the party opposing the motion has come forward with evidence that creates a 'genuine issue as to any material fact challenged' […]" Id. at 529.

Further, when evaluating a summary judgment motion, "the court must grant all favorable inferences to the non-movant party." Id. at 536. The Court in Brill went on to conclude that summary judgment should only be granted when, after granting all favorable inferences to the non-movant, the

7

evidence "is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 540.

Thus, the moving party must show that the case is so one-sided in its favor that it is entitled to judgment as a matter of law in order to win on a summary judgment motion. Where the non-moving party comes forward with any fact or evidence that even hints at an issue of material fact, then the moving party is not entitled to summary judgment. Notably, because summary judgment motions are so final and summarily dispose of a case, the court should rule on every close call in favor of the non-moving party. Thus, the standard for summary judgment is very high. Because Plaintiff has not met its burden and because Defendant does, this Court must deny Plaintiff's Motion for Summary Judgment and grant Defendant's Counter-Motion for Summary Judgment.

## I.   BAD FAITH, CONVERSION AND FRAUD

Plaintiff was treated like an independent contractor by Defendant and, to this day, Defendant has failed to comply with the real estate commission and specifically rule 11:5-4.1 in regards to proper employment practices. That rule states as follows:

> *11:5-4.1 Employment agreements; commissions; accounting to salespersons and referral agents; actions for collection of compensation*
> *(a) No salesperson or referral agent may commence operations as such for a broker and no broker may*

*authorize a salesperson or referral agent to act as such on his or her behalf until a written agreement as provided in this subsection has been signed by the broker and salesperson or referral agent. Prior to an individual's commencement of activity as a salesperson or referral agent under the authority of a broker, the broker and salesperson or referral agent shall both sign a written agreement which recites the terms under which the services of the salesperson or referral agent have been retained by the broker. Such terms shall include, but need not be limited to, the following:*

*1. The rate of compensation to be paid to the salesperson or referral agent during his or her affiliation with the broker;*

*2. A promise by the broker to pay to the salesperson or referral agent his or her portion of commissions earned within 10 business days of their receipt by the broker or as soon thereafter as such funds have cleared the broker's bank, or in accordance with another payment schedule explicitly set forth in the employment agreement;*

*3. The rate of compensation payable to the salesperson or referral agent on transactions which close and, if applicable, on renewals which occur subsequent to the termination of the salesperson's or referral agent's affiliation with the broker; and*

*4. A provision that any future changes to the agreement will not be binding unless the changes are contained in a writing signed by both parties.*

*(b) A copy of the fully executed agreement shall be provided to the salesperson or referral agent upon the commencement of his or her affiliation with the broker, and the original thereof shall be maintained by the broker as a business record in accordance with N.J.A.C. 11:5-5.5.*

*(c) All compensation paid to brokers shall, unless debited from funds held in escrow in accordance with N.J.A.C. 11:5- 5.1(d), be deposited into the general business account of the broker within five business days of their receipt by the broker.*

*(d) In the event that any monies due a salesperson or referral agent under the terms of the written agreement with their broker are not paid within 10 business days of the broker's receipt of such funds or promptly thereafter upon their having cleared the broker's account, the broker shall provide to the*

9

*salesperson or referral agent a complete and comprehensive written explanation of the failure to pay such monies.*

*(e) Upon the termination of the affiliation of a salesperson or referral agent with a broker, the broker shall make a complete accounting in writing of all monies due the salesperson or referral agent as of the date of termination and/or which may become due in the future. In the event any sums so accounted for are not in accord with the terms of the post-termination compensation clause in the written agreement between the broker and the salesperson or referral agent, the broker shall give a complete and comprehensive written explanation of any difference to the salesperson or referral agent with the accounting. Such accounting shall be delivered to the salesperson or referral agent not later than 30 days after termination.*

*(f) Copies of all written agreements as described in (a) above, of all written explanations of the failure to pay compensation due a salesperson or referral agent on a timely basis as described in (e) above, and of all accountings and written explanations regarding compensation due a salesperson or referral agent subsequent to the termination of their affiliation with a broker as described in (f) above shall be maintained by the broker, with adequate proof of the delivery of the same to the salesperson or referral agent, for a period of six years.*

In New Jersey, common law conversion is defined as " 'the exercise of any act of dominion in denial of another's title to . . . chattels, or inconsistent with such title. ' " Marsellis-Warner Corp. v. Rabens, 51 F. Supp. 2d 508, 525 (D.N.J. 1999) (quoting Mueller v. Technical Devices Corp., 8 N.J. 201, 207, 84 A.2d 620 (N.J. 1951). More loosely, conversion may be thought of as the civil remedy for theft, for unlawful taking, or for unlawful keeping.

10

The elements of conversion in New Jersey are: "(a) that the property and right to immediate possession thereof belong to the plaintiff; and (b) the wrongful act of interference with that right by the defendant." Davis v. Connolly, No. 09-cv-4629 (D.N.J. Feb. 11, 2010) (quoting First National Bank v. North Jersey Trust Co., 18 N.J. Misc. 449, 14 A.2d 765, 767 (N.J. 1940)); see also Marsellis-Warner Corp., 51 F. Supp. 2d at 525.

In New Jersey, the elements of common-law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Gennari v. Weichert Co. Realtors, 691 A.2d 350, 148 N.J. 582, 610 (N.J. 1997); Kuzian v. Electrolux Home Prods., Inc., 937 F. Supp. 2d 599, 614-615 (D.N.J. 2013).

Plaintiff is guilty of conversion. Plaintiff should have given an accounting over a year ago now and failed to do so. Plaintiff kept thousands of dollars for himself when in reality, all income for year should have been shared with Defendant. Plaintiff failed to ever let Defendant review the books, as would have been her right and instead, used the firm as his personal piggy bank and failed to properly split funds as would have been required. Plaintiff had Defendant sign fraudulent

11

agreements to continue to take the money she should have been entitled to.

A review of the 2011 operating agreement in regards to terminating the LLC and the insurance information will show material defects. (See Exhibit A – 2011 Operating Agreement.) In fact, Plaintiff has tried to commit fraud, by material altering the operating agreement to his benefit and claiming it is valid, when a simply review of both documents will show that to be false. Specifically, the version attached to the complaint has significant changes that were clearly fabricated to the benefit of the Plaintiff. These fabrications cannot be allowed to considered part of the original documents as they are blatant fraud. They were simply forged by Plaintiff, never signed by Defendant and done so in order to proceed with this litigation.

## II. <u>BREACH OF CONTRACT</u>

Plaintiff is guilty of breach of contract. To establish its contract claim against the defendant, plaintiff must prove that:

1. The parties entered into a contract containing certain terms.

2. The plaintiff did what the contract required the plaintiff to do.

3. The defendant did not do what the contract required the defendant to do. This failure is called a breach of the contract.

4. The DEFENDANT breach, or failure to do what the contract required, caused a loss to the plaintiff.

*Weichert Co. Realtors v. Tyan,* 128 *N.J.* 427, 435 (1992) (a contract arises from proper acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty.*); West Caldwell v. Caldwell*, 26 *N.J.* 9, 24-25 (1958); *Friedman v. Tappan Development Corp.*, 22 *N.J.* 523, 531 (1956); *Leitner v. Braen*, 51 N.J. Super. *31, 38-39 (App. Div. 1958).*

At no time did Plaintiff respect any version of the contract that required he treat Ms. Pope as a partner. Instead, he constantly kept significant funds for himself, withholding thousands of dollars of commissions from Ms. Pope. As previously stated, this was a breach of both of the aforementioned agreements, as well as the independent contractor agreement Plaintiff was obligated to sign, even as a partner. Additionally, the previous facts clearly show that Plaintiff blatantly and intentionally breached the contract on many occasions.

## B. <u>THE MOTION TO RECONSIDER SHOULD HAVE BEEN GRANTED</u>

I.  THE CASE SHOULD HAVE REMAINED DISMISSED, AS PLAINTIFF'S
    SECOND ATTEMPT TO ENTER JUDGMENT WAS IMPROPER AS THE
    CASE IS DISMISSED

As was previously stated, Plaintiff's motion WAs the exact same motion that was denied on December 15, 2017. Further, the case was dismissed as of December 27, 2017 pursuant to R. 4:21A-6(b). Plaintiff's later pleading, ignored both of these facts, and simply tried to re-assert the exact same arguments as before, simply adding in the bankruptcy proceeding into his argument. However, since Plaintiff's relief was already denied, that motion should be construed as either a motion to reconsider or a motion to vacate an order, neither of which Plaintiff asked for, and as such, his motion should be dismissed with prejudice.

R. 4:21A-6(b) states "(b) Dismissal. An order shall be entered dismissing the action following the filing of the arbitrator's award unless: (1) within 30 days after filing of the arbitration award, a party thereto files with the civil division manager and serves on all other parties a notice of rejection of the award and demand for a trial de novo and pays a trial de novo fee as set forth in paragraph (c) of this rule; or (2) within 50 days after the filing of the arbitration award, the parties submit a consent order to the court detailing the terms of settlement and providing for dismissal of the action or for entry of judgment; or (3) within 50 days after the filing of

14

the arbitration award, any party moves for confirmation of the arbitration award and entry of judgment thereon. The judgment of confirmation shall include prejudgment interest pursuant to R. 4:42-11(b)." Plaintiff failed to successfully do any of that, and their sole attempt to do so was denied on December 15, 2017." As such, their motion is more correctly viewed either a motion for reconsideration or to vacate.

Pursuant to R. 4:49-2, a motion for rehearing or reconsideration "shall state with specificity the basis on which it is made, including statement of the matters or controlling decision which counsel believes the court has overlooked or as to which it has erred…" R: 4:49-2. The general standard of review for a motion for reconsideration provides that a motion for reconsideration should not be made merely because a party is dissatisfied with the court's decision. D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990). Rather a party is entitled to reconsideration where the court's decision has a "palpably incorrect or irrational" basis or "it is obvious that the Court either did not consider, or failed to appreciate the significance of probative, competent evidence." Ibid. "[A] litigant must initially demonstrate that the Court acted in an arbitrary, capricious, or unreasonable manner, before the Court should engage in the actual reconsideration process." Ibid.

Plaintiff had simply failed to make a showing based on that rigorous standard. First, by simply ignoring the proper procedural posture in this case and ignoring the orders entered or the fact they **already** applied for the exact same relief and were denied. Second, By attempting to receive a judgment for a case that was properly dismissed. And third, by failing to present any evidence that 'the court's decision has a "palpably incorrect or irrational" basis or "it is obvious that the Court either did not consider, or failed to appreciate the significance of probative, competent evidence."' At most, the Plaintiff's simply showed that the bankruptcy court did not make any substantial rulings on the merits of this case, and further they showed they were willing to filed what they felt they "had to" to protect their interests in either case. If that were true, Plaintiff's would have filed a proper motion for reconsideration, which they are now out of time to do, or they would have filed **anything** as required by rule 4:21A-6(b).

Alternatively, Plaintiff could have filed a motion under 4:50-1 for relief from an order. The rule states, that a motion is granted under this rule "for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under R. 4:49; (c) fraud

16

(whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; (e) the judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application; or (f) any other reason justifying relief from the operation of the judgment or order."

Plaintiff's "arguments" failed to conform to the higher standard set for rule 4:50-1. They make no attempt to claim there was any "mistake, inadvertence, surprise, or excusable neglect" on the part of Plaintiff's attorney. In fact, they made very clear they were aware of the pending litigation in this case, yet simply ignored the orders entered and simply tried to re-assert the same argument for the same relief with new facts. Similarly, there was no "newly discovered evidence" merely Plaintiff re-attaching the same evidence already presented and the bankruptcy matter. The bankruptcy judge made clear he was not ruling on the merits of the case, so that has no bearing on this case. Further, there is no presentation of fraud, simply a regurgitation of the previous facts by Plaintiff's attorney. Additionally, there is no claim either of the orders are void, nor that they have been satisfied. Finally, there is no "other reason justifying relief" from the order. Plaintiff's attorney

simply did not like it, so he is attempting to now ignore the orders entered by the court.

II.  THE DEFENDANT WAS ENTITLED TO SUMMARY JUDGMENT AS OPPOSED TO PLAINTIFF

Pursuant to R. 4:46-2, Defendant was entitled to summary judgment or a trial on the merits. A trial de novo **was** requested pursuant to Rules 4:21A-6(b)(1) and 4:21A-6(c). Further, there is no question this was filed within 20 days of the arbitration award being entered and prior to the order strike the answers, and as such, should have been granted. However, Defendants are **not** seeking to vacate the order entered on December 27, 2017 and only present these arguments in the unlikely case the trial court chooses to vacate the order of December 27, 2017.

Based on the transcript at the deposition of Mr. Brown, there can be no question that there are no further damages other than those attorney's bills Plaintiff's attorney has fabricated and Plaintiff made clear he had no memory of seeing previously in any significant manner. (See A 92). First, as previously stated, plaintiff never responded to supplemental discover in any meaningful way – and as such there was no evidence to support the ridiculous amount received at the improper arbitration hearing. As previously mentioned, Plaintiff gave partial answers and paltry documentation at best. Further, Plaintiff **admitted** there were **no damages** as Wells Fargo is still

18

with the company. (See A 92). Further, Plaintiff admitted that his account was removed from Wells Fargo prior to Ms. Pope leaving and he never informed his employees of that fact. (Transcript p. 29). Additionally, in regards to the attorney's fees, Plaintiff has not made any payments to attorney nor seen the bill before as he was expecting to pay on a contingency basis (Transcript p. 56). Also incredibly unsettling was the fact that plaintiff admitted to lying to the IRS repeatedly to his benefit and Ms. Pope's detriment. (Transcript p. 49-52). As for Ms. Pope's counterclaims, if the case is to be re-opened, which again, we are not seeking, they should be granted. First, Plaintiff did not deny that there was a fabricated version of the operating agreement (Transcript p. 41-42). This fabricated version was purely to his benefit and Defendant's detriment. Further, Plaintiff admitted to making payments on the loan many times that Defendant took out support Plaintiff's firm. (Transcript p. 20). Further, Plaintiff even admitted that Ms. Pope was entitled to more payments than she received, (Transcript p. 33-34). Based on all of these issues, not only should Plaintiff's order be vacated, but Defendant should be granted summary judgment or permitted to go to trial to prove these issues.

III. <u>CONCLUSION</u>

It is the opinion of the Defendant/Appellant that the evidence in this case substantiates that the lower court rulings be overturned and the case be remanded back to the lower court in accordance with the aforementioned arguments.

_/s/ Joshua Thomas_
Joshua Thomas

Date: September 27, 2018

| MARTIN BROWN AND BROWN AND THOMAS, LLC | SUPERIOR COURT OF NEW JERSEY APPELLATE DIVISION DOCKET NO.: A-003453-17 |
| --- | --- |
| Plaintiff, Appellee | TRIAL COURT DOCKET NO.: CAM-L-2368-16 |
| v. | Trial Judge: Hon. Michael J. Kassel, J.S.C. |
| SHARONN THOMAS POPE Defendant, Appellant | Camden County Law Division |
| | *Civil Action* |
| | **APPELLATE BRIEF** |

CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing on the following persons, as follows:

*Manner of service*             *Name and address*

email                            E. McCord Clayton, Esq. Two
                                 Penn Center 1500 JFK Blvd.
                                 Suite 920 Philadelphia, PA
                                 19102

By:  /s/ Joshua L. Thomas

Joshua L. Thomas, Esq.
Atty ID# 003992012
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone: 215-806-1733
Email: JoshuaLThomas@gmail.com

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
1110 Pocopson Road, PO Box 415
Pocopson PA 19366
Phone: 215-806-1733
Fax: (856) 831-7668
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for Defendants

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

Brown & Pope

      PLAINTIFF

      vs.

Sharonn Thomas Pope

      DEFENDANTS

      DOCKET NO. CAM-L-2368-16

## **ANSWER TO COMPLAINT**

Defendant, Sharonn Thomas Pope, by and through her attorney Joshua Thomas by way of Answer to Complaint, says:

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Denied. Defendant does not have sufficient knowledge as to the status of "Brown and Thomas" now that she has left the entity. In as much as she has left the entity, she feels it would be improper for it to continue to use her name in such a manner.

6.    Denied. Mr. Brown and Ms. Thomas Pope sign an "Independent Contractor Agreement" and treated her as such. She never received the rights of a shareholder.

A 1

7.     Denied. This is not the same version that Defendant signed or has in her possession as was previously referenced in her motion to dismiss and incorporated here.

8.     Denied. This is not the same version that Defendant signed or has in her possession as was previously referenced in her motion to dismiss and incorporated here.

9.     Denied. This is not the same version that Defendant signed or has in her possession as was previously referenced in her motion to dismiss and incorporated here.

10.    Admitted in part, denied in part. Admitted that conversation took place then however, denied as to the rest. Defendant had already left prior to that conversation.

11.    Admitted.

12.    Denied. This is patently false; Defendant has not tried to solicit any business from Plaintiff's clients whatsoever, this is purely a smear tactic.

13.    Denied. This is patently false; Defendant has not tried to solicit any business from Plaintiff's clients whatsoever, this is purely a smear tactic. Further, it is telling Plaintiff does not attempt to attach any proofs of this false allegation.

14.    Denied. This is also patently false; this is purely a smear tactic. Further, it is telling Plaintiff does not attempt to attach any proofs of this false allegation.

15.    Denied. This is also patently false; this is purely a smear tactic. Further, it is telling Plaintiff does not attempt to attach any proofs of this false allegation.

16.    Denied. This is also patently false; this is purely a smear tactic. Further, it is telling Plaintiff does not attempt to attach any proofs of this false allegation. If anything, Plaintiff has harmed Defendant in the exact way that Plaintiff is claiming to be harmed.

17.    Denied. Plaintiff in fact failed to properly pay Defendant for payments she was entitled to and failed to properly reimburse expenses she incurred from the firm.

18.  Denied. Defendant agreed but Plaintiff refused to incur the expense for it, as Defendant
     was not in the financial position to do so, while Plaintiff clearly is and continues to be.

## ANSWER TO FIRST COUNT

19.  Denied.

20.  Denied. There are no valid contracts cited and they were in fact breached by Plaintiff
     many times prior to Defendant finally leaving.

21.  Denied. There are no valid contracts cited and they were in fact breached by Plaintiff
     many times prior to Defendant finally leaving.

22.  Denied. Defendant in fact suffered greatly because of Plaintiff's horrific conduct towards
     her.

> **WHEREFORE**, Defendants demands entry of judgment as follows:
>
> a.  Dismissing the First Count of the Complaint;
>
> b.  Awarding attorney's fees and cost of suit; and
>
> c.  Granting such other relief as the Court deems just and proper.

## ANSWER TO SECOND COUNT

23.  Denied.

24.  Denied. There are no valid contracts cited and they were in fact breached by Plaintiff
     many times prior to Defendant finally leaving.

25.  Denied. Defendant in fact suffered greatly because of Plaintiff's horrific conduct towards
     her.

26.  Denied. Defendant in fact suffered greatly because of Plaintiff's horrific conduct towards
     her.

27.    Denied. Defendant in fact suffered greatly because of Plaintiff's horrific conduct towards
her.

WHEREFORE, Defendants demands entry of judgment as follows:

a.    Dismissing the Second Count of the Complaint;

b.    Awarding attorney's fees and cost of suit; and

c.    Granting such other relief as the Court deems just and proper.

## ANSWER TO THIRD COUNT

28.    Denied.

29.    Denied. There is not only no proof of these false allegations, but Plaintiff has in fact done
exactly this against Defendant.

30.    Denied. There is not only no proof of these false allegations, but Plaintiff has in fact done
exactly this against Defendant.

WHEREFORE, Defendants demands entry of judgment as follows:

a.    Dismissing the Third Count of the Complaint;

b.    Awarding attorney's fees and cost of suit; and

c.    Granting such other relief as the Court deems just and proper.

## ANSWER TO FOURTH COUNT

31.    Denied.

32.    Denied. There is not one iota of evidence of this because it simply has not happened.

33.    Denied. Defendant has been the one actually damaged from Plaintiff's egregious actions.

WHEREFORE, Defendants demands entry of judgment as follows:

a.    Dismissing the Third Count of the Complaint;

b.    Awarding attorney's fees and cost of suit; and

c.    Granting such other relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

1.  The Complaint fails to state a cause of action upon which relief may be granted.

2.  Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

3.  Plaintiff's claims are barred by the doctrine of waiver and/or estoppel.

4.  Plaintiff is not the real party in interest and lacks standing to sue; all necessary parties have not been joined.

5.  Plaintiff claims are barred by the equitable doctrine of unclean hands, fraud, illegality, collusion, and conspiracy.

6.  To the extent that Plaintiff did sustain any damages, which Defendants denies, such damages were caused, in whole or in part, by the comparative fault of Plaintiff and /or third parties.

7.  Plaintiff has acted illegally an improperly at all relevant times and Plaintiff is therefore barred from any relief whatsoever.

8.  Plaintiffs own conduct, including that of its agents, contractors and partners, and/ or conduct of third parties, constitute superseding or intervening causes with respect to Plaintiff's claim of damage or injury.

9.  Plaintiff's claims are barred because Plaintiff would be unjustly enriched if allowed to recover all or any part of the damages or remedies alleged in the Complaint.

10. That upon information and belief, no contract ever existed in accordance with the terms that were set forth in the Complaint.

   **WHEREFORE**, Defendants demands entry of judgment as follows:

  a.  Dismissing Plaintiff's Complaint;

  b.  Awarding attorney's fees and cost of suit; and

  c.  Granting such other relief as the Court deems just and proper.

<u>**COUNTERCLAIM**</u>

1. Plaintiff had been with Brown and Pope Realtors since it's inception. (2006 Operating Agreement incorporated by reference)

2. Both Defendant and Mr. Brown put up 50 percent each to start the company.

3. Even though they were initially equal equity partners, Defendant never was permitted to review the books, see how much the gross income of the company was or have any say over any significant financial matters.

4. Further, she never received any of the proceeds from the transactions that took place in the office, contrary to what the agreement called for.

5. During that time, she was only was paid on the transactions that she personally worked on, contrary to what was called for in the agreement.

6. Additionally, while she was paid would 100 percent of the commission, she still had the transaction fees taken out.

7. She paid a $1,500.00 monthly fee which was paid directly to Mr. Brown.

8. Once the business improved with the bank owned properties (REO), Mr. Brown made my client the offer to take a 33% commission split on those, even though they were still

supposed to be equal equity partners plus for Wells Fargo she had to pay $115 per property.

9. Defendant agreed but ultimately, the work on the REOs consumed all of her time and she was unable to do any other work.

10. That was around the time Mr. Brown stopped taking the $1,500.00 monthly fee because she was working only on REOs.

11. This situation again changed to the point where my client's share was increased to 40% but she was then continued to pay the $115.00 per property fee that the bank charged per property. (See 2011 Operating Agreement incorporated by reference).

12. Defendant's commissions were 40% minus $115.00 and this put her on equal footing with every other agent in the company, even though she was supposed to be a partner.

13. As a partner in the company, my client never saw a profit or received any additional money for her share of ownership, even though the company was certainly profitable for Mr. Brown.

14. My client also took out a personal loan when things were not going well for Brown and Pope and as of May 12, 2016 the loan was valued at $17,216.96.

15. Mr. Brown would not make timely payments and let the loan fall 3 to 4 months behind on the payments, forcing Defendant to pay 3 to 4 months from her own personal funds to keep her personal property from going into foreclosure.

16. This caused great hardship for my client.

17. Further, at no time was Defendant ever treated like a true partner, often mistreated and spoken down to by Defendant.

18. Defendant was entitled to a portion of the Commissions on properties sold from at least 12/17/2009 through 03/06/15 valuing at least $957,450 but received none of that amount.

19. Mr Brown charged $150.00 fee payable to Brown and Pope realtors which was paid by co-operating realtors on sold transactions.

20. Plus there was also a charge which the agents were forced to charge buyers and sellers $300 on all sold homes

21. In January 2016 the fee was increased to $400.00 which Mr. Brown kept all funds.

22. Plaintiff was treated like an independent contractor by Defendant and, to this day, Defendant has failed to comply with the real estate commission and specifically rule 11:5-4.1 in regards to proper employment practices.[1]

---

[1] 11:5-4.1 Employment agreements; commissions; accounting to salespersons and referral agents; actions for collection of compensation (a) No salesperson or referral agent may commence operations as such for a broker and no broker may authorize a salesperson or referral agent to act as such on his or her behalf until a written agreement as provided in this subsection has been signed by the broker and salesperson or referral agent. Prior to an individual's commencement of activity as a salesperson or referral agent under the authority of a broker, the broker and salesperson or referral agent shall both sign a written agreement which recites the terms under which the services of the salesperson or referral agent have been retained by the broker. Such terms shall include, but need not be limited to, the following: 1. The rate of compensation to be paid to the salesperson or referral agent during his or her affiliation with the broker; 2. A promise by the broker to pay to the salesperson or referral agent his or her portion of commissions earned within 10 business days of their receipt by the broker or as soon thereafter as such funds have cleared the broker's bank, or in accordance with another payment schedule explicitly set forth in the employment agreement; 3. The rate of compensation payable to the salesperson or referral agent on transactions which close and, if applicable, on renewals which occur subsequent to the termination of the salesperson's or referral agent's affiliation with the broker; and 4. A provision that any future changes to the agreement will not be binding unless the changes are contained in a writing signed by both parties. (b) A copy of the fully executed agreement shall be provided to the salesperson or referral agent upon the commencement of his or her affiliation with the broker, and the original thereof shall be maintained by the broker as a business record in accordance with N.J.A.C. 11:5-5.5. (c) All compensation paid to brokers shall, unless debited from funds held in escrow in accordance with N.J.A.C. 11:5- 5.1(d), be deposited into the general business account of the broker within five business days of their receipt by the broker. (d) In the event that any monies due a salesperson or referral agent under the terms of the written agreement with their broker are not paid within 10 business days of the broker's receipt of such funds or promptly thereafter upon their having cleared the broker's account, the broker shall provide to the salesperson or referral agent a complete and comprehensive written explanation of the failure to pay such monies. (e) Upon the termination of the affiliation of a salesperson or referral agent with a broker, the broker shall make a complete accounting in writing of all monies due the salesperson or referral agent as of the date of termination and/or which may become due in the future. In the event any sums so accounted for are not in accord with the terms of the post-termination compensation clause in the written agreement between the broker and the salesperson or referral agent, the broker shall give a complete and comprehensive written explanation of any difference to the salesperson or referral agent with the accounting.

23. A review of the 2011 operating agreement in regards to terminating the LLC and the insurance information will show material defects.

24. Specifically, the version attached to the complaint has significant changes that were clearly fabricated to the benefit of the Plaintiff.

25. These fabrications cannot be allowed to considered part of the original documents as they are blatant fraud.

26. They were simply forged by Plaintiff, never signed by Defendant and done so in order to proceed with this litigation.

27. Additionally, Plaintiff is guilty of breach of contract.

28. To establish its contract claim against the defendant, plaintiff must prove that:

    a.  The parties entered into a contract containing certain terms.

    b.  The plaintiff did what the contract required the plaintiff to do.

    c.  The defendant did not do what the contract required the defendant to do. This failure is called a breach of the contract.

    d.  The defendants breach, or failure to do what the contract required, caused a loss to the plaintiff.

    *Weichert Co. Realtors v. Tyan,* 128 *N.J.* 427, 435 (1992) (a contract arises from proper acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty.); *West Caldwell*

Such accounting shall be delivered to the salesperson or referral agent not later than 30 days after termination. (f) Copies of all written agreements as described in (a) above, of all written explanations of the failure to pay compensation due a salesperson or referral agent on a timely basis as described in (e) above, and of all accountings and written explanations regarding compensation due a salesperson or referral agent subsequent to the termination of their affiliation with a broker as described in (f) above shall be maintained by the broker, with adequate proof of the delivery of the same to the salesperson or referral agent, for a period of six years.

*v. Caldwell*, 26 *N.J.* 9, 24-25 (1958); *Friedman v. Tappan Development Corp.*, 22

*N.J.* 523, 531 (1956); *Leitner v. Braen*, 51 *N.J. Super.* 31, 38-39 (App. Div. 1958).

29. At no time did Plaintiff respect any version of the contract that required he treat Ms. Thomas as a partner. Instead, he constantly kept significant funds for himself, withholding thousands of dollars of commissions from Ms. Thomas. As previously stated, this was a breach of both of the aforementioned agreements, as well as the independent contractor agreement Plaintiff was obligated to sign, even as a partner. Additionally, the previous facts clearly show that Plaintiff blatantly and intentionally breached the contract on many occasions.

**WHEREFORE**, Defendants seeks judgment as follows:

A.    Demanding the Plaintiffs be surcharged any damages related to the Breach of Contract including but not limited to any re-imbursements owed to Defendant;

B.    49% of all office furniture, computers, etc. or the liquidated value thereof;

C.    $100,000 from the proceeds of all closed properties in which Defendant did not receive any partnership funds;

D.    The loan with "Tomorrow's Financing" for Brown and Pope to be paid in full;

E.    Consequential damages;

F.    Punitive damages; and

G.    Attorney fees and cost of suit.

### RESERVATION OF DEFENSE

Defendants reserve the right to add additional affirmative defenses and counter claims as are made known during the course of discovery.

Dated: 10/26/16                ___/s/ Joshua Thomas_____
                                        Joshua Thomas, Esquire

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
1110 Pocopson Road, PO Box 415
Pocopson PA 19366
Phone: 215-806-1733
Fax: (856) 831-7668
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for Defendants

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

Brown & Pope

      PLAINTIFF

      vs.

Sharonn Thomas Pope

      DEFENDANTS

DOCKET NO. CAM-L-2368-16

## **CERTIFICATION**

Pursuant to New Jersey Court Rule 4:5-1, I hereby certify that the matter in controversy is not the subject of any other action pending and any court and is likewise not the subjects of any pending arbitration proceeding, to the best of my knowledge or belief. I further certify that I have no knowledge of any contemplated action or arbitration proceeding regarding the subject matter of this action and that, other than the parties set forth in this pleading, I am not aware of any other parties who should be joined in this action. In addition, I recognize the continuing obligation of each party to file and serve on all parties and the court a certification if there is a change in the facts stated in this original certification.

Dated: 10/26/16                         ____/s/ Joshua Thomas____
                                  Joshua Thomas, Esquire

SUPERIOR COURT OF NEW JERSEY

REPORT AND AWARD OF ARBITRATOR(S)

ARBITRATION TYPE (Check One)

☒ COMMERCIAL

☐ LEMON LAW

*BROWN*

PLAINTIFF

v.

*POPE*

DEFENDANT

CIVIL ACTION

COUNTY: _CAMDEN_

DOCKET NO: _L-2368-16_

DATE: _9-11-17_

The undersigned arbitrator(s) make(s) the following award(s) for the reasons set forth:

*BREACH OF CONTRACT, AND ATTY. FEES.*
*DAMAGES  628,635.58*
*ATTY.        95,318.43*
*723,954.01*

FILED
SEP 11 2017
CAMDEN COUNTY SUPERIOR COURT

Defense presented  ☐ yes  ☒ no

| PREVAILING PARTY | AMOUNT OF AWARD | RESPONSIBLE PARTY |
|---|---|---|
| DEF | | *POPE* |
| DEF | | |
| DEF | | |
| PL  *BROWN* | *723,954.01* | |
| PL | | |

ARBITRATOR(S) Please sign below and print name next to signature.

_X_ _URBAN_

Parties desiring to reject this award and obtain a trial *de novo* must file with the division manager a trial *de novo* request together with a $200 fee within thirty (30) days of today.  Parties requesting a trial *de novo* may be subject to payment of counsel fees and costs as provided by R.4:21A-6(c).  Note that unless otherwise expressly indicated, this award will be filed today.

Counsel and *pro se* litigants acknowledge receipt of this award by signing below.  Print name next to signature.

_E. Milord Clayton_

_E. McCord Clayton_

Revised 7/2007, CN 10978-English                         A 12

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone:215-806-1733
Fax: 888-314-8910
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for Defendants
Collateral Account: 145289

## IN THE SUPERIOR COURT OF NEW JERSEY
## CAMDEN COUNTY– CHANCERY DIVISION

Brown & Pope

      PLAINTIFF

    vs.

Sharonn Thomas Pope

      DEFENDANTS

DOCKET NO. CAM-L-2368-16

_____

TO THE COURT:

Defendant Sharonn Thomas Pope, hereby rejects the Arbitration Award entered in the above matter on September 11, 2017, and demands a Trial *De Novo*.

If trial *de novo* is sought this form must be filed with the Arbitration Administrator within 30 days of the filing of the arbitration award and served on all parties within that time. The Arbitration hearing in the above-captioned matter was held on September 11, 2017. Further, a Bankruptcy was filed on July 6, 2017 and Plaintiff did not get relief from the stay and further, his attorney was informed **not** to proceed.

Payment for the filing fee is being tendered herewith, and this notice having been served

on all parties, trial *de novo* is hereby requested in the above-captioned matter, pursuant to

RULES 4:21A-6(b)(1) and 4:21A-6(c).

_____/s/ Joshua L. Thomas_____
Joshua Thomas, Esq.

THIS NOTICE, WHEN TIMELY FILED AND SERVED ON ALL ADVERSE PARTIES,
SHALL BE SUFFICIENT TO RESTORE THE CASE TO THE TRIAL CALENDAR.

Joshua L. Thomas, Esq
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
NJ ID No. 03992012
Fax: (888) 314-8910
JoshuaLThomas@gmail.com

October 3, 2017

The Honorable Michael J. Kassel, J.S.C.
Camden County Courthouse
101 South 5th Street
Suite 330
Camden, NJ 08103

**Re:**    Brown & Pope . v. Sharonn Pope
**Docket No.:** CAM-L-2368-16

Dear Judge Kassel,

I hope this letter finds you well. This is a letter this is letter being submitted to you requesting that the order signed on September 25, 2017 and docketed on September 29, 2017 be immediately vacated, as it was entered improperly. First and foremost, the Defendant in this matter, Sharonn Pope-Thomas filed for personal bankruptcy on July 6, 2017 for an unrelated matter. (See Exhibit A – Bankruptcy filing). As such, this matter should have been stayed from that point forward. Plaintiff's attorney was aware of this filing. Further, I informed him the day of the arbitration, that should have been canceled, that we would not be attending because a bankruptcy had been filed and I asked him to inform the arbitration board of this. He apparently failed to do so and an award was entered improperly. Once I became aware of this, I immediately informed Mr. Cord of this, and he failed to act, so I submitted an appeal of the arbitration and a request for a De Novo Trial on September 24, 2017. (See Exhibit B). Nonetheless, Mr. Cord, fully aware of the bankruptcy and out appeal, moved forward with an order to strike our answer

improperly, without even giving us notice of the hearing. Further, even if he did not personal

pursue it, it was still entered improperly on September 29, 2017 after the trial De Novo request.

Then for reasons completely unknown, weeks later, the clerk improperly stated as follows:

"DEFICIENCY NOTICE: re: REQUEST FOR DE NOVO TRIAL LCV2017241491 -Other: The

court has entered an order striking the filed answer in this matter therefore, the Trial De Novo is

rejected." This was improperly entered, as the Request was submitted well before the order being

entered improperly. Then, the entering of this motion was a willful violation of the automatic

stay and Plaintiff's attorney knows it was violation, because they filed, the day after, a motion

for relief from the stay (See Exhibit X). Plaintiff is moving out of order, and by doing so, is

willfully violating the automatic stay.

Once again, this is the order we are looking to have vacated as, pursuant to 11 U.S. Code

§ 362, the matter should have been stayed. We reserve the right to pursue all ramifications

against Mr. Brown and his attorney for the violations of that rule.

Further, had we known the hearing was still to take place, even with the bankruptcy

active, we would have certainly informed the court that Mr. Brown is completely deficient in his

discovery responses, and would have motioned to compel Plaintiff respond properly to

discovery. The initial discovery requests were made on June 29, 2017 to Plaintiff (See Exhibit C

– Discovery Requests). On July 22, 2017, Mr. Cord submitted this email with these paltry

attachments. (See Exhibit D – initial discovery responses). I Immediately informed that same

that we deemed these answers nonresponsive. (See Exhibit E – Defendant response email).

Nonetheless, since it had already been scheduled, we moved forward with a deposition on

July 27, 2017 of Mr. Brown. Still, this did not waive our rights to have the litigation stayed.

Further, at the deposition, we requested further discovery. Mr. Brown's attorney submitted

further "responses" on July 30, 2017 that represented other documentation would be produced, but it never was. (See Exhibit F – July 30, 2017 responses.) Then on August 10, 2017, we put into writing our requests again from the Deposition. (See Exhibit G – further requests).

On the evening of September 10, 2017, the night that was before the apparent arbitration, Plaintiff's attorney submitted the following email and "responses", failing to acknowledge or even mention his intent to still move forward with the arbitration, even with the bankruptcy in place. These responses are again nonresponsive and give practically nothing new and do not answer any of the questions in out discovery. (See Exhibit H – September 10, 2017 responses). I informed Mr. Clayton at that time that I learned the arbitration had moved forward that it should have been stayed, yet he ignored this fact and proceeded any way, as well as with the apparent hearing where the aforementioned order was entered. As such, given the above, we request that the order be vacated and that the case be stayed pending the outcome of the bankruptcy or any other further relevant actions.  If you have any questions, please do not hesitate to call at 215-806-1733.

Thank you for your kind consideration,

 /s/ Joshua Thomas
Joshua Thomas, Esq.
Phone  215-806-1733

CC:    Cord Clayton, Esq. via email

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone: 215-806-1733
Fax: (856) 831-7668
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for DEFENDANT
**Collateral Account: 145289**

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

| | |
|---|---|
| Brown & Pope | |
| PLAINTIFF | |
| vs. | DOCKET NO. CAM-L-2368-16 |
| Sharonn Pope | |
| DEFENDANT | |

---

### DEFENDANT'S OPPOSITION TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS PURSUANT TO R. 4:46-2(b)

---

1. Denied. There were three controlling documents, A 2006 operating agreement, a 2011 operating agreement and an Independent contractor agreement. The "Independent Contractor Agreement" attached and referred to was not the same as the one Defendant signed, as there was no "Addendum B" in the one she signed.

2. Denied. As previously stated, the document that is being referred to is not the same document as Defendant signed, further there was a new operating agreement that was pot into place in 2011.

3. Admitted in part, Denied in part. Admitted the attached document has those sections, beyond that denied. Plaintiff attempts on numerous occasions to misconstrue what those sections represent and say.

4. Denied. Defendant, rather than Plaintiff, is entitled to fees for having to fight a frivolous lawsuit. Additionally, in 5(d), the fee shifting is only if the LLC is sued and says nothing about when the LLC initiates the frivolous lawsuit. Paragraph (n) specifically references collection efforts and not if LLC sues the contractor as Plaintiff's counsel attempts to claim. In fact, there are no specific provisions that call for any fee shifting in this immediate scenario.

5. Denied. The version referred to is markedly different then the version Defendant signed and includes new provisions that were not actually in the version Defendant signed, has a different date and is clearly a poor Photoshop copy of the signature page, with the date whited out and changed in Plaintiff's version. This is abundantly clear as Defendant's version is clearer and in Blue Ink, whereas Plaintiff's looks like a copy and is in black ink. Additionally, on the operating agreement Plaintiff relies on, the paragraph that was removed and replaced did not name his wife or her son whom he raised as beneficiaries and the new one names his sons with his first wife, and his daughter with his mistress and Defendant's Daughter. (See Plaintiff's Exhibit 1 and 3 and Defendant's Exhibit A – Actual 2011 Operating Agreement.)

6.  Denied. See answer to paragraph 5.

7. Denied. See answer to paragraph 5.

8. Denied. See answer to paragraph 5.

9. Denied. Defendant stated in the Motion to Dismiss, Answer and even previous communications with Plaintiff exactly what the damages were, specifically:

    a. Demanding the Plaintiffs be surcharged any damages related to the Breach of Contract including but not limited to any re-imbursements owed to Defendant;

    b. 49% of all office furniture, computers, etc. or the liquidated value thereof;

    c. $100,000 from the proceeds of all closed properties in which Defendant did not receive any partnership funds;

    d. The loan with "Tomorrow's Financing" for Brown and Pope to be paid in full;

    e. Consequential damages;

    f. Punitive damages; and

    g. Attorney fees and cost of suit.

Further, any time in the deposition Plaintiff attempts to claim that Defendant said damages were unknown, the reason was clearly stated that an accountant was needed to calculate the damages caused by Plaintiff as an accounting had not been produced and clearly states where the damages stem from. A few notable examples are:

*A. "I can't give you an accurate amount. We would need an accountant to go through the books to look through that to figure it out." (Deposition at p. 91).*

*A. "I entered into an agreement with Mr. Brown to open a business for the benefit of making a profit. I put up what I was told was fifty percent to get the business started. As time went on, I went out beyond and took out loans against two of my personal properties to keep the business going. I contributed at 18,000-dollar loan to Mr. Brown on a personal note to keep him going. I've done everything I can to prove my loyalty in this partnership and was not shown that on the other end." (Deposition at p.91-92).*

*"Q. What is the dollar value of the claim?"*
*"A. I don't know. Again, we would need an accountant to look at that."*
*(Deposition at p. 94).*

*"Q. Sitting here right now, are there any other claims that come to your mind
that you're raising in this case?*
*A. I had brought up that – my share of the furniture.*
*Q. Okay. That's the 49% of the property?*
*A. Yes.*
*Q. Do you know what it's worth?*
*A. No, I don't.*
*Q. Would it be speculative to try to value the claim?*
*A. I have no idea. With the computers, the desk.*
*Q. Are you making any claims for post-termination in commissions?*
*A. Yes.*
*Q. Do you know how much that claim is worth?*
*A. No.*
*Q. You would be speculating?*
*A. I would like to get an accountant to go through the books. "*
*(Deposition at p. 99-100).*

Additionally, on May 17, 2016, Defendant sent Plaintiff the exact amount owed on that

personal loan, and to date, Plaintiff has not contested he is responsible for it (See Exhibit

B – Tomorrow's Financing Inc. Payoff). Further, to date, Plaintiff has failed to proffer the

accounting that was originally requested back on May 4, 2016.  (See Exhibit C –

Accounting Request).

10. Denied. See the answer to paragraph 9.

11. Denied. See the answer to paragraph 9.

12. Denied. See the answer to paragraph 9.


Dated: June 12, 2017                            /s/ Joshua Thomas_____
                                               Joshua Thomas, Esquire

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone: 215-806-1733
Fax: (856) 831-7668
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for DEFENDANT
**Collateral Account: 145289**

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

Brown & Pope

PLAINTIFF

vs.

Sharonn Pope

DEFENDANT

DOCKET NO. CAM-L-2368-16

---

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

## RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff had been with Brown and Pope Realtors since it's inception. (See Exhibit A – 2006 Operating Agreement.) Both Plaintiff and Mr. Brown put up 50 percent each to start the company. Even though they were initially equal equity partners, Plaintiff never was permitted to review the books, see how much the gross income of the company was or have any say over any significant financial matters. Further, she never received any of the proceeds from the

transactions that took place in the office, contrary to what the agreement called for. During that time, she was only was paid on the transactions that she personally worked on, contrary to what was called for in the agreement. Additionally, while she was paid would 100 percent of the commission, she still had the transaction fees taken out. She paid a $1,500.00 monthly fee which was paid directly to Mr. Brown.

Once the business improved with the bank owned properties (REO), Mr. Brown made my client the offer to take a 33% commission split on those, even though they were still supposed to be equal equity partners plus for Wells Fargo she had to pay $115 per property. Plaintiff agreed but ultimately, the work on the REOs consumed all of her time and she was unable to do any other work. That was around the time Mr. Brown stopped taking the $1,500.00 monthly fee because she was working only on REOs. This situation again changed to the point where my client's share was increased to 40% but she was then continued to pay the $115.00 per property fee that the bank charged per property. (See Exhibit B – 2011 Operating Agreement.) Plaintiff's commissions were 40% minus $115.00 and this put her on equal footing with every other agent in the company, even though she was supposed to be a partner.

As a partner in the company, my client never saw a profit or received any additional money for her share of ownership, even though the company was certainly profitable for Mr. Brown. My client also took out a personal loan when things were not going well for Brown and Pope and as of May 12, 2016 the loan was valued at $17,216.96. Mr. Brown would not make timely payments and let the loan fall 3 to 4 months behind on the payments, forcing Plaintiff to pay 3 to 4 months from her own personal funds to keep her personal property from going into foreclosure. This caused great hardship for my client. Further, at no time was Plaintiff ever treated like a true partner, often mistreated and spoken down to by Defendant.

Plaintiff was entitled to a portion of the Commissions on properties sold from at least 12/17/2009 through 03/06/15 valuing at least $957,450 but received none of that amount. Mr. Brown charged $150.00 MLS fee payable to Brown and Pope realtors which was paid by co-operating realtors on sold transactions. Plus there was also a charge which the agents were forced to charge buyers and sellers $300.00 on all sold homes the fee in Jan. 2016 the fee was increased to $400.00 which Mr. Brown kept all funds. Mr. Brown was sent the request on ay 4, 2016. (See Exhibit C – Accounting Request). To date, that has not been responded to, nor was it turned over in discovery. Additionally, on May 17, 2016, Defendant sent Plaintiff the exact amount owed on that personal loan, and to date, Plaintiff has not contested he is responsible for it (See Exhibit B – Tomorrow's Financing Inc. Payoff).

Further, after the deposition took place, at the very end of the Discovery period, Plaintiff's attorney stated he would not be agreeable to extending the period for a deposition of his client regarding the above nor other items that came to light during the deposition, namely that Mr. Brown continued to run the business as a "female owned business" and reap the benefits, even years after Ms. Pope was no longer considered an owner. This likely violated Federal and State law and we made clear we wanted to explore this more in an effort to limit Ms. Pope's liability. Plaintiff's attorney declined and instead filed this immediate motion.

## **LEGAL ARGUMENT**

Because Plaintiff has failed to show that it is entitled to judgment as a matter of law, this Court should not only deny Plaintiff's Motion for Summary Judgment but grant Defendant's Motion for Summary Judgment as all evidence presented clearly show Plaintiff was the one who was in violation of the agreement, failed to actually perform his duties required and nothing was

actually shown that Defendant did anything wrong or improper.  It is well settled that in New

Jersey, courts will only grant summary judgment when there is no issue of material fact and

when it is abundantly clear that the moving party is entitled to judgment as a matter of law.

Because Defendant demonstrates that Plaintiff is not entitled to judgment as a matter of law, this

Court should deny Plaintiff's Motion and Grant Defendant's, as Plaintiff cannot succeed in

showing any of the asserted claims in his complaint. .

Pursuant to R. 4:46-2, a court should grant summary judgment only when "the pleadings,

depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact challenged and the moving party is

entitled to a judgment or order as a matter of law."  New Jersey courts have interpreted this to

mean that if, after granting all favorable inferences to the non-moving party, the movant can

show that there remains no issue of material fact, then, and only then, will a court grant summary

judgment.

To succeed on a motion for summary judgment, New Jersey courts require that "the

moving party […] establish that there is no genuine issue of material fact that the moving party is

entitled to judgment as a matter of law" Brill v. Guardian Life Ins. Co. of America, 142 N.J.

520, 528  (1995).  "A court should deny a summary judgment motion only where the party

opposing the motion has come forward with evidence that creates a 'genuine issue as to any

material fact challenged' […]" Id. at 529.

Further, when evaluating a summary judgment motion, "the court must grant all

favorable inferences to the non-movant party." Id. at 536.  The Court in Brill went on to

conclude that summary judgment should only be granted when, after granting all favorable

inferences to the non-movant, the evidence "is so one-sided that one party must prevail as a matter of law." Id. at 540.

Thus, the moving party must show that the case is so one-sided in its favor that it is entitled to judgment as a matter of law in order to win on a summary judgment motion. Where the non-moving party comes forward with any fact or evidence that even hints at an issue of material fact, then the moving party is not entitled to summary judgment. Notably, because summary judgment motions are so final and summarily dispose of a case, the court should rule on every close call in favor of the non-moving party. Thus, the standard for summary judgment is very high. Because Plaintiff has not met its burden and because Defendant does, this Court must deny Plaintiff's Motion for Summary Judgment and grant Defendant's Counter-Motion for Summary Judgment.

I.    BAD FAITH, CONVERSION  AND FRAUD

Plaintiff was treated like an independent contractor by Defendant and, to this day, Defendant has failed to comply with the real estate commission and specifically rule 11:5-4.1 in regards to proper employment practices. That rule states as follows:

> *11:5-4.1 Employment agreements; commissions; accounting to salespersons and referral agents; actions for collection of compensation*
> *(a) No salesperson or referral agent may commence operations as such for a broker and no broker may authorize a salesperson or referral agent to act as such on his or her behalf until a written agreement as provided in this subsection has been signed by the broker and salesperson or referral agent. Prior to an individual's commencement of activity as a salesperson or referral agent under the authority of a broker, the broker and salesperson or referral agent shall both sign a written agreement which recites the terms under which the services of the salesperson or referral agent have been retained by the broker. Such terms shall include, but need not be limited to, the following:*
> *1. The rate of compensation to be paid to the salesperson or referral agent during his or her affiliation with the broker;*
> *2. A promise by the broker to pay to the salesperson or referral agent his or her portion of commissions earned within 10 business days of their receipt by the broker or as soon thereafter as such funds have cleared the broker's bank, or in accordance with another payment schedule explicitly set forth in the employment agreement;*
> *3. The rate of compensation payable to the salesperson or referral agent on transactions which close and, if applicable, on renewals which occur subsequent*

A 26

*to the termination of the salesperson's or referral agent's affiliation with the broker; and*

*4. A provision that any future changes to the agreement will not be binding unless the changes are contained in a writing signed by both parties.*

*(b) A copy of the fully executed agreement shall be provided to the salesperson or referral agent upon the commencement of his or her affiliation with the broker, and the original thereof shall be maintained by the broker as a business record in accordance with N.J.A.C. 11:5-5.5.*

*(c) All compensation paid to brokers shall, unless debited from funds held in escrow in accordance with N.J.A.C. 11:5- 5.1(d), be deposited into the general business account of the broker within five business days of their receipt by the broker.*

*(d) In the event that any monies due a salesperson or referral agent under the terms of the written agreement with their broker are not paid within 10 business days of the broker's receipt of such funds or promptly thereafter upon their having cleared the broker's account, the broker shall provide to the salesperson or referral agent a complete and comprehensive written explanation of the failure to pay such monies.*

*(e) Upon the termination of the affiliation of a salesperson or referral agent with a broker, the broker shall make a complete accounting in writing of all monies due the salesperson or referral agent as of the date of termination and/or which may become due in the future. In the event any sums so accounted for are not in accord with the terms of the post-termination compensation clause in the written agreement between the broker and the salesperson or referral agent, the broker shall give a complete and comprehensive written explanation of any difference to the salesperson or referral agent with the accounting. Such accounting shall be delivered to the salesperson or referral agent not later than 30 days after termination.*

*(f) Copies of all written agreements as described in (a) above, of all written explanations of the failure to pay compensation due a salesperson or referral agent on a timely basis as described in (e) above, and of all accountings and written explanations regarding compensation due a salesperson or referral agent subsequent to the termination of their affiliation with a broker as described in (f) above shall be maintained by the broker, with adequate proof of the delivery of the same to the salesperson or referral agent, for a period of six years.*

In New Jersey, common law conversion is defined as " 'the exercise of any act of dominion in denial of another's title to . . . chattels, or inconsistent with such title. ' " *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 525 (D.N.J. 1999) (quoting *Mueller v. Technical Devices Corp.*, 8 N.J. 201, 207, 84 A.2d 620 (N.J. 1951). More loosely, conversion may be thought of as the civil remedy for theft, for unlawful taking, or for unlawful keeping.

The elements of conversion in New Jersey are: "(a) that the property and right to immediate possession thereof belong to the plaintiff; and (b) the wrongful act of interference with that right by the defendant." *Davis v. Connolly*, No. 09-cv-4629 (D.N.J. Feb. 11, 2010) (quoting *First National Bank v. North Jersey Trust Co.*, 18 N.J. Misc. 449, 14 A.2d 765, 767 (N.J. 1940)); *see also Marsellis-Warner Corp.*, 51 F. Supp. 2d at 525.

In New Jersey, the elements of common-law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Gennari v. Weichert Co. Realtors, 691 A.2d 350, 148 N.J. 582, 610 (N.J. 1997); accord Kuzian v. Electrolux Home Prods., Inc., 937 F. Supp. 2d 599, 614-615 (D.N.J. 2013).

Plaintiff is guilty of conversion. Plaintiff should have given an accounting over a year ago now and failed to do so. Plaintiff kept thousands of dollars for himself when in reality, all income for year should have been shared with Defendant. Plaintiff failed to ever let Defendant review the books, as would have been her right and instead, used the firm as his personal piggy bank and failed to properly split funds as would have been required. Plaintiff had Defendant sign fraudulent agreements to continue to take the money she should have been entitled to.

A review of the 2011 operating agreement in regards to terminating the LLC and the insurance information will show material defects. (See Exhibit A – 2011 Operating Agreement.) In fact, Plaintiff has tried to commit fraud, by material altering the operating agreement to his benefit and claiming it is valid, when a simply review of both documents will show that to be false. Specifically, the version attached to the complaint has significant changes that were clearly fabricated to the benefit of the Plaintiff. These fabrications cannot be allowed to considered part

of the original documents as they are blatant fraud. They were simply forged by Plaintiff, never signed by Defendant and done so in order to proceed with this litigation.

## II.    BREACH OF CONTRACT

Plaintiff is guilty of breach of contract. To establish its contract claim against the defendant, plaintiff must prove that:

1.  The parties entered into a contract containing certain terms.

2.  The plaintiff did what the contract required the plaintiff to do.

3.  The defendant did not do what the contract required the defendant to do. This failure is called a breach of the contract.

4.  The DEFENDANT breach, or failure to do what the contract required, caused a loss to the plaintiff.

*Weichert Co. Realtors v. Tyan,* 128 *N.J.* 427, 435 (1992) (a contract arises from proper acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty.); *West Caldwell v. Caldwell*, 26 *N.J.* 9, 24-25 (1958); *Friedman v. Tappan Development Corp*., 22 *N.J.* 523, 531 (1956); *Leitner v. Braen*, 51 *N.J. Super.* 31, 38-39 (App. Div. 1958).

At no time did Plaintiff respect any version of the contract that required he treat Ms. Pope as a partner. Instead, he constantly kept significant funds for himself, withholding thousands of dollars of commissions from Ms. Pope. As previously stated, this was a breach of both of the aforementioned agreements, as well as the independent contractor agreement Plaintiff was obligated to sign, even as a partner. Additionally, the previous facts clearly show that Plaintiff blatantly and intentionally breached the contract on many occasions.

WHEREFORE the Defendant seeks JUDGMENT as follows:

a) Demanding the Plaintiffs be surcharged any damages related to the Breach of Contract including but not limited to any re-imbursements owed to Defendant;
b) 49% of all office furniture, computers, etc. or the liquidated value thereof;
c) $100,000 from the proceeds of all closed properties in which Defendant did not receive any partnership funds;
d) The loan with "Tomorrow's Financing" for Brown and Pope to be paid in full;
e) Consequential damages;
f) Punitive damages; and
g) Attorney fees and cost of suit.

Date:  June 12, 2017                    By:____/s/ Joshua L. Thomas____

                                        Joshua L. Thomas, Esq.

## **CERTIFICATION**

Pursuant to New Jersey Court Rule 4:5-1, I hereby certify that the matter in controversy

is not the subject of any other action pending and any court and is likewise not the subjects of

any pending arbitration proceeding, to the best of my knowledge or belief. I further certify that I

have no knowledge of any contemplated action or arbitration proceeding regarding the subject

matter of this action and that, other than the parties set forth in this pleading, I am not aware of

any other parties who should be joined in this action. In addition, I recognize the continuing

obligation of each party to file and serve on all parties and the court an certification if there is a

change in the facts stated in this original certification.


Dated: June 12, 2017                              _/s/ Joshua Thomas_____
                                                   Joshua Thomas, Esquire

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on June 12, 2017 I caused to be sent a copy of the attached pleading

to attorneys for plaintiff, E. McCord Clayton, Esq. Two Penn Center 1500 JFK Blvd. Suite 920

Philadelphia, PA 19102.


Dated: June 12, 2017        ___/s/ Joshua Thomas____
                                       Joshua Thomas, Esquire

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

Brown & Pope

PLAINTIFF

vs.

Sharonn Pope

DOCKET NO. CAM-L-2368-16

DEFENDANT

This matter having been brought before the Court on Plaintiff's Motion for Summary Judgment against Defendant's counterclaim, and the Court having considered the matter, and Defendant's counter-motion for summary judgment, and the arguments of Counsel, and for good cause appearing,

It is on this _____day of _____, 2016, ORDERED that Plaintiff's motion is DENIED and Defendant's motion is GRANTED.

BY THE COURT:

_____
J.S.C.

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone: 215-806-1733
Fax: (856) 831-7668
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for DEFENDANT
**Collateral Account: 145289**

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

| | |
|---|---|
| Brown & Pope | |
| PLAINTIFF | |
| vs. | DOCKET NO. CAM-L-2368-16 |
| Sharonn Pope | |
| DEFENDANT | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION TO ENTER JUDGMENT AND COUNTER-MOTION
FOE SANCTIONS AND VACATING THE CURRENT ORDER**

---

**RELEVANT FACTS AND PROCEDURAL HISTORY**

Plaintiff's actions by filing this motion as well as all other actions taken after July 6, 2017 have been sanctionable actions as they were violations of the automatic stay, many of which were willful violations. Defendant filed for Bankruptcy on July 6, 2017 at case number 17-14588. The moment that was filed, the automatic stay was put in place. As such, this matter should have been stayed from that point forward and further, all actions taken after that point

were, at a minimum, void. Once Plaintiff's attorney had actual knowledge of the bankruptcy, all actions taken after that fact were willful violations.

Nonetheless, since it had already been scheduled, we moved forward with a deposition on July 27, 2017 of Mr. Brown. Still, this did not waive our rights to have the litigation stayed. Further, at the deposition, we requested further discovery. Mr. Brown's attorney submitted further "responses" on July 30, 2017 that represented other documentation would be produced, but it never was. (See Exhibit A – Notice of Bankruptcy) Then on August 10, 2017, we put into writing our requests again from the Deposition. (See Exhibit A – Notice of Bankruptcy).

As we informed the court, Mr. Brown is completely deficient in his discovery responses, and we would have motioned to compel Plaintiff respond properly to discovery but for the bankruptcy. The initial discovery requests were made on June 29, 2017 to Plaintiff See Exhibit A – Notice of Bankruptcy). On July 22, 2017, Mr. Cord submitted this email with these paltry attachments. (See Exhibit A – Notice of Bankruptcy). I Immediately informed that same that we deemed these answers nonresponsive. (See Exhibit A – Notice of Bankruptcy).

On the evening of September 10, 2017, the night that was before the apparent arbitration, Plaintiff's attorney submitted the following email and "responses", failing to acknowledge or even mention his intent to still move forward with the arbitration, even with the bankruptcy in place. These responses are again nonresponsive and give practically nothing new and do not answer any of the questions in out discovery. (See Exhibit A – Notice of Bankruptcy). I informed Mr. Clayton at that time that I learned the arbitration had moved forward that it should have been stayed, yet he ignored this fact and proceeded any way.

Despite Defendant filing for bankruptcy, Plaintiff's attorney proceeded with the arbitration September 11, 2017, after I expressly stated not to. I then filed a request for trial de novo on September 24, 2017 and it was docketed the same day. This document stated a bankruptcy had been filed. Then. an order was signed on September 25, 2017 and docketed on September 29, 2017 improperly. Plaintiff's attorney was aware of this filing. Further, I informed him the day of the arbitration, that should have been canceled, that we would not be attending because a bankruptcy had been filed and I asked him to inform the arbitration board of this. He apparently failed to do so and an award was entered improperly. Once I became aware of this, I immediately informed Mr. Cord of this, and he failed to act, so I submitted an appeal of the arbitration and a request for a De Novo Trial on September 24, 2017. Nonetheless, **after** our request for a trial de novo, an order to strike our answer improperly, without even giving us notice of the hearing. Even if Plaintiff's attorney did not personal pursue it, it was still entered improperly on September 29, 2017 after the trial De Novo request.

Then for reasons completely unknown, weeks later, the clerk improperly stated as follows: "DEFICIENCY NOTICE: re: REQUEST FOR DE NOVO TRIAL LCV2017241491 - Other: The court has entered an order striking the filed answer in this matter therefore, the Trial De Novo is rejected." This was improperly entered, as the Request was submitted **before** the order being entered improperly. Further, the request clearly stated a bankruptcy had been filed. Then, the entering of this immediate motion was a willful violation of the automatic stay and Plaintiff's attorney knows it was a violation, because they filed, the day after, a motion for relief from the stay with the bankruptcy court (See Exhibit C – Cord new motion). Plaintiff is moving out of order, and by doing so, is willfully violating the automatic stay.

While Plaintiff's attorney makes a material issue of when that knowledge became actual knowledge, there is no question that he knew about it prior to the filing of this motion as a notice of bankruptcy was filed on October 2, 2017. However, Plaintiff's attorney should have had knowledge of the bankruptcy well before the arbitration on September 11, 2017 and then, on that day when I informed him of it over the phone and again as of September 29, 2017 when I emailed him personally to inform of it. Further, it was stated in the trial de novo request that the bankruptcy had been filed on July 6, 2017.

## **LEGAL ARGUMENT**

### I. **THE JUDGMENT PLAINTIFF IS ATTEMPTING TO ENTER MUST BE VACATED AND DEFENDANT IS ENTITLED TO SANCTIONS**

Defendant hereby Motions this Honorable Court to vacate the Judgment Order entered in favor of Plaintiff pursuant to Rule 4:50-1 (d) and (f) and in support thereof states the following.

Rule 4:50-1 governs an applicant's motion for relief from improper judgments, such as the ones that have occurred in this case. US Bank National Association v. Guillaume, 209 N.J. 449, 466, 38 A.3d 570 (2012). Pursuant to 11 U.S. Code § 362(a)(6) and 362(k), the matter should have been stayed the moment the bankruptcy was filed. The automatic stay is truly "automatic," in that it takes effect instantly upon the filing of a bankruptcy petition and is effective against most entities regardless of whether the entity is aware of the filing. *David G. Epstein, Steve H. Nickles & James J. White*, BANKRUPTCY § 3-1 at 78 (West Practitioner Series 1992) (hereinafter cited as "Epstein et al."). The automatic stay under Section 362 of the Bankruptcy Code is triggered upon the filing of a bankruptcy petition. *In re Rodriguez*, 629 F.3d 136, 138 (3d Cir. 2010). It "operates as a stay of all enforcement proceedings against the debtor." *11 U.S.C. § 362(a)*. Thus, it provides the debtor with a

"breathing spell" by preventing creditors from pursuing collection efforts. *See In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994) (citing Mar. Elec. Co. , 959 F.2d 1194, 1204 (3d Cir. 1991)).

Section 362 also provides debtors with a remedy for willful violations of the automatic stay. Subsection (k) provides that "an individual injured by any willful violation of stay . . . shall recover actual damages including costs a nd attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *11 U.S.C § 362(k)(1)*. To recover under Section 362(k), the debtor must prove three elements by a preponderance of the evidence: "(1) a violation of the stay occurred; (2) the creditor had knowledge of the bankruptcy case when acting; and (3) the violation caused actual damages." *In re McGowan,* No. 10 – 12944, 2014 WL 793125, at *2 (Bankr. D.N.J. Feb. 2, 2014) (quoting  In re Lienhard , 498 B.R. 443, 450 (Bankr. M.D. Pa. 2013)); see In re Rodriguez, No. 07- 24687 MBK, 2012 WL 589553, at *3 (Bankr. D.N.J. Feb. 22, 2012).

Further, "On its own initiative, the court may enter an order describing the specific conduct that appears to violate this rule and directing the attorney or pro se party to show cause why he or she has not violated the rule. The order to show cause shall issue before a voluntary dismissal or settlement of the claims made by or against the pro se party or the attorney who is the subject of the order to show cause." R. 1:4-8(c).

In this case, as previously mentioned, a bankruptcy had been filed prior to the arbitration occurring, Plaintiff had at least constructive knowledge prior to the entry of the improper arbitration award and even if not actual knowledge at that time, Plaintiff had actual knowledge as of September 24, 2017 when we filed the request for trial de novo. As such, all actions taken by Plaintiff after that time should not only be considered void and vacated but should also be considered sanctionable behavior. The Plaintiff's action's clearly fall into the guideline set out by

CAM-L-002368-16  11/09/2017 7:43:23 PM  Pg 6 of 11 Trans ID: LCV2017453938

FILED, Case 18-17430-cmg Division 0.Doc 47  22-Filed 06/07/19 : Entered 06/07/19 15:50:24  Desc Main
Document   Page 72 of 282

*11 U.S.C § 362(k)(1)*. First, there is no question that moving forward with the arbitration, receiving the order dismissing the answer and counterclaim and moving forward with this motion are all violations of the automatic stay. There is no question that the stay was in place, is still in place and was in place while all those actions occurred.

Second, even if Plaintiff's attorney claims to not have had actual knowledge prior to the arbitration, there can be no question that the knowledge was present prior to the order striking off the answer, and filing this motion. Further, Plaintiff practically admits to as much by filing the motion for relief form the stay in the bankruptcy court, presumably to try and undo the severe violations they have already caused.

Third, there is no question actual damages were caused. Because of these violations, Plaintiff has received massive improper damages that never could have actually been substantiated if there was opposition and further, they are now trying to enforce an order that is void. As such, there is no question that sanctions can be applied based on R. 1:4-8(c).

## II.   THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT AS OPPOSED TO PLAINTIFF

Pursuant to <u>R.</u> 4:46-2, a court should grant summary judgment only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and the moving party is entitled to a judgment or order as a matter of law."  New Jersey courts have interpreted this to mean that if, after granting all favorable inferences to the non-moving party, the movant can show that there remains no issue of material fact, then, and only then, will a court grant summary judgment.

To succeed on a motion for summary judgment, New Jersey courts require that "the moving party […] establish that there is no genuine issue of material fact that the moving party is

entitled to judgment as a matter of law" <u>Brill v. Guardian Life Ins. Co. of America</u>, 142 N.J.

520, 528  (1995).  "A court should deny a summary judgment motion only where the party

opposing the motion has come forward with evidence that creates a 'genuine issue as to any

material fact challenged' […]" <u>Id.</u> at 529.

Further, when evaluating a summary judgment motion, "the court must grant all

favorable inferences to the non-movant party." <u>Id.</u> at 536.  The Court in <u>Brill</u> went on to

conclude that summary judgment should only be granted when, after granting all favorable

inferences to the non-movant, the evidence "is so one-sided that one party must prevail as a

matter of law." <u>Id.</u> at 540.

Based on the transcript at the deposition of Mr. Brown, there can be no question that

there are no further damages other than those attorney's bills Plaintiff's attorney has fabricated

and Plaintiff made clear he had n memory of seeing previously in any significant manner. First,

as previously stated, plaintiff never responded to supplemental discover in any meaningful way –

and as such there was no evidence to support the ridiculous amount received at the improper

arbitration hearing.  As previously mentioned, Plaintiff gave partial answers and paltry

documentation at best.

Tellingly, Plaintiff **admitted** there were **no damages** as Wells Fargo is still with the

company. (Exhibit D- Brown transcript page 53-54). Further, Plaintiff admitted that his account

was removed from Wells Fargo prior to Ms. Pope leaving and he never informed his employees

of that fact. (Transcript p. 29). Additionally, in regards to the attorney's fees, Plaintiff has not

made any payments to attorney nor seen the bill before as he was expecting to pay on a

contingency basis (Transcript p. 56). Also incredibly unsettling was the fact that plaintiff

admitted to lying to the IRS repeatedly to his benefit and Ms. Pope's detriment. (Transcript p. 49-52).

As for Ms. Pope's counterclaims, they should be granted once the improper order striking her answer is vacated. First, Plaintiff did not deny that there was a fabricated version of the operating agreement (Transcript p. 41-42). This fabricated version was purely to his benefit and Defendant's detriment. Further, Plaintiff admitted to making payments on the loan many times that Defendant took out support Plaintiff's firm. (Transcript p. 20). Further, Plaintiff even admitted that Ms. Pope was entitled to more payments than she received, (Transcript p. 33-34). Based on all of these issues, not only should Plaintiff's order be vacated, but Defendant should be granted summary judgment or permitted to go to trial to prove these issues.

WHEREFORE the Defendant seeks JUDGMENT as follows:

a) Demanding the Plaintiffs be surcharged any damages related to the Breach of Contract including but not limited to any re-imbursements owed to Defendant;
b) 49% of all office furniture, computers, etc. or the liquidated value thereof;
c) $100,000 from the proceeds of all closed properties in which Defendant did not receive any partnership funds;
d) The loan with "Tomorrow's Financing" for Brown and Pope to be paid in full;
e) Consequential damages;
f) Punitive damages; and
g) Attorney fees and cost of suit.


Date:  November 9, 2017          By:___/s/ Joshua L. Thomas____

                                  Joshua L. Thomas, Esq.

## <u>CERTIFICATION</u>

Pursuant to New Jersey Court Rule 4:5-1, I hereby certify that the matter in controversy is not the subject of any other action pending and any court and is likewise not the subjects of any pending arbitration proceeding, to the best of my knowledge or belief. I further certify that I have no knowledge of any contemplated action or arbitration proceeding regarding the subject matter of this action and that, other than the parties set forth in this pleading, I am not aware of any other parties who should be joined in this action. In addition, I recognize the continuing obligation of each party to file and serve on all parties and the court an certification if there is a change in the facts stated in this original certification.

Dated: November 9, 2017                     _/s/ Joshua Thomas_____
                                            Joshua Thomas, Esquire

## CERTIFICATION OF SERVICE

I hereby certify that on November 9, 2017 I caused to be sent a copy of the attached

pleading to attorneys for plaintiff, E. McCord Clayton, Esq. Two Penn Center 1500 JFK Blvd.

Suite 920 Philadelphia, PA 19102.

Dated: November 9, 2017                                    ___/s/ Joshua Thomas____
                                                           Joshua Thomas, Esquire

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

Brown & Pope

      PLAINTIFF

   vs.

Sharonn Pope

      DEFENDANT

DOCKET NO. CAM-L-2368-16

This matter having been brought before the Court on Plaintiff's Motion for Judgment against Defendan, and the Court having considered the matter, and Defendant's response, and the arguments of Counsel, and for good cause appearing,

It is on this _____day of _____, 2017, ORDERED that Plaintiff's motion is DENIED and Defendant's motion is GRANTED.

BY THE COURT:

_____
J.S.C.

Joshua L. Thomas, Esq
Joshua L. Thomas & Associaton
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
NJ ID No. 03992012
Fax: (888) 314-8910
JoshuaLThomas@gmail.com

June 19, 2017

      **<u>VIA FASCIMILE (856) 379-2133</u>**
      The Honorable Michael J. Kassel, J.S.C.
      Superior Court of New Jersey
      Camden County Courthouse
      101 South 5th Street
      Camden, NJ 08103

**Re:**    Brown & Pope . v. Sharonn Pope
       **Docket No.:** CAM-L-2368-16

Dear Judge Kassel,

      I hope this fax finds you well. This is a letter this is letter being submitted to you requesting that the order signed on September 25, 2017 and docketed on September 29, 2017 be immediately vacated, as it was entered improperly. First and foremost, the Defendant in this matter, Sharonn Pope-Thomas filed for personal bankruptcy on July 6, 2017 for an unrelated matter. (See Exhibit A – Bankruptcy filing). As such, this matter should have been stayed from that point forward. Plaintiff's attorney was aware of this filing. Further, I informed him the day of the arbitration, that should have been canceled, that we would not be attending because a bankruptcy had been filed and I asked him to inform the arbitration board of this. He apparently failed to do so and an award was entered improperly. Once I became aware of this, I immediately informed Mr. Cord of this, and he failed to act, so I submitted an appeal of the arbitration and a request for a De Novo Trial on September 24, 2017. (See Exhibit B). Nonetheless, Mr. Cord, fully aware of the bankruptcy and out appeal, moved forward with an order to strike our answer

improperly, without even giving us notice of the hearing. Once again, this is the order we are looking to have vacated as, pursuant to 11 U.S. Code § 362, the matter should have been stayed. We reserve the right to pursue all ramifications against Mr. Brown and his attorney for the violations of that rule.

Further, had we known the hearing was still to take place, even with the bankruptcy active, we would have certainly informed the court that Mr. Brown is completely deficient in his discovery responses, and would have motioned to compel Plaintiff respond properly to discovery. The initial discovery requests were made on June 29, 2017 to Plaintiff (See Exhibit C – Discovery Requests). On July 22, 2017, Mr. Cord submitted this email with these paltry attachments. (See Exhibit D – initial discovery responses). I Immediately informed that same that we deemed these answers nonresponsive. (See Exhibit E – Defendant response email).

Nonetheless, since it had already been scheduled, we moved forward with a deposition on July 27, 2017 of Mr. Brown. Still, this did not waive our rights to have the litigation stayed. Further, at the deposition, we requested further discovery. Mr. Brown's attorney submitted further "responses" on July 30, 2017 that represented other documentation would be produced, but it never was. (See Exhibit F – July 30, 2017 responses.) Then on August 10, 2017, we put into writing our requests again from the Deposition. (See Exhibit G – further requests).

On the evening of September 10, 2017, the night that was before the apparent arbitration, Plaintiff's attorney submitted the following email and "responses", failing to acknowledge or even mention his intent to still move forward with the arbitration, even with the bankruptcy in place. These responses are again nonresponsive and give practically nothing new and do not answer any of the questions in out discovery. (See Exhibit H – September 10, 2017 responses). I informed Mr. Clayton at that time that I learned the arbitration had moved forward that it should

have been stayed, yet he ignored this fact and proceeded any way, as well as with the apparent

hearing where the aforementioned order was entered. As such, given the above, we request that

the order be vacated and that the case be stayed pending the outcome of the bankruptcy or any

other further relevant actions.  If you have any questions, please do not hesitate to call at 215-

806-1733.

           Thank you for your kind consideration,

           /s/ Joshua Thomas           _____

           Joshua Thomas, Esq.

           Phone   215-806-1733

CC:    Cord Clayton, Esq. via email

| Fill in this information to identify your case: |
| --- |

United States Bankruptcy Court for the:

Eastern District of Pennsylvania

Case number (*If known*): _____

Chapter you are filing under:
- ☐ Chapter 7
- ☐ Chapter 11
- ☐ Chapter 12
- ☑ Chapter 13

☐ Check if this is an amended filing

## Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy    12/15

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:  Identify Yourself

| | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
| --- | --- | --- |
| **1. Your full name**<br><br>Write the name that is on your government-issued picture identification (for example, your driver's license or passport).<br><br>Bring your picture identification to your meeting with the trustee. | Sharonn<br>First name<br><br>E<br>Middle name<br><br>Thomas-Pope<br>Last name<br><br>_____<br>Suffix (Sr., Jr., II, III) | _____<br>First name<br><br>_____<br>Middle name<br><br>_____<br>Last name<br><br>_____<br>Suffix (Sr., Jr., II, III) |
| **2. All other names you have used in the last 8 years**<br><br>Include your married or maiden names. | Sharonn<br>First name<br><br>E<br>Middle name<br><br>Thomas<br>Last name<br><br>_____<br>First name<br><br>_____<br>Middle name<br><br>_____<br>Last name | _____<br>First name<br><br>_____<br>Middle name<br><br>_____<br>Last name<br><br>_____<br>First name<br><br>_____<br>Middle name<br><br>_____<br>Last name |
| **3. Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx – xx – 6 3 6 6<br>OR<br>9 xx – xx – ____ ____ ____ | xxx – xx – ____ ____ ____ ____<br>OR<br>9 xx – xx – ____ ____ ____ |

A 48

| | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **4.** **Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years**<br><br>Include trade names and *doing business as* names | ☐ I have not used any business names or EINs.<br><br>Vanguard Realty Group Inc<br>Business name<br><br>Brown and Pope<br>Business name<br><br><br>EIN<br><br><br>EIN | ☐ I have not used any business names or EINs.<br><br>Business name<br><br><br>Business name<br><br><br>EIN<br><br><br>EIN |

| | | | **If Debtor 2 lives at a different address:** |
|---|---|---|---|
| **5.** **Where you live** | 856 N. 29th Street<br>Number        Street<br><br><br>Philadelphia        PA    19130<br>City        State    ZIP Code<br>Philadelphia County<br>County<br><br>**If your mailing address is different from the one above, fill it in here.** Note that the court will send any notices to you at this mailing address.<br><br><br>Number        Street<br><br><br>P.O. Box<br><br><br>City        State    ZIP Code | | Number        Street<br><br><br><br>City        State    ZIP Code<br><br>County<br><br>**If Debtor 2's mailing address is different from yours, fill it in here.** Note that the court will send any notices to this mailing address.<br><br><br>Number        Street<br><br><br>P.O. Box<br><br><br>City        State    ZIP Code |

| | | |
|---|---|---|
| **6.** **Why you are choosing *this district* to file for bankruptcy** | *Check one:*<br><br>☑ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason. Explain.<br>(See 28 U.S.C. § 1408.) | *Check one:*<br><br>☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason. Explain.<br>(See 28 U.S.C. § 1408.) |

A 49

| **Part 2:** | **Tell the Court About Your Bankruptcy Case** |
|---|---|

**7. The chapter of the Bankruptcy Code you are choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy* (Form 2010)). Also, go to the top of page 1 and check the appropriate box.

☐ Chapter 7

☐ Chapter 11

☐ Chapter 12

☑ Chapter 13

**8. How you will pay the fee**

☑ **I will pay the entire fee when I file my petition.** Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9. Have you filed for bankruptcy within the last 8 years?**

☑ No

☐ Yes.  District _____ When _____ Case number _____

District _____ When _____ Case number _____

District _____ When _____ Case number _____

**10. Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

☑ No

☐ Yes.

Debtor _____ Relationship to you _____
District _____ When _____ Case number, if known _____

Debtor _____ Relationship to you _____
District _____ When _____ Case number, if known _____

**11. Do you rent your residence?**

☑ No.  Go to line 12.

☐ Yes.  Has your landlord obtained an eviction judgment against you and do you want to stay in your residence?

☐ No. Go to line 12.

☐ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it with this bankruptcy petition.

| Part 3: | Report About Any Businesses You Own as a Sole Proprietor |
|---|---|

**12. Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

☐ No. Go to Part 4.

☑ Yes. Name and location of business

Vanguard  Realty Group Inc
Name of business, if any

923 Haddonfield Road
Number      Street

Cherry Hill                          NJ        08002
City                                 State     ZIP Code

*Check the appropriate box to describe your business:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☑ None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines.* If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☑ No.  I am not filing under Chapter 11.

☐ No.  I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes. I am filing under Chapter 11 and I am a small business debtor according to the definition in the Bankruptcy Code.

| Part 4: | Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention |
|---|---|

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

☑ No

☐ Yes.   What is the hazard?

If immediate attention is needed, why is it needed?

Where is the property?

| **Part 5:** | **Explain Your Efforts to Receive a Briefing About Credit Counseling** |
|---|---|

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

**About Debtor 1:**

*You must check one:*

☑ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**
Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**
Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.** I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.** My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.** I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

**About Debtor 2 (Spouse Only in a Joint Case):**

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**
Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**
Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.** I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.** My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.** I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

| **Part 6:** | **Answer These Questions for Reporting Purposes** |
|---|---|

**16. What kind of debts do you have?**

**16a. Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

☐ No. Go to line 16b.
☑ Yes. Go to line 17.

**16b. Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.
☐ Yes. Go to line 17.

16c. State the type of debts you owe that are not consumer debts or business debts.

_____

---

**17. Are you filing under Chapter 7?**

☑ No.  I am not filing under Chapter 7. Go to line 18.

**Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?**

☐ Yes. I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

   ☐ No
   ☐ Yes

---

**18. How many creditors do you estimate that you owe?**

☑ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

---

**19. How much do you estimate your assets to be worth?**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☑ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

**20. How much do you estimate your liabilities to be?**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☑ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

| **Part 7:** | **Sign Below** |
|---|---|

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

✖ /s/ Sharonn E Thomas-Pope _____
Signature of Debtor 1

✖ _____
Signature of Debtor 2

Executed on  07/06/2017
    MM / DD / YYYY

Executed on _____
    MM / DD / YYYY

---

A 53

**For your attorney, if you are represented by one**

**If you are not represented by an attorney, you do not need to file this page.**

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible.  I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

✖ /s/ JOSHUA THOMAS

Signature of Attorney for Debtor

Date     07/06/2017

MM   /   DD  / YYYY

JOSHUA THOMAS

Printed name

Joshua L Thomas & Associates

Firm name

225 Wilmington West Chester Pike

Number    Street

Suite 200

Chadds Ford                              PA        19317

City                                      State      ZIP Code

Contact phone  2158061733          Email address  joshualthomas@gmail.com

312476                                    PA

Bar number                                State

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone:215-806-1733
Fax: 888-314-8910
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for Defendants
Collateral Account: 145289

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

Brown & Pope

      PLAINTIFF

      vs.

                               DOCKET NO. CAM-L-2368-16

Sharonn Thomas Pope

      DEFENDANTS

_____

TO THE COURT:

     Defendant Sharonn Thomas Pope, hereby rejects the Arbitration Award entered in the

above matter on September 11, 2017, and demands a Trial *De Novo*.

     If trial *de novo* is sought this form must be filed with the Arbitration Administrator within

30 days of the filing of the arbitration award and served on all parties within that time. The

Arbitration hearing in the above-captioned matter was held on September 11, 2017. Further, a

Bankruptcy was filed on July 6, 2017 and Plaintiff did not get relief from the stay and further, his

attorney was informed **not** to proceed.

Payment for the filing fee is being tendered herewith, and this notice having been served

on all parties, trial *de novo* is hereby requested in the above-captioned matter, pursuant to

RULES 4:21A-6(b)(1) and 4:21A-6(c).


                      _____/s/ Joshua L. Thomas_____
                      Joshua Thomas, Esq.

THIS NOTICE, WHEN TIMELY FILED AND SERVED ON ALL ADVERSE PARTIES,
SHALL BE SUFFICIENT TO RESTORE THE CASE TO THE TRIAL CALENDAR.

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone:215-806-1733
Fax: 888-314-8910
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for Defendants

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

Brown & Pope

     PLAINTIFF

    vs.

Sharonn Thomas Pope

    DEFENDANTS

DOCKET NO. CAM-L-2368-16

## DEFENDANT'S COMBINED REQUESTS FOR ADMISSIONS, INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

### DEFINITIONS AND INSTRUCTIONS

A.    These Requests for Admission and Interrogatories are to be considered continuing in character, and, therefore, your response should be modified or supplemented as you obtain further or different information and/or additional documents.

B.    The term "person" refers to the plural, as well as the singular, or any natural person, firm, corporation, association, group or organization, unless specifically otherwise  stated.

C.    The term "identify" when used in reference to an individual person means to state his or her full name, job title, business and home telephone numbers and present home and business addresses. The identification should be sufficient so as to enable Plaintiff to notice his or her deposition, or to subpoena said person.

D.    The term "identify" when used in reference to a document means to state the date, title and nature of the document (e.g., contract, letter, memorandum, chart, etc.); the name of the author of the document and his home and business telephone numbers and business addresses of each addressee or recipient; the present location of the document; and the name, home and business telephone numbers and home business addresses of any custodian of the document.

The identification should be with "reasonable particularity" so as to enable Plaintiff to request the production of the document. If any such document was, but is no longer in your control, state what disposition has been made of it.

E.    "The Complaint" refers to the Complaint filed in this action under the caption set forth above.

F.    The "New Matter" refers to the New Matter Defendant filed in response to Plaintiff s Complaint.

G.    The conjunctions "and" and "or" shall not be interpreted disjunctively or to exclude any information otherwise within the scope of any interrogatory.

H.    "Including" means "including but not limited to."

I.    "Document" means without limitation, the following items in your custody or control, whether printed or recorded or reproduced by any mechanical process, or written or produced by hand: agreements, reports, correspondence, telegrams, memoranda, summaries or records of telephone conversations or interviews, diaries, graphs, notebooks, manuals, charts, deeds, maps, letters, minutes of meetings, photographs, films, pamphlets, tape or audio  recordings, computer records, computer disks, electronic data, electronic media, electronic records, magnetic tape or disks, e-mails, advertisements, circulars, press releases, drafts,  marginal comments appearing on file folders or other documents and all other writings and recordings. If multiple copies of a document exist and are not identical in all respects, each non- identical document should be considered a separate document.

J.    "You" or "Your" shall refer to Plaintiff or any other entities affiliated with such entities, including, but not limited to, predecessors, successors, affiliates, parents, subsidiaries, assigns, employees, representatives, agents, subcontractors, attorneys, accountants, and any and all persons acting on their behalf.

K.    "Reflect," "reflected" and/or "reflecting" shall refer to relating to, evidencing, embodied, pertaining, constituting, identifying, stating, supporting, memorializing or in any other manner as being relevant to the subject matter described in the particular category of documents requested or any portion thereof.

L.    Plaintiff s Requests for Admission are served under Pa.R.C.P. 4014, and your answers must be in compliance therewith, including but not limited to responding to same within 30 days, failing which Plaintiff s Requests for Admission will be deemed admitted.

## REQUEST FOR ADMISSION #1

On or about May 4, 2016, your attorney received a dissolution letter stating that pursuant to "the Real Estate Commission requires you to furnish my client with a  complete statement of account in writing of all money owed to my client within 7 days of today's notice" and to date, you have failed to do so.

**RESPONSE:**

## INTERROGATORY #1

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

## REQUEST FOR PRODUCTION #1

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

## REQUEST FOR ADMISSION #3

Plaintiff was making sporadic payments while Ms. Pope was still with Brown and Pope on the loan from "Tomorrow's Financing" that, as of May 12, 2016, had a payoff of $17,216.96 and since she has left, Plaintiff has failed to make any payments on that loan.

**RESPONSE:**

## INTERROGATORY #3

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

## REQUEST FOR PRODUCTION #3

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

**REQUEST FOR ADMISSION #4**

      Plaintiff failed to specify which alleged "long-standing client accounts" Defendant allegedly took, and as such, by failing to produce evidence of that "taking" has waived the right to pursue action for either alleged taking.

      **RESPONSE:**

**INTERROGATORY #4**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

**REQUEST FOR PRODUCTION #4**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

**REQUEST FOR ADMISSION #5**

Any "long-standing client accounts" that Plaintiff lost were from his own failure to properly perform, negligence and improper actions, as opposed to any alleged actions on the part of the Defendant.

**RESPONSE:**

**INTERROGATORY #5**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

**REQUEST FOR PRODUCTION #5**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

## REQUEST FOR ADMISSION #6

Pursuant to all true relevant contracts that were in existence between the parties, Defendant is entitled to 49% of all office furniture, computers, or the liquidated value thereof and capital that was part of "Brown and Pope" at the time she left.

**RESPONSE:**

## INTERROGATORY #6

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

## REQUEST FOR PRODUCTION #6

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

## REQUEST FOR ADMISSION #7

   Pursuant to all true relevant contracts that were in existence between the parties, Defendant is entitled to $100,000 from the proceeds of all closed properties in which Defendant did not receive any partnership funds at the time she left.

  **RESPONSE:**

## INTERROGATORY #7

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

## REQUEST FOR PRODUCTION #7

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

## REQUEST FOR ADMISSION #8

      Pursuant to all true relevant contracts that were in existence between the parties, Defendant is entitled to all damages, including consequential, punitive and other liquidated damages, as well as all attorney's fees and costs caused by this action.

      **RESPONSE:**

## INTERROGATORY #8

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

## REQUEST FOR PRODUCTION #8

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

**REQUEST FOR ADMISSION #9**

      Wells Fargo Home Mortgage dba Premiere Asset Services did, in fact, fire Plaintiff prior to joining with Defendant by their own choice.

      **RESPONSE:**


**INTERROGATORY #9**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.


**REQUEST FOR PRODUCTION #9**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

**THE ABOVE REQUEST FOR ADMISSION0**

      Plaintiff did, in fact, threaten Defendant via text message in January, 2016 in regards to her getting a license.

      **RESPONSE:**

**INTERROGATORY #10**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

**REQUEST FOR PRODUCTION #10**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone:215-806-1733
Fax: 888-314-8910

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

| | |
|---|---|
| Brown & Pope | |
| PLAINTIFF | |
| vs. | DOCKET NO. CAM-L-2368-16 |
| Sharonn Thomas Pope | |
| DEFENDANTS | |

**NOTICE OF DEPOSITION**

To:   Martin Brown
      c/o E. McCord Clayton, Esq.
      Two Penn Center
      1500 JFK Blvd., Suite 920
      Philadelphia, PA 19102

PLEASE TAKE NOTICE that, pursuant to the New Jersey Rules of Civil Procedure, Plaintiff, by her attorneys, will take the deposition of Martin Brown, before a person duly authorized to administer oaths, at the office of Joshua L. Thomas & Associates, PLLC 225 Wilmington-West Chester Pike Suite 200 Chadds Ford, PA 19317 on **Tuesday, July 18, 2017**, commencing at **10:30 a.m**. and to continue from day to day until completed.

Dated:  June 26, 2017                    BY:   _/s/ Joshua Thomas_
                                               **Joshua Thomas**
                                               *Attorney for Defendant*

651111

| | | |
|---|---|---|
| Schedule K-1 (Form 1065) | **2011** For calendar year 2011, or tax | ☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0099 |

Department of the Treasury
Internal Revenue Service

year beginning _____ , 2011
ending _____

**Partner's Share of Income, Deductions, Credits, etc.**   ► See separate instructions.

**Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

| Part I   Information About the Partnership | | 1 Ordinary business income (loss) | 15 Credits |
|---|---|---|---|
| **A** Partnership's employer identification number | | **−9,171.** | |

**A** Partnership's employer identification number
20-5841221

**B** Partnership's name, address, city, state, and ZIP code
BROWN AND THOMAS LLC
2105 VOORHEES TOWN CENTER
VOORHEES, NJ 08043

**C** IRS Center where partnership filed return
CINCINNATI, OH

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II   Information About the Partner**

**E** Partner's identifying number
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    ·

**F** Partner's name, address, city, state, and ZIP code
SHARONN THOMAS-POPE
49 GRAY PEBBLE CIRCLE
SICKLERVILLE, NJ 08081

**G** ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I** What type of entity is this partner?  INDIVIDUAL

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 50.00000 % | 50.00000 % |
| Loss | 50.00000 % | 50.00000 % |
| Capital | 50.00000 % | 50.00000 % |

**K** Partner's share of liabilities at year end:

| | | |
|---|---|---|
| Nonrecourse | $ | |
| Qualified nonrecourse financing | $ | 37,317. |
| Recourse | $ | |

**L** Partner's capital account analysis:

| | | |
|---|---|---|
| Beginning capital account | $ | −7,501. |
| Capital contributed during the year | $ | |
| Current year increase (decrease) | $ | −9,171. |
| Withdrawals and distributions | $ | |
| Ending capital account | $ | −16,672. |

☒ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If 'Yes', attach statement (see instructions)

| # | Item | |
|---|---|---|
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | |
| 4 | Guaranteed payments | |
| 5 | Interest income | |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | |
| 11 | Other income (loss) | |

16 Foreign transactions

17 Alternative minimum tax (AMT) items
A   −696.

18 Tax-exempt income and nondeductible expenses

| 12 | Section 179 deduction | | 19 | Distributions |
|---|---|---|---|---|
| 13 | Other deductions | | 20 | Other information |

| 14 | Self-employment earnings (loss) | |
|---|---|---|
| A | −9,171. | |
| C | 167,964. | |

*See attached statement for additional information.

FOR IRS USE ONLY

MB107

| | | | |
|---|---|---|---|
| | | ☐ Final K-1 | ☐ Amended K-1    OMB No. 1545-0099 |

**Schedule K-1**
**(Form 1065)**

**2012**

For calendar year 2012, or tax

Department of the Treasury
Internal Revenue Service

year beginning _____ , 2012
ending _____

**Partner's Share of Income, Deductions, Credits, etc.**   ► See separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) −11,866. | 15 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items A −611. |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| | | 19 | Distributions |
| 12 | Section 179 deduction | | |
| 13 | Other deductions | 20 | Other information |
| 14 | Self-employment earnings (loss) A −11,866. C 221,288. | | |

**Part I  Information About the Partnership**

**A** Partnership's employer identification number
20-5841221

**B** Partnership's name, address, city, state, and ZIP code
BROWN AND THOMAS LLC
2105 VOORHEES TOWN CENTER
VOORHEES, NJ 08043

**C** IRS Center where partnership filed return
CINCINNATI, OH

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II  Information About the Partner**

**E** Partner's identifying number
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

**F** Partner's name, address, city, state, and ZIP code
SHARONN THOMAS-POPE
49 GRAY PEBBLE CIRCLE
SICKLERVILLE, NJ 08081

**G** ☒ General partner or LLC member-manager  ☐ Limited partner or other LLC member

**H** ☒ Domestic partner  ☐ Foreign partner

**I1** What type of entity is this partner? (see instr) INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc), check here (see instructions) ........................... ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 50.00000 % | 50.00000 % |
| Loss | 50.00000 % | 50.00000 % |
| Capital | 50.00000 % | 50.00000 % |

**K** Partner's share of liabilities at year end:

Nonrecourse ............................ $ _____
Qualified nonrecourse financing ........ $ 37,317.
Recourse .............................. $ _____

**L** Partner's capital account analysis:

Beginning capital account ............. $ −16,672.
Capital contributed during the year .... $ _____
Current year increase (decrease) ....... $ −11,866.
Withdrawals and distributions .......... $ _____
Ending capital account ................ $ −28,538.

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If 'Yes', attach statement (see instructions)

*See attached statement for additional information.

FOR IRS USE ONLY

MB108

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2012

PTPA0312  01/02/13

□ Final K-1   □ Amended K-1

651113

OMB No. 1545-0099

## Schedule K-1
## (Form 1065)

### 2013

For calendar year 2013, or tax

Department of the Treasury
Internal Revenue Service

year beginning _____ , 2013

ending _____

## Partner's Share of Income, Deductions,
## Credits, etc.   ► See separate instructions.

| Part I | Information About the Partnership |

**A** Partnership's employer identification number
20-5841221

**B** Partnership's name, address, city, state, and ZIP code
BROWN AND THOMAS LLC
2105 VOORHEES TOWN CENTER
VOORHEES, NJ 08043

**C** IRS Center where partnership filed return
CINCINNATI, OH

**D** □ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |

**E** Partner's identifying number
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

**F** Partner's name, address, city, state, and ZIP code
SHARONN THOMAS-POPE
49 GRAY PEBBLE CIRCLE
SICKLERVILLE, NJ 08081

**G** ☒ General partner or LLC member-manager   □ Limited partner or other LLC member

**H** ☒ Domestic partner   □ Foreign partner

**I1** What type of entity is this partner? . . . . INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc), check here (see instructions) . . . . . . . . . . . . . . . □

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 50.00000 % | 50.00000 % |
| Loss | 50.00000 % | 50.00000 % |
| Capital | 50.00000 % | 50.00000 % |

**K** Partner's share of liabilities at year end:

Nonrecourse . . . . . . . . . . . . . $
Qualified nonrecourse financing . . . . . $ 47,766.
Recourse . . . . . . . . . . . . . . $

**L** Partner's capital account analysis:

Beginning capital account . . . . . . . $ -28,538.
Capital contributed during the year . . . $
Current year increase (decrease) . . . . $ -12,115.
Withdrawals and distributions . . . . . . $
Ending capital account . . . . . . . . . $ -40,653.

☒ Tax basis   □ GAAP   □ Section 704(b) book
□ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
□ Yes   ☒ No
If 'Yes', attach statement (see instructions)

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |

| 1 | Ordinary business income (loss) -12,115. | 15 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items A -533. |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions |
| 13 | Other deductions | 20 | Other information |
| 14 | Self-employment earnings (loss) A -12,115. C 238,098. | | |

*See attached statement for additional information.

F
O
R

I
R
S

U
S
E

O
N
L
Y

MB109

BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2013

PTPA0312  12/05/13

A 72

651113

OMB No. 1545-0123

☐ Final K-1  ☐ Amended K-1

**Schedule K-1**
**(Form 1065)**

**2014**

For calendar year 2014, or tax

Department of the Treasury
Internal Revenue Service

year beginning _____ , 2014
ending _____ , _____

## Partner's Share of Income, Deductions, Credits, etc.  ► See separate instructions.

### Part I  Information About the Partnership

**A** Partnership's employer identification number
20-5841221

**B** Partnership's name, address, city, state, and ZIP code
BROWN AND THOMAS LLC
2105 VOORHEES TOWN CENTER
VOORHEES, NJ 08043

**C** IRS Center where partnership filed return
CINCINNATI, OH

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II  Information About the Partner

**E** Partner's identifying number
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

**F** Partner's name, address, city, state, and ZIP code
SHARONN THOMAS-POPE
49 GRAY PEBBLE CIRCLE
SICKLERVILLE, NJ 08081

**G** ☒ General partner or LLC member-manager  ☐ Limited partner or other LLC member

**H** ☒ Domestic partner  ☐ Foreign partner

**I1** What type of entity is this partner? . . . . . INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . . . . . . . . . . . . . . . . ☐

**J** Partner's share of profit, loss, and capital (see instructions):

|  | Beginning | Ending |
|---|---|---|
| Profit | 50.00000 % | 50.00000 % |
| Loss | 50.00000 % | 50.00000 % |
| Capital | 50.00000 % | 50.00000 % |

**K** Partner's share of liabilities at year end:

Nonrecourse . . . . . . . . . . . . . $
Qualified nonrecourse financing . . . . $  47,766.
Recourse . . . . . . . . . . . . . . $

**L** Partner's capital account analysis:

Beginning capital account . . . . . . $  -40,653.
Capital contributed during the year . . $  19,759.
Current year increase (decrease) . . . $  -20,076.
Withdrawals & distributions . . . . . $
Ending capital account . . . . . . . $  -40,970.

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If 'Yes', attach statement (see instructions)

### Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) -20,076. | 15 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items |
| | | A | 0. |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions |
| 13 | Other deductions | | |
| | | 20 | Other information |
| 14 | Self-employment earnings (loss) A -20,076. | | |
| | C 198,231. | | |

*See attached statement for additional information.

F
O
R

I
R
S

U
S
E

O
N
L
Y

MB110

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2014

PTPA0312  11/28/14

| Final K-1 | Amended K-1 | OMB No. 1545-0123 |

**651113**

**Schedule K-1**
(Form 1065)

**2015**

For calendar year 2015, or tax

Department of the Treasury
Internal Revenue Service

year beginning _____ , 2015

ending _____

## Partner's Share of Income, Deductions, Credits, etc. ► See separate instructions.

| **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |

| # | Item | # | Item |
|---|------|---|------|
| 1 | Ordinary business income (loss) −56,663. | 15 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 17 | Alternative minimum tax (AMT) items A ____ 0. |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | |
| 12 | Section 179 deduction | 19 | Distributions |
| 13 | Other deductions | | |
| | | 20 | Other information |
| 14 | Self-employment earnings (loss) A −56,663. C 364,419. | | |

### Part I  Information About the Partnership

**A** Partnership's employer identification number
20-5841221

**B** Partnership's name, address, city, state, and ZIP code
BROWN AND THOMAS LLC
2105 VOORHEES TOWN CENTER
VOORHEES, NJ 08043

**C** IRS Center where partnership filed return
CINCINNATI, OH

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II  Information About the Partner

**E** Partner's identifying number
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

**F** Partner's name, address, city, state, and ZIP code
SHARONN THOMAS-POPE
49 GRAY PEBBLE CIRCLE
SICKLERVILLE, NJ 08081

**G** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I1** What type of entity is this partner? . . . . . INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . . . . . . . . . . . . . . . . . . . . . ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|-----------|--------|
| Profit | 50.00000 % | 50.00000 % |
| Loss | 50.00000 % | 50.00000 % |
| Capital | 50.00000 % | 50.00000 % |

**K** Partner's share of liabilities at year end:

Nonrecourse . . . . . . . . . . . . . $ _____
Qualified nonrecourse financing . . . . . $ 47,766.
Recourse . . . . . . . . . . . . . . . $ _____

**L** Partner's capital account analysis:

Beginning capital account . . . . . . . . $ −40,970.
Capital contributed during the year . . . $ _____
Current year increase (decrease) . . . . $ −56,663.
Withdrawals & distributions . . . . . . . $ _____
Ending capital account . . . . . . . . . $ −97,633.

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes  ☒ No
If 'Yes', attach statement (see instructions)

*See attached statement for additional information.

**MB111**

BAA For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2015
PTPA0312  07/22/15

Schedule K-1 (Form 1065) 2015    SHARONN THOMAS-POPE    20-5841221    Page 2

This list identifies the codes used on Schedule K-1 for all partners and provides summarized reporting information for partners who file Form 1040. For detailed reporting and filing information, see the separate Partner's Instructions for Schedule K-1 and the instructions for your income tax return.

**1 Ordinary business income (loss).** Determine whether the income (loss) is passive or nonpassive and enter on your return as follows.

| | Report on |
|---|---|
| Passive loss | See the Partner's Instructions |
| Passive income | Schedule E, line 28, column (g) |
| Nonpassive loss | Schedule E, line 28, column (h) |
| Nonpassive income | Schedule E, line 28, column (j) |
| **2** Net rental real estate income (loss) | See the Partner's Instructions |
| **3** Other net rental income (loss) | |
| Net income | Schedule E, line 28, column (g) |
| Net loss | See the Partner's Instructions |
| **4** Guaranteed payments | Schedule E, line 28, column (j) |
| **5** Interest income | Form 1040, line 8a |
| **6 a** Ordinary dividends | Form 1040, line 9a |
| **6 b** Qualified dividends | Form 1040, line 9b |
| **7** Royalties | Schedule E, line 4 |
| **8** Net short-term capital gain (loss) | Schedule D, line 5 |
| **9 a** Net long-term capital gain (loss) | Schedule D, line 12 |
| **9 b** Collectibles (28%) gain (loss) | 28% Rate Gain Worksheet, line 4 (Schedule D Instructions) |
| **9 c** Unrecaptured section 1250 gain | See the Partner's Instructions |
| **10** Net section 1231 gain (loss) | See the Partner's Instructions |
| **11** Other income (loss) | |

Code
| A | Other portfolio income (loss) | See the Partner's Instructions |
|---|---|---|
| B | Involuntary conversions | See the Partner's Instructions |
| C | Sec. 1256 contracts & straddles | Form 6781, line 1 |
| D | Mining exploration costs recapture | See Pub. 535 |
| E | Cancellation of debt | Form 1040, line 21 or Form 982 |
| F | Other income (loss) | See the Partner's Instructions |
| **12** | Section 179 deduction | See the Partner's Instructions |
| **13** | Other deductions | |
| A | Cash contributions (50%) | |
| B | Cash contributions (30%) | |
| C | Noncash contributions (50%) | |
| D | Noncash contributions (30%) | See the Partner's Instructions |
| E | Capital gain property to a 50% organization (30%) | |
| F | Capital gain property (20%) | |
| G | Contributions (100%) | |
| H | Investment interest expense | Form 4952, line 1 |
| I | Deductions — royalty income | Schedule E, line 19 |
| J | Section 59(e)(2) expenditures | See the Partner's Instructions |
| K | Deductions — portfolio (2% floor) | Schedule A, line 23 |
| L | Deductions — portfolio (other) | Schedule A, line 28 |
| M | Amounts paid for medical insurance | Schedule A, line 1 or Form 1040, line 29 |
| N | Educational assistance benefits | See the Partner's Instructions |
| O | Dependent care benefits | Form 2441, line 12 |
| P | Preproductive period expenses | See the Partner's Instructions |
| Q | Commercial revitalization deduction from rental real estate activities | See Form 8582 Instructions |
| R | Pensions and IRAs | See the Partner's Instructions |
| S | Reforestation expense deduction | See the Partner's Instructions |
| T | Domestic production activities information | See Form 8903 Instructions |
| U | Qualified production activities income | Form 8903, line 7b |
| V | Employer's Form W-2 wages | Form 8903, line 17 |
| W | Other deductions | See the Partner's Instructions |
| **14** | Self-employment earnings (loss) | |

**Note.** If you have a section 179 deduction or any partner-level deductions, see the Partner's Instructions before completing Schedule SE.

| A | Net earnings (loss) from self-employment | Schedule SE, Section A or B |
|---|---|---|
| B | Gross farming or fishing income | See the Partner's Instructions |
| C | Gross non-farm income | See the Partner's Instructions |
| **15** | Credits | |
| A | Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | |
| B | Low-income housing credit (other) from pre-2008 buildings | |
| C | Low-income housing credit (section 42(j)(5)) from post-2007 buildings | |
| D | Low-income housing credit (other) from post-2007 buildings | See the Partner's Instructions |
| E | Qualified rehabilitation expenditures (rental real estate) | |
| F | Other rental real estate credits | |
| G | Other rental credits | |
| H | Undistributed capital gains credit | Form 1040, line 73; check box a |
| I | Biofuel producer credit | |
| J | Work opportunity credit | See the Partner's Instructions |
| K | Disabled access credit | |

Code
| L | Empowerment zone employment credit | |
|---|---|---|
| M | Credit for increasing research activities | See the Partner's Instructions |
| N | Credit for employer social security and Medicare taxes | |
| O | Backup withholding | |
| P | Other credits | |
| **16** | Foreign transactions | |
| A | Name of country or U.S. possession | |
| B | Gross income from all sources | Form 1116, Part I |
| C | Gross income sourced at partner level | |

Foreign gross income sourced at partnership level
| D | Passive category | |
|---|---|---|
| E | General category | Form 1116, Part I |
| F | Other | |

Deductions allocated and apportioned at partner level
| G | Interest expense | Form 1116, Part I |
|---|---|---|
| H | Other | Form 1116, Part I |

Deductions allocated and apportioned at partnership level to foreign source income
| I | Passive category | |
|---|---|---|
| J | General category | Form 1116, Part I |
| K | Other | |

Other information
| L | Total foreign taxes paid | Form 1116, Part II |
|---|---|---|
| M | Total foreign taxes accrued | Form 1116, Part II |
| N | Reduction in taxes available for credit | Form 1116, line 12 |
| O | Foreign trading gross receipts | Form 8873 |
| P | Extraterritorial income exclusion | Form 8873 |
| Q | Other foreign transactions | See the Partner's Instructions |
| **17** | Alternative minimum tax (AMT) items | |
| A | Post-1986 depreciation adjustment | |
| B | Adjusted gain or loss | |
| C | Depletion (other than oil & gas) | See the Partner's Instructions and the Instructions for Form 6251 |
| D | Oil, gas, & geothermal — gross income | |
| E | Oil, gas, & geothermal — deductions | |
| F | Other AMT items | |
| **18** | Tax-exempt income and nondeductible expenses | |
| A | Tax-exempt interest income | Form 1040, line 8b |
| B | Other tax-exempt income | See the Partner's Instructions |
| C | Nondeductible expenses | See the Partner's Instructions |
| **19** | Distributions | |
| A | Cash and marketable securities | |
| B | Distribution subject to section 737 | See the Partner's Instructions |
| C | Other property | |
| **20** | Other information | |
| A | Investment income | Form 4952, line 4a |
| B | Investment expenses | Form 4952, line 5 |
| C | Fuel tax credit information | Form 4136 |
| D | Qualified rehabilitation expenditures (other than rental real estate) | See the Partner's Instructions |
| E | Basis of energy property | See the Partner's Instructions |
| F | Recapture of low-income housing credit (section 42(j)(5)) | Form 8611, line 8 |
| G | Recapture of low-income housing credit (other) | Form 8611, line 8 |
| H | Recapture of investment credit | See Form 4255 |
| I | Recapture of other credits | See the Partner's Instructions |
| J | Look-back interest — completed long-term contracts | See Form 8697 |
| K | Look-back interest — income forecast method | See Form 8866 |
| L | Dispositions of property with section 179 deductions | |
| M | Recapture of section 179 deduction | |
| N | Interest expense for corporate partners | |
| O | Section 453(l)(3) information | |
| P | Section 453A(c) information | |
| Q | Section 1260(b) information | |
| R | Interest allocable to production expenditures | See the Partner's Instructions |
| S | CCF nonqualified withdrawals | |
| T | Depletion information — oil and gas | |
| U | Reserved | |
| V | Unrelated business taxable income | |
| W | Precontribution gain (loss) | |
| X | Section 108(i) information | |
| Y | Net investment income | |
| Z | Other information | |

MB112

CAM-L-002368-16    11/09/2017 7:43:23 PM  Pg 32 of 98 Trans ID: LCV2017453938

FILED, Case 18-17430-elf Division of1047-2 22Filed 06/07/19 Entered 06/07/19 15:50:24    Desc Main
Document    Page 109 of 282

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

*Brown & Pope*
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ 08081

**Summary Of Expense Account Activity**

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---:|---:|---:|
| EC | e-showings.com<br>e-showings for all listing | 200707 | | | 07/24/2007 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200709 | | | 08/24/2007 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200709 | | | 09/24/2007 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200710 | | | 10/24/2007 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200711 | | | 11/24/2007 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200712 | | | 12/24/2007 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200801 | | | 01/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200802 | | | 02/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200803 | | | 03/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200804 | | | 04/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200806 | | | 05/23/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | DELET | | | 05/23/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com | DELET | | | 05/23/2008 | -1.00 | 50.00 | -50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200806 | | | 06/25/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200807 | | | 07/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200808 | | | 08/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200809 | | | 09/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200810 | | | 10/24/2008 | 1.00 | 50.00 | 50.00 |

MB113

A 76

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

### General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

**Brown & Pope**
REALTORS⁺
**856-306-2500**
www.BrownAndPope.com

| | Agt. # 101 |
|---|---|
| **Sharonn Thomas**<br>49 Graypebble Circle<br>Sicklerville NJ  08081 | |

| Summary Of Expense Account Activity | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---|---|---|
| EC | e-showings.com<br>e-showings for all listing | 200811 | | | 11/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200811 | | | 11/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200812 | | | 12/24/2008 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200901 | | | 01/24/2009 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200903 | | | 02/25/2009 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200903 | | | 03/24/2009 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200904 | | | 04/24/2009 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200905 | | | 05/29/2009 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200908 | | | 06/25/2009 | 1.00 | 50.00 | 50.00 |
| EC | e-showings.com<br>e-showings for all listing | 200908 | | | 08/03/2009 | 1.00 | 50.00 | 50.00 |
| RG | Realty Lead Generator | 200908 | | | 08/03/2009 | 1.00 | 250.00 | 250.00 |
| EC | e-showings.com<br>e-showings for all listing | 200909 | | | 08/25/2009 | 1.00 | 50.00 | 50.00 |
| RG | Realty Lead Generator | 200909 | | | 08/25/2009 | 1.00 | 250.00 | 250.00 |
| EC | e-showings.com<br>e-showings for all listing | 200909 | | | 09/22/2009 | 1.00 | 100.00 | 100.00 |
| RG | Realty Lead Generator | 200909 | | | 09/22/2009 | 1.00 | 250.00 | 250.00 |
| EC | e-showings.com<br>e-showings for all listing | 200910 | | | 10/22/2009 | 1.00 | 100.00 | 100.00 |
| RG | Realty Lead Generator | 200910 | | | 10/22/2009 | 1.00 | 250.00 | 250.00 |
| EC | e-showings.com<br>e-showings for all listing | 200911 | | | 11/24/2009 | 1.00 | 100.00 | 100.00 |
| RG | Realty Lead Generator<br>marketing credit | 200912 | | | 12/09/2009 | 1.00 | -2,000.00 | -2,000.00 |
| 99 | Bad Debt<br>owners credit | 201001 | | | 12/18/2009 | 1.00 | -5,000.00 | -5,000.00 |

MB114

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope** REALTORS®
856-306-2500
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

| | Agt. # 101 |
|---|---|
| **Sharonn Thomas**<br>49 Graypebble Circle<br>Sicklerville NJ  08081 | |

**Summary Of Expense Account Activity**

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|----------|------|----------|
| EC | e-showings.com<br>e-showings  for all listing | 200912 | | | 12/18/2009 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201001 | | | 01/27/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201002 | | | 02/25/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201003 | | | 03/25/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201005 | | | 05/02/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201005 | | | 05/28/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201006 | | | 06/28/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201007 | | | 07/28/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201008 | | | 08/26/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201009 | | | 09/29/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201010 | | | 10/28/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201011 | | | 11/29/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201012 | | | 12/29/2010 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201101 | | | 01/29/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201102 | | | 02/28/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201103 | | | 03/29/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201104 | | | 04/29/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201105 | | | 05/29/2011 | 1.00 | 100.00 | 100.00 |

MB115

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

| | |
|---|---|
| Sharonn Thomas<br>49 Graypebble Circle<br>Sicklerville NJ  08081 | Agt. # 101 |

**Summary Of Expense Account Activity**

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|----------|------|----------|
| EC | e-showings.com<br>e-showings  for all listing | 201106 | | | 06/29/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201110 | | | 07/28/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201110 | | | 08/28/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201110 | | | 09/28/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201110 | | | 10/28/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201111 | | | 11/28/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201112 | | | 12/28/2011 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201205 | | | 01/28/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201205 | | | 02/28/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201205 | | | 03/28/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201205 | | | 04/30/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | 201205 | | | 05/31/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 06/28/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 07/28/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 08/28/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 09/28/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 10/28/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 11/28/2012 | 1.00 | 100.00 | 100.00 |

MB116

A 79

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

| | Agt. # 101 |
|---|---|
| **Sharonn Thomas**<br>**49 Graypebble Circle**<br>**Sicklerville NJ 08081** | |

**Summary Of Expense Account Activity**

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---|---|---|
| EC | e-showings.com<br>e-showings  for all listing | | | | 12/28/2012 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 01/28/2013 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 02/28/2013 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 03/28/2013 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 04/28/2013 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 05/28/2013 | 1.00 | 100.00 | 100.00 |
| 99 | Bad Debt<br>owner portion of loan payment | | | | 06/21/2013 | 1.00 | 1,190.00 | 1,190.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 06/28/2013 | 1.00 | 100.00 | 100.00 |
| 99 | Bad Debt<br>owner lone share payment | | | | 07/08/2013 | 1.00 | 650.00 | 650.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 07/28/2013 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 08/28/2013 | 1.00 | 100.00 | 100.00 |
| 99 | Bad Debt<br>loan | | | | 09/03/2013 | 1.00 | 12,365.35 | 12,365.35 |
| 99 | Bad Debt | | | | 09/03/2013 | 1.00 | -12,365.35 | -12,365.35 |
| 99 | managment pay<br>operations managment check | | | | 09/04/2013 | 1.00 | 12,365.35 | 12,365.35 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 09/28/2013 | 1.00 | 100.00 | 100.00 |
| 99 | Bad Debt<br>owners fee | | | | 10/04/2013 | 1.00 | 2,980.00 | 2,980.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 10/28/2013 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 11/28/2013 | 1.00 | 100.00 | 100.00 |

MB117

A 80

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

*Brown & Pope*
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

**Summary Of Expense Account Activity**

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---|---|---|
| EC | e-showings.com<br>e-showings  for all listing | | | | 12/28/2013 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 01/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 02/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 03/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 04/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 05/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 06/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 07/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 08/28/2014 | 1.00 | 100.00 | 100.00 |
| 52 | 100%monthly fee<br>commission  1425 E Johnson | | | | 08/31/2014 | 1.00 | -96.66 | -96.66 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 09/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 10/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 11/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 12/28/2014 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 01/28/2015 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 02/28/2015 | 1.00 | 100.00 | 100.00 |
| EC | e-showings.com<br>e-showings  for all listing | | | | 03/28/2015 | 1.00 | 100.00 | 100.00 |
| 99 | Bad Debt<br>Darnelll King team member  unpaid | | | TRANSFER | 04/27/2016 | 1.00 | 2,920.36 | 2,920.36 |

MB118

FILED, Case 18-17430-cdf Division Doc 47 22 Filed, 06/07/19 Entered 06/07/19 15:50:24   Desc Main
Document    Page 115 of 282

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

Agt. # 101

**Sharonn Thomas**
**49 Graypebble Circle**
**Sicklerville NJ  08081**

### Summary Of Expense Account Activity

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|---------:|-----:|---------:|
| 99 | Bad Debt early termination fee<br>4 Red Gravel Circle  termination fee for pending reo sale | | | | 05/03/2016 | 1.00 | -600.00 | -600.00 |
| 99 | Bad Debt termination fee 126 n<br>126 n broad  termiation fee | | | | 05/04/2016 | 1.00 | 120.00 | 120.00 |
| 99 | 2023 harbour   termination fee<br>termination fee | | | | 05/09/2016 | 1.00 | 138.00 | 138.00 |
| 99 | termination fee and mls<br>darnell   119 s girard | | | | 05/09/2016 | 1.00 | 390.00 | 390.00 |
| 99 | termination fee<br>33 pershing  darnell king | | | | 05/12/2016 | 1.00 | 214.20 | 214.20 |
| 99 | termination fee<br>112 wesley | | | | 05/16/2016 | 1.00 | 287.44 | 287.44 |
| 99 | termination fee<br>1001 e chestnut   buyer and seller side | | | | 05/18/2016 | 1.00 | 585.00 | 585.00 |
| 99 | termination fee<br>-417. 40 Buttonwood | | | | 05/24/2016 | 1.00 | 417.00 | 417.00 |
| 99 | Termination fee<br>5 Green Tree Rd | DELET | | | 06/05/2016 | 1.00 | 431.61 | 431.61 |
| 99 | Termination fee | DELET | | | 06/05/2016 | -1.00 | 431.61 | -431.61 |
| 99 | termination fee<br>5 Green Tree Road | | | | 06/05/2016 | 1.00 | 431.61 | 431.61 |
| 99 | termination fee<br>512 Garwood | | | | 06/10/2016 | 1.00 | 0.00 | 0.00 |
| 99 | Termination Fee<br>286 atlantic st bridgeton | | | | 06/23/2016 | 1.00 | 960.00 | 960.00 |
| 99 | termination fee<br>202 kenedy | | | | 07/02/2016 | 1.00 | 630.00 | 630.00 |
| 99 | termination fee<br>38 walnut williamstown | | | | 07/02/2016 | 1.00 | 366.00 | 366.00 |
| 99 | temination fee<br>68 New Brooklyn rd | | | | 07/06/2016 | 1.00 | 153.00 | 153.00 |
| 99 | termination fee<br>48 Orlando | | | | 07/06/2016 | 1.00 | 495.00 | 495.00 |
| 99 | termination fee 2403 Golf<br>2403 Golf Stream | | | | 07/20/2016 | 1.00 | 828.00 | 828.00 |

MB119

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

**Summary Of Expense Account Activity**

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|----------|------|----------|
| 99 | termination fee 180. 31 cardinal | | | | 08/03/2016 | 1.00 | 180.00 | 180.00 |
| 99 | termination fee 261.47 30 sunset | | | | 08/03/2016 | 1.00 | 261.47 | 261.47 |
| 99 | termination fee 147 chelsea cir termination fee | | | | 09/01/2016 | 1.00 | 360.00 | 360.00 |
| 99 | Clear balance for year end | | | | 12/31/2016 | 1.00 | 200.14 | 200.14 |
| | | | | | | | | 28,475.91 |

### Personal Expenses

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|----------|------|----------|
| 35 | E & O INSURANCE | 200703 | | | 03/28/2007 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | DELET | | | 04/01/2007 | 1.00 | 458.00 | 458.00 |
| 35 | E & O INSURANCE | DELET | | | 04/01/2007 | -1.00 | 458.00 | -458.00 |
| 35 | E & O INSURANCE | 200704 | | | 04/24/2007 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | DELET | | | 04/28/2007 | 1.00 | 42.00 | 42.00 |
| 35 | Rev-E & O INSURANCE | DELET | | | 04/28/2007 | -1.00 | 42.00 | -42.00 |
| 13 | License renewal | 200705 | NJSTAT | 20070426 | 05/01/2007 | 1.00 | 100.00 | 100.00 |
| 13 | Rev-License renewal | 200904 | NJSTAT | 20070426 | 05/01/2007 | -1.00 | 100.00 | -100.00 |
| 35 | E & O INSURANCE | 200705 | | | 05/24/2007 | 1.00 | 42.00 | 42.00 |
| 06 | STATIONERY SUPPLIES | 200706 | | | 06/08/2007 | 1.00 | 399.00 | 399.00 |
| | Home warranty for 8634 Fayette st first american home warranty | | | | | | | |
| 35 | E & O INSURANCE | 200706 | | | 06/24/2007 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200707 | | | 07/24/2007 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200709 | | | 08/24/2007 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200709 | | | 09/24/2007 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200710 | | | 10/24/2007 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200711 | | | 11/24/2007 | 1.00 | 42.00 | 42.00 |
| AD | Agent paying adminstrative fee | 200712 | | | 12/11/2007 | 1.00 | 300.00 | 300.00 |
| 35 | E & O INSURANCE | 200712 | | | 12/24/2007 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200801 | | | 01/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200802 | | | 02/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200803 | | | 03/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200804 | | | 04/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200806 | | | 05/23/2008 | 1.00 | 42.00 | 42.00 |

MB120

A 83

FILED, Case# 18-17430-cdv Division Doc# 47-22 Filed, 06/07/19 7. Entered 06/07/19 15:50:24   Desc Main
Document     Page 117 of 282

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043



**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

### General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

Agt. # 101

**Sharonn Thomas**
**49 Graypebble Circle**
**Sicklerville NJ  08081**

| Summary Of Expense Account Activity | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

**Personal Expenses**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---|---|---|
| 35 | E & O INSURANCE | DELET | | | 05/23/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | DELET | | | 05/23/2008 | -1.00 | 42.00 | -42.00 |
| 35 | E & O INSURANCE | 200806 | | | 06/25/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200807 | | | 07/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200808 | | | 08/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200809 | | | 09/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200810 | | | 10/24/2008 | 1.00 | 42.00 | 42.00 |
| 09 | LATE CHARGE | 200812 | | | 11/24/2008 | 1.00 | -1,867.00 | -1,867.00 |
|  | over charge credit | | | | | | | |
| 35 | E & O INSURANCE | 200811 | | | 11/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200811 | | | 11/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200812 | | | 12/24/2008 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200901 | | | 01/24/2009 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200903 | | | 02/25/2009 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200903 | | | 03/25/2009 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200904 | | | 04/24/2009 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200905 | | | 05/29/2009 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200908 | | | 06/25/2009 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200908 | | | 08/03/2009 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200909 | | | 08/25/2009 | 1.00 | 42.00 | 42.00 |
| 35 | E & O INSURANCE | 200909 | | | 09/22/2009 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 200910 | | | 10/22/2009 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 200911 | | | 11/24/2009 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 200912 | | | 12/18/2009 | 1.00 | 75.00 | 75.00 |
| 36 | E & O INSURANCE | 201001 | | | 01/27/2010 | 1.00 | 75.00 | 75.00 |
| 10 | BOARD DUES & FEES | 201002 | | | 02/25/2010 | 1.00 | 380.00 | 380.00 |
| 35 | E & O INSURANCE | 201002 | | | 02/25/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201003 | | | 03/25/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201005 | | | 05/02/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201005 | | | 05/28/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201006 | | | 06/28/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201007 | | | 07/28/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201008 | | | 08/26/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201009 | | | 09/29/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201010 | | | 10/28/2010 | 1.00 | 75.00 | 75.00 |

MB121

A 84

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

|  | Agt. # 101 |
| --- | --- |
| **Sharonn Thomas**
49 Graypebble Circle
Sicklerville NJ  08081 | |

| Summary Of Expense Account Activity | |
| --- | --- |
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

## Summary Of New Charges

**Personal Expenses**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 35 | E & O INSURANCE | 201011 | | | 11/29/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201012 | | | 12/29/2010 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201101 | | | 01/29/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201102 | | | 02/28/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201103 | | | 03/29/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201104 | | | 04/29/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201105 | | | 05/29/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201106 | | | 06/29/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201110 | | | 07/28/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201110 | | | 08/28/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201110 | | | 09/28/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201110 | | | 10/28/2011 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201111 | | | 11/28/2011 | 1.00 | 75.00 | 75.00 |
| 24 | ADVERT. - OTHER | 201112 | | | 12/21/2011 | 1.00 | 233.99 | 233.99 |
| 35 | E & O INSURANCE | 201112 | | | 12/28/2011 | 1.00 | 75.00 | 75.00 |
| 24 | ADVERT. - OTHER
U&o ON 1950 MEDARY | 201205 | | | 01/27/2012 | 1.00 | -103.00 | -103.00 |
| 35 | E & O INSURANCE | 201205 | | | 01/28/2012 | 1.00 | 75.00 | 75.00 |
| 24 | ADVERT. - OTHER
marketing reimburstment | 201205 | | | 02/21/2012 | 1.00 | -420.00 | -420.00 |
| 35 | E & O INSURANCE | 201205 | | | 02/28/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201205 | | | 03/28/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201205 | | | 04/30/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | 201205 | | | 05/31/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 06/28/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 07/28/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 08/28/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 09/28/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 10/28/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 11/28/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 12/28/2012 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 01/28/2013 | 1.00 | 75.00 | 75.00 |
| 20 | ADVERT.
gas | | | | 02/22/2013 | 1.00 | 200.00 | 200.00 |
| 35 | E & O INSURANCE | | | | 02/28/2013 | 1.00 | 75.00 | 75.00 |

MB122

| | | |
| --- | --- | --- |
| Prepared by: Martin Brown,Sr.
July 12, 2017, 08:48:48 PM | Lone Wolf Technologies [8.6.3]
brokerWOLF (Version 17.06.01) | Page:  10 |

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS
**856-306-2500**
www.BrownAndPope.com

### General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ 08081

**Summary Of Expense Account Activity**

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

**Personal Expenses**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|----------|------|----------|
| 24 | ADVERT. - OTHER | | | | 03/11/2013 | 1.00 | 200.00 | 200.00 |
| | gas | | | | | | | |
| 24 | ADVERT. - OTHER | | | | 03/14/2013 | 1.00 | 750.00 | 750.00 |
| 35 | E & O INSURANCE | | | | 03/28/2013 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 04/28/2013 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 05/28/2013 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 06/28/2013 | 1.00 | 75.00 | 75.00 |
| 13 | License | | | | 07/05/2013 | 1.00 | 200.00 | 200.00 |
| | wfg | | | | | | | |
| AD | convention Fee | | | | 07/12/2013 | 1.00 | 224.00 | 224.00 |
| | Hotel.com vacations | | | | | | | |
| 35 | E & O INSURANCE | | | | 07/28/2013 | 1.00 | 75.00 | 75.00 |
| 20 | ADVERT. | | | | 08/10/2013 | 1.00 | 360.00 | 360.00 |
| 35 | E & O INSURANCE | | | | 08/28/2013 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 09/28/2013 | 1.00 | 75.00 | 75.00 |
| 24 | ADVERT. - OTHER | | | | 10/21/2013 | 1.00 | 450.00 | 450.00 |
| | labtop digital camera | | | | | | | |
| 35 | E & O INSURANCE | | | | 10/28/2013 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 11/28/2013 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 12/28/2013 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 01/28/2014 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 02/28/2014 | 1.00 | 75.00 | 75.00 |
| 10 | BOARD DUES & FEES | | | | 03/15/2014 | 1.00 | 550.00 | 550.00 |
| 35 | E & O INSURANCE | | | | 03/28/2014 | 1.00 | 75.00 | 75.00 |
| 10 | BOARD DUES & FEES | | | | 03/29/2014 | 1.00 | 185.00 | 185.00 |
| 09 | LATE CHARGE | | | | 04/16/2014 | 1.00 | 1,077.50 | 1,077.50 |
| | loan owner share payment | | | | | | | |
| 35 | E & O INSURANCE | | | | 04/28/2014 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 05/28/2014 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 06/28/2014 | 1.00 | 75.00 | 75.00 |
| AD | Agent paying adminstrative fee | | | | 07/21/2014 | 1.00 | 300.00 | 300.00 |
| | 15 Delawar ave Berlin nj | | | | | | | |
| AD | Agent paying adminstrative fee | | | | 07/21/2014 | 1.00 | -150.00 | -150.00 |
| | u&O reimburstment 15 delaware ave | | | | | | | |

MB123

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

*Brown*
*& Pope*
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

---

Agt. # 101

**Sharonn Thomas**
**49 Graypebble Circle**
**Sicklerville NJ 08081**

**Summary Of Expense Account Activity**

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

---

### Summary Of New Charges

**Personal Expenses**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|----------|------|----------|
| 35 | E & O INSURANCE | | | | 07/28/2014 | 1.00 | 75.00 | 75.00 |
| AD | Agent paying adminstrative fee 3138 master st | | | | 08/02/2014 | 1.00 | 300.00 | 300.00 |
| 35 | E & O INSURANCE | | | | 08/28/2014 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 09/28/2014 | 1.00 | 75.00 | 75.00 |
| 20 | ADVERT. 1414 n conestoga | | | | 10/09/2014 | 1.00 | -93.00 | -93.00 |
| 35 | E & O INSURANCE | | | | 10/28/2014 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 11/28/2014 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 12/28/2014 | 1.00 | 75.00 | 75.00 |
| 15 | SIGNS signs | | | | 01/22/2015 | 1.00 | 150.00 | 150.00 |
| 24 | ADVERT. - OTHER ast Howard | DELET | | | 01/26/2015 | 1.00 | 123.36 | 123.36 |
| 24 | ADVERT. - OTHER | DELET | | | 01/26/2015 | -1.00 | 123.36 | -123.36 |
| 35 | E & O INSURANCE | | | | 01/28/2015 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 02/28/2015 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 03/28/2015 | 1.00 | 75.00 | 75.00 |
| 10 | BOARD DUES & FEES BCCAR | | | | 04/04/2015 | 1.00 | 450.00 | 450.00 |
| 24 | ADVERT. - OTHER iagent over payment reimburst | | | | 05/18/2015 | 1.00 | 70.00 | 70.00 |
| 24 | ADVERT. - OTHER camera | | | | 06/11/2015 | 1.00 | 180.00 | 180.00 |
| 13 | License renewal | | | | 07/07/2015 | 1.00 | 100.00 | 100.00 |
| 24 | ADVERT. - OTHER | | | | 09/03/2015 | 1.00 | 363.16 | 363.16 |
| 24 | ADVERT. - OTHER market re imburstment | | | | 10/08/2015 | 1.00 | 425.00 | 425.00 |
| AD | Agent additional commission 5946 webster | | | | 11/28/2015 | 1.00 | 400.00 | 400.00 |
| 11 | MLS fee 6112 wanut | | | | 12/01/2015 | 1.00 | 0.00 | 0.00 |
| 35 | E & O INSURANCE | | | | 02/28/2016 | 1.00 | 75.00 | 75.00 |
| 35 | E & O INSURANCE | | | | 03/28/2016 | 1.00 | 75.00 | 75.00 |

MB124

A 87

---

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

### Summary Of Expense Account Activity

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

## Summary Of New Charges

### Personal Expenses

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|----------|------|----------|
| 35 | E & O INSURANCE | | | | 04/28/2016 | 1.00 | 75.00 | 75.00 |
| 11 | MLS fee | | | | 08/03/2016 | 1.00 | 150.00 | 150.00 |
| | 30 sunset | | | | | | | |
| | | | | | | | | 12,316.65 |

### Office Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|----------|------|----------|
| 51 | DF-100% PLAN - NO DESK AT | 200703 | | | 03/15/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 25 | ONE TIME INITIATION FEE | 200703 | | | 03/28/2007 | 1.00 | 500.00 | 500.00 |
| | Ida's Daniel's fee | | | | | | | |
| 30 | WEB SITE | 200703 | | | 03/28/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200703 | | | 03/28/2007 | 1.00 | 500.00 | 500.00 |
| 25 | ONE TIME INITIATION FEE | 200704 | | | 04/09/2007 | 1.00 | 500.00 | 500.00 |
| | Jade Alston | | | | | | | |
| 25 | ONE TIME INITIATION FEE | 200704 | | | 04/09/2007 | 1.00 | 500.00 | 500.00 |
| | For Jade Alston | | | | | | | |
| 25 | ONE TIME INITIATION FEE | 200704 | | | 04/09/2007 | 1.00 | -500.00 | -500.00 |
| | correction | | | | | | | |
| 30 | WEB SITE | 200704 | | | 04/24/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200704 | | | 04/24/2007 | 1.00 | 500.00 | 500.00 |
| | Ida Daniels | | | | | | | |
| 47 | DF-LIC. ASSIST SHARING | 200704 | | | 04/24/2007 | 1.00 | 500.00 | 500.00 |
| | Jade Alston | | | | | | | |
| 51 | DF-100% PLAN - NO DESK AT | 200704 | | | 04/24/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | DELET | | | 04/28/2007 | 1.00 | 25.00 | 25.00 |
| 30 | Rev-WEB SITE | DELET | | | 04/28/2007 | -1.00 | 25.00 | -25.00 |
| 47 | DF-LIC. ASSIST SHARING | DELET | | | 04/28/2007 | 1.00 | 500.00 | 500.00 |
| 47 | Rev-DF-LIC. ASSIST | DELET | | | 04/28/2007 | -1.00 | 500.00 | -500.00 |
| 51 | DF-100% PLAN - NO DESK AT | DELET | | | 04/28/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | Rev-DF-100% PLAN - NO | DELET | | | 04/28/2007 | -1.00 | 1,250.00 | -1,250.00 |
| 25 | ONE TIME INITIATION FEE | 200705 | | | 05/03/2007 | 1.00 | 500.00 | 500.00 |
| | correcting initiation fee for Jade deleted from April 30/07 statement | | | | | | | |
| 30 | WEB SITE | 200705 | | | 05/24/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200705 | | | 05/24/2007 | 1.00 | 500.00 | 500.00 |

MB125

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

Agt. # 101

**Sharonn Thomas**
**49 Graypebble Circle**
**Sicklerville NJ  08081**

### Summary Of Expense Account Activity
| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

**Office Charges**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---|---|---|
| 47 | DF-LIC. ASSIST SHARING | 200705 | | | 05/24/2007 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200705 | | | 05/24/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200706 | | | 06/24/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200706 | | | 06/24/2007 | 1.00 | 500.00 | 500.00 |
| 47 | DF-LIC. ASSIST SHARING | 200706 | | | 06/24/2007 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200706 | | | 06/24/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200707 | | | 07/24/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200707 | | | 07/24/2007 | 1.00 | 500.00 | 500.00 |
| 47 | DF-LIC. ASSIST SHARING | 200707 | | | 07/24/2007 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200707 | | | 07/24/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 47 | DF-LIC. ASSIST SHARING | 200709 | | | 08/20/2007 | 1.00 | 500.00 | 500.00 |
| | Desk Fee for August for Amy Gallo-Stone | | | | | | | |
| 30 | WEB SITE | 200709 | | | 08/24/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200709 | | | 08/24/2007 | 1.00 | 500.00 | 500.00 |
| 47 | DF-LIC. ASSIST SHARING | 200709 | | | 08/24/2007 | 1.00 | 500.00 | 500.00 |
| 47 | DF-LIC. ASSIST SHARING | 200709 | | | 08/24/2007 | 1.00 | 500.00 | 500.00 |
| | Amy Gallo-Stone | | | | | | | |
| 51 | DF-100% PLAN - NO DESK AT | 200709 | | | 08/24/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200709 | | | 09/24/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200709 | | | 09/24/2007 | 1.00 | 500.00 | 500.00 |
| 47 | DF-LIC. ASSIST SHARING | 200709 | | | 09/24/2007 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200709 | | | 09/24/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200710 | | | 10/24/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200710 | | | 10/24/2007 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200710 | | | 10/24/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200711 | | | 11/24/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200711 | | | 11/24/2007 | 1.00 | 500.00 | 500.00 |
| 47 | DF-LIC. ASSIST SHARING | 200711 | | | 11/24/2007 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200711 | | | 11/24/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 47 | DF-LIC. ASSIST SHARING | 200712 | | | 11/28/2007 | 1.00 | -500.00 | -500.00 |
| | removing fee for Ida Daniels | | | | | | | |
| 30 | WEB SITE | 200712 | | | 12/24/2007 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200712 | | | 12/24/2007 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200712 | | | 12/24/2007 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200801 | | | 01/24/2008 | 1.00 | 25.00 | 25.00 |

MB126

A 89

Prepared by: Martin Brown,Sr.
July 12, 2017, 08:48:48 PM
Lone Wolf Technologies [8.6.3]
brokerWOLF (Version 17.06.01)
Page:   14

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ 08081

Agt. # 101

### Summary Of Expense Account Activity

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

#### Office Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---:|---:|---:|
| 47 | DF-LIC. ASSIST SHARING | 200801 | | | 01/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200801 | | | 01/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200802 | | | 02/24/2008 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200802 | | | 02/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200802 | | | 02/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200803 | | | 03/24/2008 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200803 | | | 03/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200803 | | | 03/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 25 | ONE TIME INITIATION FEE | 200804 | | | 04/03/2008 | 1.00 | 500.00 | 500.00 |
| | for new team member  Adam Halperin | | | | | | | |
| 30 | WEB SITE | 200804 | | | 04/24/2008 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200804 | | | 04/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200804 | | | 04/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200806 | | | 05/23/2008 | 1.00 | 25.00 | 25.00 |
| 30 | WEB SITE | DELET | | | 05/23/2008 | 1.00 | 25.00 | 25.00 |
| 30 | WEB SITE | DELET | | | 05/23/2008 | -1.00 | 25.00 | -25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200806 | | | 05/23/2008 | 1.00 | 500.00 | 500.00 |
| 47 | DF-LIC. ASSIST SHARING | DELET | | | 05/23/2008 | 1.00 | 500.00 | 500.00 |
| 47 | DF-LIC. ASSIST SHARING | DELET | | | 05/23/2008 | -1.00 | 500.00 | -500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200806 | | | 05/23/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | DELET | | | 05/23/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | DELET | | | 05/23/2008 | -1.00 | 1,250.00 | -1,250.00 |
| 30 | WEB SITE | 200806 | | | 06/25/2008 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200806 | | | 06/25/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200806 | | | 06/25/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200807 | | | 07/24/2008 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200807 | | | 07/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200807 | | | 07/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200808 | | | 08/24/2008 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200808 | | | 08/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200808 | | | 08/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200809 | | | 09/24/2008 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200809 | | | 09/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200809 | | | 09/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200810 | | | 10/24/2008 | 1.00 | 25.00 | 25.00 |

MB127

A 90

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS

**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

Agt. # 101

### Summary Of Expense Account Activity

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

**Office Charges**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---|---:|---:|
| 47 | DF-LIC. ASSIST SHARING | 200810 | | | 10/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200810 | | | 10/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200811 | | | 11/24/2008 | 1.00 | 25.00 | 25.00 |
| 30 | WEB SITE | 200811 | | | 11/24/2008 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200811 | | | 11/24/2008 | 1.00 | 500.00 | 500.00 |
| 47 | DF-LIC. ASSIST SHARING | 200811 | | | 11/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200811 | | | 11/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200811 | | | 11/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200812 | | | 12/24/2008 | 1.00 | 25.00 | 25.00 |
| 47 | DF-LIC. ASSIST SHARING | 200812 | | | 12/24/2008 | 1.00 | 500.00 | 500.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200812 | | | 12/24/2008 | 1.00 | 1,250.00 | 1,250.00 |
| 47 | DF-LIC. ASSIST SHARING no longer has team members | 200901 | | | 01/14/2009 | 1.00 | -500.00 | -500.00 |
| 30 | WEB SITE | 200901 | | | 01/24/2009 | 1.00 | 25.00 | 25.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200901 | | | 01/24/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 47 | DF-LIC. ASSIST SHARING no lic asst | 200901 | | | 01/26/2009 | 1.00 | -1,500.00 | -1,500.00 |
| 30 | WEB SITE | 200903 | | | 02/25/2009 | 1.00 | 25.00 | 25.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200903 | | | 02/25/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200903 | | | 03/24/2009 | 1.00 | 25.00 | 25.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200903 | | | 03/24/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200904 | | | 04/24/2009 | 1.00 | 25.00 | 25.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200904 | | | 04/24/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200905 | | | 05/29/2009 | 1.00 | 25.00 | 25.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200905 | | | 05/29/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200908 | | | 06/25/2009 | 1.00 | 25.00 | 25.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200908 | | | 06/25/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200908 | | | 08/03/2009 | 1.00 | 25.00 | 25.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200908 | | | 08/03/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200909 | | | 08/25/2009 | 1.00 | 25.00 | 25.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200909 | | | 08/25/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200909 | | | 09/22/2009 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200909 | | | 09/22/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200910 | | | 10/22/2009 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200910 | | | 10/22/2009 | 1.00 | 1,250.00 | 1,250.00 |

MB128

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

*Brown & Pope*
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

### Summary Of Expense Account Activity

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

**Office Charges**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|----|-------------|--------|-------|----------|------|----------|------|----------|
| 30 | WEB SITE | 200911 | | | 11/24/2009 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200911 | | | 11/24/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 200912 | | | 12/18/2009 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 200912 | | | 12/18/2009 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201001 | | | 01/27/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201001 | | | 01/27/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201002 | | | 02/25/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201002 | | | 02/25/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201003 | | | 03/25/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201003 | | | 03/25/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201005 | | | 05/02/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201005 | | | 05/02/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201005 | | | 05/28/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201005 | | | 05/28/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201006 | | | 06/28/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201006 | | | 06/28/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201007 | | | 07/28/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201007 | | | 07/28/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201008 | | | 08/26/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201008 | | | 08/26/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201009 | | | 09/29/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201009 | | | 09/29/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201010 | | | 10/28/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201010 | | | 10/28/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201011 | | | 11/29/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201011 | | | 11/29/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201012 | | | 12/29/2010 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201012 | | | 12/29/2010 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201101 | | | 01/29/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201101 | | | 01/29/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201102 | | | 02/28/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201102 | | | 02/28/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201103 | | | 03/29/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201103 | | | 03/29/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201104 | | | 04/29/2011 | 1.00 | 75.00 | 75.00 |

MB129

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

**Summary Of Expense Account Activity**

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

**Office Charges**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---:|---:|---:|
| 51 | DF-100% PLAN - NO DESK AT | 201104 | | | 04/29/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201105 | | | 05/29/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201105 | | | 05/29/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201106 | | | 06/29/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201106 | | | 06/29/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201110 | | | 07/28/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201110 | | | 07/28/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201110 | | | 08/28/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201110 | | | 08/28/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201110 | | | 09/28/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201110 | | | 09/28/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201110 | | | 10/28/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201110 | | | 10/28/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201111 | | | 11/28/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201111 | | | 11/28/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201112 | | | 12/28/2011 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201112 | | | 12/28/2011 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201205 | | | 01/28/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201205 | | | 01/28/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201205 | | | 02/28/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201205 | | | 02/28/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201205 | | | 03/28/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201205 | | | 03/28/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201205 | | | 04/30/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201205 | | | 04/30/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | 201205 | | | 05/31/2012 | 1.00 | 75.00 | 76.00 |
| 51 | DF-100% PLAN - NO DESK AT | 201205 | | | 05/31/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 06/28/2012 | 1.00 | 75.00 | 76.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 06/28/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 07/28/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 07/28/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 08/28/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 08/28/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 09/28/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 09/28/2012 | 1.00 | 1,250.00 | 1,250.00 |

MB130

A 93

FILED, Case 18-17430-edv Doc 47-2 Filed 06/07/19 Entered 06/07/19 15:50:24   Desc Main
Document    Page 127 of 282

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043



*Brown*
*& Pope*
REALTORS®

**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

| | Agt. # 101 |
|---|---|
| Sharonn Thomas | |
| 49 Graypebble Circle | |
| Sicklerville NJ 08081 | |

**Summary Of Expense Account Activity**

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

**Office Charges**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---|---|---|
| 30 | WEB SITE | | | | 10/28/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 10/28/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 11/28/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 11/28/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 12/28/2012 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 12/28/2012 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 01/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 01/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 02/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 02/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 03/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 03/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 04/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 04/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 05/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 05/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 06/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 06/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 07/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 07/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 08/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 08/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 09/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 09/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 10/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 10/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 11/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 11/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 12/28/2013 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 12/28/2013 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 01/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 01/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 02/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 02/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 03/28/2014 | 1.00 | 75.00 | 75.00 |

MB131

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

### Summary Of Expense Account Activity

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Summary Of New Charges

**Office Charges**

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---|---|---|
| 51 | DF-100% PLAN - NO DESK AT | | | | 03/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 04/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 04/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 05/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 05/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 06/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 06/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 07/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 07/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 08/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 08/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 46 | DESK FEE | | | | 09/27/2014 | 1.00 | -671.00 | -671.00 |
| | commission credit for  5344 westford rd philadelia | | | | | | | |
| 30 | WEB SITE | | | | 09/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 09/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 10/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 10/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 11/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 11/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 12/12/2014 | 1.00 | -3,000.00 | -3,000.00 |
| | owner bonus | | | | | | | |
| 30 | WEB SITE | | | | 12/28/2014 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 12/28/2014 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 01/28/2015 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 01/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 02/28/2015 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 02/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 30 | WEB SITE | | | | 03/28/2015 | 1.00 | 75.00 | 75.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 03/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 04/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 05/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 06/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 07/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 08/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 09/28/2015 | 1.00 | 1,250.00 | 1,250.00 |

MB132

**FILED, Case** **CAM-L-002368-16**  **11/09/2017 7:22:37 PM 00076597 Page 1**

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

| | Agt. # 101 |
|---|---|
| **Sharonn Thomas** | |
| **49 Graypebble Circle** | |
| **Sicklerville NJ  08081** | |

### Summary Of Expense Account Activity

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

## Summary Of New Charges

### Office Charges

| CD | Description | Stmt # | Vend# | Invoice# | Date | Quantity | Cost | Extended |
|---|---|---|---|---|---|---:|---:|---:|
| 51 | DF-100% PLAN - NO DESK AT | | | | 10/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 11/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 12/28/2015 | 1.00 | 1,250.00 | 1,250.00 |
| 51 | DF-100% PLAN - NO DESK AT | | | | 01/28/2016 | 1.00 | 1,250.00 | 1,250.00 |
| 46 | test | DELET | | | 03/18/2016 | 1.00 | 45.00 | 45.00 |
| | lic test | | | | | | | |
| 46 | test | DELET | | | 03/18/2016 | -1.00 | 45.00 | -45.00 |
| | | | | | | | | 152,629.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|---|---|---|---|---|---|---|---:|
| CH | Cash Payment | 200703 | personal | 03/27/2007 | | | -1,250.00 |
| CH | Cash Payment | 200704 | 2494 | 04/09/2007 | | | -1,067.00 |
| CH | Commission check 070002-A | 200704 | 01001 | 04/09/2007 | 070002 | 1101 Laurel Oak Rd, | -1,000.00 |
| CH | Cash Payment | 200705 | 2550 | 05/03/2007 | | | -2,317.00 |
| CH | Cash Payment | 200706 | 20070605 | 06/05/2007 | | | -2,417.00 |
| | may invoice | | | | | | |
| CH | Commission check 070074-A | 200706 | 01040 | 06/08/2007 | 070074 | 8634 fayette, | -399.00 |
| CH | Cash Payment | 200706 | 2647 | 06/21/2007 | | | -2,317.00 |
| | june expenses | | | | | | |
| CH | Cash Payment | 200709 | 0090 | 08/10/2007 | | | -2,367.00 |
| CH | Cash Payment | 200709 | 115 | 08/20/2007 | | | -1,000.00 |
| CH | Cash Payment | 200709 | 000 | 08/24/2007 | | | -2,367.00 |
| CH | Cash Payment | 200710 | 2850 | 10/02/2007 | | | -2,367.00 |
| CH | Cash Payment | 200711 | 2944 | 11/06/2007 | | | -1,867.00 |
| LA | interest and late fees | 200712 | | 12/06/2007 | | | 125.00 |
| | 6048 Magnolia  Lawyer Abstract | | | | | | |
| LA | interest and late fees | 200712 | | 12/06/2007 | | | -138.49 |
| | over paid fees for 2235 fountain | | | | | | |
| CH | Commission check 070145-A | 200712 | 01101 | 12/11/2007 | 070145 | 6048 magnolia, | -2,153.51 |
| CH | Commission check 070166-A | 200801 | EFT19 | 01/07/2008 | 070166 | 5524 Delancey, | -1,439.65 |
| CH | Commission check 070151-A | 200801 | 01115 | 01/24/2007 | 070151 | 2204 n 17, | -427.35 |
| CH | Commission check 070173-A | 200802 | 01116 | 01/28/2008 | 070173 | 1215 wilton, | -1,867.00 |
| CH | Commission check 070192-A | 200803 | 01128 | 03/17/2008 | 070192 | 2820 n  Croskey st, | -1,867.00 |

MB133

| | | |
|---|---|---|
| Prepared by: Martin Brown,Sr.<br>July 12, 2017, 08:48:48 PM | Lone Wolf Technologies [8.6.3]<br>brokerWOLF (Version 17.06.01) | Page: 21 |

FILED, Case 16-17430-elf Division Doc 47  Filed 06/07/19  Entered 06/07/19 15:50:24   Desc Main
Document       Page 130 of 282

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

### Summary Of Expense Account Activity

| | |
|---|---:|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|----|-------------|--------|---------|------|----------|---------|-------:|
| CH | Commission check | 200804 | 01135 | 04/03/2008 | | | -1,867.00 |
| CH | Commission check 070181-A | 200804 | 01140 | 04/17/2008 | 070181 | 5724 Hazel, | -1,867.00 |
| CH | Commission check 070193-A | 200806 | 01157 | 06/04/2008 | 070193 | 2017 w oxford, | -2,367.00 |
| CH | Commission check 070217-A | 200807 | 01164 | 07/07/2008 | 070217 | 201 e upsal, | -1,867.00 |
| CH | Commission check 070252-A | 200809 | 01178 | 08/25/2008 | 070252 | 1256 Mt. Airy | -1,867.00 |
| CH | Commission check 070241-A | 200809 | 01183 | 09/10/2008 | 070241 | 134 Mifflin st, | -6,745.05 |
| LA | interest and late fees 134 mifflin st | 200809 | | 09/10/2008 | | | 4,878.05 |
| LA | truck rental reimburstment | 200809 | | 09/10/2008 | | | 0.00 |
| CH | Commission check 070229-A | 200810 | 01189 | 09/30/2008 | 070229 | 2124 Morris, | -1,867.00 |
| CH | Commission check 070307-A | 200903 | EFT171 | 02/17/2009 | 070307 | 1108 Union, | -1,970.34 |
| CH | Commission check 070273-A | 200903 | EFT172 | 02/17/2009 | 070273 | 6029 irving, | -1,637.99 |
| CH | Cash Payment | 200905 | Cash | 05/15/2009 | | | -1,000.00 |
| CH | Cash Payment priti | 200905 | 1018 | 05/29/2009 | | | -350.00 |
| CH | Cash Payment | 200908 | Cash | 06/16/2009 | | | -700.00 |
| CH | Cash Payment | 200909 | Cash | 08/07/2009 | | | -4,200.00 |
| CH | Commission check 070423-A | 200910 | 01292 | 09/29/2009 | 070423 | 53 Wilson Dr, | -1,250.00 |
| CH | Commission check 070443-A | 201002 | 131O | 11/03/2009 | 070443 | 5 E Providence Ave, | -1,500.00 |
| CH | Commission check 070467-A | 201001 | 01338 | 01/27/2010 | 070467 | 7321 Drexel Rd, | -1,500.00 |
| CH | Commission check 070407-A | 201003 | 01344 | 02/25/2010 | 070407 | 5400 woodcrest | -1,880.00 |
| CH | Commission check 070480-A | 201003 | 01347 | 03/09/2010 | 070480 | 214 paxon, | -1,100.00 |
| CH | Cash Payment | 201003 | 3699 | 03/23/2010 | | | -500.00 |
| CH | Commission check 070503-A | 201005 | 01365 | 04/13/2010 | 070503 | 1031 53rd, | -1,000.00 |
| CH | Commission check 070515-A | 201005 | EFT285 | 05/06/2010 | 070515 | 5020 north 12th, | -1,141.72 |
| CH | Commission check 070526-A | 201006 | EFT291 | 06/01/2010 | 070526 | 112 Flagstone Way, | -49.65 |
| CH | Commission check 070528-A | 201006 | 01381 | 06/03/2010 | 070528 | 1061 Chews Landing | -3,050.00 |
| CH | Commission check 070530-A | 201006 | EFT294 | 06/09/2010 | 070530 | 7 windy, blackwood | -198.62 |
| CH | Commission check 070534-A | 201006 | EFT301 | 06/15/2010 | 070534 | 1080 W Malaga, | -49.65 |
| CH | Commission check 070539-A | 201006 | EFT306 | 06/29/2010 | 070539 | 1 Villiage | -297.93 |
| CH | Commission check 070541-A | 201006 | EFT308 | 06/29/2010 | 070541 | 1801 Stallion, | -99.31 |
| CH | Commission check 070542-A | 201007 | EFT309 | 07/12/2010 | 070542 | 57 Alexandra, Marlton | -99.31 |
| CH | Commission check 070545-A | 201007 | EFT310 | 07/13/2010 | 070545 | 370 Little Mill Rd, Pine | -49.65 |
| CH | Commission check 070548-A | 201007 | EFT314 | 07/15/2010 | 070548 | 602 lake, blackwood | -99.31 |
| CH | Commission check 070551-A | 201007 | 01392 | 07/21/2010 | 070551 | 29 w 138 6c, | -1,500.00 |
| CH | Commission check 070552-A | 201007 | EFT315 | 07/26/2010 | 070552 | 120 peace ln, | -49.65 |

MB134

FILED, Case # 18-17430-cdf Division Doc 47-22 Filed 06/07/19, Entered 06/07/19 15:50:24  Desc Main
Document    Page 131 of 282

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS

**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ 08081

**Summary Of Expense Account Activity**

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|---|---|---|---|---|---|---|---|
| CH | Commission check 070556-A | 201007 | EFT316 | 07/27/2010 | 070556 | 1719 manor | -99.31 |
| CH | Commission check 070559-A | 201008 | EFT320 | 08/02/2010 | 070559 | 2047 Lucas, | -148.96 |
| CH | Commission check 070560-A | 201008 | EFT321 | 08/05/2010 | 070560 | 1808 cornus | -49.65 |
| CH | Commission check 070562-A | 201008 | EFT323 | 08/09/2010 | 070502 | 14 Jacqueline | -148.96 |
| CH | Commission check 070569-A | 201008 | 01399 | 08/16/2010 | 070569 | 161 carlton | -99.31 |
| CH | Commission check 070572-A | 201008 | 00001 | 08/19/2010 | 070572 | 32 pebble, blackwood | -148.96 |
| CH | Commission check | 201009 | 021001 | 08/27/2010 | | | -158.89 |
| CH | Commission check | 201009 | EFT329 | 09/03/2010 | | | -198.62 |
| CH | Commission check | 201009 | 01406 | 09/07/2010 | | | -1,491.21 |
| CH | Commission check 070588-A | 201009 | EFT330 | 09/08/2010 | 070588 | 523 Jones, | -49.65 |
| CH | Commission check 070591-A | 201009 | EFT331 | 09/19/2010 | 070591 | 31 clement | -99.31 |
| CH | Commission check 070593-A | 201009 | EFT332 | 09/19/2010 | 070593 | 104 Garfield | -99.31 |
| CH | Commission check 070597-A | 201010 | EFT333 | 10/01/2010 | 070597 | 16 Cenntinnial, | -347.58 |
| CH | Commission check 070602-A | 201010 | EFT337 | 10/13/2010 | 070602 | 302 Village, Timber | -148.96 |
| CH | Commission check | 201010 | EFT339 | 10/13/2010 | | | -248.27 |
| CH | Commission check 070606-A | 201010 | EFT340 | 10/13/2010 | 070606 | 234 pine | -49.31 |
| CH | Commission check 070561-A | 201010 | 01413 | 10/14/2010 | 070561 | 1420 s 56th, | -1,200.00 |
| CH | Commission check | 201011 | EFT342 | 10/28/2010 | | | -297.92 |
| CH | Commission check 070611-A | 201011 | EFT343 | 10/28/2010 | 070611 | 31 lawrence, | -148.96 |
| CH | Commission check 070599-A | 201011 | 01416 | 10/28/2010 | 070599 | 4320 dexter | -700.00 |
| CH | Commission check 070614-A | 201011 | EFT344 | 11/14/2010 | 070614 | 141 Oakmont Rd, | -49.65 |
| CH | Commission check 070616-A | 201011 | EFT345 | 11/14/2010 | 070616 | 201 Mill Rd, | -99.31 |
| CH | Commission check | 201011 | 01422 | 11/15/2010 | | | -100.00 |
| CH | Commission check 070624-A | 201011 | 01426 | 11/23/2010 | 070624 | 33 Cider | -100.00 |
| CH | Commission check 070629-A | 201012 | 01430 | 12/10/2010 | 070629 | 268 s 56th st, | -353.10 |
| CH | Commission check 070634-A | 201012 | 01436 | 12/24/2010 | 070634 | 2827 n 24th, | -340.80 |
| CH | Commission check 070621-A | 201101 | 01443 | 01/19/2011 | 070621 | 2027 emily | -560.00 |
| CH | Commission check 070628-A | 201102 | EFT355 | 01/31/2011 | 070628 | 15 King James Rd, | 0.35 |
| CH | Cash Payment | 201102 | Cash | 02/04/2011 | | | -1,500.00 |
| CH | Commission check 070634-C | 201102 | EFT356 | 02/10/2011 | 070634 | 2827 n 24th, | -163.86 |
| CH | Commission check 070644-A | 201102 | EFT360 | 02/21/2011 | 070644 | 4542 17th, | -319.65 |
| CH | Commission check 070646-A | DELET | 1460 | 03/03/2011 | 070646 | 206 University Ave, | -714.51 |
| CH | Rev-Commission check | DELET | 1460 | 03/03/2011 | 070646 | 206 University Ave, | 714.51 |
| CH | Commission check 070646-A | 201103 | 1460 | 03/03/2011 | 070646 | 206 University Ave, | -714.51 |
| CH | Commission check 070649-A | 201103 | 01462 | 03/11/2011 | 070649 | 8 Seward Ave, | -19.65 |
| CH | Commission check 070652-A | 201103 | 01468 | 03/25/2011 | 070652 | 817 Summer st, | -744.01 |

MB135

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

*Brown & Pope*
REALTORS
856-306-2500
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

### Summary Of Expense Account Activity

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|----|-------------|--------|---------|------|----------|---------|--------|
| CH | Commission check 070653-A | 201104 | 01472 | 03/30/2011 | 070653 | 127 Caley ave, Mt | -427.71 |
| CH | Commission check 070654-A | 201104 | 01474 | 03/31/2011 | 070654 | 2317 Cedar Lane. | -456.46 |
| CH | Commission check 070656-A | 201104 | 01477 | 04/03/2011 | 070656 | 320 Baird Ave, Mt | -162.37 |
| CH | Commission check | 201105 | 01514 | 05/09/2011 | | | -750.00 |
| CH | Commission check | 201105 | 01517 | 05/11/2011 | | | -150.00 |
| CH | Commission check 070690-A | 201105 | 01522 | 05/20/2011 | 070690 | 306 Walnut, Oaklyn | -400.00 |
| CH | Commission check 070663-A | 201105 | 01524 | 05/23/2011 | 070663 | 7105 Theodore | -200.00 |
| CH | Commission check | 201106 | 01529 | 06/02/2011 | | | -300.00 |
| CH | Commission check 070696-A | 201106 | 01532 | 06/15/2011 | 070696 | 384 Forest Road, | -700.00 |
| CH | Commission check | 201106 | 01534 | 06/20/2011 | | | -353.00 |
| CH | Commission check 070699-A | 201106 | 01537 | 06/23/2011 | 070699 | 11-10 Beach Channel | -147.00 |
| CH | Commission check | 201110 | 01542 | 06/30/2011 | | | -1,200.00 |
| CH | Commission check 070704-A | 201110 | 01545 | 07/06/2011 | 070704 | 1403 Tanglewood | -300.00 |
| CH | Commission check | 201110 | 01553 | 07/28/2011 | | | -480.00 |
| CH | Commission check 070716-A | 201110 | 01555 | 08/10/2011 | 070716 | 22 Lehigh Ave, | -200.00 |
| CH | Commission check 070717-A | 201110 | 01557 | 08/11/2011 | 070717 | 136 Grape St, | -820.00 |
| CH | Commission check 070722-A | 201110 | 001565 | 08/30/2011 | 070722 | 185 Tiber st, | -223.75 |
| CH | Rev-Commission check | 201110 | 01477 | 08/31/2011 | 070656 | 320 Baird Ave, Mt | 162.37 |
| CH | Commission check 070656-A | 201110 | EFT376 | 08/31/2011 | 070656 | 320 Baird Ave, Mt | -162.37 |
| CH | Commission check | 201110 | 01568 | 09/04/2011 | | | -175.00 |
| CH | Commission check 070727-A | 201110 | 01571 | 09/08/2011 | 070727 | 55 Commonwealth | -187.40 |
| CH | Commission check 070728-A | 201110 | 01573 | 09/19/2011 | 070728 | 6 Diamond Crt, | -500.00 |
| CH | Commission check 070729-A | 201110 | 01574 | 09/20/2011 | 070729 | 13 Woodvale Dr, | -413.85 |
| CH | Commission check | 201110 | 01576 | 09/30/2011 | | | -490.62 |
| CH | Commission check 070735-A | 201110 | 01580 | 10/05/2011 | 070735 | 232 Vincent Circle, | -300.00 |
| CH | Commission check 070736-A | 201110 | 01583 | 10/07/2011 | 070736 | 44 Colby Ave, | -109.38 |
| CH | Commission check 070737-A | 201110 | 01584 | 10/07/2011 | 070737 | 104 Auckland Dr, | -350.00 |
| CH | Commission check 070738-A | 201110 | 01585 | 10/07/2011 | 070738 | 2516 N Heald st, | -50.00 |
| CH | Commission check 070741-A | 201110 | EFT382 | 10/12/2011 | 070741 | 2053 Victoria st. | -49.02 |
| CH | Commission check 070742-A | 201110 | 01590 | 10/15/2011 | 070742 | 579 Paoli Ave, | -150.98 |
| CH | Commission check 070751-A | 201111 | 01595 | 10/28/2011 | 070751 | 4720 Oakland st, | -266.00 |
| CH | Commission check 070753-A | 201111 | 01597 | 11/02/2011 | 070753 | 2118 wharton st, | -172.44 |
| CH | Commission check 070754-A | 201111 | 01599 | 11/07/2011 | 070754 | 8 Rockland Terr, | -305.10 |
| CH | Commission check 070755-A | 201111 | 01602 | 11/08/2011 | 070755 | 2023 e elkhard st, | -34.00 |
| CH | Commission check 070756-A | 201111 | 01604 | 11/09/2011 | 070756 | 114 sterling ave, | -310.07 |
| CH | Commission check 070757-A | 201111 | 01606 | 11/10/2011 | 070757 | 200 Norman st, Aston | -58.25 |

MB136

A 99

CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 56 of 98 Trans ID: LCV2017453938

FILED, Case No. 17-430-edf Division: Doc # 47 Filed 06/07/19 Entered 06/07/19 15:50:24   Desc Main
Document      Page 133 of 282

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

| | | |
|---|---|---|
| Agt. # 101 | | |
| Sharonn Thomas | | |
| 49 Graypebble Circle | | |
| Sicklerville NJ  08081 | | |

**Summary Of Expense Account Activity**

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|---|---|---|---|---|---|---|---|
| CH | Commission check 070759-A | 201111 | 01610 | 11/21/2011 | 070759 | 1232 south 15th, | -176.30 |
| CH | Commission check 070762-A | 201111 | 01613 | 11/28/2011 | 070762 | 140 Watchung Ave, | -349.59 |
| CH | Commission check 070768-A | 201112 | 01625 | 12/10/2011 | 070768 | 534 beach 25th st, far | -110.04 |
| CH | Commission check | 201112 | 01628 | 12/21/2011 | | | -170.11 |
| CH | Commission check 070744-A | 201205 | 01633 | 01/23/2012 | 070744 | 1950 Medary, | -294.95 |
| CH | Commission check | 201205 | 01635 | 01/31/2012 | | | -2,100.34 |
| CH | Commission check 070781-A | 201205 | 01637 | 02/01/2012 | 070781 | 2103 Barr Rd, | -500.00 |
| CH | Commission check 070782-A | 201205 | 01639 | 02/06/2012 | 070782 | 5143 knox, | -209.14 |
| CH | Commission check | 201205 | 01641 | 02/10/2012 | | | -418.46 |
| CH | Commission check 070790-A | 201205 | 01644 | 02/21/2012 | 070790 | 7833 Michener Ave, | -205.80 |
| CH | Commission check | DELET | BATCH | 02/24/2012 | | | -1,000.00 |
| CH | Rev-Commission check | DELET | BATCH | 02/24/2012 | | | 1,000.00 |
| CH | Commission check | 201205 | 01647 | 02/24/2012 | | | -500.00 |
| CH | Commission check 070793-A | 201205 | 01648 | 03/05/2012 | 070793 | 15 Kintyre Crt, | -1,000.00 |
| CH | Commission check 070785-A | 201205 | 01654 | 03/07/2012 | 070785 | 2918 n 27th, | -180.40 |
| CH | Commission check 070795-A | 201205 | 01655 | 03/13/2012 | 070795 | 321 stone hurst crt, | -150.00 |
| CH | Commission check | 201205 | 01657 | 03/14/2012 | | | -150.00 |
| CH | Commission check 070761-A | 201205 | 01687 | 03/25/2012 | 070761 | 2059 cobbscreek, | -150.00 |
| CH | Commission check | 201205 | 01669 | 04/02/2012 | | | -337.20 |
| CH | Commission check | 201205 | 01675 | 04/10/2012 | | | -300.00 |
| CH | Commission check 070810-A | 201205 | 01678 | 04/12/2012 | 070810 | 400 Harvey, Claymont | -300.00 |
| CH | Commission check 070811-A | 201205 | 01680 | 04/29/2012 | 070811 | 21 Franklin, Middleton | -400.00 |
| CH | Commission check 070787-A | 201205 | 01682 | 04/30/2012 | 070787 | 6023 Nassau, | -500.00 |
| CH | Commission check | 201205 | 01683 | 05/04/2012 | | | -650.00 |
| CH | Commission check 070817-A | 201205 | 01691 | 05/11/2012 | 070817 | 1302 Beaumont | -200.00 |
| CH | Commission check 070775-B | 201205 | EFT398 | 05/23/2012 | 070775 | 2059  Cobbs Creek | -148.34 |
| CH | Commission check 070821-A | 201205 | EFT399 | 05/23/2012 | 070821 | 713 E 7th, wilmington | -4.47 |
| CH | Commission check 070827-A | | 01701 | 06/22/2012 | 070827 | 3332 Huntley Sq dr | -107.90 |
| CH | Commission check 070828-A | | EFT402 | 06/26/2012 | 070828 | 6008 n warnock, | -456.15 |
| CH | Commission check | | 01703 | 06/28/2012 | | | -1,139.80 |
| CH | Commission check | | 01706 | 06/30/2012 | | | -856.14 |
| CH | Commission check 070834-A | | 01709 | 07/05/2012 | 070834 | 315  Goldsmith Lane, | -400.00 |
| CH | Commission check 070837-A | | 01717 | 07/16/2012 | 070837 | 2502 Denny Road, | -242.15 |
| CH | Commission check 070841-A | | 01725 | 07/23/2012 | 070841 | 13748 Mile Stretch, | -83.46 |
| CH | Commission check 070842-A | | 01727 | 07/23/2012 | 070842 | 3300 Green Meadow | -101.60 |
| CH | Commission check 070843-A | | 01730 | 07/27/2012 | 070843 | 1503 E Market Street, | -205.80 |

MB137

A 100

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

| | | Agt. # 101 |
|---|---|---|

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

### Summary Of Expense Account Activity

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|---|---|---|---|---|---|---|---|
| CH | Commission check 070845-A | | 01731 | 07/31/2012 | 070845 | 110 Aidone Ln, New | -200.00 |
| CH | Commission check 070847-A | | 01733 | 08/01/2012 | 070847 | 103 North st, | -266.99 |
| CH | Commission check | | 01737 | 08/06/2012 | | | -200.00 |
| CH | Commission check 070851-A | | 01740 | 08/13/2012 | 070851 | 3575 Plum Tree Drive | -200.00 |
| CH | Commission check | | 01741 | 08/13/2012 | | | -200.00 |
| CH | Commission check 070854-A | | 01745 | 08/20/2012 | 070854 | 5817 Harverford Ave, | -203.83 |
| CH | Commission check | | 0017480 | 09/05/2012 | | | -637.20 |
| CH | Commission check 070860-A | | 17482 | 09/06/2012 | 070860 | 1726 Worthigton Crt, | -209.37 |
| CH | Commission check 070857-A | | 01754 | 09/20/2012 | 070857 | 2714 Ridge Ave, | -200.00 |
| CH | Commission check | | 01755 | 09/27/2012 | | | -200.00 |
| CH | Commission check 070867-A | | 01757 | 09/28/2012 | 070867 | 41 Franklin ave, | -200.00 |
| CH | Commission check 070868-A | | 01759 | 10/01/2012 | 070868 | 30510 Piney Neck | -250.00 |
| CH | Commission check | | 01761 | 10/03/2012 | | | -250.00 |
| CH | Commission check 070871-A | | 01763 | 10/09/2012 | 070871 | 235 Auckland Drive, | -149.60 |
| CH | Commission check 070874-A | | 01765 | 10/11/2012 | 070874 | 6705 cathedral Ave, | -100.00 |
| CH | Commission check 070875-A | | 01767 | 10/12/2012 | 070875 | 5118 Street, | -125.78 |
| CH | Commission check 070876-A | | 01769 | 10/16/2012 | 070876 | 2345 orthodox st, | -8.60 |
| CH | Commission check 070877-A | | 01771 | 10/18/2012 | 070877 | 1229 Marlyn Road, | -166.78 |
| CH | Commission check | | 01773 | 10/21/2012 | | | -250.59 |
| CH | Commission check 070883-A | | 01778 | 11/06/2012 | 070883 | 6 swansea Lane, | -250.00 |
| CH | Commission check 070885-A | | 01780 | 11/07/2012 | 070885 | 1221 North 30th ST, | -149.91 |
| CH | Commission check 070886-A | | 01782 | 11/08/2012 | 070886 | 1012 East Church, | -78.11 |
| CH | Commission check 070887-A | | 01784 | 11/09/2012 | 070887 | 138 Roselyn st, | -87.34 |
| CH | Commission check | | 01786 | 11/13/2012 | | | -382.89 |
| CH | Commission check | | 01788 | 11/23/2012 | | | -250.00 |
| CH | Commission check 070892-A | | 01790 | 11/29/2012 | 070892 | 9906 walker house rd | -256.15 |
| CH | Commission check 070893-A | | 01792 | 12/04/2012 | 070893 | 7752 Woodbine ave, | -205.10 |
| CH | Commission check 070894-A | | 01794 | 12/06/2012 | 070894 | 16120 Parklawn | -250.00 |
| CH | Commission check | | 01796 | 12/10/2012 | | | -95.17 |
| CH | Commission check 070902-A | | 01798 | 12/11/2012 | 070902 | 6711 Danford Dr, | -250.34 |
| CH | Commission check 070903-A | | 01800 | 12/13/2012 | 070903 | 151 Auckland dr, | -193.24 |
| CH | Commission check 070904-A | | 01802 | 12/14/2012 | 070904 | 3322 Mondawmin | -56.15 |
| CH | Commission check 070905-A | | 01804 | 12/18/2012 | 070905 | 115 Germantown | -56.15 |
| CH | Commission check 070906-A | | 01806 | 12/19/2012 | 070906 | 2243 S Norwood st, | -17.83 |
| CH | Commission check 070908-A | | 01809 | 12/24/2012 | 070908 | 42 Talister Cr, | -144.12 |
| CH | Commission check 070909-A | | 01811 | 12/26/2012 | 070909 | 334 Dew Drop LN, | -298.80 |

MB138

A 101

FILED, Case 18-17430-elf Division Doc 47 Filed 06/07/19 Entered 06/07/19 15:50:24   Desc Main
Document   Page 135 of 282

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

Agt. # 101

Sharonn Thomas
49 Graypebble Circle
Sicklerville NJ  08081

### Summary Of Expense Account Activity

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|----|-------------|--------|---------|------|----------|---------|--------|
| CH | Commission check 070910-A | | 01813 | 12/31/2012 | 070910 | 6726 Graceland ave, | -127.06 |
| CH | Commission check 070911-A | | 01815 | 01/03/2013 | 070911 | 632 Briarcliff Road, | -282.20 |
| CH | Commission check 070912-A | | 01817 | 01/05/2013 | 070912 | 5027 37th ave, | -282.44 |
| CH | Commission check | | 01819 | 01/15/2013 | | | -235.25 |
| CH | Commission check 070915-A | | 01821 | 01/18/2013 | 070915 | 609 48th, Baltimore | -803.00 |
| CH | Commission check 070919-A | | 01826 | 01/31/2013 | 070919 | 3001 willow ave, | -254.31 |
| CH | Commission check 070920-A | | 01828 | 02/06/2013 | 070920 | 2920 Harview Ave, | -285.24 |
| CH | Commission check | | 01830 | 02/07/2013 | | | -250.00 |
| CH | Commission check 070924-A | | 01834 | 02/11/2013 | 070924 | 7 Genesse Lane, | -83.45 |
| CH | Commission check 070926-A | | 01836 | 02/13/2013 | 070926 | 6432 Boyer Street, | -250.00 |
| CH | Commission check 070927-A | | 01840 | 02/15/2013 | 070927 | 517 westway rd, Glen | -250.00 |
| CH | Commission check 070928-A | | 01842 | 02/22/2013 | 070928 | | -91.60 |
| CH | Commission check 070929-A | | 01844 | 02/26/2013 | 070929 | 3122 Weikel st, | -8.89 |
| CH | Commission check | | BATCH | 03/06/2013 | | | -728.60 |
| CH | Commission check 070935-A | | 01846 | 03/08/2013 | 070935 | 2600 saint clair dr, | -424.61 |
| CH | Commission check | | 01851 | 03/14/2013 | | | -1,291.51 |
| CH | Commission check 070942-A | | 01853 | 03/18/2013 | 070942 | 7455 Forrest Ave, | -250.00 |
| CH | Commission check 070044-A | | 01857 | 03/26/2013 | 070044 | 2756 Cheyenne Crt, | -250.00 |
| CH | Commission check 070945-A | | 01859 | 03/27/2013 | 070945 | 7518 Forrest Ave, | -100.60 |
| CH | Commission check 070949-A | | 01861 | 03/28/2013 | 070949 | 616 Old Denton Rd, | -206.55 |
| CH | Commission check 070950-A | | 01863 | 04/03/2013 | 070950 | 5733 Newholme ave, | -87.34 |
| CH | Commission check | | 01868 | 04/12/2013 | | | -250.00 |
| CH | Commission check 070946-A | | 001867 | 04/19/2013 | 070946 | 2424 Gaul, | -250.00 |
| CH | Commission check | | 10001 | 04/27/2013 | | | -500.00 |
| CH | Commission check 070939-A | | 1871 | 04/30/2013 | 070939 | 6941 Tulip st, | -250.00 |
| CH | Commission check 070962-A | | 01873 | 05/03/2013 | 070962 | 102 Breezewood Dr, | -284.30 |
| CH | Commission check | | 01875 | 05/07/2013 | | | -200.00 |
| CH | Commission check 070952-A | | 01877 | 05/09/2013 | 070952 | 4140 Sterling, | -186.64 |
| CH | Commission check 070941-A | | 01879 | 05/18/2013 | 070941 | 2014 S Newkirk st. | -196.72 |
| CH | Commission check | | 01881 | 05/23/2013 | | | -250.00 |
| CH | Commission check 070965-A | DELET | 01883 | 05/26/2013 | 070965 | 203 North Cass St, | -250.00 |
| CH | Rev-Commission check | DELET | 01883 | 05/26/2013 | 070965 | 203 North Cass St, | 250.00 |
| CH | Commission check 070965-A | | 01885 | 05/26/2013 | 070965 | 203 North Cass St, | -250.00 |
| CH | Commission check | | 01887 | 06/02/2013 | | | -300.00 |
| CH | Commission check 070971-A | | 01891 | 06/05/2013 | 070971 | 6501 Springwater Crt | -250.00 |
| CH | Commission check 070972-A | | 01893 | 06/07/2013 | 070972 | 25 Concord, Newark | -250.00 |

MB139

A 102

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043



**Brown & Pope**
REALTORS
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

| | |
|---|---|
| Agt. # 101 | **Summary Of Expense Account Activity** |
| Sharonn Thomas | Previous Balances: $0.00 |
| 49 Graypebble Circle | Expenses Charged: 193,421.56 |
| Sicklerville NJ 08081 | Payments Received: -193,421.56 |
| | Expense Total Now Due: $0.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|----|-------------|--------|---------|------|----------|---------|--------|
| CH | Commission check 070956-A | | 01895 | 06/13/2013 | 070956 | 2660 S Massey, | -18.18 |
| CH | Commission check | | 01897 | 06/21/2013 | | | -788.66 |
| CH | Commission check 070977-A | | 01904 | 06/29/2013 | 070977 | 10477 Foxtail Ct, | -300.20 |
| CH | Commission check 070978-A | | 01908 | 07/03/2013 | 070978 | 9987 Sherwood Farm | -548.45 |
| CH | Commission check 070979-A | | 01910 | 07/05/2013 | 070979 | 179 Valerie Ln, Bear | -851.15 |
| CH | Commission check 070980-A | | 01912 | 07/08/2013 | 070980 | 1202 Fallston, | -650.00 |
| CH | Commission check | | 01915 | 07/12/2013 | | | -224.00 |
| CH | Commission check 070991-A | | 01917 | 07/15/2013 | 070991 | 2207 Graham Dr, | -100.00 |
| CH | Commission check 070969-A | | 01919 | 07/16/2013 | 070969 | 2160 Crotona Ave, | -200.26 |
| CH | Commission check 070992-A | | 01922 | 07/25/2013 | 070992 | 145 North Highland | -59.42 |
| CH | Commission check | | 01924 | 07/28/2013 | | | -236.43 |
| CH | Commission check | | 01929 | 08/02/2013 | | | -305.67 |
| LA | interest and late fees overpayment 915 taylor | | | 08/02/2013 | | | 1,000.05 |
| CH | Commission check 070994-A | | 01932 | 08/04/2013 | 070994 | 4523 Fitch ave, | -1,100.00 |
| CH | Commission check 070995-A | | 01934 | 08/10/2013 | 070995 | 7116 Donnell Pl c8, | -133.25 |
| CH | Commission check 070982-A | | 01937 | 08/15/2013 | 070982 | 1174 POPham, Bronx | -600.02 |
| CH | Commission check 070967-A | | 01941 | 08/22/2013 | 070967 | 12008 Tempeton Dr | -250.00 |
| CH | Commission check | | 01945 | 08/27/2013 | | | -250.00 |
| CH | Commission check 071006-A | | 01948 | 08/30/2013 | 071006 | 11211 White Barn Ct, | -663.19 |
| LA | Advance advance | | | 08/30/2013 | | | 100.00 |
| CH | Commission check | DELET | EFT417 | 09/03/2013 | | | -750.00 |
| CH | Rev-Commission check | DELET | EFT417 | 09/03/2013 | | | 750.00 |
| CH | Commission check 071005-A | | EFT418 | 09/04/2013 | 071005 | 73306 Delaire | -4,428.17 |
| CH | Commission check 071007-A | | EFT419 | 09/04/2013 | 071007 | 2704 south 80th, | -4,010.78 |
| CH | Commission check 071008-A | | EFT420 | 09/04/2013 | 071008 | 9627 Boundless | -4,676.40 |
| CH | Commission check | | 01951 | 09/04/2013 | | | -191.37 |
| CH | Commission check | | 01953 | 09/12/2013 | | | -397.76 |
| CH | Commission check 071019-A | | 01956 | 09/24/2013 | 071019 | 234 West Manheim | -112.06 |
| CH | Commission check 071014-A | | 01957 | 09/25/2013 | 071014 | 4737 RoseHill St, | -77.41 |
| CH | Commission check | | 001885 | 09/30/2013 | | | -281.11 |
| CH | Commission check | | 01963 | 10/04/2013 | | | -3,000.00 |
| CH | Commission check | | 01969 | 10/11/2013 | | | -232.10 |
| CH | Commission check | | 01977 | 10/21/2013 | | | -300.00 |
| CH | Commission check 071035-A | | 01979 | 10/27/2013 | 071035 | 1533 Violet Drive, | -150.00 |

MB140

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043

**Brown & Pope**
REALTORS
**856-306-2500**
www.BrownAndPope.com

### General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

| | Agt. # 101 |
|---|---|
| **Sharonn Thomas**<br>**49 Graypebble Circle**<br>**Sicklerville NJ  08081** | |

| Summary Of Expense Account Activity | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

#### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|---|---|---|---|---|---|---|---|
| CH | Commission check 071037-A | DELET | 01982 | 11/01/2013 | 071037 | 11211 White Barn Ct, | -250.19 |
| CH | Rev-Commission check | DELET | 01982 | 11/01/2013 | 071037 | 11211 White Barn Ct, | 250.19 |
| CH | Commission check | | 01984 | 11/01/2013 | | | -403.01 |
| CH | Commission check 071044-A | | 01986 | 11/16/2013 | 071044 | 412 Streamside Dr, | -250.00 |
| CH | Commission check 071045-A | | 01989 | 11/21/2013 | 071045 | 226 Sussex Road, | -500.00 |
| CH | Commission check 071046-A | | 01991 | 12/04/2013 | 071046 | 1215 1215 Macarthur | -88.43 |
| CH | Commission check 071050-A | | 01993 | 12/14/2013 | 071050 | 2108 Woodlawn Dr, | -1,000.00 |
| CH | Commission check 071051-A | | 01995 | 12/14/2013 | 071051 | 39491 Jarrell Dr, | -250.00 |
| CH | Commission check 071052-A | | 01997 | 12/14/2013 | 071052 | 1343 w toronto st, | -143.10 |
| CH | Commission check 071054-A | | 01999 | 12/21/2013 | 071054 | 57 North Peach | -365.46 |
| CH | Commission check 071056-A | | 02002 | 12/24/2013 | 071056 | 2835 Indiana st, | -216.43 |
| CH | Commission check 071048-A | | 02004 | 12/26/2013 | 071048 | 1604 Roberts Way | -250.00 |
| CH | Commission check 071057-A | | 02007 | 01/02/2014 | 071057 | 30 Rockland Rd, | -500.11 |
| CH | Commission check 071059-A | | 02012 | 01/05/2014 | 071059 | 1203 Cooper st, | -34.31 |
| CH | Commission check 071063-A | | 02015 | 01/23/2014 | 071063 | 7432 Thouron, | -250.00 |
| CH | Commission check 071066-A | | 02016 | 01/23/2014 | 071066 | 3769 Payne | -100.00 |
| CH | Commission check 071072-A | | 02020 | 02/12/2014 | 071072 | 402 north Hilton, | -157.90 |
| CH | Commission check | | 02024 | 02/22/2014 | | | -301.48 |
| CH | Commission check | | 02027 | 03/07/2014 | | | -1,000.00 |
| CH | Commission check 071077-A | | 02029 | 03/10/2014 | 071077 | 11341 Ramling Road, | -1,000.00 |
| CH | Commission check 071079-A | | 02031 | 03/10/2014 | 071079 | 1031 Pirates Ct | -571.22 |
| CH | Commission check 071062-A | | 02033 | 03/12/2014 | 071062 | 2978 F Mourning | -118.55 |
| CH | Commission check 071081-A | | 02035 | 03/15/2014 | 071081 | 601 walnut Ridge | -199.55 |
| CH | Commission check | | 02037 | 03/19/2014 | | | -350.00 |
| CH | Commission check 071060-A | | 02039 | 03/25/2014 | 071060 | 418 Torner | -0.45 |
| CH | Commission check | | 02041 | 03/29/2014 | | | -700.00 |
| CH | Commission check 071088-A | | 02043 | 04/10/2014 | 071088 | 604 Brooke Ave, | -455.45 |
| CH | Commission check 071092-A | | 02045 | 04/16/2014 | 071092 | 3564 E Crown Ave, | -502.30 |
| CH | Commission check 071087-A | | 02047 | 04/21/2014 | 071087 | 65 Brobst | -1,000.00 |
| CH | Commission check 071106-A | | 02050 | 04/29/2014 | 071106 | 1913 Dalkeith st, | -500.00 |
| CH | Commission check 071068-A | | 02053 | 05/08/2014 | 071068 | 1316 mcclellan st, | -584.12 |
| CH | Commission check | | 02055 | 05/19/2014 | | | -120.63 |
| CH | Commission check 071078-A | | 02059 | 05/28/2014 | 071078 | 14 Winchester CT, | -640.75 |
| CH | Commission check | | 02063 | 06/05/2014 | | | -951.63 |
| CH | Commission check 071123-A | | 02070 | 06/14/2014 | 071123 | 3217 w Hilton st, | -143.10 |
| CH | Commission check 071127-A | | 02077 | 07/03/2014 | 071127 | 1082 Lakewood | -1,000.00 |

MB141

A 104

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043



## General EXPENSE STATEMENT By Date Range
From January 01, 2006 To June 30, 2017

**856-306-2500**
www.BrownAndPope.com

| | | Agt. # 101 |
|---|---|---|
| Sharonn Thomas | | |
| 49 Graypebble Circle | | |
| Sicklerville NJ 08081 | | |

**Summary Of Expense Account Activity**

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|---|---|---|---|---|---|---|---|
| CH | Commission check 071102-A | | 02078 | 07/07/2014 | 071102 | 121 Edgewood | -664.52 |
| CH | Commission check 071129-A | | 02085 | 07/21/2014 | 071129 | 15 Delaware Ave, | -150.00 |
| CH | Cash Payment | | Cash | 07/21/2014 | | | -1,000.00 |
| CH | Commission check | | 02090 | 08/02/2014 | | | -800.00 |
| CH | Commission check 071128-B | | EFT447 | 08/31/2014 | 071128 | 2236 essex, Baltimore | -111.38 |
| CH | Commission check 071140-A | | 02112 | 09/16/2014 | 071140 | 12516 Chilton rd | -600.00 |
| CH | Commission check 071156-A | | EFT453 | 09/30/2014 | 071156 | 210 e somerset, | -78.81 |
| CH | Commission check 071158-A | | 02124 | 10/20/2014 | 071158 | 2512 N33rd, | -841.36 |
| CH | Commission check | | 02125 | 10/22/2014 | | | -506.25 |
| CH | Commission check 071160-A | | 02135 | 10/24/2014 | 071160 | 5547 Osage Ave, | -1.54 |
| CH | Commission check 071161-A | | 02136 | 10/30/2014 | 071161 | 2028 south croskey, | -75.25 |
| CH | Commission check 071164-A | | 02142 | 11/04/2014 | 071164 | 1463 Saint John | -1,000.00 |
| CH | Commission check | | 02144 | 11/07/2014 | | | -424.75 |
| CH | Commission check 071180-A | | 02154 | 12/08/2014 | 071180 | 31 Stone | -350.00 |
| CH | Commission check 071200-A | DELET | 02188 | 02/12/2015 | 071200 | 100 John T. O'Leary | -650.00 |
| CH | Rev-Commission check | DELET | 02188 | 02/12/2015 | 071200 | 100 John T. O'Leary | 650.00 |
| CH | Commission check 071200-A | | 02189 | 02/12/2015 | 071200 | 100 John T. O'Leary | -650.00 |
| CH | Commission check 071118-A | | 02195 | 02/19/2015 | 071118 | 156 pine, runnemede | -189.97 |
| CH | Commission check 071214-A | | 02200 | 02/27/2015 | 071214 | 2022 & 2031 Pierce | -460.03 |
| CH | Commission check 071238-A | | 02232 | 03/30/2015 | 071238 | 2322 watkins, | -750.00 |
| CH | Commission check 071241-A | | 02233 | 03/31/2015 | 071241 | 2 Berkshire Dr, Sewell | -1,000.00 |
| CH | Commission check 071239-A | | 02247 | 04/08/2015 | 071239 | 5172 Parkside, | -199.65 |
| CH | Commission check 071221-A | | 02248 | 04/10/2015 | 071221 | 18 Starlite Hill Rd, | -255.60 |
| CH | Commission check | | 02291 | 05/22/2015 | | | -490.00 |
| CH | Commission check 071270-B | | 02303 | 05/26/2015 | 071270 | 25 Black Watch Trail, | -200.00 |
| CH | Commission check 071294-A | | 02314 | 06/11/2015 | 071294 | 14 Birchgrove Rd, | -180.00 |
| CH | Commission check | | 02361 | 08/03/2015 | | | -600.00 |
| CH | Commission check 071318-A | | 02378 | 09/03/2015 | 071318 | 229 W browing, | -363.16 |
| CH | Commission check 071337-A | | 02390 | 09/17/2015 | 071337 | 1040 S Merricac | -500.00 |
| CH | Commission check | | 02411 | 10/08/2015 | | | -450.00 |
| CH | Commission check 071357-A | | 02416 | 10/19/2015 | 071357 | 3112 North Patton | -141.72 |
| CH | Commission check 071380-A | | 02452 | 11/28/2015 | 071380 | 5946 webster | -400.00 |
| CH | Commission check | | 02456 | 12/02/2015 | | | -150.00 |
| CH | Commission check 071419-A | | 02594 | 05/03/2016 | 071419 | 4 Red Gravel Circle, | -2,000.00 |
| CH | Commission check 071473-A | | EFT539 | 05/09/2016 | 071473 | 126 north broad, | -400.00 |
| CH | Commission check 071475-A | | EFT540 | 05/09/2016 | 071475 | 2023 Harbour Drive, | -460.00 |

MB142

**Brown & Pope Realtors**
2105 Voorhees Town Center
Voorhees NJ 08043



**Brown & Pope**
REALTORS®
**856-306-2500**
www.BrownAndPope.com

## General EXPENSE STATEMENT By Date Range
### From January 01, 2006 To June 30, 2017

Agt. # 101

**Sharonn Thomas**
**49 Graypebble Circle**
**Sicklerville NJ  08081**

### Summary Of Expense Account Activity

| | |
|---|---|
| Previous Balances: | $0.00 |
| Expenses Charged: | 193,421.56 |
| Payments Received: | -193,421.56 |
| Expense Total Now Due: | $0.00 |

### Payments Made In This Period

| CD | Description | Stmt # | Check # | Date | Trans. # | Address | Amount |
|----|-------------|--------|---------|------|----------|---------|--------|
| CH | Commission check 071476-A | | EFT541 | 05/09/2016 | 071476 | 119 s girard, | -800.00 |
| CH | Commission check | | EFT542 | 05/16/2016 | | | -1,672.15 |
| CH | Commission check 071486-A | | EFT543 | 05/18/2016 | 071486 | 1001 e chestnut, | -1,889.65 |
| CH | Commission check 071447-A | | EFT544 | 05/24/2016 | 071447 | 40 Buttonwood rd, | -1,390.00 |
| CH | Commission check 071464-A | | EFT546 | 06/05/2016 | 071464 | 5 Green tree, | -1,438.80 |
| CH | Commission check 071467-A | | EFT547 | 06/10/2016 | 071467 | 512 Gardwood, | -3,000.00 |
| CH | Commission check 071498-A | | 02648 | 06/23/2016 | 071498 | 286 atlantic st, | -3,200.00 |
| CH | Commission check | | 02657 | 07/02/2016 | | | -3,109.65 |
| CH | Commission check | | EFT549 | 07/06/2016 | | | -2,160.00 |
| | | | | | | | -193,421.56 |

MB143

Prepared by: Martin Brown,Sr.
July 12, 2017, 08:48:48 PM

Lone Wolf Technologies [8.6.3]
brokerWOLF (Version 17.06.01)



# Invoice

2 Penn Center
1500 JFK Boulevard, Suite 920
Philadelphia, PA  19102
(267) 242-3943
cord@claytonlit.com
www.claytonlit.com

**BILL TO**

Mr. Martin Brown
2105 Voorhees Town Center
Voorhees, NJ  08043 USA

| INVOICE # | DATE | TOTAL DUE | | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 1066 | 07/21/2017 | $82,067.50 | | Due on receipt | |

| DATE | SERVICE | HOURS | AMOUNT |
|---|---|---|---|
| 05/02/2016 | **Hours**<br>Draft engagement letter and discuss same with client. | 0:48 | 340.00 |
| 05/04/2016 | **Hours**<br>Review file and send introductory email to other side. | 0:30 | 212.50 |
| 05/05/2016 | **Hours**<br>Prepare for and confer with client regarding background. | 0:30 | 212.50 |
| 05/06/2016 | **Hours**<br>Confer with client and prompt defendants | 0:18 | 127.50 |
| 05/09/2016 | **Hours**<br>Research and draft complaint; draft letter to JThomas; discuss next steps with client. | 3:30 | 1,487.50 |
| 05/10/2016 | **Hours**<br>Research and draft complaint; confer with JThomas; discuss next steps with client. | 3:06 | 1,317.50 |
| 05/11/2016 | **Hours**<br>Research and draft complaint; confer with client and CGolkow re: next steps. | 1:48 | 765.00 |
| 05/17/2016 | **Hours**<br>Review Pope's settlement demand; call with J. Thomas to discuss details; and confer with client re: same. | 1:54 | 807.50 |

MB144

| DATE | SERVICE | HOURS | AMOUNT |
|---|---|---|---|
| 05/18/2016 | **Hours**<br>Confer with client re: respective settlement positions of Brown and Pope; call with J. Thomas to discuss mediation and ask about independent contractor agreement. | 1:30 | 637.50 |
| 05/20/2016 | **Hours**<br>Review of second contract sent over by client; analysis of client commission material; and prompt JThomas re: mediation status. | 1:18 | 552.50 |
| 05/23/2016 | **Hours**<br>Review, analysis and communications relating to commission accounting regulations, mediation scheduling, LLC rules and potential mediators. | 1:18 | 552.50 |
| 05/24/2016 | **Hours**<br>Review, analysis and communications relating to commission accounting regulations, mediation scheduling, LLC rules and potential mediators. | 2:06 | 892.50 |
| 05/25/2016 | **Hours**<br>Review, analysis and communications relating to commission accounting regulations, mediation scheduling, LLC rules and potential mediators. | 1:30 | 637.50 |
| 05/26/2016 | **Hours**<br>Tel. calls and emails with M. Brown and J. Thomas re: mediation and accounting issues. | 1:48 | 765.00 |
| 06/01/2016 | **Hours**<br>Exchange emails with J. Thomas re: mediation; update client re: same: and review client documents. | 2:06 | 892.50 |
| 06/02/2016 | **Hours**<br>Emails with Thomas re: next steps. | 0:24 | 170.00 |
| 06/07/2016 | **Hours**<br>Efforts to arrange mediation | 0:18 | 127.50 |
| 06/08/2016 | **Hours**<br>Prompt counsel to move forward | 0:30 | 212.50 |
| 06/10/2016 | **Hours**<br>Communications re: status with JThomas and MBrown | 0:30 | 212.50 |
| 06/12/2016 | **Hours**<br>Research claims for complaint | 2:00 | 850.00 |
| 06/14/2016 | **Hours**<br>Research and draft complaint and revise engagement letter | 3:24 | 1,445.00 |

MB145

| DATE | SERVICE | HOURS | AMOUNT |
|---|---|---|---|
| 06/16/2016 | **Hours** Research and analyze potential claims; revise complaint; and revise engagement letter. | 3:12 | 1,360.00 |
| 06/17/2016 | **Hours** Work on complaint -- claims, research, filing forms, summons, fees, certifications etc. | 3:06 | 1,317.50 |
| 06/18/2016 | **Hours** Work on complaint -- claims, research, filing forms, summons, fees, certifications etc. | 3:36 | 1,530.00 |
| 06/19/2016 | **Hours** Research and drafting of causes of action and complaint. | 1:30 | 637.50 |
| 06/20/2016 | **Hours** Work on complaint, exhibits, revisions and filing logistics. | 2:00 | 850.00 |
| 06/21/2016 | **Hours** Work on complaint, exhibits, revisions and filing logistics. | 2:00 | 850.00 |
| 06/23/2016 | **Hours** Work on complaint, exhibits, revisions and filing logistics. | 1:00 | 425.00 |
| 07/05/2016 | **Hours** Make service arrangements | 0:30 | 212.50 |
| 07/13/2016 | **Hours** Address issues pertaining to service and case management. | 0:30 | 212.50 |
| 07/14/2016 | **Hours** Address issues pertaining to service and case management. | 0:30 | 212.50 |
| 07/29/2016 | **Hours** Review service, calendar response and update client | 0:30 | 212.50 |
| 08/11/2016 | **Hours** Prepare response to Real Estate Commission and correspond with J. Thomas. | 3:00 | 1,275.00 |
| 08/12/2016 | **Hours** Prepare response to Real Estate Commission and correspond with J. Thomas. | 1:42 | 722.50 |
| 08/15/2016 | **Hours** Analyze case issues and work on discovery requests | 4:00 | 1,700.00 |

MB146

| DATE | SERVICE | HOURS | AMOUNT |
|---|---|---|---|
| 08/16/2016 | **Hours** <br> Analyze case issues and work on discovery requests | 3:30 | 1,487.50 |
| 08/17/2016 | **Hours** <br> Analyze case issues and work on discovery requests | 1:42 | 722.50 |
| 08/18/2016 | **Hours** <br> Analyze case issues and work on discovery requests | 1:24 | 595.00 |
| 09/22/2016 | **Hours** <br> Research motion for default and confer with client | 1:12 | 510.00 |
| 09/23/2016 | **Hours** <br> Research motion for default and confer with client | 0:30 | 212.50 |
| 09/25/2016 | **Hours** <br> Research default issues; email JThomas; and work on opposition brief. | 1:30 | 637.50 |
| 09/28/2016 | **Hours** <br> Research and draft brief in opposition to MTD. | 6:24 | 2,720.00 |
| 09/29/2016 | **Hours** <br> Research and draft brief in opposition to motion to dismiss | 3:42 | 1,572.50 |
| 10/01/2016 | **Hours** <br> Research and draft brief in opposition to motion to dismiss | 0:18 | 127.50 |
| 10/03/2016 | **Hours** <br> Finalize and file opposition to motion to dismiss. | 0:24 | 170.00 |
| 10/04/2016 | **Hours** <br> Finalize and file opposition to motion to dismiss. | 1:54 | 807.50 |
| 10/05/2016 | **Hours** <br> MTD Opposition filing | 0:30 | 212.50 |
| 10/06/2016 | **Hours** <br> MTD Opposition filing | 0:18 | 127.50 |
| 10/18/2016 | **Hours** <br> Address issues pertaining to motion to dismiss and discovery responses. | 0:54 | 382.50 |
| 10/19/2016 | **Hours** <br> Address issues pertaining to motion to dismiss and discovery responses. | 1:12 | 510.00 |
| 10/20/2016 | **Hours** <br> Address issues pertaining to motion to dismiss and discovery responses. | 0:12 | 85.00 |

MB147

| DATE | SERVICE | HOURS | AMOUNT |
|---|---|---|---|
| 11/13/2016 | **Hours**<br>Review answer and address ECF matters. | 0:30 | 212.50 |
| 12/06/2016 | **Hours**<br>Analysis of potential responses to counterclaim; review discovery responses; and consider case strategy. | 1:54 | 807.50 |
| 12/07/2016 | **Hours**<br>Analysis of potential responses to counterclaim; review discovery responses; and consider case strategy. | 4:36 | 1,955.00 |
| 12/13/2016 | **Hours**<br>Work on answer and case status. | 1:18 | 552.50 |
| 12/14/2016 | **Hours**<br>Work on answer and case status. | 1:00 | 425.00 |
| 01/03/2017 | **Hours**<br>File review for scheduling conference plus emails with client regarding case status | 1:06 | 467.50 |
| 01/09/2017 | **Hours**<br>Review file in preparation for case management conference; review discovery and response shortcomings; draft deficiency letter to JThomas. | 2:06 | 892.50 |
| 01/19/2017 | **Hours**<br>Prepare for case management conference | 0:24 | 170.00 |
| 01/22/2017 | **Hours**<br>Prepare for case management conference. | 1:00 | 425.00 |
| 01/23/2017 | **Hours**<br>Participate in case management conference before court | 3:00 | 1,275.00 |
| 01/25/2017 | **Hours**<br>Communications with client and opposing counsel regarding next steps in litigation and discovery matters. | 1:18 | 552.50 |
| 02/13/2017 | **Hours**<br>Analysis of discovery issues and document productions. | 1:00 | 425.00 |
| 02/14/2017 | **Hours**<br>Address discovery deficiencies | 1:00 | 425.00 |
| 02/16/2017 | **Hours**<br>Evaluate Pope's discovery production; review Brown's discovery materials and prepare for production; analyze potential discovery requests; and confer with client. | 3:30 | 1,487.50 |
| 02/27/2017 | **Hours**<br>Manage Brown document production. | 0:42 | 297.50 |
| 03/17/2017 | **Hours**<br>Deposition preparations and arrangements | 1:12 | 510.00 |

MB148

| DATE | SERVICE | HOURS | AMOUNT |
|------|---------|-------|--------|
| 03/27/2017 | **Hours**<br>Deposition preparations | 0:42 | 297.50 |
| 03/29/2017 | **Hours**<br>Prepare for deposition | 1:12 | 510.00 |
| 03/30/2017 | **Hours**<br>Prepare for Pope's deposition | 3:30 | 1,487.50 |
| 03/31/2017 | **Hours**<br>Prepare for Pope's deposition | 3:54 | 1,657.50 |
| 04/01/2017 | **Hours**<br>Prepare for Pope's deposition | 2:06 | 892.50 |
| 04/03/2017 | **Hours**<br>Prepare for and meet with client; prepare for deposition of S. Pope. | 6:00 | 2,550.00 |
| 04/04/2017 | **Hours**<br>Pope deposition preparation | 3:36 | 1,530.00 |
| 04/05/2017 | **Hours**<br>Prepare for and take Pope deposition plus follow-up notes afterwards. | 4:54 | 2,082.50 |
| 04/24/2017 | **Hours**<br>Review Pope deposition and draft email to client regarding next steps. | 2:36 | 1,105.00 |
| 04/25/2017 | **Hours**<br>Analysis of next steps in litigation, potential risks and benefits, and related advice to client. | 1:54 | 807.50 |
| 05/05/2017 | **Hours**<br>Case evaluation plus related discussions with JThomas re: next steps. | 1:18 | 552.50 |
| 05/13/2017 | **Hours**<br>Work on motion for summary judgment | 1:42 | 722.50 |
| 05/15/2017 | **Hours**<br>Work on motion for summary judgment. | 5:18 | 2,252.50 |
| 05/18/2017 | **Hours**<br>Work on motion for summary judgment. | 6:42 | 2,847.50 |
| 05/20/2017 | **Hours**<br>Work on motion for summary judgment. | 1:00 | 425.00 |
| 05/21/2017 | **Hours**<br>Work on motion for summary judgment. | 1:12 | 510.00 |
| 05/22/2017 | **Hours**<br>Work on motion for summary judgment. | 1:18 | 552.50 |
| 05/23/2017 | **Hours**<br>Address MSJ filing, JThomas response, and confer with client re: same. | 1:06 | 467.50 |
| 06/11/2017 | **Hours**<br>Preparations for trial testimony and exhibits. | 1:36 | 680.00 |

MB149

CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 69 of 98 Trans ID: LCV2017453938

FILED, Case 18-17430-ed Division Doc 147-22 Filed 06/07/19 , Entered 06/07/19 15:50:24   Desc Main
Document    Page 146 of 282

| DATE | SERVICE | HOURS | AMOUNT |
|---|---|---|---|
| 06/12/2017 | **Hours**<br>Preparations for trial testimony and exhibits. | 1:48 | 765.00 |
| 06/13/2017 | **Hours**<br>Prepare for trial; confer with chambers and JThomas regarding trial scheduling. | 2:30 | 1,062.50 |
| 06/14/2017 | **Hours**<br>Work on trial preparations and also MSJ reply brief. | 3:42 | 1,572.50 |
| 06/15/2017 | **Hours**<br>Work on MSJ reply brief and trial preparations | 3:12 | 1,360.00 |
| 06/18/2017 | **Hours**<br>Research, draft and file MSJ reply brief. | 1:06 | 467.50 |
| 06/21/2017 | **Hours**<br>Address MSJ oral argument scheduling and preparations | 0:48 | 340.00 |
| 06/22/2017 | **Hours**<br>Prepare for oral argument re: motion for summary judgment. | 1:36 | 680.00 |
| 06/23/2017 | **Hours**<br>Prepare for and participate in oral argument on motion for summary judgment; report to client re: same; and prepare for next steps given reopening of discovery. | 3:54 | 1,657.50 |
| 06/27/2017 | **Hours**<br>Analysis of discovery matters in light of extension. | 0:24 | 170.00 |
| 06/29/2017 | **Hours**<br>Work on affirmative discovery requests and trial exhibit preparation; also, review of Pope's discovery requests. | 2:12 | 935.00 |
| 07/02/2017 | **Hours**<br>Review Pope discovery and work on Brown discovery | 0:24 | 170.00 |
| 07/03/2017 | **Hours**<br>Review Pope's discovery requests and confer with client regarding same; prepare and serve Brown's discovery on Pope together with supporting exhibits. | 3:24 | 1,445.00 |
| 07/16/2017 | **Hours**<br>Analysis of issues pertaining to recovery of attorneys' fees; draft RFA responses. | 1:36 | 680.00 |
| 07/17/2017 | **Hours**<br>Review of new case documents for potential production; also, analysis of fee recovery issues. | 1:24 | 595.00 |

MB150

| DATE | SERVICE | HOURS | AMOUNT |
|------|---------|-------|--------|
| 07/19/2017 | **Hours**<br>Revise draft discovery responses; communicate with client; address discovery production and trial exhibit issues. | 2:18 | 977.50 |
| 07/20/2017 | **Hours**<br>Confer with client regarding discovery responses, arrangements and production; review of documents in preparation for production. | 1:48 | 765.00 |

Attached is your monthly invoice.  Please remit payment upon receipt.

BALANCE DUE

**$82,067.50**

MB151

FILED, Case 18-17430 Civil Division Doc 47  22 Filed, 06/07/19 7, Entered 06/07/19 15:50:24  Desc Main
Document      Page 148 of 282



**Josh Thomas <joshualthomas@gmail.com>**

---

## Brown: Supplemental Production

---

**Josh Thomas** <joshualthomas@gmail.com>                                          Sat, Jul 22, 2017 at 5:27 PM
To: Cord Clayton <cord@claytonlit.com>
Bcc: Sharonn Thomas Pope <sharonn.thomas@comcast.net>

Mr. Cord,

We consider this response completely nonresponsive to our requests and consider them still outstanding. We expect actual responses to our requests or we will be submitting a motion to compel.

Further, considering how much you seem to overcharge your client, it is understandable why he may have no interest in paying your  bill,  it goes without saying, but my client wi not be paying tour bill either. That said, since you sent your bill, we want to know, as an additional discover demand, how much of that bill has been paid to date. For that request, you can consider the first day for that supplemental request and reserve the right to supplement those requests as time goes on.

Be guided accordingly,

Joshua Thomas
[Quoted text hidden]

A 115

CLAYTON COMMERCIAL LITIGATION LLC
E. McCord Clayton, Esq.
Two Penn Center
1500 JFK Boulevard, Suite 920
Philadelphia, PA 19102
Ph: 267-242-3943
www.claytonlit.com

| | | |
|---|---|---|
| **MARTIN BROWN** | : | SUPERIOR COURT OF NEW JERSEY |
| | : | CAMDEN COUNTY |
| and | : | LAW DIVISION |
| | : | |
| **BROWN AND THOMAS, LLC** | : | Civil Action L-2368-16 |
| | : | |
| Plaintiffs | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| **SHARONN THOMAS POPE** | : | |
| | : | |
| Defendant | : | |
| | : | |

## PLAINTIFFS' RESPONSES TO DEFENDANT'S DISCOVERY REQUESTS

Plaintiffs Martin Brown ("Brown") and Brown and Thomas, LLC ("BTL"), by their undersigned counsel, hereby respond to Defendant's June 29, 2017 Discovery Requests pursuant to the New Jersey Court Rules.

RFA 1.  Denied.  Pope was provided with annual K-1s throughout her tenure.  Upon her departure, Pope failed to reply to Brown's email asking for a list of the properties she had handled.  Moreover, Plaintiffs believed that no money was owed; accordingly, Plaintiffs brought suit to resolve the parties' apparent dispute regarding the matter, and have produced documents herein pertaining to expenses and profitability.

ROG 1.  Brown and/or Pope.

RFP 1.  Responsive documents (if any) have been produced separately.


RFA 2 / ROG 2 / RFP 2.  None included in requests.


RFA 3.  Denied.  No loan was taken out by either Brown or BTL.  Depending on its profitability, BTL made occasional and sporadic monthly payments on a loan taken out by Pope.  That loan was never an obligation of BTL.  The payoff amount is unknown.  BTL has made no payments on that loan in more than a year.

ROG 3.  Brown and/or Pope.

RFP 3.  Responsive documents (if any) have been produced separately.


RFA 4.  Denied.  To date, Defendant has not sought any discovery regarding this issue (except during Brown's deposition, where this matter was addressed).  Although not called for by this request, two accounts at issue were Wells Fargo and Fannie Mae (as also discussed at Pope's deposition).

ROG 4.  Brown and/or Pope.

RFP 4.  Responsive documents (if any) have been produced separately.


RFA 5.  Denied.

ROG 5.  Brown and/or Pope.

RFP 5.  Responsive documents (if any) have been produced separately.


RFA 6.  Denied.

ROG 6.  Brown and/or Pope.

RFP 6.  Responsive documents (if any) have been produced separately.

2

RFA 7.  Denied.

ROG 7.  Brown and/or Pope.

RFP 7.  Responsive documents (if any) have been produced separately.


RFA 8.  Denied.

ROG 8.  Brown and/or Pope.

RFP 8.  Responsive documents (if any) have been produced separately.


RFA 9.  Denied.  It is admitted only that Brown's personal contract with Wells Fargo was

terminated.  Brown cannot recall the precise timing of that termination.  However, other BTL

agents continue to have contracts with Wells Fargo.

ROG 9.  Brown and/or Pope.

RFP 9.  Responsive documents (if any) have been produced separately.

RFA 10.  Denied.  Plaintiffs do not know what Pope is talking about.

ROG 10.  Brown and/or Pope.

RFP 10.  Responsive documents (if any) have been produced separately.


Respectfully Submitted,


_____
E. McCord Clayton, Esq.
Clayton Commercial Litigation LLC
Two Penn Center
1500 JFK Boulevard, Suite 920
Philadelphia, PA 19102
Ph: 267-242-3943
www.claytonlit.com


Dated: July 30, 2017

4

CERTIFICATE OF SERVICE

I hereby certify that on the date referenced below I served the foregoing document on Defendant's counsel, Joshua L. Thomas, Esq. via email (by agreement).


_____

E. McCord Clayton, Esq.


Dated: July 30, 2017

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone:215-806-1733
Fax: 888-314-8910
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for Defendants

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

Brown & Pope

      PLAINTIFF

    vs.

Sharonn Thomas Pope

      DEFENDANTS

DOCKET NO. CAM-L-2368-16

### **DEFENDANT'S SUPPLEMENTAL COMBINED REQUESTS FOR ADMISSIONS, INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

#### **DEFINITIONS AND INSTRUCTIONS**

A.    These Requests for Admission and Interrogatories are to be considered continuing in character, and, therefore, your response should be modified or supplemented as you obtain further or different information and/or additional documents.

B.    The term "person" refers to the plural, as well as the singular, or any natural person, firm, corporation, association, group or organization, unless specifically otherwise stated.

C.    The term "identify" when used in reference to an individual person means to state his or her full name, job title, business and home telephone numbers and present home and business addresses. The identification should be sufficient so as to enable Plaintiff to notice his or her deposition, or to subpoena said person.

D.    The term "identify" when used in reference to a document means to state the date, title and nature of the document (e.g., contract, letter, memorandum, chart, etc.); the name of the author of the document and his home and business telephone numbers and business addresses of each addressee or recipient; the present location of the document; and the name, home and business telephone numbers and home business addresses of any custodian of the document.

CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 78 of 98 Trans ID: LCV2017453938

FILED, Case 18-17430-edf Division Doc 147  22  Filed 06/07/19 , Entered 06/07/19 15:50:24   Desc Main
Document     Page 155 of 282

The identification should be with "reasonable particularity" so as to enable Plaintiff to request the production of the document. If any such document was, but is no longer in your control, state what disposition has been made of it.

E.      "The Complaint" refers to the Complaint filed in this action under the caption set forth above.

F.      The "New Matter" refers to the New Matter Defendant filed in response to Plaintiff s Complaint.

G.      The conjunctions "and" and "or" shall not be interpreted disjunctively or to exclude any information otherwise within the scope of any interrogatory.

H.      "Including" means "including but not limited to."

I.      "Document" means without limitation, the following items in your custody or control, whether printed or recorded or reproduced by any mechanical process, or written or produced by hand: agreements, reports, correspondence, telegrams, memoranda, summaries or records of telephone conversations or interviews, diaries, graphs, notebooks, manuals, charts, deeds, maps, letters, minutes of meetings, photographs, films, pamphlets, tape or audio  recordings, computer records, computer disks, electronic data, electronic media, electronic records, magnetic tape or disks, e-mails, advertisements, circulars, press releases, drafts,  marginal comments appearing on file folders or other documents and all other writings and recordings. If multiple copies of a document exist and are not identical in all respects, each non- identical document should be considered a separate document.

J.      "You" or "Your" shall refer to Plaintiff or any other entities affiliated with such entities, including, but not limited to, predecessors, successors, affiliates, parents, subsidiaries, assigns, employees, representatives, agents, subcontractors, attorneys, accountants, and any and all persons acting on their behalf.

K.      "Reflect," "reflected" and/or "reflecting" shall refer to relating to, evidencing, embodied, pertaining, constituting, identifying, stating, supporting, memorializing or in any other manner as being relevant to the subject matter described in the particular category of documents requested or any portion thereof.

L.      Plaintiff s Requests for Admission are served under Pa.R.C.P. 4014, and your answers must be in compliance therewith, including but not limited to responding to same within 30 days, failing which Plaintiff s Requests for Admission will be deemed admitted.

## REQUEST FOR ADMISSION #1

Brown and Pope was dissolved prior to the complaint that commenced this action was filed.

**RESPONSE:**

## INTERROGATORY #1

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

## REQUEST FOR PRODUCTION #1

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

CAM-L-002368-16    11/09/2017 7:43:23 PM  Pg 80 of 98 Trans ID: LCV2017453938

FILED, Case file-App30-edivision D00-047 22 Filed, 06/07/19 , Entered 06/07/19 15:50:24    Desc Main
Document    Page 157 of 282

**REQUEST FOR ADMISSION #2**

You made material misstatements to the IRS regarding the percentage breakdown of the entity Brown and Pope on your K-1 forms from 2011-2015.

**RESPONSE:**

**INTERROGATORY #2**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

**REQUEST FOR PRODUCTION #2**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

CAM-L-002368-16  11/09/2017 7:43:23 PM  Pg 81 of 98 Trans ID: LCV2017453938

FILED, Case 18-17430-edf Divison Doc 47 22Filed, 06/07/19 , Entered 06/07/19 15:50:24    Desc Main
                              Document         Page 158 of 282

### REQUEST FOR ADMISSION #3

You made payments from the operations account of Brown and Pope towards the Loan from "Tomorrow's Financing" that as of May 12, 2016 had a payoff of $17,216.96.

**RESPONSE:**

### INTERROGATORY #3

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

### REQUEST FOR PRODUCTION #3

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 82 of 98 Trans ID: LCV2017453938

FILED, Case 18-17430-edJ DocivisiD0c 47  22Filed. 06/06/17593897, Enteredd 06/07/19 15:50:24   Desc Main
                    Document      Page 159 of 282

**REQUEST FOR ADMISSION #4**

The Loan from "Tomorrow's Financing" that as of May 12, 2016 had a payoff of $17,216.96 because it was taken out to support Brown and Pope which is why you were making payments on it.

**RESPONSE:**

**INTERROGATORY #4**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

**REQUEST FOR PRODUCTION #4**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

## REQUEST FOR ADMISSION #5

You stopped making payments on the Loan from "Tomorrow's Financing" that as of May 12, 2016 had a payoff of $17,216.96 because Ms. Pope left Brown and Pope.


**RESPONSE:**




## INTERROGATORY #5

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.




## REQUEST FOR PRODUCTION #5

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

**REQUEST FOR ADMISSION #6**

After Ms. Pope left, you still had an employee who had a Wells Fargo account.

**RESPONSE:**

**INTERROGATORY #6**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

**REQUEST FOR PRODUCTION #6**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

**REQUEST FOR ADMISSION #7**

There is no actual evidence in existence to substantiate a monetary loss was incurred by Brown and Pope when Ms. Pope left Brown and Pope.

**RESPONSE:**

**INTERROGATORY #7**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify the name, address and telephone number of each and every person who can, will or may testify in support of your RESPONSE.

**REQUEST FOR PRODUCTION #7**

If your RESPONSE to THE ABOVE REQUEST FOR ADMISSION was anything other than an unqualified admission, identify and produce each and every document in your possession, or of which you have knowledge, in support of your RESPONSE.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

As requested on July 27, 2017 at the deposition, the following documents are now demanded in addition to the previous requests:

1. All files that were entered into the "Lone Wolf Technologies" software that was forwarded to your CPA from 2006 until Ms. 2016.
2. A List of all realtors that worked for Brown and Pope from 2006-2017.
3. When the name of the entity brown and Pope was changed and all proof of that name change that was filed with the state.
4. Any Proof or evidence that the total value of the furniture, computers and any other office materials at that time that Brown and Pope was dissolved was $1,500.00.
5. All tax returns for Martin Brown from 2006-2016.
6. All tax returns for Brown and Pope from 2006-2016.
7. Evidence from the operations account of all payments made on the Loan from "Tomorrow's Financing" that as of May 12, 2016 had a payoff of $17,216.96.
8. Any evidence currently in your possession of losses or damages caused by Ms. Pope leaving.
9. All monthly bills allegedly send to Ms. Pope for her expenses.

CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 87 of 98 Trans ID: LCV2017453938

FILED, Case 18-17430-CLOR Division Doc 47  22 Filed, Q6/07/19897, Entered 06/07/19 15:50:24    Desc Main
Document     Page 164 of 282

Verification


I, Martin Brown, verify that the facts stated in the foregoing pleadings are true and correct to the best of my knowledge, information and belief.  I understand that false statements therein are subject to the penalties relating to unsworn falsification to authorities.


_____

Martin Brown

Gmail - Brown-Pope Dis    CAM-L-002368-16    11/09/2017 7:43:23 PM  Pg 88 of 98 Trans ID: LCV2017453938    8a44c&jsver=EaIL6uz...

FILED, Case 18-17430-elf Division Doc 147 22 Filed 06/07/19, Entered 06/07/19 15:50:24    Desc Main
Document        Page 165 of 282



**Josh Thomas <joshualthomas@gmail.com>**

---

# Brown-Pope Discovery Responses

---

**Cord Clayton** <cord@claytonlit.com>                                   Sun, Sep 10, 2017 at 7:21 PM
To: Josh Thomas <joshualthomas@gmail.com>

Please see attached.

*Regards, Cord*

E. McCord Clayton, Esq.

Clayton Commercial Litigation, LLC

2 Penn Center

1500 JFK Blvd., Suite 920

Philadelphia, PA  19102

267-242-3943

www.claytonlit.com



---

**3 attachments**

**2017 09 11 Brown Responses to Supplemental Discovery-v2.pdf**
148K

**M. Brown Dox - E (Invoice No. 1070).pdf**
121K

**M. Brown Dox - F (DBA Name Change).pdf**
156K

A 132

CLAYTON COMMERCIAL LITIGATION LLC
E. McCord Clayton, Esq.
Two Penn Center
1500 JFK Boulevard, Suite 920
Philadelphia, PA 19102
Ph: 267-242-3943
www.claytonlit.com

| | | |
|---|---|---|
| **MARTIN BROWN** | : | SUPERIOR COURT OF NEW JERSEY |
| | : | CAMDEN COUNTY |
| and | : | LAW DIVISION |
| | : | |
| **BROWN AND THOMAS, LLC** | : | Civil Action L-2368-16 |
| | : | |
| Plaintiffs | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| **SHARONN THOMAS POPE** | : | |
| | : | |
| Defendant | : | |
| | : | |

### <u>PLAINTIFFS' RESPONSES TO DEFENDANT'S DISCOVERY REQUESTS</u>

Plaintiffs Martin Brown ("Brown") and Brown and Thomas, LLC ("BTL"), by their

undersigned counsel, hereby respond to Defendant's August 10, 2017 Supplemental Discovery

Requests pursuant to the New Jersey Court Rules.

RFA 1.  Plaintiffs object that these requests were tardily served.  Subject to and without

waiver of objections, denied.

ROG 1.  Plaintiffs object that these requests were tardily served.  Subject to and without

waiver of objections, Brown and/or Pope.

RFP 1.  Plaintiffs object that these requests were tardily served.  Subject to and without

waiver of objections, responsive documents (if any) have been produced separately.

RFA 2.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, denied.  Rather, the company accountant simply carried forward the percentages from the parties' initial agreement in subsequent filings.  Although inaccurate following the changed agreement, any error was minor, and inured to Ms. Pope's benefit.

ROG 2.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, Brown and/or Pope.

RFP 2.  Plaintiffs object that these requests were tardily served. Subject to and without waiver of objections, responsive documents (if any) have been produced separately.

RFA 3.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, it is admitted that such payments on Ms. Pope's personal loan as were occasionally made by BTL came from its operating account.  Any remaining allegations are denied, including as to the payoff amount.

ROG 3.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, Brown and/or Pope.

RFP 3.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, responsive documents (if any) have been produced separately.

RFA 4.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, denied.  Plaintiffs are unaware regarding the payoff amount, or Defendant's reasons for taking the loan, but believe the loan was intended as a business risk on her part.

A 134

ROG 4.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, Brown and/or Pope.

RFP 4.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, responsive documents (if any) have been produced separately.

RFA 5.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, denied.  Payments were only ever made occasionally, and were stopped because of the financial circumstances of the company, Ms. Pope's departure, and her breaches of her contractual and other duties as described in Plaintiff's Complaint herein.

ROG 5.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, Brown and/or Pope.

RFP 5.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, responsive documents (if any) have been produced separately.

RFA 6.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, denied as stated, but admitted that BTL continued after Ms. Pope's departure to have contractual relationships with one or more independent contractors who had Wells Fargo accounts.

ROG 6.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, Brown and/or Pope.

RFP 6.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, responsive documents (if any) have been produced separately.

3

RFA 7.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, denied.

ROG 7.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, Brown and/or Pope.

RFP 7.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, responsive documents (if any) have been produced separately.

Additional RFP 1.  Plaintiffs object that these requests were tardily served.  Plaintiffs further object that this request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Additional RFP 2.  Plaintiffs object that these requests were tardily served.  Plaintiffs further object that this request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Additional RFP 3.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of its objections, responsive documents are produced herewith.

Additional RFP 4.  Plaintiffs object that these requests were tardily served.  Plaintiffs further object insofar as this request assumes facts not in evidence, insofar as BTL has not been dissolved; rather, only its d/b/a name has changed.

Additional RFP 5.  Plaintiffs object that these requests were tardily served.  Plaintiffs further object that this request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Additional RFP 6.  Plaintiffs object that these requests were tardily served.  Plaintiffs further object that this request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Additional RFP 7.  Plaintiffs object that these requests were tardily served.  Plaintiffs further object that this request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Additional RFP 8.  Plaintiffs object that these requests were tardily served.  Subject to and without waiver of objections, responsive documents have already been produced.

Additional RFP 9.  Plaintiffs object that these requests were tardily served.  Plaintiffs further object that this request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiver of objections, responsive documents have already been produced.

Respectfully Submitted,

_____

E. McCord Clayton, Esq.
Clayton Commercial Litigation LLC
Two Penn Center
1500 JFK Boulevard, Suite 920
Philadelphia, PA 19102
Ph: 267-242-3943
www.claytonlit.com

Dated: September 10, 2017

CERTIFICATE OF SERVICE

 I hereby certify that on the date referenced below I served the foregoing document on Defendant's counsel, Joshua L. Thomas, Esq. via email (by agreement).

_____

E. McCord Clayton, Esq.

Dated: September 10, 2017



# Invoice

**CLAYTON COMMERCIAL LITIGATION LLC**

2 Penn Center
1500 JFK Boulevard, Suite 920
Philadelphia, PA  19102
(267) 242-3943
cord@claytonlit.com
www.claytonlit.com

**BILL TO**

Mr. Martin Brown
2105 Voorhees Town Center
Voorhees, NJ  08043 USA

| INVOICE # | DATE | TOTAL DUE | | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 1070 | 09/07/2017 | $95,318.43 | | Due on receipt | |

| DATE | ACCOUNT SUMMARY | AMOUNT |
|---|---|---|
| 07/21/2017 | Balance Forward | $83,758.43 |
| | Payments and credits between 07/21/2017 and 09/07/2017 | 0.00 |
| | New charges (details below) | 11,560.00 |
| | Total Amount Due | $95,318.43 |

| DATE | SERVICE | HOURS | AMOUNT |
|---|---|---|---|
| 07/21/2017 | **Hours** <br> Work on supplemental Brown document discovery production, plus Brown deposition arrangements and deposition preparations. | 3:18 | 1,402.50 |
| 07/22/2017 | **Hours** <br> Prepare and produce supplemental document production; prepare for deposition of M. Brown. | 3:00 | 1,275.00 |
| 07/23/2017 | **Hours** <br> Prepare for deposition of MBrown. | 2:48 | 1,190.00 |
| 07/24/2017 | **Hours** <br> Prepare for defense of MBrown deposition and confer with client re: same. | 3:54 | 1,657.50 |
| 07/26/2017 | **Hours** <br> Prepare for MBrown deposition. | 1:12 | 510.00 |
| 07/27/2017 | **Hours** <br> Prepare for MBrown deposition; confer with client re: same; participate in deposition; and follow-up afterwards. | 4:54 | 2,082.50 |

MB-152

| DATE | SERVICE | HOURS | AMOUNT |
|------|---------|-------|--------|
| 07/30/2017 | **Hours** <br> Review, revise and finalize Brown's discovery responses. | 1:06 | 467.50 |
| 08/14/2017 | **Hours** <br> Review and analyze discovery issues. | 0:36 | 255.00 |
| 08/16/2017 | **Hours** <br> Work on discovery responses and requests. | 1:42 | 722.50 |
| 08/17/2017 | **Hours** <br> Work on responses to Pope's supplemental discovery requests, communicate with client regarding same, and work on affirmative discovery requests. | 2:54 | 1,232.50 |
| 08/18/2017 | **Hours** <br> Work on discovery responses and affirmative discovery. | 0:24 | 170.00 |
| 08/28/2017 | **Hours** <br> Work on discovery responses and confer with client regarding same. | 1:24 | 595.00 |

|  |  |
|---|---|
| TOTAL OF NEW CHARGES | 11,560.00 |
| BALANCE DUE | **$95,318.43** |

CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 97 of 98 Trans ID: LCV2017453938
FILED, Case 18-17430-eff Division Doc 47 22 Filed, 00/07/597, Entered 06/07/19 15:50:24   Desc Main
Document    Page 174 of 282

MB-154

CAM-L-002368-16   10/02/2017 1:46:37 PM  Pg 10 of 11 Trans ID: LCV2017273696

07/14/17

Taxpayer Identification# **205-841-221/001**

Dear Business Representative:

Congratulations! You are now registered with the New Jersey Division of Revenue.

Use the Taxpayer Identification Number listed above on all correspondence with the Divisions of Revenue and Taxation, as well as with the Department of Labor (if the business is subject to unemployment withholdings). Your tax returns and payments will be filed under this number, and you will be able to access information about your account by referencing it.

Additionally, please note that State law requires all contractors and subcontractors with Public agencies to provide proof of their registration with the Division of Revenue. The law also amended Section 92 of the Casino Control Act, which deals with the casino service industry.

We have attached a Proof of Registration Certificate for your use. To comply with the law, if you are currently under contract or entering into a contract with a State agency, you must provide a copy of the certificate to the contracting agency.

If you have any questions or require more information, feel free to call our Registration Hotline at (609)292-9292.

I wish you continued success in your business endeavors.

Sincerely,

*James J. Fruscione*

James J. Fruscione
Director
New Jersey Division of Revenue

---

**STATE OF NEW JERSEY**
**BUSINESS REGISTRATION CERTIFICATE**

DEPARTMENT OF TREASURY/
DIVISION OF REVENUE
PO BOX 252
TRENTON, N.J 08646-0252

TAXPAYER NAME:
**BROWN AND THOMAS, LLC**

TRADE NAME:
**BROWN REALTORS**

ADDRESS:
**2105 VOORHEES TOWN CENTER**
**VOORHEES NJ 08043**

SEQUENCE NUMBER:
**2153015**

EFFECTIVE DATE:
07/14/17

ISSUANCE DATE:
07/14/17

*James J. Fruscione*

Director
New Jersey Division of Revenue

FORM-BRC

MB-155



*State of New Jersey*

DEPARTMENT OF BANKING AND INSURANCE
LICENSING SERVICES BUREAU – REAL ESTATE
PO BOX 474
Trenton, NJ 08625-0474
Tel. (609) 292-7272
FAX (609) 292-6765

Chris Christie
*Governor*

Kim Guadagno
*Lt. Governor*

Richard J. Badolato
*Commissioner*

June 28, 2016

Martin S Brown, Sr.
c/o Brown and Thomas LLC
2105 Voorhees Town Center
Voorhees, NJ 08043

RE: **BROWN REALTORS**

Dear Mr. Brown, Sr.

This will acknowledge receipt of the Registration of Alternate Name certificate(s) filed with the New Jersey Department of Treasury, Division of Revenue for the above referenced name(s).

Be advised that you have the right to transact business under the alternate name(s) listed above effective **June 28, 2016.**

Sincerely,

*Mary Vargas*
Mary Vargas
Supervisor of Real Estate Licensing

Visit us on the Web at dobi.nj.gov
New Jersey is an Equal Opportunity Employer • Printed on Recycled Paper and Recyclable

(Page 4 of 4)

(Page 4 of 4)

CAM-L-002368-16   10/02/2017 1:46:37 PM  Pg 11 of 11 Trans ID: LCV2017273696

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone:215-806-1733
Fax: 888-314-8910
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Attorney for Defendants
Collateral Account: 145289

IN THE SUPERIOR COURT OF NEW JERSEY
CAMDEN COUNTY– CHANCERY DIVISION

| | |
|---|---|
| Brown & Pope | |
| PLAINTIFF | |
| vs. | |
| | DOCKET NO. CAM-L-2368-16 |
| Sharonn Thomas Pope | |
| DEFENDANTS | |

_____

TO THE COURT:

Defendant Sharonn Thomas Pope, hereby rejects the Arbitration Award entered in the above matter on September 11, 2017, and demands a Trial *De Novo*.

If trial *de novo* is sought this form must be filed with the Arbitration Administrator within 30 days of the filing of the arbitration award and served on all parties within that time. The Arbitration hearing in the above-captioned matter was held on September 11, 2017. Further, a Bankruptcy was filed on July 6, 2017 and Plaintiff did not get relief from the stay and further, his attorney was informed **not** to proceed.

Payment for the filing fee is being tendered herewith, and this notice having been served

on all parties, trial *de novo* is hereby requested in the above-captioned matter, pursuant to

RULES 4:21A-6(b)(1) and 4:21A-6(c).


                                                 /s/ Joshua L. Thomas_____
                                          Joshua Thomas, Esq.

THIS NOTICE, WHEN TIMELY FILED AND SERVED ON ALL ADVERSE PARTIES,
SHALL BE SUFFICIENT TO RESTORE THE CASE TO THE TRIAL CALENDAR.



**Josh Thomas <joshualthomas@gmail.com>**

---

## Ch-13 17-14588-elf Motion for Relief From Stay-Sharonn E Thomas-P

---

**BKECF_LiveDB@paeb.uscourts.gov** <BKECF_LiveDB@paeb.uscourts.gov>

Wed, Nov 1, 2017 at 4:49 PM

To: BKECF_LiveDB@paeb.uscourts.gov

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30-page limit do not apply.**

**U.S. Bankruptcy Court**

**Eastern District of Pennsylvania**

Notice of Electronic Filing

The following transaction was received from E. McCord CLAYTON entered on 11/1/2017 at 4:49 PM EST and filed on 11/1/2017

**Case Name:**        Sharonn E Thomas-Pope
**Case Number:**    17-14588-elf
**Document Number:** 51

**Docket Text:**
Motion for Relief from Stay . Fee Amount $181.00, Filed by Martin Brown Represented by E. McCord CLAYTON (Counsel). Objections due by 11/21/2017. (Attachments: # (1) Exhibit 1-1 # (2) Exhibit 1-2 # (3) Exhibit 1-3 # (4) Exhibit 2-1 # (5) Exhibit 2-2 # (6) Exhibit 3 # (7) Exhibit 4 # (8) Exhibit 5 # (9) Exhibit 6 # (10) Service List Certificate of Service) (CLAYTON, E.)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** 17-10.30 MFR.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-0] [883ce40a39ed9e29c207bbb1e4cdeec171369e9fdf9f05cf4cabea78a62cd77f43 652e1b037afe29b66c9e63b44075b7c3637b67fd592334016b3b54cc133e03]]
**Document description:** Exhibit 1-1
**Original filename:** C:\fakepath\Exhibit 1-1.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-1] [16fec5403e45697b313d7d228d7531e5217e3361541507939637ae4a490b3acddd 92fe899ccc999636c317265cd6dc6c997de6c619f7b419456a8c85f4eb0386]]
**Document description:** Exhibit 1-2
**Original filename:** C:\fakepath\Exhibit 1-2.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-2] [6a29e9b8a808e079036c2741e740956d7cdadf00cb962e99093b0afd613c380fb9 4deb109eec7a8e846701a99908d3fee064ff784bab9f5c0d3a708f0f2513bf]]
**Document description:** Exhibit 1-3
**Original filename:** C:\fakepath\Exhibit 1-3.pdf
**Electronic document Stamp:**

A 145

Gmail - Ch-13 17-14588-elf          CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 2 of 3 Trans ID: LCV2017453938  f348a44c&jsver=M-xhR...

FILED, Case 18-17430-elf Division Docket 47 22-Filed 06/07/19 6697, Entered 06/07/19 15:50:24   Desc Main
                              Document          Page 179 of 282

[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-
3] [7b3d9b264723d76141097d3eb61118c064df441b456635f59ce0baa244384e3e55
0af7c3a236a63b4305253312276f39f917ad2a00d0f3b336b2471b82217eb4]]
**Document description:**Exhibit 2-1
**Original filename:**C:\fakepath\Exhibit 2-1.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-
4] [16751dd727d2982590d381f05d751bf531eb993c47d6acc1c5e0513b999484771a
e94f8ede5f9a3ecb94ed3b5b8b2eaa724ee67195bd4d612b20b133975bce65]]
**Document description:**Exhibit 2-2
**Original filename:**C:\fakepath\Exhibit 2-2.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-
5] [32c626526d540108f72cf6227317b89fef16106f9005e2df67849a4c074db187d5
6a2e801cbc77b4e8f25400f33e320da07870b92e90e9c1050be06371bb70c3]]
**Document description:**Exhibit 3
**Original filename:**C:\fakepath\Exhibit 3.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-
6] [a0f4dd863e133ec38c8bb936fa520e9096f72cf4477323bf62a8116ba51f70f2c8
47722cb2d694b7a2ca954385d8aecddbfd30f5c1d8b4ba3541f5baccabb363]]
**Document description:**Exhibit 4
**Original filename:**C:\fakepath\Exhibit 4.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-
7] [7e2bd994a7d997fe0745ab7f7a017fee8eeff1963d7aae7ddae5a5af402a7e2abe
49857e75d3b2a39106e6b1c0a83a6310d339e0abdce6b8a34e0c0bb6d44002]]
**Document description:**Exhibit 5
**Original filename:**C:\fakepath\Exhibit 5.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-
8] [3cebeacffd9d3a9279e9f02c1da61994f6f468efda6fadfecb8c56f633994e17f2
608214613521d8c840e97068daedb1aad89ec448ba3e363a4dd1012c8ee995]]
**Document description:**Exhibit 6
**Original filename:**C:\fakepath\Exhibit 6.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-
9] [a51909d4b6cbdbc726d291815119dc91c9bc496853e745d772bf4d85d3708a0c5f
28c1929393d2ae868a8d65e0a5a50b878363087b2d6cfe0ff11144972d335b]]
**Document description:**Service List Certificate of Service
**Original filename:**C:\fakepath\17-10.30 MFR - Certificate of Service.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1008166204 [Date=11/1/2017] [FileNumber=25950805-
10] [32a22fc057dbaab714f3a4f8be0a9544364ae94e9c56c468433b3f85e34a805e4
43ba347876ec02f0cabf4ef546673bfa143a0d8a2f98a30f2a69ae24a32a99e]]


**17-14588-elf Notice will be electronically mailed to:**

JEROME B. BLANK on behalf of Creditor Ditech Financial LLC
paeb@fedphe.com

DANIELLE BOYLE-EBERSOLE on behalf of Creditor U.S. Bank, National Association, et al. c/o Select Portfolio
Servicing, Inc.
debersole@hoflawgroup.com, bbleming@hoflawgroup.com

E. McCord CLAYTON on behalf of Creditor Martin Brown
cord@claytonlit.com

A 146

Gmail - Ch-13 17-14588-e CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 3 of 3 Trans ID: LCV2017453938 f348a44c&jsver=M-xhR...

FILED, Case 18-17430-elf Doc 47 22 Filed 06/07/19   Entered 06/07/19 15:50:24   Desc Main
Document      Page 180 of 282

KEVIN S. FRANKEL on behalf of Creditor JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
pa-bk@logs.com

KEVIN S. FRANKEL on behalf of Creditor NATIONSTAR MORTGAGE LLC, Et al.
pa-bk@logs.com

MARIO J. HANYON on behalf of Creditor JPMorgan Chase Bank, NA
paeb@fedphe.com

PETER E. MELTZER on behalf of Creditor Dalin Funding LP
bankruptcy@wglaw.com, state@wglaw.com

WILLIAM C. MILLER, Esq.
ecfemails@ph13trustee.com, philaecf@gmail.com

JIM PEAVLER on behalf of Creditor PA Dept of Revenue
RA-occbankruptcy1@state.pa.us, RA-occbankruptcy6@state.pa.us

HARRY B. REESE on behalf of Creditor WELLS FARGO BANK, N.A.
harry.reese@pkallc.com, chris.amann@pkallc.com;nick.bracey@pkallc.com;jill@pkallc.
com;samantha.gonzalez@pkallc.com

REBECCA ANN SOLARZ on behalf of Creditor THE BANK OF NEW YORK MELLON f/k/a THE BANK OF NEW
YORK as Trustee for FIRST HORIZON ALTERNATIVE MORTGAGE SECURITIES TRUST 2006-FA2
bkgroup@kmllawgroup.com

THOMAS YOUNG.HAE SONG on behalf of Creditor Ditech Financial LLC
pa.bkecf@fedphe.com

JOSHUA LOUIS THOMAS on behalf of Debtor Sharonn E Thomas-Pope
joshualthomas@gmail.com

United States Trustee
USTPRegion03.PH.ECF@usdoj.gov

MATTEO SAMUEL WEINER on behalf of Creditor U.S. Bank National Association, as indenture trustee, for the CIM
Trust 2016-FRE1, Mortgage-Backed Notes, Series 2016-FRE1
bkgroup@kmllawgroup.com

ROBERT WINFIELD WILLIAMS on behalf of Creditor First Tennessee Bank, National Association
rwilliams@mwm-law.com

**17-14588-elf Notice will not be electronically mailed to:**

The Bank Of New York Mellon
Robertson, Anschutz & Schneid
6409 Congress Ave
Suite 100
Boca Raton, FL 33487

# MARLENE BELL REPORTING, INC.

*BROWN & POPE v.*

*SHARONN THOMAS POPE*

---

*MARTIN BROWN*

*July 27, 2017*

---

*MARLENE BELL REPORTING, INC.*

*123 South Broad Street*

*Suite 1310*

*Philadelphia, Pennsylvania 19109*

*(215) 735-0422 * (856) 985-0055*

Original File 072717ku.txt

**Min-U-Script® with Word Index**

BROWN & POPE v.
SHARONN THOMAS POPE

MARTIN BROWN
July 27, 2017

---

**Page 1**

```
 1           ------------------------------------
 2           IN THE SUPERIOR COURT OF NEW JERSEY
             LAW DIVISION: CAMDEN COUNTY
 3                  NO. CAM-L-2368-16
             ------------------------------------
 4
 5  ----------------------------
    BROWN & POPE              )
 6                           )
             Plaintiff,       )
 7                           )
       - vs -                 )
 8                           )
    SHARONN THOMAS POPE       )
 9                           )
             Defendant        )
10  ----------------------------
11
12
13           ------------------------------
14           THURSDAY, JULY 27, 2017
             ------------------------------
15
16          Deposition of MARTIN BROWN, held at
17  309 Fellowship Road, Suite 200, Mt. Laurel,
18  New Jersey, commencing at 12:40 p.m., on the
19  above date, before Karen M. Unghire, Court
20  Reporter and Notary Public.
21                  - - -
22
23          MARLENE BELL REPORTING, INC.
            123 South Broad Street, Suite 1310
24           Philadelphia, Pennsylvania  19109
                   (215)735-0422
25              mbreportinginc@aol.com
```

---

**Page 2**

```
 1  A P P E A R A N C E S
 2
 3  CLAYTON COMMERCIAL LITIGATION, LLC
    BY:  E. McCORD CLAYTON, ESQUIRE
 4  Two Penn Center, Suite 920
    1500 John F. Kennedy Boulevard
 5  Philadelphia, PA  19102
    267-242-3943
 6  cord@claytonlit.com
    --Representing the Plaintiff
 7
 8
    JOSHUA L. THOMAS, ESQUIRE
 9  1110 Pocopson Road
    Pocopson, PA  19366
10  215-806-1733
    JoshuaLThomas@gmail.com
11  --Representing the Defendant
12
13  ALSO PRESENT:  SHARONN THOMAS POPE
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1                 I N D E X
 2  WITNESS                                 PAGE
 3    MARTIN BROWN
 4    BY MR. THOMAS                            4
 5
 6
 7              E X H I B I T S
 8  I.D.                                    PAGE
 9  Exhibit A      E-mail, 4/22/16            5
10  Exhibit B      Statement of Account       8
11  Exhibit C      Amortization Table        18
12  Exhibit D      E-mail Chain              26
13  Exhibit E      Contractor Agreement      30
14  Exhibit F      LLC Operating Agreement   35
15  Exhibit G      Schedule K-1              43
16  Exhibit H      Invoice, 7/21/17          55
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1                  ---
 2           P R O C E E D I N G S
 3                  ---
 4       MARTIN BROWN, having been duly
 5  sworn, was examined and testified as
 6  follows:
 7                  ---
 8           E X A M I N A T I O N
 9                  ---
10  BY MR. THOMAS:
11     Q.   Can you state your full name for the
12  record.
13     A.   Martin Brown.
14     Q.   I'll do a slightly abbreviated version.
15  You're not under any medication or for any reason
16  can't answer the questions truthfully and
17  completely, today?
18     A.   No.
19     Q.   What do you do for a living,
20  Mr. Brown?
21     A.   I'm a real estate broker.
22     Q.   And where do you currently work?
23     A.   Brown Realtors, in Voorhees.
24     Q.   And how long have you been in that
25  profession?
```

Page 5

1    **A.    This is year 22.**
2    Q.    And you mentioned the business name.
3 How long has it been under that name?
4         MR. CLAYTON: Objection. Vague
5    and ambiguous.
6         MR. THOMAS: I think we're all
7    aware that there was a recent name change.
8 BY MR. THOMAS:
9    Q.    Do you know about when that occurred?
10   **A.    I don't know the exact date. It's**
11 **been some months.**
12   Q.    So a year, a few months, just
13 generally?
14   **A.    After April of last year. So I don't**
15 **know if it was May or June.**
16   Q.    All right. Thank you. And then you
17 mentioned April of last year.
18        MR. THOMAS: I'll start with, I guess
19   we'll call this one Exhibit A.
20        - - -
21        (E-mail with attached letter dated
22        4/22/16 received and marked for
23        identification as Deposition Exhibit A)
24        - - -
25 BY MR. THOMAS:

Page 6

1    Q.    So can you tell me what Exhibit A looks
2 like to you?
3    **A.    So this looks like the e-mail I got,**
4 **where it requested to dissolve the partnership.**
5    Q.    And it's a two-page exhibit. Page 2,
6 is that the letter that was attached or at least
7 looks like the letter that was attached?
8    **A.    I believe so.**
9    Q.    And when you received this -- I'll take
10 a step back. The e-mail is to soldmartin@aol.com.
11 That was your e-mail at the time?
12   **A.    Correct.**
13   Q.    Once you received this e-mail, what did
14 you do after that?
15   **A.    I'm not sure what you're asking.**
16   Q.    I'll rephrase. I know, because I sent
17 the e-mail, that there was no direct response.
18 Did you contact your attorney? Did you contact
19 Ms. Pope? What was your, I guess, reaction after
20 you received this e-mail?
21   **A.    Hard to answer. I know it was maybe**
22 **late on a Sunday night or something I saw this**
23 **e-mail. I'm not sure what I did.**
24   Q.    So just to confirm, though, I know that
25 the letter asks for a set of paperwork, or at least

Page 7

1 I guess we would call it an accounting, a statement
2 of account, within seven days. I think we're all in
3 agreement that by April 29th, there was not a
4 statement of account sent to me or anybody else. Is
5 that accurate?
6         I'll refer to the third line from the
7 bottom -- the fourth line, actually. It's asking
8 you to furnish my client with a complete statement
9 of account, in writing, of all money owed to my
10 client, within seven days of today's notice.
11        I assume that was not sent or anything
12 along those lines was not sent at that time?
13   **A.    On that day, I know it wasn't sent,**
14 **no.**
15   Q.    And then do you remember ever sending a
16 complete accounting to my client of what she was
17 owed?
18   **A.    I remember sending to your client an**
19 **e-mail asking for an accounting of all business that**
20 **she may or may not be owed money on, so I could give**
21 **her an accurate account.**
22   Q.    So in response, what you're saying is
23 you sent my e-mail request, would that be fair to
24 say?
25   **A.    I sent a request to your client.**

Page 8

1         **MR. THOMAS:** Exhibit B.
2         - - -
3         (Statement of Account received
4         and marked for identification as Deposition
5         Exhibit B)
6         - - -
7 BY MR. THOMAS:
8    Q.    And Exhibit B actually comes from your
9 attorney. I don't think it has an exhibit number,
10 instead it has Bates stamps on the bottom. So if
11 it's okay with you, we'll refer to the Bates stamps
12 for any page references we need.
13        Do you see what I'm talking about when
14 I say Bates stamp on the bottom right-hand corner?
15   **A.    I have no idea what a Bates stamp is.**
16   Q.    Do you see where it says, on the first
17 page, MB, some zeros and then the number 95?
18   **A.    Yes, I do.**
19   Q.    So those are what I'll call Bates
20 stamps, from here on out.
21   **A.    Okay.**
22   Q.    In essence, those just number the pages
23 as part of a group of paperwork. So I guess this is
24 approximately 12 pages, and it's a list of
25 properties. Does this look familiar to you?

CAM-L-002368-16    11/09/2017 7:43:23 PM  Pg 4 of 24 Trans ID: LCV2017453938

FILED, Case 18-17480-ABA Division Oct 47 22 Filed 06/07/19 7. Entered 06/07/19 15:50:24    Desc Main
BROWN & POPE v.                                                                              MARTIN BROWN
SHARONN THOMAS POPE              Document        Page 184 of 282                              July 27, 2017

Page 9

1     A.    It looks like a report generated from
2  properties from 2006 to 2017.
3     Q.    And there are names.  The first line
4  has the number 131 and then a name.  Can you give me
5  who that person is, the name listed there?
6     A.    Darnell King.
7     Q.    And then about a third of the way down
8  the page, there is a name next to the number 101.
9  Can you give me that name, as well?
10    A.    That's Sharonn Thomas.
11    Q.    And then I'll give you time to look
12 through, but if you can, can you look through and
13 tell me if there are any other names listed in these
14 transactions or this set of papers?
15    A.    No, doesn't appear so.
16    Q.    I guess the next question I would ask
17 then is from 2006 to 2017, did you have any other
18 agents working at Brown and Pope Realtors, during
19 that time?
20    A.    Absolutely.
21    Q.    Can you say their names for the record,
22 who else you had working at that time?
23    A.    From 2006 to 2017?
24    Q.    Specifically in reference to agents or
25 realtors, as many as you can remember.

Page 10

1     A.    There's a lot of folks.
2     Q.    I'll say this, to save us a little
3  time, here.  Within the next 10 days, can you give
4  as complete a list as possible to your attorney, to
5  submit over to us, for all those people?
6     A.    Who worked for?
7     Q.    Brown and Pope during that time.
8     A.    From 2006 to '17?
9     Q.    Yes.  Specifically, the realtors who
10 would have been working at that time.
11    MR. CLAYTON: We'll take that
12    request under advisement, but I don't know
13    whether we'll meet it or not.  You should
14    ask the witness any questions that you want
15    to have answered, today.
16    MR. THOMAS: Sure.  Again,
17    we're going to say for the record, we are
18    requesting a list of realtors from 2006 to
19    2017, as part of a supplemental discovery
20    request.
21    MR. CLAYTON: Like I say, we'll
22    take that request under advisement, but if
23    you want to serve written discovery, that's
24    what you should do.  In the meantime, the
25    witness is here to answer your deposition

Page 11

1  questions.
2     MR. THOMAS: We submitted that,
3     but I appreciate the input.
4  BY MR. THOMAS:
5     Q.    So what I would say is during that
6  time, even without knowing the full extent of the
7  names, you did have other realtors working at the
8  firm, at that time?
9     A.    Absolutely.
10    Q.    Approximately, do you know around the
11 number, if you can estimate?
12    A.    From 2006 to 2017?
13    Q.    Yes.  I know it's a long time.
14    A.    Maybe 10 or 12 realtors.
15    Q.    And then during that time -- and I know
16 it might change for some of them.  Generally, what
17 was the percentage of the commission that you,
18 personally, got during that time, for those
19 realtors?
20    A.    They all have individual contracts.
21    Q.    Was there a general number you would
22 use?
23    A.    No.
24    Q.    Was there a range then, like 1 to 50, 1
25 to 10, a range for the percentage, you would be able

Page 12

1  to use?
2     A.    No.
3     Q.    Do you remember, during that time, what
4  the percent of the commission for Ms. Pope was, that
5  you received?
6     A.    If it's isolated down to company REO
7  business that I introduced to anybody in the office,
8  they received 40 percent.
9     Q.    So that's, 40 percent is what your take
10 would be?
11    A.    No, 40 percent is what the agent got
12 of the gross commission.
13    Q.    So you would get 60 percent?
14    A.    Correct.
15    Q.    And that was limited to REO property?
16    A.    Yes.
17    Q.    Do you believe that Ms. Thomas or
18 Ms. Pope, did her numbers fit into the same range?
19    A.    At some point, for REO properties,
20 yes.
21    Q.    Was there any time while she was
22 working at Brown and Pope that it was around 33
23 percent?
24    A.    I believe that everybody that was
25 doing REOs was somewhere at 30 percent.  She did get

Page 13

1   a third for H.U.D. properties, the client?  When I
2   had H.U.D. in multiple states, she got a third.
3       Q.    And then when you received the
4   commissions, your 60 percent of those REOs, just
5   generally speaking, was that just immediately a
6   check written out to you, or how did you receive
7   those funds?
8       A.    Well, I'd receive the whole funds and
9   paid the agents.
10      Q.    So you got the initial amount and then
11  the agent would get paid their 40 percent?
12      A.    That's correct.
13      Q.    So when you received that 60 percent,
14  did you keep an accounting of how much you received
15  for each specific property?  Did you keep it
16  monthly?  Or how did you keep that account?
17      A.    Yeah, every property is put into a
18  system.
19      Q.    When you say a system, I don't know
20  what that means.
21      A.    Lone Wolf is the real estate system
22  that I use.
23      Q.    So did you use the same system
24  throughout the entire timeframe of '06 to '17?
25      A.    Yes.  That's where these reports are.

Page 14

1       Q.    And in terms of those records, I know
2   that -- and we'll get into this in a little bit, but
3   I know that there were tax forms submitted.
4             Did you use the Lone Wolf records to
5   do your taxes for your income that year or did you
6   transcribe them into another form?  Or how did that
7   actually occur?
8       A.    No.  Lone Wolf are the reports that
9   were given to my CPA each year.
10      Q.    So he received it directly from the
11  program and did you print it out and send it to him?
12      A.    Well, I had to print it out and send
13  it to him.
14      Q.    And that was -- for now, let's keep it
15  limited to 2011 to 2015.  Did you have the same CPA
16  during that timeframe?
17      A.    Yes.
18      Q.    And do you remember what the CPA's name
19  is?
20      A.    Yes, Vince Malovich.
21      Q.    Can you spell, as best as you can, the
22  last name?
23      A.    I don't know how to spell his last
24  name.
25      Q.    But it's Malovich?

Page 15

1       A.    Yeah, Malovich.
2       Q.    And then in terms of that 60 percent,
3   did you share it with anyone else in the company,
4   such as another partner or anyone else who was part
5   of the company, at that time?
6       A.    No.
7       Q.    So you got the 60 percent and then it
8   was generally just used for expenses?  Or what was
9   it actually used for during that time?
10      A.    Yeah, bills or whatever.
11      Q.    And your personal take after that, how
12  did you calculate what you would be receiving after
13  that point?
14      A.    It would depend after the bills were
15  paid.
16      Q.    And then did you use Lone Wolf to
17  accommodate for the bills, or how was that
18  actually --
19      A.    Everything is on Lone Wolf.
20      Q.    Let's change gears for one moment.
21  When the company first started, Brown and Pope that
22  is, how was capital, I guess accrued?  How much do
23  you remember you contributed versus how much Ms.
24  Pope contributed?
25            MR. CLAYTON: Objection.

Page 16

1        assumes facts not in evidence.  Calls for
2        speculation.
3   BY MR. THOMAS:
4       Q.    You can answer the question.
5       A.    I don't remember the figures.
6       Q.    When it was initially created, did you
7   contribute any capital?
8       A.    Yes.
9       Q.    Do you remember, roughly, how much?
10      A.    No.
11      Q.    Would there be, in the Lone Wolf system
12  or any other system that you have, a number for how
13  much capital was actually contributed?
14      A.    I don't know.  Probably not.
15      Q.    When Brown and Pope was created, what
16  type of entity was it?
17      A.    An LLC.
18      Q.    Do you have the origination paperwork
19  from that LLC?
20      A.    The origination paper?  I have the LLC
21  agreements, yes.
22            MR. THOMAS: I'm going to make
23        an official request for a copy of the LLC
24        agreement.  Same as with the other one,
25        consider it a new discovery request.

Page 17

1    MR. CLAYTON: Sir, here's what
2 I'd suggest. To the extent you're making
3 requests today, please put them in a
4 confirming letter to follow the deposition,
5 and we'll take it under advisement. But
6 this is a deposition, it's not a written
7 discovery request forum.
8    You've had an opportunity and will
9 have opportunities to submit written
10 discovery, if you want to do that.
11    MR. THOMAS: We will be. We'll
12 be submitting supplemental, based on this,
13 but I'm stating for the record, as well as
14 if need be, we'll be submitting
15 supplemental requests, but we're asking on
16 the record for an LLC agreement.
17    As part of this deposition, we did ask
18 for supporting documents and received very
19 little, if any. So again, we're asking
20 for the LLC agreement from the origination.
21 BY MR. THOMAS:
22    Q.    So do you remember, at any time after
23 the entity was created, how capital was collected
24 up? Or I guess put another way, did you contribute
25 your own personal capital after the entity was

Page 18

1 created?
2    A.    Yes.
3    Q.    Do you remember, approximately, how
4 much?
5    A.    No idea.
6    Q.    Do you remember capital being inputted
7 from Ms. Pope, during that time?
8    A.    I really don't know. We had an office
9 custom built and all kinds of stuff going on. So I
10 really don't know what the numbers were.
11    MR. THOMAS: I'm going to submit this
12 as Exhibit C.
13    - - -
14    (Amortization Table received
15    and marked for identification as Deposition
16    Exhibit C)
17    - - -
18 BY MR. THOMAS:
19    Q.    There was a lien or a loan taken out,
20 it looks like, based on the amortization table, on
21 page 2, in approximately 2009, for $30,000. There
22 were some payments that were made by you,
23 personally, on this loan. Do you remember how much
24 you personally paid on this loan, from 2009 until
25 Ms. Pope left?

Page 19

1    MR. CLAYTON: Objection.
2 foundation, speculation, and assumes facts
3 not in evidence.
4 BY MR. THOMAS:
5    Q.    And you can still answer the question.
6    A.    I don't remember a $30,000 loan. I
7 thought the figures were more of -- the $30,000 may
8 have been what was owed, with the interest, over the
9 time. The $30,000 figure I don't recollect.
10    Q.    Do you remember what the amount was,
11 based on your personal knowledge, how much it was
12 for?
13    A.    No, I don't remember.
14    Q.    Because it says here total loan amount
15 of $51,720, and I assume that includes the interest,
16 but does that number sound familiar to you?
17    MR. CLAYTON: Objection. Asked
18    and answered. Foundation, speculation,
19    assumes facts not in evidence.
20 BY MR. THOMAS:
21    Q.    And you can still answer the question.
22    A.    No, I don't remember the numbers.
23    Q.    It says there are 86 payments made as
24 of May 30th, 2016. We're agreeing that you made
25 some of those payments.

Page 20

1    Do you remember, out of those 86, how
2 many were made by you?
3    MR. CLAYTON: Same objections.
4 BY MR. THOMAS:
5    Q.    And you can still answer the question.
6    A.    No idea.
7    Q.    I guess we'll take a step back. Do you
8 remember making payments on this loan?
9    A.    Yes.
10    Q.    And do you remember when you stopped
11 making those payments?
12    A.    No idea.
13    Q.    Did you stop making them before
14 Ms. Pope left the firm or did you stop making them
15 when she left?
16    A.    I don't know the answer to that.
17    Q.    There were payments made, and there
18 were payments made throughout 2016. When you made
19 those payments, did you usually pay them out of the
20 firm's account or out of your personal account?
21    MR. CLAYTON: Objection.
22    foundation, speculation, and assumes facts
23    not in evidence.
24 BY MR. THOMAS:
25    Q.    And you can still answer the question.

| Page 21 | Page 23 |
|---|---|

**Page 21**

1  A.  The payments were made out of the
2  operations account.
3  Q.  And did you keep an expense report for
4  those payments?
5  A.  No.
6  Q.  So was it just considered normal
7  operating expenses?
8  A.  If there was money to pay the
9  payments, they were paid.  If not, they weren't
10  paid.
11  Q.  And then did you ever send any evidence
12  that it was paid, to Ms. Pope?  Or did she see that
13  it was being paid during that time?  Or did you just
14  tell her, word of mouth, that, hey, we made the
15  payment this month?
16  MR. CLAYTON: Objection.  Compound,
17  confusing, foundation and speculation.
18  BY MR. THOMAS:
19  Q.  You can answer the question.
20  A.  No, I just paid them when the money
21  was there for payment.
22  Q.  And then did you tell Ms. Pope that you
23  paid it?
24  A.  No.
25  Q.  Did you receive -- I guess this is more

**Page 22**

1  of a practical question.  How did you know how much
2  to pay each month?
3  A.  The payment was the same.  I had a
4  piece of paper with the payment amount on it.
5  Q.  What was the payment amount?
6  A.  I don't remember the amount.
7  Q.  But you remember it was the same every
8  single month?
9  A.  Yeah.
10  Q.  Do you remember, roughly, was it a
11  thousand dollars, $500, what the payment was?
12  A.  I don't remember if it was
13  three-something or four-something.  I don't remember
14  the figure.
15  Q.  But you do remember paying around 3- to
16  $400 when the money was available?
17  A.  I believe so.
18  Q.  Before we do the next document, I'm
19  just going to ask you a few questions.
20  Do you remember, approximately, when
21  the Wells Fargo relationship was created?
22  A.  It's been 15 years or so.
23  Q.  And so do you remember, approximately,
24  how it was created?
25  A.  It was created through a proposal

**Page 23**

1  application process.
2  Q.  Do you remember who crafted that
3  proposal?
4  A.  It would have been me.
5  Q.  Do you remember a, I guess, community
6  development business proposal that Ms. Pope
7  submitted, I believe at your behest, to Wells Fargo?
8  A.  That had nothing to do with REO
9  accounts.
10  Q.  Well, why don't you tell me what it had
11  to do with.
12  A.  In my recollection, that was some kind
13  of company she was developing, a nonprofit company,
14  to do mortgage counseling and to get a grant from
15  Wells Fargo to do that mortgage counseling.
16  Q.  And then do you remember that Wells
17  Fargo ever paid Brown and Pope any amount for that?
18  A.  No, I don't remember.
19  Q.  If I would say that there was
20  approximately $10,000 from Wells Fargo, written to
21  Brown and Pope, in relation to the business
22  proposal, does that sound reasonable?
23  MR. CLAYTON: Objection.
24  Foundation, speculation.
25  BY MR. THOMAS:

**Page 24**

1  Q.  You can still answer the question.
2  A.  I don't remember it, but possible.
3  Q.  And then if there was, based on the
4  relationship that Brown and Pope had, if Wells Fargo
5  were to write any funds, would it be going to Ms.
6  Pope, directly, or would it be going to Brown and
7  Pope, directly?
8  MR. CLAYTON: Same objections.
9  BY MR. THOMAS:
10  Q.  You can answer the question.
11  A.  I don't know where.  I didn't really
12  handle that.  She did.
13  Q.  Generally speaking, when Wells Fargo
14  paid Brown and Pope for services, how did those
15  payments, how were they received?
16  A.  Brown and Pope for services?  If we're
17  talking about the same thing, that was a nonprofit
18  entity of Wells Fargo, that had nothing to do with
19  REOs.  So I don't know what services.  That's a
20  totally different thing.
21  Q.  We'll jump into the REOs.  Why don't
22  you tell me how the REO relationship with Wells
23  Fargo worked.
24  A.  Oh, that's what I said.  It's from a
25  proposal application process.

BROWN & POPE v.                                                                    MARTIN BROWN
SHARONN THOMAS POPE                                                                July 27, 2017

---

Page 25

1    Q.    And then what did you actually do for
2  Wells Fargo?  Or what did the firm do for Wells
3  Fargo?
4    A.    We did any and everything involved in
5  the management of a property, from start to when the
6  property sold.
7    Q.    And then you, personally, what did you
8  handle from that component?  Or were you more of an
9  overseeing entity, in terms of the Wells Fargo
10  management or sales?
11    A.    Well, when it started out, you know, I
12  did everything with a personal assistant.
13    Q.    And then when Ms. Pope became involved
14  with that process, how did those -- I guess, how did
15  that shift?  What did you shift to her or how did
16  those responsibilities change?
17    A.    So at some juncture, upper management
18  at Wells Fargo reached out to me and asked me if I
19  had any other REO agents that could do this work.
20    MR. THOMAS: Let's go on to
21  Exhibit D, because I think that's directly
22  on point, now.
23    - - -
24    (E-mail chain received and
25  marked for identification as Deposition

---

Page 26

1  Exhibit D)
2    - - -
3    MR. THOMAS: I'm going to say
4  for the record, Exhibit D was actually
5  used in the previous deposition.  So I'm
6  simply putting the Exhibit D sticker over
7  where the previous deposition sticker was,
8  just for clarity sake, but I'll show what
9  I'm talking about.
10  BY MR. THOMAS:
11    Q.    So you've had a chance to look at this
12  chain of e-mails.  Are you familiar with what this
13  is?
14    A.    Yes.
15    Q.    You, personally, sent the e-mail to a
16  Mr. Michael Shiflet.  You were the one that sent him
17  the e-mail on the first page, dated July 17th.  Was
18  that you who sent that e-mail from
19  soldmartin@aol.com?
20    A.    The first page has an e-mail from
21  Sharonn.
22    Q.    Correct.  And then after that, the
23  second half of the first page has an e-mail from
24  Brown and Pope Realtors.  So that second e-mail,
25  that was from you?

---

Page 27

1    A.    Yep.
2    Q.    And what was, I guess for lack of a
3  better term, your intent behind sending the e-mail?
4    A.    I was setting up accounts for agents
5  in the office.
6    Q.    Did you send any e-mails for any other
7  agents or was it only sent for Ms. Pope?
8    A.    No, several agents.
9    Q.    Do you know who those other agents
10  were, at that time?
11    A.    Renee Burton, Kim Thomas, Darnell
12  King.
13    Q.    Did it include a Monica Dillard?
14    A.    Monica Dillard, yeah.
15    Q.    A Ms. Butcher-Jallah?
16    A.    That's correct.
17    Q.    And what was, I guess, the purpose for
18  setting up these agents?
19    A.    The purpose was to grow the business.
20    Q.    And when you say grow the business, can
21  you elaborate a little more?
22    A.    The more properties, the more income.
23    Q.    Okay.  So I guess it's a little more.
24  In terms of I guess 2014, what percentage of the
25  business was with Wells Fargo, when these e-mails

---

Page 28

1  were sent?
2    A.    What percentage of my personal
3  business was with Wells Fargo?
4    Q.    Brown and Pope and your personal, if it
5  changes.
6    A.    I mean, so I was the only one with an
7  account with Wells Fargo, so that was my personal
8  business.
9    Q.    And it became part of Brown and Pope
10  when you were setting up additional, I guess point
11  people?  Or what was the thought process of setting
12  up additional people with Wells Fargo?
13    A.    To increase my income.
14    Q.    Fair enough.  Was it also to try and
15  build up Brown and Pope, as well, or was it just
16  your personal income?
17    A.    I mean, I guess, inherently, the
18  perception of the volume, by signs, but you know,
19  it's a hundred percent commission.  Just like when I
20  worked for other companies, I had teams and it was
21  to build my income.
22    Q.    That makes sense.  It's reasonable.
23  And then based off of I guess the addition of these
24  people, do you know approximately how much your
25  income increased during that time?

---

BROWN & POPE v.　MARTIN BROWN
SHARONN THOMAS POPE　July 27, 2017

| Page 29 | Page 31 |
|---|---|
| 1　A.　No, I don't. | 1　BY MR. THOMAS: |
| 2　Q.　Do you know a percentage increase? | 2　Q.　Do you know what this Exhibit E is? |
| 3　A.　No. | 3　A.　It looks like the independent |
| 4　Q.　Would it be fair to say that because of | 4　contractor agreement. |
| 5　these additional people working with Wells Fargo, | 5　Q.　Do you remember signing it and when it |
| 6　though, your income increased? | 6　was created? |
| 7　A.　Yes. | 7　A.　I don't see a date when I signed it. |
| 8　Q.　And was there any time that this | 8　Q.　Did you sign the independent contractor |
| 9　relationship with Wells Fargo changed or it | 9　agreement? |
| 10　decreased? | 10　A.　That is my signature. |
| 11　A.　Well, the business fluctuates. | 11　Q.　What is? |
| 12　Q.　I'll just go ask the question as | 12　A.　On the last page, the signature page. |
| 13　directly as I can. Do you remember, at any given | 13　Q.　I believe you're talking about -- |
| 14　time, when the business with Wells Fargo was not | 14　A.　It would be 014. |
| 15　going well or if they eventually chose to leave? | 15　Q.　So that's your signature, where I guess |
| 16　A.　If they eventually chose to leave? So | 16　it says Brown and Thomas, LLC, d/b/a, your signature |
| 17　they didn't choose to leave my company. They can | 17　is below that section? |
| 18　make an individual decision based on scoring, | 18　A.　Yeah, where it says by Martin, right. |
| 19　When inventory gets low, to remove agents without | 19　Q.　Oh, so that's just your signature right |
| 20　the highest score. It happened all the time. | 20　there? |
| 21　Q.　And did it happen in this case? | 21　A.　Yeah. |
| 22　A.　My account was removed in the scoring | 22　Q.　What is the -- and I just can't read |
| 23　process, at some point. | 23　it. |
| 24　Q.　Do you remember, approximately, when | 24　A.　Broker. |
| 25　that was? | 25　Q.　So you were a broker, at that time? |

| Page 30 | Page 32 |
|---|---|
| 1　A.　No, I don't remember. | 1　A.　Correct. |
| 2　Q.　How did you learn that your account was | 2　Q.　Are you still, currently a broker? |
| 3　removed? | 3　A.　Correct. |
| 4　A.　E-mail. | 4　Q.　And to the right of your signature, |
| 5　Q.　Do you remember approximately when? | 5　that looks like it's a handwritten description. |
| 6　A.　No, I don't. | 6　Is it normal for the contractor to print their name |
| 7　Q.　How did you tell the other members of | 7　or would there usually be a signature there? |
| 8　Brown and Pope about the fact your account was | 8　A.　Should have signed it. But it's |
| 9　removed? Or did you tell? | 9　signed, the other documents. The addendums are |
| 10　A.　There was no reason to. | 10　signed by her. Addendum A, the credit card addendum |
| 11　Q.　So did you ever tell them, or no? | 11　is signed by her. So the other parts of the |
| 12　A.　Not that I'm aware of, no. | 12　contract have signatures. |
| 13　Q.　All right. Fair enough. That's | 13　Q.　Did you sign any of the other parts of |
| 14　direct. Let's shift gears, slightly. | 14　the contract? |
| 15　MR. THOMAS: I'm going to call | 15　A.　No. |
| 16　this Exhibit E. It's the same as before. | 16　Q.　Just so we're clear, so the only part |
| 17　Exhibit E was used in the previous | 17　of the contract that you signed was the one where |
| 18　deposition. So I'm just going to put a new | 18　she printed her name? |
| 19　sticker over where the other one was, but | 19　A.　Correct. |
| 20　it's the same exhibit. | 20　Q.　On page, I guess MB16, what is that |
| 21　- - - | 21　addendum? I guess I should say what is that |
| 22　(Independent Contractor | 22　document? |
| 23　Agreement received and marked for | 23　A.　This is an addendum of the agreed upon |
| 24　identification as Deposition Exhibit E) | 24　commissions for wholesale business, for retail |
| 25　- - - | 25　business. |

CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 10 of 24 Trans ID: LCV2017453938

FILED, Case 18-17430-ef  Division  Doc 47  22 Filed  06/07/19 7:44:47  Entered 06/07/19 15:50:24  Desc Main
BROWN & POPE v.                                                                                    MARTIN BROWN
SHARONN THOMAS POPE        Document        Page 190 of 282                              July 27, 2017

Page 33

1    Q.    And based on your understanding of that
2  document, what was Ms. Thomas, Ms. Pope entitled to
3  for her commissions, based on this document?
4    **A.    For retail business, she's entitled to**
5  **whatever the document says.  She was paid $1,250 a**
6  **month, and she received a commission, minus the**
7  **other things that are described at the top of the**
8  **Addendum A.**
9    Q.    I guess that's my question.  So the
10 commission percentage, what would she be entitled
11 to?
12        MR. CLAYTON: Objection.  Asked
13     and answered.
14 BY MR. THOMAS:
15   Q.    You can still answer.  The actual
16 percentage of commission, though, what would she be
17 entitled to?
18        MR. CLAYTON: Same objection.
19 BY MR. THOMAS:
20   Q.    You can still answer the question.
21   **A.    So on retail business, she's entitled**
22 **to what the agreement says.**
23   Q.    So this specific agreement, this
24 independent contractor agreement, my understanding
25 is she would be entitled to a hundred percent of the

Page 34

1  commissions, based on this specific agreement.
2  Would that be accurate?
3    **A.    Minus the other fees at the top of the**
4  **agreement.**
5    Q.    That's fair.  So it would be a hundred
6  percent minus, I guess, the $1,250 a month at home?
7    **A.    No, at the top of the agreement**
8  **there's other fees.**
9    Q.    Can you tell me exactly what you're
10 referencing, just for clarity?
11   **A.    The top of the agreement, 5 percent**
12 **brokerage fee, .009 insurance administration fee,**
13 **$50 transaction fee for each side, buyer and seller,**
14 **$40 per closed transaction.  So all those fees.**
15   Q.    So in essence, it's a hundred percent,
16 minus those fees?
17   **A.    Right.  For retail business, yes.**
18   Q.    Just so I'm a hundred percent clear,
19 because I was actually a little confused, this says
20 realty executives will collect no less than a
21 hundred percent of the total commissions towards
22 outstanding bills that are one to 30 days past due.
23 What is that referencing?
24   **A.    So what that meant was, is that I**
25 **could have taken a hundred percent of her commission**

Page 35

1  every time, to pay her bill.
2    Q.    And in terms of that bill, how did
3  Ms. Thomas know what that bill was or what her
4  outstanding balance was?
5    **A.    On a monthly basis, she received a**
6  **copy of her bill.**
7    Q.    So you're saying at the time, there was
8  a monthly bill sent out to Ms. Thomas that said this
9  is what your current balance is?
10   **A.    That's correct.**
11       MR. THOMAS: The next one, it's
12     going to be two documents, but they're both
13     Exhibit F.
14           - - -
15     (LLC Operating Agreement
16     received and marked for identification as
17     Deposition Exhibit F)
18           - - -
19 BY MR. THOMAS:
20   Q.    So you've had a chance to check out the
21 two exhibits.  Do you know what these two exhibits
22 are?
23   **A.    They both say operating agreement.**
24   Q.    I guess in terms of the dates, let's
25 start with I guess page 1 of this exhibit.

Page 36

1        MR. CLAYTON: You're marking.
2     both of these as Exhibit F, together?
3        MR. THOMAS: Yes.
4        MR. CLAYTON: Which is page 1?
5        MR. THOMAS: So page 1 would
6     be the one that does not have the previous
7     exhibit number on it.
8        MR. CLAYTON: Got it.
9        MR. THOMAS: Of the LLC
10     agreement.
11 BY MR. THOMAS:
12   Q.    So for page 1 of this LLC agreement,
13 what date was it actually originally made, at the
14 top?
15   **A.    It says November 5th.**
16   Q.    And the other one, since you have them
17 both side to side, it makes it very easy, what date
18 was that one created?
19   **A.    November 5th.**
20   Q.    And what year for both?
21   **A.    2011.**
22   Q.    So in essence, these should be the same
23 document; is that accurate?
24       MR. CLAYTON: Objection.
25     foundation, speculation.

Page 37

1      MR. THOMAS: Let me rephrase
2   the question.
3   BY MR. THOMAS:
4      Q.   Did you create two separate LLC
5   operating agreements on November 5th or did you
6   create just one?
7      A.   The only one I'm familiar with is this
8   one here.
9      Q.   So when you say this one --
10     A.   The one that's dated.  They're both
11  dated the same date.
12     Q.   So let's just make this easy.  So the
13  one that you're referencing was the one that was on
14  top, was the first one.  And just to distinguish, it
15  has the signature page dated November 17th, 2011; is
16  that correct?
17     A.   Yes.
18     Q.   And then the second one, which I'll
19  just call the second one, has a signature page,
20  November 5th, 2011?
21     A.   Yes.
22     Q.   So for the first one, you're saying
23  you're only familiar with the first one; is that
24  correct?
25     A.   Yes, this one is the only one I

Page 38

1   recollect.
2      Q.   And then in terms of the signature
3   page, is it fair to say -- and I know that this is a
4   copy, but is it fair to say that this one was signed
5   with blue ink, even though right now it's black ink?
6      MR. CLAYTON: Objection.
7   Foundation.
8      MR. THOMAS: Yeah, scratch
9   that.
10  BY MR. THOMAS:
11     Q.   When you say you're only familiar with
12  this, what do you mean?
13     A.   So I know that when I made changes to
14  the operating agreement, that I also did long
15  paragraphs in the withdraw or death section.  So
16  that's why I recall that this would be the one.
17     Q.   Why did you make the updates, for what
18  purpose?
19     A.   Well, the updates were made because
20  the Real Estate Commission in Connecticut required
21  that the broker have the majority ownership of the
22  company.  That's why.
23     Q.   And you're saying that Commission, you
24  still had to follow those rules, even though you
25  were not in Connecticut; is that correct?

Page 39

1      A.   Absolutely.
2      Q.   Did you do much business in
3   Connecticut?
4      A.   No.  The office failed, so we closed
5   it.
6      Q.   At the time that this operating
7   agreement was signed, what state or states were you
8   planning on working in?
9      A.   I mean, I had licenses in New Jersey,
10  PA, Delaware, New York, Maryland, and Connecticut
11  being the last one.
12     Q.   And I guess at the time that you had
13  created this LLC, did you have a specific area
14  you were looking to try and do work in, such as just
15  New Jersey, or were you looking to try to work in
16  all of those states?
17     A.   When I created this operating
18  agreement?
19     Q.   Yes.
20     A.   Well, the adjustments for the
21  operating agreement was because of the requirement
22  of the Connecticut Real Estate Commission to make
23  adjustments to the operating agreement.
24     Q.   And what specific adjustments are you
25  referencing?

Page 40

1      A.   Well, the biggest adjustment was that
2   I had to have the majority share, own the majority
3   share of the company.
4      Q.   If you look at withdraw of death, for
5   both of those agreements, I believe it's the fourth
6   page for both, it appears with the lengthier
7   component, that there were some significant changes,
8   but they did not actually change the 49 percent.
9      Do you remember or do you recall -- or
10  you can certainly review -- what those specific
11  changes were to the withdraw of death section, in I
12  guess the first version, the longer version?
13     MR. CLAYTON: Objection.
14  Compound and confusing.
15  BY MR. THOMAS:
16     Q.   You can answer the question.
17     A.   Well, whatever you see there is what
18  was changed.
19     Q.   When did you make the change?
20     MR. CLAYTON: Objection.
21  Assumes facts not in evidence.  Speculation
22  and foundation.
23  BY MR. THOMAS:
24     Q.   You can still answer the question.
25     A.   Whatever the date of this agreement

Page 41

1   was, is when the change was made.
2       Q.   So November 5th the change was made?
3       A.   Correct.
4       Q.   And then this part, the second version
5   was made November 17th; is that correct?
6       A.   No, it was signed on November 17th.
7       Q.   And the other one has a signature page
8   that's attached as, I believe November 5th; is that
9   correct?
10      A.   Yes, that's what it says.
11      Q.   Why are there two -- in your opinion,
12  why are there two different signature pages?
13      A.   I have no idea.
14      Q.   Do you remember signing the second copy
15  on November 5th?
16      A.   That's my signature, absolutely.
17      Q.   The signature page on November 5th, for
18  the second version, would you have signed it and
19  then go back and make changes, afterwards?
20          MR. CLAYTON: Objection.
21  Foundation and speculation.
22          THE WITNESS: No.
23  BY MR. THOMAS:
24      Q.   So the changes that you made to the
25  November 17th version, those were made before you

Page 42

1   went and signed; is that correct?
2           MR. CLAYTON: Same objections.
3   BY MR. THOMAS:
4       Q.   You can answer.  I guess what I'm
5   trying to get to the bottom of is that second
6   version that has the November 5th signature page,
7   was it signed on November 5th, if you still had to
8   make changes?
9       A.   I have no idea, but it's signed and
10  it's signed by both parties, and then so was this
11  one.  And they're different dates; right?
12      Q.   Do you remember signing the one dated
13  November 5th?
14      A.   That's my signature.
15      Q.   And I'll note that's not directly a yes
16  or a no, but you're stating that that is your
17  signature?
18      A.   Correct.
19      Q.   Just to confirm for the record, the
20  version that's dated November 5th, that cover page,
21  that has the crossed out Exhibit 3 on it; is that
22  correct?
23      A.   Yes.
24      Q.   That was submitted by your attorney at
25  the previous deposition.  Do you remember the

Page 43

1   previous deposition?  I believe you attended.
2       A.   Yeah.  I was there, yeah.
3           MR. THOMAS: I'm going to give
4       you what can be labeled as Exhibit G.
5           - - -
6           (2011 Schedule K-1 received and
7       marked for identification as Deposition
8       Exhibit G)
9   BY MR. THOMAS:
10      Q.   Exhibit G, are you familiar with these
11  documents?
12      A.   Yes.
13      Q.   What are they?
14      A.   It's called a K-1.  It's from the
15  business tax returns.  It's Sharonn's report of the
16  write-off for company losses each year.
17      Q.   Did you have one for yourself, as well?
18      A.   Yes.
19      Q.   Same as before -- and I already know
20  what your attorney is going to object to, but we're
21  going to be requesting a copy of your write-off, as
22  well, for the tax years 2011 to 2015, for review, as
23  part of discovery.
24          MR. CLAYTON: So, as before, I
25      would suggest that you put all of these

Page 44

1       supplemental requests into a confirming
2       letter, and we'll take it under advisement.
3       And to the extent you're making documentary
4       requests, I suggest you put them into
5       document requests, if you want them to be
6       considered as such.
7           MR. THOMAS: Understood.  And
8       I'm going to say, just as before, we're
9       going to continue this request, and we will
10      be submitting a request of all of these, in
11      writing, to you.
12  BY MR. THOMAS:
13      Q.   So how were these, I guess losses, how
14  were these numbers calculated?
15      A.   Reports are sent to the CPA, and
16  that's what happens.
17      Q.   What reports are sent to the CPA?
18      A.   Out of Lone Wolf, there's
19  end-of-the-year reports, they're sent to the CPA and
20  he does the taxes.
21      Q.   Does Ms. Pope have to sign off on
22  these, since it's her name on them?
23      A.   Probably somewhere along the line, in
24  the beginning, he had her signature.
25      Q.   So each year, 2011 through 2015, did

**BROWN & POPE v.**
**SHARONN THOMAS POPE**

**MARTIN BROWN**
**July 27, 2017**

Page 45

1  she have to sign the new forms?
2  **A.   I don't believe either one of us**
3  **signed new forms.**
4  Q.    So who actually signed the tax return
5  when it was submitted to the IRS?
6  **MR. CLAYTON:** Objection.  Vague
7  and ambiguous.
8  BY MR. THOMAS:
9  Q.    Who signed the tax return, each of
10  these years when it was submitted to the IRS?
11  **MR. CLAYTON:** Same objection.
12  BY MR. THOMAS:
13  Q.    You can answer the question.
14  **A.   We each had our own tax returns.  This**
15  **is just an addition to the tax return.**
16  Q.    For these partner's share of income and
17  deduction items, did Brown and Pope submit a tax
18  return?
19  **A.   No.**
20  Q.    So it was only submitted as a
21  supplement to each individual's tax return?
22  **A.   That's correct.**
23  Q.    So these Schedule K-1 forms were only
24  to be used for a personal tax return?
25  **A.   Correct.**

Page 46

1  Q.    And so during this entire timeframe,
2  '11 through '15, there was no tax return submitted
3  by the entity; is that correct?
4  **A.   No, I don't think that's correct.**
5  Q.    It does have its own EIN number; is
6  that correct?
7  **A.   Right.  So there was a business tax**
8  **return every year, I believe, for the entity, as**
9  **well.**
10  Q.    Let me take a step back.  You're saying
11  that these K-1s were specific only to
12  Ms. Sharonn Thomas Pope?
13  **A.   The one you have in your hand, yes.**
14  Q.    I have from 2011 -- and you can tell me
15  if you don't.  I have '11, '12, '13, '14 and '15.
16  **A.   Correct.**
17  Q.    During those years, what was the
18  partner's share being reported during those five
19  years?
20  **A.   50 percent.**
21  Q.    Does that reflect all of the agreements
22  that were signed and in effect during that time?
23  **MR. CLAYTON:** Objection.  Calls
24  for a legal conclusion, foundation.
25  **MR. THOMAS:** It's a very purely

Page 47

1  factual question.
2  BY MR. THOMAS:
3  Q.    Every single agreement that controlled
4  during that time, did it reflect 50 percent
5  ownership?
6  **MR. CLAYTON:** Same objections.
7  BY MR. THOMAS:
8  Q.    You can answer the question.
9  **A.   I never changed the benefit to her by**
10  **one percent.**
11  Q.    What was the purpose for having
12  yourself at 51 percent, on the agreements?
13  **A.   Because the Real Estate Commission of**
14  **Connecticut required it.**
15  Q.    During the entire time that Ms. Pope
16  was active in the firm, was there ever a single real
17  estate anything that was either bought or sold or
18  dealt with through Connecticut?
19  **A.   Yes.  There was a couple transactions,**
20  **yes.**
21  Q.    Do you remember the timeframe for those
22  or when those occurred?
23  **A.   No.**
24  Q.    But you're stating that there were at
25  least one or two that occurred through Connecticut?

Page 48

1  **A.   I believe so, yes.**
2  Q.    In what state or states did the vast
3  majority of the work occur?
4  **A.   It depends on what years.**
5  Q.    Would it be fair to say most years the
6  vast majority of them were in New Jersey?
7  **A.   No.  Some years the vast majority of**
8  **them were in Maryland.**
9  Q.    Nonetheless, during that entire 2011 to
10  2015, the IRS paperwork that was submitted always
11  said that she was a 50 percent shareholder; is that
12  correct?
13  **A.   The K-1, yes.**
14  Q.    Is there any other paperwork that
15  exists, that you're aware of, that specifically
16  stated she was a 50 percent owner?
17  **A.   The original operating agreement.**
18  Q.    And since that original operating
19  agreement, was she considered a 50 percent owner in
20  any other documents since then, besides these K-1s?
21  **A.   I'm confused with your question.**
22  Q.    These say from 2011 to 2015 she's a 50
23  percent owner; is that correct?
24  **A.   Those were the only K-1s that were**
25  **retrievable from the accountant on record.  It's**

Page 49

1  been the same since we opened.
2      Q.   When you say it's been the same, you're
3  saying that she's been considered, as reported to
4  the IRS, as a 50 percent shareholder?
5          MR. CLAYTON: Objection.
6  Foundation.  Calls for a legal conclusion.
7          MR. THOMAS: I will point out
8      he answered the question.
9  BY MR. THOMAS:
10     Q.   But you can answer that question again,
11 if you'd like.
12         So again, on the documents submitted
13 to the IRS, it was reported that Ms. Sharonn Thomas
14 Pope was a 50 percent partner; is that correct?
15         MR. CLAYTON: Same objections.
16 BY MR. THOMAS:
17     Q.   You can still answer the question.
18     A.   I never changed the benefit to her by
19 a couple percent on a loss of taxes.
20     Q.   So just to confirm, that would be a yes
21 then, that these documents all reflect -- and we can
22 go through each one, if you'd like, but these
23 documents all reflect that she's a 50 percent owner;
24 is that correct?
25         MR. CLAYTON: Same objection.

Page 50

1      legal conclusion and asked and answered.
2  BY MR. THOMAS:
3      Q.   And you can answer yes or no.
4      A.   Okay.  So I answered.
5      Q.   And that answer is yes or no?
6          MR. CLAYTON: Same objections.
7      He's answered the question.  At this point,
8      you're just arguing with him and you're
9      asking him to make legal conclusions that
10     he's not competent to make.
11 BY MR. THOMAS:
12     Q.   Okay.  I'll go through each one, since
13 your attorney wants me to.
14         In 2011, part J of the Schedule K-1,
15 what is part J?
16     A.   Number one, I'm not an accountant.  So
17 I can't really interpret these forms for you.
18     Q.   That's okay.  The numbers, in part 2,
19 where it says information about the partner, there's
20 a paragraph J.  What does it specifically say?
21         MR. CLAYTON: Mr. Thomas, you're not
22 listening to the witness.
23         MR. THOMAS: If I may, you're
24 not here to testify.
25         MR. CLAYTON: He's just

Page 51

1  explained that he doesn't understand this,
2  and that's the basis for my foundation
3  objection.
4          MR. THOMAS: And I'm going to
5  say you're not here to testify, sir, with all
6  due respect.  He can answer the questions
7  himself.  If he's not sure, I can
8  clarify for him.
9          MR. CLAYTON: You're asking him
10 to speculate, you're asking him for legal
11 conclusions, as to which he has no
12 foundation, and you're wasting time, given
13 that the documents have already been marked
14 as an exhibit.  But with those objections,
15 it's your deposition.
16         MR. THOMAS: Respectfully, they
17 are marked as an exhibit.
18         MR. CLAYTON: Yes, that's my
19 point.
20         MR. THOMAS: And I'm simply
21 asking his interpretation of the documents
22 that he submitted to the IRS or, through his
23 accountant, submitted.
24 BY MR. THOMAS:
25     Q.   So just to clarify -- and we can try it

Page 52

1  once more to "save time."
2          On each K-1, every single one is
3  marked as a 50 percent partner; is that correct?
4          MR. CLAYTON: Objection.  It
5  mischaracterizes the evidence, which
6  describes the partner's share of the
7  profit, loss and capital.
8          MR. THOMAS: I'm going to say
9  once again, with all due respect, you're not
10 here to testify.  Your client is.
11         MR. CLAYTON: You're
12 mischaracterizing the evidence.  I'm making
13 an objection on that basis.
14         MR. THOMAS: That's not an
15 actual objection.
16         MR. CLAYTON: It is.
17         MR. THOMAS: I'd like to see
18 the New Jersey rules that say that's an
19 objection.
20 BY MR. THOMAS:
21     Q.   But nonetheless, what is your
22 understanding of the partner's share, based on these
23 documents?
24     A.   The section says --
25         MR. CLAYTON: Same objections.

BROWN & POPE v.                                                          MARTIN BROWN
SHARONN THOMAS POPE               July 27, 2017

| | Page 53 |
|---|---|

1    THE WITNESS: Profit, loss and
2    capital.  They all say 50 percent.
3    BY MR. THOMAS:
4    Q.    Okay.  Thank you.  And that's the same
5    for all, from 2011 to 2015?
6    A.    **In that section, that's what they all**
7    **say.**
8    Q.    Thank you.  Do you currently, still
9    have either Wells Fargo or Fannie Mae as a client to
10   your current real estate entity?
11   MR. CLAYTON: Objection.  Vague
12   and ambiguous.
13   BY MR. THOMAS:
14   Q.    You can answer the question.
15   A.    **My company still has a Wells Fargo**
16   **account, yes.**
17   Q.    That Wells Fargo account, is it of the
18   same nature as it was prior to Ms. Pope Thomas
19   leaving?
20   MR. CLAYTON: Same objection.
21   THE WITNESS: I'm not sure of
22   that question.
23   MR. THOMAS: It can't be the
24   same objection.
25   MR. CLAYTON: It's vague and

| | Page 54 |
|---|---|

1    ambiguous.  He didn't understand the
2    question, either.  It is the same objection.
3    BY MR. THOMAS:
4    Q.    The Wells Fargo account you currently
5    have, what type of work do you do?
6    A.    **It's an agent in my office that does**
7    **the exact same REO work for that account.**
8    Q.    That agent in your office that does the
9    exact same REO work, as you just said, have they
10   been doing that work since Ms. Pope left?
11   A.    **Yes.**
12   Q.    Did they do that work prior to
13   Ms. Pope leaving?
14   A.    **Yes.**
15   Q.    Fannie Mae, same question.  So you
16   still have Fannie Mae as a client?
17   A.    **No.**
18   MR. CLAYTON: Same objections.
19   Vague and ambiguous.
20   MR. THOMAS: It's very clear
21   and your client answered it with a very clear
22   yes.  I think he understood the
23   question.
24   THE WITNESS: I said no.
25   BY MR. THOMAS:

| | Page 55 |
|---|---|

1    Q.    I'm sorry.  You said no, but you
2    still answered the question.
3    So Fannie Mae, do you remember
4    approximately what year they left as a client?
5    A.    **I don't have the exact doc, but maybe**
6    **June of last year.**
7    Q.    June of 2016?
8    A.    **I believe it was 30 days or so after**
9    **Sharonn Thomas left the office.**
10   Q.    I'm sorry, I skipped this part, but the
11   individual who still has the Wells Fargo account, in
12   your firm, are they a broker?
13   A.    **No, they're an agent in my office.**
14   MR. THOMAS: Last set of documents,
15   and this can be marked as Exhibit H.
16   - - -
17   (Invoices received and marked
18   for identification as Deposition Exhibit H)
19   - - -
20   BY MR. THOMAS:
21   Q.    Are you familiar with this Exhibit?
22   A.    **Yes.**
23   Q.    What is it?
24   A.    **This is my current legal fees for**
25   **this.**

| | Page 56 |
|---|---|

1    Q.    How do you usually receive this
2    information, on a monthly basis, on a quarterly
3    basis?  How are these fees usually submitted to you?
4    A.    **Everything is done electronically.**
5    Q.    What's the rate that you usually
6    receive these bills?
7    A.    **I don't know.**
8    Q.    Do you usually pay monthly, do you pay
9    quarterly?  How are the payments made?
10   A.    **No.  My retainer agreement is based on**
11   **a two-fold system, contingency agreement and fees**
12   **and costs.**
13   Q.    Have you reviewed those bills
14   thoroughly, since they've been sent to you?
15   A.    **Yes.**
16   Q.    Was there ever any part that you
17   personally disagreed with?
18   A.    **No.**
19   Q.    Are you aware of any specific point
20   where your attorney communicated with you in these
21   bills?
22   Oh, here we go.  Such as May 18, 2016,
23   do you acknowledge that was a charge for
24   communicating with you?
25   A.    **Yes.**

Page 57

1    Q.    Did you speak with your attorney on
2  that day, that you remember?
3    A.    Yes.
4    Q.    How did you speak with your attorney
5  that day?  It says conferred.  That's why I'm
6  asking.
7    A.    Well, we either talked over the phone,
8  with documents over a computer, or I met with him in
9  his office.
10   Q.    Are you saying you're not sure on that
11 day or you're saying that that was generally how
12 those --
13   A.    Yeah, I don't know if that was a phone
14 conversation or the day I met in his office.
15   Q.    So you're aware of all of these bills
16 and you have not contested any of the charges
17 that you have been incurred?
18   A.    That's correct.
19   Q.    Has it been discussed that if this case
20 were to be dismissed, how these bills would be paid?
21         MR. CLAYTON: Pause there.
22         MR. THOMAS: I will rephrase it
23    so it doesn't fall under attorney/client
24    privilege.
25         MR. CLAYTON: Thank you.

Page 58

1         MR. THOMAS: Because I assume
2    that's what your concern is, even though
3    you didn't object.
4         MR. CLAYTON: I was making up
5    my mind, but I think that you solved my
6    problem.  Please rephrase.
7  BY MR. THOMAS:
8    Q.    You mentioned an agreement, and I don't
9  want to know the terms of that agreement.  Let me
10 just make that clear.  I don't want to know those
11 terms.
12         As part of discussions for settlement,
13 if this case were settled and dismissed, was there
14 an agreement that the bills would be paid after
15 that?
16         MR. CLAYTON: Objection, on the
17    grounds of attorney/client privilege,
18    and instruct the witness not to answer.
19         MR. THOMAS: I'm actually not
20    going to say you can answer that question,
21    but let me limit it to this.
22 BY MR. THOMAS:
23   Q.    It's your understanding that these
24 bills are all fair bills that have been incurred by
25 your attorney, that have been sent to you; is that

Page 59

1  correct?
2    A.    Correct.
3    Q.    And it's your understanding that these
4  bills should all be paid in a timely manner; is that
5  correct?
6    A.    They should be paid as agreed upon in
7  my retainer agreement.
8    Q.    Page 151, actually, just a quick
9  question there, last page.  Ignoring the balance due
10 for the moment, what does the very small text say at
11 the bottom of that page, next to balance due?
12   A.    You're talking about where it says
13 "attached is the monthly invoice"?
14   Q.    Yes.
15   A.    "Please make payment upon receipt."
16   Q.    What is your understanding of that
17 phrase?
18   A.    I have no understanding of that
19 phrase.
20   Q.    Neither do I.
21         MR. THOMAS: If we may take
22    about two minutes to pause, I'm going to
23    confer with my client, but I believe we may
24    be finished.
25                  - - -

Page 60

1         (At this point, a short recess
2    was taken, after which time the deposition
3    resumed.)
4                  - - -
5  BY MR. THOMAS:
6    Q.    Two quick follow-ups.  You mentioned
7  that the new, I guess Brown Realtors, do you
8  remember what date, approximately, that was actually
9  created?
10         MR. CLAYTON: Objection.  Foundation
11    and assumes facts not in evidence.
12 BY MR. THOMAS:
13   Q.    You can answer the question.
14         MR. CLAYTON: Also vague.
15         THE WITNESS: Somewhere after
16    this e-mail saying that she wanted nothing
17    else to do with the company, it was done.
18 BY MR. THOMAS:
19   Q.    Was it after the Complaint was filed?
20   A.    It was some date after I received a
21 letter saying she is no longer involved in the
22 company.
23   Q.    Just for clarification purposes then,
24 when the Complaint was filed, was Brown and Pope
25 still in existence or was Brown Realtors created, as

Page 61

1  well?
2        MR. CLAYTON: Same objections.
3  legal conclusions, foundation and assumes
4  facts not in evidence.  Also asked and
5  answered and speculation.
6  BY MR. THOMAS:
7     Q.    You can answer the question.
8     A.    Yeah.  My only recollection is some
9  date after the partner said she wanted nothing to do
10  with the company anymore.
11    Q.    And based on your estimate, since this
12  has come up a few times, the hard, physical
13  possessions in the office, such as furniture,
14  computers and any other office materials, if you
15  were told to put a value on them, what would your
16  best estimate be?
17        MR. CLAYTON: Objection.  Calls for
18  speculation.  Lack of foundation.
19  BY MR. THOMAS:
20    Q.    You can still answer the question.
21    A.    $1,500.
22    Q.    And was it $1,500 at the time that
23  Ms. Thomas Pope left or is it $1,500 now?
24    A.    Same.
25        MR. THOMAS: I think we're

Page 62

1  done, actually.  Okay.
2        MR. CLAYTON: Let me have a
3  minute with my client, actually.
4        - - -
5        (At this point, a short recess
6  was taken, after which time the deposition
7  resumed.)
8        - - -
9        MR. CLAYTON: I have no
10  questions, at this time.  I would like to
11  reserve the right for the witness to read
12  and sign the deposition.
13        And with that, the deposition
14  is concluded.  Thank you, all.
15        MR. THOMAS: Thank, you very
16  much.
17        - - -
18        (DEPOSITION CONCLUDED - 2:06 P.M.)
19        - - -
20
21
22
23
24
25

Page 63

1              C E R T I F I C A T E
2
3
4        I, KAREN M. UNGHIRE, Court Reporter -
5  Notary Public, do hereby certify that the
6  proceedings, evidence, and objections noted are
7  contained fully and accurately in the notes taken by
8  me of the preceding deposition, and that this copy
9  is a correct transcript of the same.
10
11
12
13
14
15
16
17        _____
18        KAREN M. UNGHIRE
         COURT REPORTER - NOTARY PUBLIC
19
20
21
22
23
24
25

Page 64

1            E R R A T A   S H E E T
2
3        I, MARTIN BROWN, hereby acknowledge that I
4  have read the foregoing deposition dated July 27,
5  2017, and that the same is a true and correct
6  transcription of the answers given by me to the
7  questions propounded, except for the changes, if
8  any, noted on the Errata Sheet.
9
10        --------------------------------
         MARTIN BROWN
11
12  PAGE     LINE      DESCRIPTION CORRECTION
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

BROWN & POPE v.                                                                    MARTIN BROWN
SHARONN THOMAS POPE                                                                July 27, 2017

## $

**$1,250 (2)**
33:5;34:6
**$1,500 (3)**
61:21,22,23
**$10,000 (1)**
23:20
**$30,000 (4)**
18:21;19:6,7,9
**$40 (1)**
34:14
**$400 (1)**
22:16
**$50 (1)**
34:13
**$500 (1)**
22:11
**$51,720 (1)**
19:15

## A

**abbreviated (1)**
4:14
**able (1)**
11:25
**Absolutely (4)**
9:20;11:9;39:1;
41:16
**accommodate (1)**
15:17
**account (18)**
7:2,4,9,21;8:3;13:16;
20:20,20;21:2;28:7;
29:22;30:2,8;53:16,17;
54:4,7;55:11
**accountant (3)**
48:25;50:16;51:23
**accounting (4)**
7:1,16,19;13:14
**accounts (2)**
23:9;27:4
**accrued (1)**
15:22
**accurate (4)**
7:5,21;34:2;36:23
**acknowledge (1)**
56:23
**active (1)**
47:16
**actual (2)**
33:15;52:15
**actually (17)**
7:7;8:8;14:7;15:9,
18;16:13;25:1;26:4;
34:19;36:13;40:8;45:4;
58:19;59:8;60:8;62:1,3
**Addendum (5)**
32:10,10,21,23;33:8
**addendums (1)**
32:9

**addition (2)**
28:23;45:15
**additional (3)**
28:10,12;29:5
**adjustment (1)**
40:1
**adjustments (3)**
39:20,23,24
**administration (1)**
34:12
**advisement (4)**
10:12,22;17:5;44:2
**afterwards (1)**
41:19
**Again (5)**
10:16;17:19;49:10,
12;52:9
**agent (5)**
12:11;13:11;54:6,8;
55:13
**agents (10)**
9:18,24;13:9;25:19;
27:4,7,8,9,18;29:19
**agreed (2)**
32:23;59:6
**agreeing (1)**
19:24
**agreement (33)**
7:3;16:24;17:16,20;
30:23;31:4,9;33:22,23,
24;34:1,4,7,11;35:15,
23;36:10,12;38:14;
39:7,18,21,23;40:25;
47:3;48:17,19;56:10,
11;58:8,9,14;59:7
**agreements (5)**
16:21;37:5;40:5;
46:21;47:12
**along (3)**
7:12;44:23
**always (1)**
48:10
**ambiguous (5)**
5:5;45:7;53:12;54:1,
19
**Amortization (2)**
18:14,20
**amount (7)**
13:10;19:10,14;22:4,
5,6;23:17
**answered (10)**
10:15;19:18;33:13;
49:8;50:1,4,7;54:21;
55:2;61:5
**anymore (1)**
61:10
**appear (1)**
9:15
**appears (1)**
40:6
**application (2)**
23:1;24:25
**appreciate (1)**

11:3
**approximately (12)**
8:24;11:10;18:3,21;
22:20,23;23:20;28:24;
29:24;30:5;55:4;60:8
**April (3)**
5:14,17;7:3
**area (1)**
39:13
**arguing (1)**
50:8
**around (3)**
11:10;12:22;22:15
**assistant (1)**
25:12
**assume (3)**
7:11;19:15;58:1
**assumes (7)**
16:1;19:2,19;20:22;
40:21;60:11;61:3
**attached (5)**
5:21;6:6,7;41:8;
59:13
**attended (1)**
43:1
**attorney (10)**
6:18;8:9;10:4;42:24;
43:20;50:13;56:20;
57:1,4;58:25
**attorney/client (2)**
57:23;58:17
**available (1)**
22:16
**aware (5)**
5:7;30:12;48:15;
56:19;57:15

## B

**back (4)**
6:10;20:7;41:19;
46:10
**balance (4)**
35:4,9;59:9,11
**based (12)**
17:12;18:20;19:11;
24:3;28:23;29:18;33:1,
3;34:1;52:22;56:10;
61:11
**basis (5)**
35:5;51:2;52:13;
56:2,3
**Bates (5)**
8:10,11,14,15,19
**became (2)**
25:13;28:9
**beginning (1)**
44:24
**behest (1)**
23:7
**behind (1)**
27:3
**below (1)**

31:17
**benefit (2)**
47:9;49:18
**besides (1)**
48:20
**best (2)**
14:21;61:16
**better (1)**
27:3
**biggest (1)**
40:1
**bill (5)**
35:1,2,3,6,8
**bills (13)**
15:10,14,17;34:22;
56:6,13,21;57:15,20;
58:14,24,24;59:4
**bit (1)**
14:2
**black (1)**
38:5
**blue (1)**
38:5
**both (9)**
35:12,23;36:2,17,20;
37:10;40:5,6;42:10
**bottom (5)**
7:7;8:10,14;42:5;
59:11
**bought (1)**
47:17
**broker (6)**
4:21;31:24,25;32:2;
38:21;55:12
**brokerage (1)**
34:12
**BROWN (25)**
4:4,13,20,23;9:18;
10:7;12:22;15:21;
16:15;23:17,21;24:4,6,
14,16;26:24;28:4,9,15;
30:8;31:16;45:17;60:7,
24,25
**build (2)**
28:15,21
**built (1)**
18:9
**Burton (1)**
27:11
**business (20)**
5:2;7:19;12:7;23:6,
21;27:19,20,25;28:3,8;
29:11,14;32:24,25;
33:4,21;34:17;39:2;
43:15;46:7
**Butcher-Jallah (1)**
27:15
**buyer (1)**
34:13

## C

**calculate (1)**

15:12
**calculated (1)**
44:14
**call (5)**
5:19;7:1;8:19;30:15;
37:19
**called (1)**
43:14
**Calls (4)**
16:1;46:23;49:6;
61:17
**Can (47)**
4:11;6:1;9:4,9,12,12,
21,25;10:3;11:11;
14:21,21;16:4;19:5,21;
20:5,25;21:19;24:1,10;
27:20;29:13,17;33:15,
20;34:9;40:10,16,24;
42:4;43:4;45:13;46:14;
47:8;49:10,17,21;50:3;
51:6,7,25;53:14;55:15;
58:20;60:13;61:7,20
**capital (8)**
15:22;16:7,13;17:23,
25;18:6;52:7;53:2
**card (1)**
32:10
**case (3)**
29:21;57:19;58:13
**certainly (1)**
40:10
**chain (2)**
25:24;26:12
**chance (2)**
26:11;35:20
**change (8)**
5:7;11:16;15:20;
25:16;40:8,19;41:1,2
**changed (4)**
29:9;40:18;47:9;
49:18
**changes (7)**
28:5;38:13;40:7,11;
41:19,24;42:8
**charge (1)**
56:23
**charges (1)**
57:16
**check (2)**
13:6;35:20
**choose (1)**
29:17
**chose (2)**
29:15,16
**clarification (1)**
60:23
**clarify (2)**
51:8,25
**clarity (2)**
26:8;34:10
**CLAYTON (54)**
5:4;10:11,21;15:25;
17:1;19:1,17;20:3,21;

BROWN & POPE v.
SHARONN THOMAS POPE

21:16;23:23;24:8;
33:12,18;36:1,4,8,24;
38:6;40:13,20;41:20;
42:2;43:24;45:6,11;
46:23;47:6;49:5,15,25;
50:6,21,25;51:9,18;
52:4,11,16,25;53:11,
20,25;54:18;57:21,25;
58:4,16;60:10,14;61:2,
17;62:2,9
**clear (5)**
32:16;34:18;54:20,
21;58:10
**client (13)**
7:8,10,16,18,25;
13:1;52:10;53:9;54:16,
21;55:4;59:23;62:3
**closed (2)**
34:14;39:4
**collect (1)**
34:20
**collected (1)**
17:23
**commission (12)**
11:17;12:4,12;28:19;
33:6,10,16;34:25;
38:20,23;39:22;47:13
**commissions (5)**
13:4;32:24;33:3;
34:1,21
**communicated (1)**
56:20
**communicating (1)**
56:24
**community (1)**
23:5
**companies (1)**
28:20
**company (14)**
12:6;15:3,5,21;
23:13,13;29:17;38:22;
40:3;43:16;53:15;
60:17,22;61:10
**competent (1)**
50:10
**Complaint (2)**
60:19,24
**complete (3)**
7:8,16;10:4
**completely (1)**
4:17
**component (2)**
25:8;40:7
**Compound (2)**
21:16;40:14
**computer (1)**
57:8
**computers (1)**
61:14
**concern (1)**
58:2
**concluded (2)**
62:14,18

**conclusion (3)**
46:24;49:6;50:1
**conclusions (3)**
50:9;51:11;61:3
**confer (1)**
59:23
**conferred (1)**
57:5
**confirm (3)**
6:24;42:19;49:20
**confirming (1)**
17:4;44:1
**confused (1)**
34:19;48:21
**confusing (2)**
21:17;40:14
**Connecticut (8)**
38:20,25;39:3,10,22;
47:14,18,25
**consider (1)**
16:25
**considered (4)**
21:6;44:6;48:19;
49:3
**contact (2)**
6:18,18
**contested (1)**
57:16
**contingency (1)**
56:11
**continue (1)**
44:9
**contract (3)**
32:12,14,17
**Contractor (5)**
30:22;31:4,8;32:6;
33:24
**contracts (1)**
11:20
**contribute (2)**
16:7;17:24
**contributed (3)**
15:23,24;16:13
**controlled (1)**
47:3
**conversation (1)**
57:14
**copy (5)**
16:23;35:6;38:4;
41:14;43:21
**corner (1)**
8:14
**costs (1)**
56:12
**counseling (2)**
23:14,15
**couple (2)**
47:19;49:19
**cover (1)**
42:20
**CPA (5)**
14:9;15;44:15,17,19
**CPA's (1)**

14:18
**crafted (1)**
23:2
**create (2)**
37:4,6
**created (13)**
16:6,15;17:23;18:1;
22:21,24,25;31:6;
36:18;39:13,17;60:9,
25
**credit (1)**
32:10
**crossed (1)**
42:21
**current (1)**
35:9;53:10;55:24
**currently (4)**
4:22;32:2;53:8;54:4
**custom (1)**
18:9

**D**

**d/b/a (1)**
31:16
**Darnell (2)**
9:6;27:11
**date (9)**
5:10;31:7;36:13,17;
37:11;40:25;60:8,20;
61:9
**dated (7)**
5:21;26:17;37:10,11,
15;42:12,20
**dates (2)**
35:24;42:11
**day (5)**
7:13;57:2,5,11,14
**days (5)**
7:2,10;10:3;34:22;
55:8
**dealt (1)**
47:18
**death (3)**
38:15;40:4,11
**decision (1)**
29:18
**decreased (1)**
29:10
**deduction (1)**
45:17
**Delaware (1)**
39:10
**depend (1)**
15:14
**depends (1)**
48:4
**Deposition (23)**
5:23;8:4;10:25;17:4,
6,17;18:15;25:25;26:5,
7;30:18,24;35:17;
42:25;43:1,7;51:15;
55:18;60:2;62:6,12,13,

18
**described (1)**
33:7
**describes (1)**
52:6
**description (1)**
32:5
**developing (1)**
23:13
**development (1)**
23:6
**different (3)**
24:20;41:12;42:11
**Dillard (2)**
27:13,14
**direct (2)**
6:17;30:14
**directly (6)**
14:10;24:6,7;25:21;
29:13;42:15
**disagreed (1)**
56:17
**discovery (6)**
10:19,23;16:25;17:7,
10;43:23
**discussed (1)**
57:19
**discussions (1)**
58:12
**dismissed (2)**
57:20;58:13
**dissolve (1)**
6:4
**distinguish (1)**
37:14
**doc (1)**
55:5
**document (7)**
22:18;32:22;33:2,3,
5;36:23;44:5
**documentary (1)**
44:3
**documents (13)**
17:18;32:9;35:12;
43:11;48:20;49:12,21,
23;51:13,21;52:23;
55:14;57:8
**dollars (1)**
22:11
**done (3)**
56:4;60:17;62:1
**down (2)**
9:7;12:6
**due (5)**
34:22;51:6;52:9;
59:9,11
**duly (1)**
4:4
**during (18)**
9:18;10:7;11:5,15,
18;12:3;14:16,15,9;
18:7;21:13;28:25;46:1,
17,18,22;47:4,15;48:9

**E**

**easy (2)**
36:17;37:12
**effect (1)**
46:22
**EIN (1)**
46:5
**either (5)**
45:2;47:17;53:9;
54:2;57:7
**elaborate (1)**
27:21
**electronically (1)**
56:4
**else (5)**
7:4;9:22;15:3,4;
60:17
**E-mail (20)**
5:21;6:3,10,11,13,17,
20,23;7:19,23;25:24;
26:15,17,18,20,23,24;
27:3;30:4;60:16
**e-mails (3)**
26:12;27:6,25
**end-of-the-year (1)**
44:19
**enough (2)**
28:14;30:13
**entire (4)**
13:24;46:1;47:15;
48:9
**entitled (6)**
33:2,4,10,17,21,25
**entity (8)**
16:16;17:23,25;
24:18;25:9;46:3,8;
53:10
**essence (3)**
8:22;34:15;36:22
**estate (7)**
4:21;13:21;38:20;
39:22;47:13,17;53:10
**estimate (3)**
11:11;61:11,16
**even (4)**
11:6;38:5,24;58:2
**eventually (2)**
29:15,16
**everybody (1)**
12:24
**evidence (10)**
16:1;19:3,19;20:23;
21:11;40:21;52:5,12;
60:11;61:4
**exact (4)**
5:10;54:7,9;55:5
**exactly (1)**
34:9
**examined (1)**
4:5
**executives (1)**

34:20
**Exhibit (33)**
5:19,23;6:1,5;8:1,5,
8,9;18:12,16;25:21;
26:1,4,6;30:16,17,20,
24;31:2;35:13,17,25;
36:2,7;42:21;43:4,8,
10;51:14,17;55:15,18,
21
**exhibits (2)**
35:21,21
**existence (1)**
60:25
**exists (1)**
48:15
**expense (1)**
21:3
**expenses (2)**
15:8;21:7
**explained (1)**
51:1
**extent (3)**
11:6;17:2;44:3

**F**

**fact (1)**
30:8
**facts (7)**
16:1;19:2,19;20:22;
40:21;60:11;61:4
**factual (1)**
47:1
**failed (1)**
39:4
**fair (9)**
7:23;28:14;29:4;
30:13;34:5;38:3,4;
48:5;58:24
**fall (1)**
57:23
**familiar (8)**
8:25;19:16;26:12;
37:7,23;38:11;43:10;
55:21
**Fannie (4)**
53:9;54:15,16;55:3
**Fargo (25)**
22:21;23:7,15,17,20;
24:4,13,18,23;25:2,3,9,
18;27:25;28:3,7,12;
29:5,9,14;53:9,15,17;
54:4;55:11
**fee (3)**
34:12,12,13
**fees (7)**
34:3,8,14,16;55:24;
56:3,11
**few (3)**
5:12;22:19;61:12
**figure (2)**
19:9;22:14
**figures (2)**

16:5;19:7
**filed (2)**
60:19,24
**finished (1)**
59:24
**firm (5)**
11:8;20:14;25:2;
47:16;55:12
**firm's (1)**
20:20
**first (10)**
8:16;9:3;15:21;
26:17,20,23;37:14,22,
23;40:12
**fit (1)**
12:18
**five (1)**
46:18
**fluctuates (1)**
29:11
**folks (1)**
10:1
**follow (2)**
17:4;38:24
**follows (1)**
4:6
**follow-ups (1)**
60:6
**form (1)**
14:6
**forms (5)**
14:3;45:1,3,23;50:17
**forum (1)**
17:7
**foundation (16)**
19:2,18;20:22;21:17;
23:24;36:25;38:7;
40:22;41:21;46:24;
49:6;51:2,12;60:10;
61:3,18
**four-something (1)**
22:13
**fourth (2)**
7:7;40:5
**full (2)**
4:11;11:6
**funds (3)**
13:7,8;24:5
**furnish (1)**
7:8
**furniture (1)**
61:13

**G**

**gears (2)**
15:20;30:14
**general (1)**
11:21
**generally (6)**
5:13;11:16;13:5;
15:8;24:13;57:11
**generated (1)**

9:1
**gets (1)**
29:19
**given (1)**
14:9;29:13;51:12
**grant (1)**
23:14
**gross (1)**
12:12
**grounds (1)**
58:17
**group (1)**
8:23
**grow (2)**
27:19,20
**guess (30)**
5:18;6:19;7:1;8:23;
9:16;15:22;17:24;20:7;
21:25;23:5;25:14;27:2,
17,23,24;28:10,17,23;
31:15;32:20,21;33:9;
34:6;35:24,25;39:12;
40:12;42:4;44:13;60:7

**H**

**half (1)**
26:23
**hand (1)**
46:13
**handle (2)**
24:12;25:8
**handwritten (1)**
32:5
**happen (1)**
29:21
**happened (1)**
29:20
**happens (1)**
44:16
**Hard (2)**
6:21;61:12
**here's (1)**
17:1
**hey (1)**
21:14
**highest (1)**
29:20
**himself (1)**
51:7
**home (1)**
34:6
**HUD (2)**
13:1,2
**hundred (7)**
28:19;33:25;34:5,15,
18,21,25

**I**

**idea (6)**
8:15;18:5;20:6,12;
41:13;42:9

**identification (8)**
5:23;8:4;18:15;
25:25;30:24;35:16;
43:7;55:18
**Ignoring (1)**
59:9
**immediately (1)**
13:5
**include (1)**
27:13
**includes (1)**
19:15
**income (8)**
14:5;27:22;28:13,16,
21,25;29:6;45:16
**increase (2)**
28:13;29:2
**increased (2)**
28:25;29:6
**incurred (2)**
57:17;58:24
**Independent (4)**
30:22;31:3,8;33:24
**individual (1)**
11:20;29:18;55:11
**individual's (1)**
45:21
**information (2)**
50:19;56:2
**inherently (1)**
28:17
**initial (1)**
13:10
**initially (1)**
16:6
**ink (2)**
38:5,5
**input (1)**
11:3
**inputted (1)**
18:6
**instead (1)**
8:10
**instruct (1)**
58:18
**insurance (1)**
34:12
**intent (1)**
27:3
**interest (2)**
19:8,15
**interpret (1)**
50:17
**interpretation (1)**
51:21
**into (7)**
12:18;13:17;14:2,6;
24:21;44:1,4
**introduced (1)**
12:7
**inventory (1)**
29:19
**invoice (1)**

59:13
**Invoices (1)**
55:17
**involved (3)**
25:4,13;60:21
**IRS (5)**
45:5,10;48:10;49:4,
13;51:22
**isolated (1)**
12:6
**items (1)**
45:17

**J**

**Jersey (4)**
39:9,15;48:6;52:18
**July (1)**
26:17
**jump (1)**
24:21
**juncture (1)**
25:17
**June (3)**
5:15;55:6,7

**K**

**K-1 (6)**
43:6,14;45:23;48:13;
50:14;52:2
**K-1s (3)**
46:11;48:20,24
**keep (5)**
13:14,15,16;14:14;
21:3
**Kim (1)**
27:11
**kind (1)**
23:12
**kinds (1)**
18:9
**King (2)**
9:6;27:12
**knowing (1)**
11:6
**knowledge (1)**
19:11

**L**

**labeled (1)**
43:4
**lack (2)**
27:2;61:18
**last (9)**
5:14;17:14;22:23;
31:12;39:11;55:6,14;
59:9
**late (1)**
6:22
**learn (1)**
30:2

CAM-L-002368-16    11/09/2017 7:43:23 PM   Pg 21 of 24 Trans ID: LCV2017453938
FILED, Case 18-17430-cv Division Docket 47 22 Filed 06/07/19, Entered 06/07/19 15:50:24   Desc Main

BROWN & POPE V.                                                                                          MARTIN BROWN
SHARONN THOMAS POPE                Document        Page 201 of 282                                       July 27, 2017

**least (3)**
6:6,25;47:25
**leave (3)**
29:15,16,17
**leaving (2)**
53:19;54:13
**left (7)**
18:25;20:14,15;
54:10;55:4,9;61:23
**legal (7)**
46:24;49:6;50:1,9;
51:10;55:24;61:3
**lengthier (1)**
40:6
**less (1)**
34:20
**letter (7)**
5:21;6:6,7,25;17:4;
44:2;60:21
**licenses (1)**
39:9
**lien (1)**
18:19
**limit (1)**
58:21
**limited (2)**
12:15;14:15
**line (4)**
7:6,7;9:3;44:23
**lines (1)**
7:12
**list (3)**
8:24;10:4,18
**listed (2)**
9:5,13
**listening (1)**
50:22
**little (6)**
10:2;14:2;17:19;
27:21,23;34:19
**living (1)**
4:19
**LLC (12)**
16:17,19,20,23;
17:16,20;31:16;35:15;
36:9,12;37:4;39:13
**loan (6)**
18:19,23,24;19:6,14;
20:8
**Lone (7)**
13:21;14:4,8;15:16,
19;16:11;44:18
**long (4)**
4:24;5:3;11:13;
38:14
**longer (2)**
40:12;60:21
**look (5)**
8:25;9:11,12;26:11;
40:4
**looking (2)**
39:14,15
**looks (7)**

6:1,3,7;9:1;18:20;
31:3;32:5
**loss (3)**
49:19;52:7;53:1
**losses (2)**
43:16;44:13
**lot (1)**
10:1
**low (1)**
29:19

**M**

**Mae (4)**
53:9;54:15,16;55:3
**majority (6)**
38:21;40:2,2;48:3,6,
7
**makes (2)**
28:22;36:17
**making (8)**
17:2;20:8,11,13,14;
44:3;52:12;58:4
**Malovich (3)**
14:20,25;15:1
**management (3)**
25:5,10,17
**manner (1)**
59:4
**many (2)**
9:25;20:2
**marked (12)**
5:22;8:4;18:15;
25:25;30:23;35:16;
43:7;51:13,17;52:3;
55:15,17
**marking (1)**
36:1
**MARTIN (3)**
4:4,13;31:18
**Maryland (2)**
39:10;48:8
**materials (1)**
61:14
**May (9)**
5:15;7:20,20;19:7,
24;50:23;56:22;59:21,
23
**maybe (3)**
6:21;11:14;55:5
**MB (1)**
8:17
**MB16 (1)**
32:20
**mean (4)**
28:6,17;38:12;39:9
**means (1)**
13:20
**meant (1)**
34:24
**meantime (1)**
10:24
**medication (1)**

4:15
**meet (1)**
10:13
**members (1)**
30:7
**mentioned (4)**
5:2,17;58:8;60:6
**met (2)**
57:8,14
**Michael (1)**
26:16
**might (1)**
11:16
**mind (1)**
58:5
**minus (4)**
33:6;34:3,6,16
**minute (1)**
62:3
**minutes (1)**
59:22
**mischaracterizes (1)**
52:5
**mischaracterizing (1)**
52:12
**moment (2)**
15:20;59:10
**money (5)**
7:9,20;21:8,20;22:16
**Monica (2)**
27:13,14
**month (5)**
21:15;22:2,8;33:6;
34:6
**monthly (6)**
13:16;35:5,8;56:2,8;
59:13
**months (2)**
5:11,12
**more (8)**
19:7;21:25;25:8;
27:21,22,22,23;52:1
**mortgage (2)**
23:14,15
**most (1)**
48:5
**mouth (1)**
21:14
**much (12)**
13:14;15:22,23;16:9,
13;18:4,23;19:11;22:1;
28:24;39:2;62:16
**multiple (1)**
13:2

**N**

**name (14)**
4:11;5:2,3,7;9:4,5,8,
9;14:18,22,24;32:6,18;
44:22
**names (4)**
9:3,13,21;11:7

nature (1)
53:18
**need (2)**
8:12;17:14
**Neither (1)**
59:20
**new (10)**
16:25;30:18;39:9,10,
15;45:1,3;48:6;52:18;
60:7
**next (6)**
9:8,16;10:3;22:18;
35:11;59:11
**night (1)**
6:22
**Nonetheless (2)**
48:9;52:21
**nonprofit (2)**
23:13;24:17
**normal (2)**
21:6;32:6
**note (1)**
42:15
**notice (1)**
7:10
**November (16)**
36:15,19;37:5,15,20;
41:2,5,6,8,15,17,25;
42:6,7,13,20
**number (12)**
8:9,17,22;9:4,8;
11:11,21;16:12;19:16;
36:7;46:5;50:16
**numbers (5)**
12:18;18:10;19:22;
44:14;50:18

**O**

**object (2)**
43:20;58:3
**Objection (31)**
5:4;15:25;19:1,17;
20:21;21:16;23:23;
33:12,18;36:24;38:6;
40:13,20;41:20;45:6,
11;46:23;49:5,25;51:3;
52:4,13,15,19;53:11,
20,24;54:2;58:16;
60:10;61:17
**objections (10)**
20:3;24:8;42:2;47:6;
49:15;50:6;51:14;
52:25;54:18;61:2
**occur (2)**
14:7;48:3
**occurred (3)**
5:9;47:22,25
**off (2)**
28:23;44:21
**office (12)**
12:7;18:8;27:5;39:4;
54:6,8;55:9,13;57:9,

14;61:13,14
**official (1)**
16:23
**Once (1)**
6:13;52:1,9
**one (41)**
5:19;15:20;16:24;
26:16;28:6;30:19;
32:17;34:22;35:11;
36:6,16,18;37:6,7,8,9,
10,13,13,14,18,19,22,
23,25,25;38:4,16;
39:11;41:7;42:11,12;
43:17;45:2;46:13;
47:10,25;49:22;50:12,
16;52:2
**only (12)**
27:7;28:6;32:16;
37:7,23,25;38:11;
45:20,23;46:11;48:24;
61:8
**opened (1)**
49:1
**operating (11)**
21:7;35:15,23;37:5;
38:14;39:6,17,21,23;
48:17,18
**operations (1)**
21:2
**opinion (1)**
41:11
**opportunities (1)**
17:9
**opportunity (1)**
17:8
**original (2)**
48:17,18
**originally (1)**
36:13
**origination (3)**
16:18,20;17:20
**out (16)**
8:20;13:6;14:11,12;
18:19;20:1,19,20;21:1;
25:11,18;35:8,20;
42:21;44:18;49:7
**outstanding (1)**
34:22;35:4
**over (6)**
10:5;19:8;26:6;
30:19;57:7,8
**overseeing (1)**
25:9
**owed (4)**
7:9,17,20;19:8
**own (4)**
17:25;40:2;45:14;
46:5
**owner (2)**
48:16,19,23;49:23
**ownership (2)**
38:21;47:5

## P

**PA (1)**
39:10
**Page (26)**
6:5;8:12,17;9:8;
18:21;26:17,20,23;
31:12,12;32:20;35:25;
36:4,5,12;37:15,19;
38:3;40:6;41:7,17;
42:6,20;59:8,9,11
**pages (3)**
8:22,24;41:12
**paid (17)**
13:9,11;15:15;18:24;
21:9,10,12,13,20,23;
23:17;24:14;33:5;
57:20;58:14;59:4,6
**paper (2)**
16:20;22:4
**papers (1)**
9:14
**paperwork (5)**
6:25;8:23;16:18;
48:10,14
**paragraph (1)**
50:20
**paragraphs (1)**
38:15
**part (14)**
8:23;10:19;15:4;
17:17;28:9;32:16;41:4;
43:23;50:14,15,18;
55:10;56:16;58:12
**parties (1)**
42:10
**partner (5)**
15:4;49:14;50:19;
52:3;61:9
**partner's (4)**
45:16;46:18;52:6,22
**partnership (1)**
6:4
**parts (2)**
32:11,13
**past (1)**
34:22
**Pause (1)**
57:21;59:22
**pay (6)**
20:19;21:8;22:2;
35:1;56:8,8
**paying (1)**
22:15
**payment (7)**
21:15,21;22:3,4,5,
11;59:15
**payments (13)**
18:22;19:23,25;20:8,
11,17,18,19;21:1,4,9;
24:15;56:9
**people (5)**

10:5;28:11,12,24;
29:5
**per (1)**
34:14
**percent (35)**
12:4,8,9,11,13,23,25;
13:4,11,13;15:2,7;
28:19;33:25;34:6,11,
15,18,21,25;40:8;
46:20;47:4,10,12;
48:11,16,19,23;49:4,
14,19,23;52:3;53:2
**percentage (7)**
11:17,25;27:24;28:2;
29:2;33:10,16
**perception (1)**
28:18
**person (1)**
9:5
**personal (10)**
15:11;17:25;19:11;
20:20;25:12;28:2,4,7,
16;45:24
**personally (6)**
11:18;18:23,24;25:7;
26:15;56:17
**phone (2)**
57:7,13
**phrase (2)**
59:17,19
**physical (1)**
61:12
**piece (1)**
22:4
**planning (1)**
39:8
**please (3)**
17:3;58:6;59:15
**PM (1)**
62:18
**point (11)**
12:19;15:13;25:22;
28:10;29:23;49:7;50:7;
51:19;56:19;60:1;62:5
**Pope (40)**
6:19;9:18;10:7;12:4,
18,22;15:21,24;16:15;
18:7,25;20:14;21:12,
22;23:6,17,21;24:4,6,7,
14,16;25:13;26:24;
27:7;28:4,9,15;30:8;
33:2;44:21;45:17;
46:12;47:15;49:14;
53:18;54:10,13;60:24;
61:23
**possessions (1)**
61:13
**possible (2)**
10:4;24:2
**practical (1)**
22:1
**previous (6)**
26:5,7;30:17;36:6;

42:25;43:1
**print (3)**
14:11,12;32:6
**printed (1)**
32:18
**prior (2)**
53:18;54:12
**privilege (2)**
57:24;58:17
**Probably (2)**
16:14;44:23
**problem (1)**
58:6
**process (5)**
23:1;24:25;25:14;
28:11;29:23
**profession (1)**
4:25
**profit (2)**
52:7;53:1
**program (1)**
14:11
**properties (5)**
8:25;9:2;12:19;13:1;
27:22
**property (5)**
12:15;13:15,17;25:5,
6
**proposal (5)**
22:25;23:3,6,22;
24:25
**purely (1)**
46:25
**purpose (4)**
27:17,19;38:18;
47:11
**purposes (1)**
60:23
**put (7)**
13:17;17:3,24;30:18;
43:25;44:4;61:15
**putting (1)**
26:6

## Q

**quarterly (2)**
56:2,9
**quick (2)**
59:8;60:6

## R

**range (3)**
11:24,25;12:18
**rate (1)**
56:5
**reached (1)**
25:18
**reaction (1)**
6:19
**read (2)**
31:22;62:11

**real (7)**
4:21;13:21;38:20;
39:22;47:13,16;53:10
**really (4)**
18:8,10;24:11;50:17
**Realtors (11)**
4:23;9:18,25;10:9,
18;11:7,14,19;26:24;
60:7,25
**realty (1)**
34:20
**reason (2)**
4:15;30:10
**reasonable (2)**
23:22;28:22
**recall (2)**
38:16;40:9
**receipt (1)**
59:15
**receive (5)**
13:6,8;21:25;56:1,6
**received (22)**
5:22;6:9,13,20;8:3;
12:5,8;13:3,13,14;
14:10;17:18;18:14;
24:15;25:24;30:23;
33:6;35:5,16;43:6;
55:17;60:20
**receiving (1)**
15:12
**recent (1)**
5:7
**recess (2)**
60:1;62:5
**recollect (2)**
19:9;38:1
**recollection (2)**
23:12;61:8
**record (7)**
4:12;9:21;10:17;
17:13,16;26:4;42:19;
48:25
**records (2)**
14:1,4
**refer (2)**
7:6;8:11
**reference (1)**
9:24
**references (1)**
8:12
**referencing (4)**
34:10,23;37:13;
39:25
**reflect (4)**
46:21;47:4;49:21,23
**relation (1)**
23:21
**relationship (4)**
22:21;24:4,22;29:9
**remember (45)**
7:15,18;9:25;12:3;
14:18;15:23;16:5,9;
17:22;18:3,6,23;19:6,

10,13,22;20:1,8,10;
22:6,7,10,12,13,15,20,
23;23:2,5,16,18;24:2;
29:13,24;30:1,5;31:5;
40:9;41:14;42:12,25;
47:21;55:3;57:2;60:8
**remove (1)**
29:19
**removed (3)**
29:22;30:3,9
**Renee (1)**
27:11
**REO (8)**
12:6,15,19;23:8;
24:22;25:19;54:7,9
**REOs (3)**
12:25;13:4;24:19,21
**rephrase (4)**
6:16;37:1;57:22;
58:6
**report (3)**
9:1;21:3;43:15
**reported (3)**
46:18;49:3,13
**reports (5)**
13:25;14:8;44:15,17,
19
**request (10)**
7:23,25;10:12,20,22;
16:23,25;17:7;44:9,10
**requested (1)**
6:4
**requesting (2)**
10:18;43:21
**requests (5)**
17:3,15;44:1,4,5
**required (2)**
38:20;47:14
**requirement (1)**
39:21
**reserve (1)**
62:11
**respect (2)**
51:6;52:9
**Respectfully (1)**
51:16
**response (2)**
6:17;7:22
**responsibilities (1)**
25:16
**resumed (1)**
60:3;62:7
**retail (4)**
32:24;33:4,21;34:17
**retainer (2)**
56:10;59:7
**retrievable (1)**
48:25
**return (8)**
45:4,9,15,18,21,24;
46:2,8
**returns (2)**
43:15;45:14

CAM-L-002368-16    11/09/2017 7:43:23 PM    Pg 23 of 24 Trans ID: LCV2017453938

FILED, Case 18-17430-ed divisions Doc 647-22 Filed 06/07/19 Entered 06/07/19 15:50:24   Desc Main
                                      Document        Page 203 of 282

**review (1)**
40:10;43:22
**reviewed (1)**
56:13
**right (10)**
5:16;30:13;31:18,19;
32:4;34:17;38:5;42:11;
46:7;62:11
**right-hand (1)**
8:14
**roughly (2)**
16:9;22:10
**rules (2)**
38:24;52:18

**S**

**sake (1)**
26:8
**sales (1)**
25:10
**same (35)**
12:18;13:23;14:15;
16:24;20:3;22:3,7;
24:8,17;30:16,20;
33:18;36:22;37:11;
42:2;43:19;45:11;47:6;
49:1,2,15,25;50:6;
52:25;53:4,18,20,24;
54:2,7,9,15,18;61:2,24
**save (2)**
10:2;52:1
**saw (1)**
6:22
**saying (10)**
7:22;35:7;37:22;
38:23;46:10;49:3;
57:10,11;60:16,21
**Schedule (3)**
43:6;45:23;50:14
**score (1)**
29:20
**scoring (2)**
29:18,22
**scratch (1)**
38:8
**second (8)**
26:23,24;37:18,19;
41:4,14,18;42:5
**section (5)**
31:17;38:15;40:11;
52:24;53:6
**seller (1)**
34:13
**send (4)**
14:11,12;21:11;27:6
**sending (3)**
7:15,18;27:3
**sense (1)**
28:22
**sent (18)**
6:16;7:4,11,12,13,23,
25;26:15,16,18;27:7;

**28:1;35:8;44:15,17,19;
56:14;58:25**
**separate (1)**
37:4
**serve (1)**
10:23
**services (3)**
24:14,16,19
**set (3)**
6:25;9:14;55:14
**setting (4)**
27:4,18;28:10,11
**settled (1)**
58:13
**settlement (1)**
58:12
**seven (2)**
7:2,10
**several (1)**
27:8
**share (7)**
15:3;40:2,3;45:16;
46:18;52:6,22
**shareholder (1)**
48:11;49:4
**Sharonn (5)**
9:10;26:21;46:12;
49:13;55:9
**Sharonn's (1)**
43:15
**Shiflet (1)**
26:16
**shift (3)**
25:15,15;30:14
**short (2)**
60:1;62:5
**show (1)**
26:8
**side (3)**
34:13;36:17,17
**sign (5)**
31:8;32:13;44:21;
45:1;62:12
**signature (18)**
31:10,12,15,16,19;
32:4,7;37:15,19;38:2;
41:7,12,16,17;42:6,14,
17;44:24
**signatures (1)**
32:12
**signed (18)**
31:7;32:8,9,10,11,
17;38:4;39:7;41:6,18;
42:1,7,9,10;45:3,4,9;
46:22
**significant (1)**
40:7
**signing (3)**
31:5;41:14;42:12
**signs (1)**
28:18
**simply (2)**
26:6;51:20

**single (2)**
22:8;47:3,16;52:2
**skipped (1)**
55:10
**slightly (2)**
4:14;30:14
**small (1)**
59:10
**sold (2)**
25:6;47:17
**soldmartin@aolcom (2)**
6:10;26:19
**solved (1)**
58:5
**somewhere (3)**
12:25;44:23;60:15
**sorry (2)**
55:1,10
**sound (2)**
19:16;23:22
**speak (2)**
57:1,4
**speaking (2)**
13:5;24:13
**specific (8)**
13:15;33:23;34:1;
39:13,24;40:10;46:11;
56:19
**Specifically (4)**
9:24;10:9;48:15;
50:20
**speculate (1)**
51:10
**speculation (11)**
16:2;19:2,18;20:22;
21:17;23:24;36:25;
40:21;41:21;61:5,18
**spell (2)**
14:21,23
**stamp (2)**
8:14,15
**stamps (3)**
8:10,11,20
**start (3)**
5:18;25:5;35:25
**started (2)**
15:21;25:11
**state (3)**
4:11;39:7;48:2
**stated (1)**
48:16
**statement (4)**
7:1,4,8;8:3
**states (4)**
13:2;39:7,16;48:2
**stating (3)**
17:13;42:16;47:24
**step (3)**
6:10;20:7;46:10
**sticker (3)**
26:6,7;30:19
**still (19)**
19:5,21;20:5,25;

**24:1;32:2;33:15,20;
38:24;40:24;42:7;
49:17;53:8,15;54:16;
55:2,11;60:25;61:20**
**stop (2)**
20:13,14
**stopped (1)**
20:10
**stuff (1)**
18:9
**submit (4)**
10:5;17:9;18:11;
45:17
**submitted (13)**
11:2;14:3;23:7;
42:24;45:5,10,20;46:2;
48:10;49:12;51:22,23;
56:3
**submitting (3)**
17:12,14;44:10
**suggest (3)**
17:2;43:25;44:4
**Sunday (1)**
6:22
**supplement (1)**
45:21
**supplemental (4)**
10:19;17:12,15;44:1
**supporting (1)**
17:18
**sure (6)**
6:15,23;10:16;51:7;
53:21;57:10
**sworn (1)**
4:5
**system (7)**
13:18,19,21,23;
16:11,12;56:11

**T**

**Table (2)**
18:14,20
**talked (1)**
57:7
**talking (5)**
8:13;24:17;26:9;
31:13;59:12
**tax (12)**
14:3;43:15,22;45:4,
9,14,15,17,21,24;46:2,
7
**taxes (3)**
14:5;44:20;49:19
**teams (1)**
28:20
**term (1)**
27:3
**terms (9)**
14:1;15:2;25:9;
27:24;35:2,24;38:2;
58:9,11
**testified (1)**

**4:5
testify (3)**
50:24;51:5;52:10
**third (4)**
7:6;9:7;13:1,2
**THOMAS (101)**
4:10;5:6,8,18,25;8:1,
7;9:10;10:16;11:2,4;
12:17;16:3,22;17:11,
21;18:11,18;19:4,20;
20:4,24;21:18;23:25;
24:9;25:20;26:3,10;
27:11;30:15;31:1,16;
33:2,14,19;35:3,8,11,
19;36:3,5,9,11;37:1,3;
38:8,10;40:15,23;
41:23;42:3;43:3,9;
44:7,12;45:8,12;46:12,
25;47:2,7;49:7,9,13,16;
50:2,11,21,23;51:4,16,
20,24;52:8,14,17,20;
53:3,13,18,23;54:3,20,
25;55:9,14,20;57:22;
58:1,7,19,22;59:21;
60:5,12,18;61:6,19,23,
25;62:15**
**thoroughly (1)**
56:14
**though (6)**
6:24;29:6;33:16;
38:5,24;58:2
**thought (2)**
19:7;28:11
**thousand (1)**
22:11
**three-something (1)**
22:13
**throughout (1)**
13:24;20:18
**timeframe (4)**
13:24;14:16;46:1;
47:21
**timely (1)**
59:4
**times (1)**
61:12
**today (3)**
4:17;10:15;17:3
**today's (1)**
7:10
**together (1)**
36:2
**told (1)**
61:15
**top (6)**
33:7;34:3,7,11;
36:14;37:14
**total (2)**
19:14;34:21
**totally (1)**
24:20
**towards (1)**
34:21

CAM-L-002368-16   11/09/2017 7:43:23 PM  Pg 24 of 24 Trans ID: LCV2017453938

FILED, Case No. 18-17430 Doc 47-22 Filed 06/07/19 Entered 06/07/19 15:50:24 Desc Main
Document    Page 204 of 282

BROWN & POPE V.
SHARONN THOMAS POPE

MARTIN BROWN
July 27, 2017

**transaction (2)**
34:13,14
**transactions (2)**
9:14;47:19
**transcribe (1)**
14:6
**truthfully (1)**
4:16
**try (4)**
28:14;39:14,15;
51:25
**trying (1)**
42:5
**two (9)**
35:12,21,21;37:4;
41:11,12;47:25;59:22;
60:6
**two-fold (1)**
56:11
**two-page (1)**
6:5
**type (2)**
16:16;54:5

**U**

**under (7)**
4:15;5:3;10:12,22;
17:5;44:2;57:23
**Understood (2)**
44:7;54:22
**up (8)**
17:24;27:4,18;28:10,
12,15;58:4;61:12
**updates (2)**
38:17,19
**upon (3)**
32:23;59:6,15
**upper (1)**
25:17
**use (6)**
11:22;12:1;13:22,23;
14:4;15:16
**used (5)**
15:8,9;26:5;30:17;
45:24
**usually (6)**
20:19;32:7;56:1,3,5,
8

**V**

**Vague (6)**
5:4;45:6;53:11,25;
54:19;60:14
**value (1)**
61:15
**vast (3)**
48:2,6,7
**version (8)**
4:14;40:12,12;41:4,
18,25;42:6,20
**versus (1)**

15:23
**Vince (1)**
14:20
**volume (1)**
28:18
**Voorhees (1)**
4:23

**W**

**wants (1)**
50:13
**wasting (1)**
51:12
**way (2)**
9:7;17:24
**Wells (25)**
22:21;23:7,15,16,20;
24:4,13,18,22;25:2,2,9,
18;27:25;28:3,7,12;
29:5,9,14;53:9,15,17;
54:4;55:11
**weren't (1)**
21:9
**What's (1)**
56:5
**whole (1)**
13:8
**wholesale (1)**
32:24
**withdraw (3)**
38:15;40:4,11
**within (3)**
7:2,10;10:3
**without (2)**
11:6;29:19
**witness (10)**
10:14,25;41:22;
50:22;53:1,21;54:24;
58:18;60:15;62:11
**Wolf (7)**
13:21;14:4,8;15:16,
19;16:11;44:18
**word (1)**
21:14
**work (10)**
4:22;25:19;39:14,15;
48:3;54:5,7,9,10,12
**worked (3)**
10:6;24:23;28:20
**working (7)**
9:18,22;10:10;11:7;
12:22;29:5;39:8
**write (1)**
24:5
**write-off (2)**
43:16,21
**writing (2)**
7:9;44:11
**written (5)**
10:23;13:6;17:6,9;
23:20

**Y**

**year (12)**
5:1,12,14,17;14:5,9;
36:20;43:16;44:25;
46:8;55:4,6
**years (8)**
22:22;43:22;45:10;
46:17,19;48:4,5,7
**Yep (1)**
27:1
**York (1)**
39:10

**Z**

**zeros (1)**
8:17

**0**

**009 (1)**
34:12
**014 (1)**
31:14
**06 (1)**
13:24

**1**

**1 (6)**
11:24,24;35:25;36:4,
5,12
**10 (3)**
10:3;11:14,25
**101 (1)**
9:8
**11 (2)**
46:2,15
**12 (3)**
8:24;11:14;46:15
**13 (1)**
46:15
**131 (1)**
9:4
**14 (1)**
46:15
**15 (3)**
22:22;46:2,15
**151 (1)**
59:8
**17 (2)**
10:8;13:24
**17th (5)**
26:17;37:15;41:5,6,
25
**18 (1)**
56:22

**2**

**2 (3)**

6:5;18:21;50:18
**2:06 (1)**
62:18
**2006 (6)**
9:2,17,23;10:8,18;
11:12
**2009 (2)**
18:21,24
**2011 (12)**
14:15;36:21;37:15,
20;43:6,22;44:25;
46:14;48:9,22;50:14;
53:5
**2014 (1)**
27:24
**2015 (6)**
14:15;43:22;44:25;
48:10,22;53:5
**2016 (4)**
19:24;20:18;55:7;
56:22
**2017 (5)**
9:2,17,23;10:19;
11:12
**22 (1)**
5:1
**29th (1)**
7:3

**3**

**3 (1)**
42:21
**3- (1)**
22:15
**30 (3)**
12:25;34:22;55:8
**30th (1)**
19:24
**33 (1)**
12:22

**4**

**4/22/16 (1)**
5:22
**40 (4)**
12:8,9,11;13:11
**49 (1)**
40:8

**5**

**5 (1)**
34:11
**50 (12)**
11:24;46:20;47:4;
48:11,16,19,22;49:4,
14,23;52:3;53:2
**51 (1)**
47:12
**5th (12)**
36:15,19;37:5,20;

41:2,8,15,17;42:6,7,13,
20

**6**

**60 (5)**
12:13;13:4,13;15:2,7

**8**

**86 (2)**
19:23;20:1

**9**

**95 (1)**
8:17

Joshua L. Thomas, Esq
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
NJ ID No. 03992012
Fax: (888) 314-8910
JoshuaLThomas@gmail.com

January 18, 2018

The Honorable Michael J. Kassel, J.S.C.
Camden County Courthouse
101 South 5th Street,
Suite 330
Camden, NJ 08103

Re:   Brown & Pope . v. Sharonn Pope
       **Docket No.:** CAM-L-2368-16

Dear Judge Kassel,

I hope this letter finds you well. I would like to once again make clear my objection with the current motion being considered "unopposed" tomorrow. First, I have confirmation that you are now in possession of a hard copy of the paperwork submitted. Further, I'd like to point out that a Hearing was scheduled for 09:00 AM on 01/19/2018 back on January 8, 2018. Then, my objection was submitted on January 11, 2018. Opposing counsel then submitted a reply on January 16, 2018 at 9:26 AM. Your correspondence regarding the requirement of my paperwork was then submitted on January 16, 2018 at 3:56 PM. I find it unlikely that you had a paper copy of opposing counsel's reply at that time. As such, it seems that there is a double standard at play in this case, especially given that when opposing counsel failed to submit paperwork previously, his motion was not denied without being given a chance to cure, instead it was simply adjourned so he could comply. However, your ruling against defendants in this matter seems entirely unjust and the idea. Further, the requirement that you would allegedly adjourn only if opposing counsel agreed also seemed unjust. We were not given a similar option in regards to the previous hearing. That is all we are asking for in this case, as we complied within one day of your request. Stating we can "file a motion to reconsider" does not seem adequate, and further, it makes more sense for us to simply appeal the matter, if it is ruled on in such a way tomorrow as "unopposed" so the appellate division can immediately intercede in this matter. Further, opposing counsel seems to

have admitted to ex parte communications in their reply that are complete unsubstantiated by the
court record or e-courts in regards to the order that was submitted December 27, 2017 being "in
error", since there is no such indication anywhere on the record. If their motion is granted while
that order still stands, it is a manifest injustice, since the case is currently "dismissed". Given all
of the above, we request again that the hearing be adjourned one cycle to be heard properly and
so the current record can be made clear. If you have any questions, please do not hesitate to call
at 215-806-1733.

Thank you for your kind consideration,

 /s/ Joshua Thomas          _____
Joshua Thomas, Esq.
Phone   215-806-1733

CC:    Cord Clayton, Esq. via e-courts

| | |
|---|---|
| **MARTIN BROWN** | : SUPERIOR COURT OF NEW JERSEY |
| | : CAMDEN COUNTY |
| and | : LAW DIVISION |
| | : |
| **BROWN AND THOMAS, LLC** | : Civil Action L-2368-16 |
| | : |
| Plaintiffs | : |
| v. | : |
| | : |
| **SHARONN THOMAS POPE** | : |
| | : |
| Defendant | : |
| | : |

## ORDER

This matter having been brought before the Court on the application of Martin Brown and

Brown and Thomas LLC (collectively, "Brown") by way of Motion to Confirm Arbitral Award

and Enter Judgment Thereon, as and against Sharonn Thomas Pope ("Pope"), and the Court

having considered the matter, and any response thereto, and for good cause appearing,

IT IS, on this _____19_____ day of _____January_____, 2018, ORDERED

THAT Brown's Motion is hereby GRANTED.  Accordingly, the prior September 11, 2017,

arbitral award herein in favor of Brown and against Pope in the aggregate amount of

$723,954.01 is hereby now CONFIRMED and entered as a final JUDGMENT of this Court in

the amount of $723,954.01 in favor of Brown and against Pope as to all claims raised herein.

BY THE COURT:

_____
J.,
    Michael J. Kassel, J.S.C.

A 174  **"Reasons Set Forth on Record"**
1/19/18

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
CAMDEN COUNTY, NEW JERSEY
DOCKET NO.: CAM-L-2368-16
APP. DIV. NO.: A-003453-17-T4

MARTIN BROWN AND BROWN AND      :
THOMAS, LLC,
                                :

        Plaintiffs,                     TRANSCRIPT
                                :           OF
    v.                                    MOTION
                                :

SHARONN THOMAS POPE,
                                :

        Defendant.

                    Place:  Camden County Superior Court
                            Hall of Justice
                            101 S. 5th Street
                            Camden, NJ 08103-4001

                    Date:   March 16, 2018


**BEFORE:**

    THE HONORABLE MICHAEL J. KASSEL, J.S.C.


**TRANSCRIPT ORDERED BY:**

    JOSHUA LOUIS THOMAS, ESQ. (Attorney at Law)


**APPEARANCES:**

    E. McCORD CLAYTON, ESQ.
    (Clayton Commercial Litigation, LLC)
    Attorney for the Plaintiffs

    JOSHUA LOUIS THOMAS, ESQ. (Attorney at Law)
    Attorney for the Defendant

*Rebecca Y. Natal, AD/T 557*
*A*UTOMATED TRANSCRIPTION SERVICES
*P.O. Box 1582*
*Laurel Springs, New Jersey*
*(856) 784-4276*
*(856) 784-7254 (fax)*
*autotranscripts@comcast.net*

I N D E X

**ARGUMENT**                                                      **PAGE**(S)

BY:  Mr. Thomas     5, 12, 18, 19, 24, 26, 31, 32, 35
                                                          39
BY:  Mr. Clayton    11, 13, 18, 23, 30, 32, 34, 36

**THE COURT** - Decision              23, 25, 44, 46

---

3

```
 1              THE COURT:  All right.  2368-16.
 2              Appearances, please?
 3              MR. CLAYTON:  May it please the Court.  Cord
 4    Clayton of Clayton Commercial Litigation on behalf of
 5    plaintiffs, Martin Brown and Brown and Thomas, L.L.C.
 6    And with me today, Your Honor, is my client, Martin
 7    Brown.
 8              THE COURT:  All right.  Make yourselves
 9    comfortable.
10              MR. THOMAS:  I'm Joshua Thomas on behalf of
11    the defendant, Ms. Pope, Your Honor.
12              THE COURT:  All right.  Why don't you all
13    have a seat.
14              A lot of mistakes have been made in this
15    case.  Attorneys are not complying with the A.O.C.
16    requirement that hard copies of motions and oppositions
17    be filed with the Court's chambers.  Let me take this
18    -- take this opportunity to explain the reason for
19    that, the reason for the A.O.C. requirement.
20              We're now going to e-filing and a lot of
21    attorneys still think that when they e-file their
22    stuff, that ends it.  But the A.O.C. has placed the --
23    -- the Supreme Court of New Jersey has placed the
24    obligation on the attorneys to make sure that the hard
25    copies of all their filings are filed directly with the
```

**4**

1  Court's chambers.
2  That's my Law Clerk over there.  He doesn't
3  have the time to download not just all the motions, but
4  all the appendices, which, by the way, Mr. Clayton,
5  this is your stuff.  Right?
6  MR. CLAYTON:  That's correct, Your Honor.
7  THE COURT:  All right.  Well, if you didn't
8  send me a hard copy of it, my Law Clerk would have to
9  download all of this stuff.  Right?  So the attorneys
10  should understand that the Courts aren't being punitive
11  in denying motions because of noncompliance or granting
12  motions as being unopposed when, in fact, there is e-
13  filed opposition.  It's because even though the A.O.C.
14  directive came out in June of 2017, and it's now March
15  of 2018, so that's about nine months, we're still
16  getting noncompliance.
17  All right.  To go to the facts of this case,
18  the first problem occurred was there was a mandatory
19  arbitration in this matter that somebody didn't show up
20  on and there are specific Court rules that deal with
21  the issue as to when somebody -- a party doesn't show
22  up.  So that's what we're going to start with and take
23  it from there to see where we end up.
24  All right.  Who filed -- who -- it was a
25  Motion for Reconsideration.  Who filed the Motion for

**5**

1  Reconsideration?
2  MR. THOMAS:  We did, Your Honor.
3  THE COURT:  All right.  That's you, Mr.
4  Thomas?
5  MR. THOMAS:  Yes, Your Honor.
6  THE COURT:  All right, Mr. Thomas.  What hap
7  -- what's your version of what -- was it your client
8  that didn't show up at the arbitration?
9  MR. THOMAS:  So I had actually spoke to my
10  client regarding it and there were two reasons why
11  there was a no show, essentially.  Number one was I
12  actually had another arbitration scheduled that exact
13  same day.  And I was -- actually walked out to actually
14  speak to Mr. Clayton when he called, saying that he had
15  actually -- was moving forward with the arbitration.
16  So I was actually, literally, in one that had just
17  started about ten minutes before I -- I got the call
18  from Mr. Clayton.  That was number one.
19  THE COURT:  Well, I want to back up a second.
20  MR. THOMAS:  Sure.
21  THE COURT:  You got notice of the arbitration
22  weeks in advance.  Right?
23  MR. THOMAS:  Well, and that brings us to
24  point 2 --
25  THE COURT:  Uh-huh.

FILED, Case 18-17430-dv Division 006-147 22 Filed 06/07/19, Entered 06/07/19 15:50:24   Desc Main
Document     Page 211 of 282

6

1       MR. THOMAS:  -- which was -- and this is, I
2   think, the most heavily contested component of it, that
3   there was a bankruptcy filed --
4       THE COURT:  Right.
5       MR. THOMAS:  -- and we had been under the
6   apparent misinterpretation that because of that
7   bankruptcy, the arbitration was stayed.
8       THE COURT:  Uh-huh.
9       MR. THOMAS:  So that was the reason why we
10  were under the impression that there was no longer a
11  scheduling conflict and that the fact that I was in the
12  arbitration, the other arbitration, it wasn't a
13  conflict, that it just occurred.  I explained to Mr.
14  Clayton when he called that I had another conflict and
15  that that I was under the impression that it had been,
16  that the arbitration was not scheduled and that was my
17  reasoning behind that.
18      Mr. Clayton made clear he had apparently sent
19  an e-mail, which I did not receive, at least ten days
20  (inaudible) before that with the pre-arbitration
21  information.  I did not receive it.  I did not get
22  notice of it.  Had I did, I would have certainly said
23  that, you know, this shouldn't go forward.
24      And it's that arbitration, Your Honor, where
25  we're saying that we had originally come in prior to


7

1   then.  There was a Motion for Summary Judgment filed.
2   We had agreed to arbitration after that -- after that
3   had been denied.  The arbitration occurred, as you
4   said.  We then submitted paperwork asking for a trial
5   de novo.  That paperwork had originally been accepted
6   and that --
7       THE COURT:  All right, I want to -- but we'll
8   get -- we'll get to it in a second.
9       MR. THOMAS:  Okay.
10      THE COURT:  I want to -- still want to back
11  up.
12      MR. THOMAS:  Sure.
13      THE COURT:  There's an arbitra- -- there's a
14  man- -- there's a mandatory arbitration scheduled.
15      MR. THOMAS:  Uh-huh.
16      THE COURT:  The first reason you gave, that
17  there was a conflict, is not convincing because a) if
18  there is a conflict in the scheduling, that -- that has
19  to be addressed, obviously, well before a day before or
20  the day of the arbitration since everybody's given
21  notice of these arbitrations weeks in advance.
22      The second round, this -- this bankruptcy
23  issue, is a -- is a more serious issue.
24      MR. THOMAS:  Yes.
25      THE COURT:  I'll agree with you in -- in that

1    regard.  But did you make any attempt to notify the
2    Arbitration Administrator before the arbitration date
3    to advise that you were under the belief that the
4    matter was -- that this matter was -- at least one of
5    the litigants was in bankruptcy and that, therefore,
6    the matter should not proceed to arbitration?
7             MR. THOMAS:  We did not directly state that
8    to the Arbitration Committee.  We had submitted
9    paperwork to the Court and the Court actually received
10   the fact that this was actually stayed.  So Camden
11   County did receive it, not Your Honor.  I'm not saying
12   I sent it to Your Honor.
13            THE COURT:  Uh-huh.
14            MR. THOMAS:  I'm saying Camden County did
15   receive notice of it.  There was no issue with that.
16   It was for --
17            THE COURT:  But what is it --
18            MR. THOMAS:  Right.
19            THE COURT:  -- I -- if I didn't receive it,
20   well -- well, show me -- what is it in all this --
21            MR. THOMAS:  Right.
22            THE COURT:  -- that -- that was submitted
23   before the arbitration to indicate that -- who is in
24   bankruptcy, Brown or Pope?
25            MR. THOMAS:  Ms. Pope, Your Honor.

9

1             THE COURT:  All right.  Ms. Pope was in
2    bankruptcy?  All right.
3             MR. THOMAS:  Yes.  And we -- I mean, there
4    was -- I would say, about five or six, at least,
5    ongoing cases at that time regarding her and some other
6    properties.  In no other case was this an issue.  No
7    other case that had come up why we didn't get notice or
8    we're going to move forward.  This is the only --
9             THE COURT:  But I -- but I'm still -- I want
10   to back up a second.
11            MR. THOMAS:  Right.
12            THE COURT:  What did you submit to the
13   Superior Court to indicate that Ms. Pope was in
14   bankruptcy and that, therefore, the arbitration should
15   not proceed?
16            MR. THOMAS:  Right.  There was -- and I don't
17   have it in front of me -- there was another case in
18   Camden that was listed in her paperwork, so Camden
19   County was -- did receive, and they were on the list,
20   that actually received the information that the
21   bankruptcy had been filed.  That was how they received
22   notice it was -- this case apparently was not listed in
23   the initial paperwork.  It was subse- -- listed
24   afterwards, but in the initial paperwork it was not
25   included --

 1              THE COURT:  All right.
 2              MR. THOMAS:  -- which is why I believed the
 3      arbitration proceeded when it did.
 4              THE COURT:  All right.  Well, before we get
 5      to the de novo process, because I do want to give Mr.
 6      Clayton an opportunity to speak.  So your posi- -- your
 7      position is is that you told your client not to appear
 8      because you felt that Ms. Pope was still in bankruptcy
 9      and that, therefore, there was a bankruptcy stay.
10              MR. CLAYTON:  It's not that I felt -- that's
11      correct.
12              THE COURT:  Uh-huh.
13              MR. CLAYTON:  We had spoken about it and we
14      --
15              THE COURT:  Who's the we?
16              MR. CLAYTON:  My client and I had spoken
17      about it --
18              THE COURT:  All right.
19              MR. CLAYTON:  -- and we had both agreed that
20      because of the bankruptcy, the arbitration didn't need
21      to proceed.
22              THE COURT:  All right, hold up -- all right.
23              MR. CLAYTON:  And so that's correct, Your
24      Honor.
25              THE COURT:  All right.

11

 1              MR. CLAYTON:  Essentially, yes.
 2              THE COURT:  All right.  Mr. Clayton -- all
 3      right, Mr. Clayton, what -- what do you have to say
 4      about -- up until that point in time -- and I'm -- I'm
 5      not dealing with what happened after the arbitration.
 6      As of the date of the arbitration, you heard Mr.
 7      Thomas's representations.  What -- what -- what -- what
 8      do you have to say about all of that?
 9              MR. CLAYTON:  I -- I think what most jumped
10      out to me in what Mr. Thomas said is that he notified
11      us or the Court regarding the existence of the
12      bankruptcy at any time prior September 11th.  That --
13              THE COURT:  What's -- what's September 11th?
14              MR. CLAYTON:  That was the date of the
15      arbitration hearing in this matter, Your Honor.
16              THE COURT:  All right.  So the arbitration is
17      September 11th.  Did you receive anything from Mr.
18      Thomas indicating a concern about the arbitration
19      because of -- because of Ms. Pope's -- his client --
20      it's his client --
21              MR. CLAYTON:  Uh-huh.
22              THE COURT:  -- because of Ms. Pope's
23      bankruptcy?
24              MR. CLAYTON:  We did not, Your Honor, and
25      that's not just me saying that or characterizing the

FILED, Case: 18-17430 Appellate Division Doc: 147-22 Filed: 06/07/19, Entered: 06/07/19 15:50:24 Desc Main
Document Page 214 of 282

12

1   record.  That was the subject of a bench trial before
2   the Bankruptcy Court in this matter in December, and at
3   that time, the Bankruptcy Court found, as a factual
4   finding, based upon hearing testimony from me and from
5   Mr. Thomas and reviewing the record, that we were not
6   on notice regarding the bankruptcy at any time prior to
7   September 29th, 2017 --
8            THE COURT:  Right.  But -- but what -- I --
9            MR. CLAYTON:  -- which was long --
10           THE COURT:  -- I mean, you should -- all
11   right.  Where's -- where's the -- where's that finding
12   on -- from the Bankruptcy Court Judge?
13           MR. CLAYTON:  Your Honor, that's listed.
14   It's in the transcript and --
15           THE COURT:  Is it -- is it part of this?
16           MR. CLAYTON:  It is, Your Honor.
17           THE COURT:  All right.
18           MR. CLAYTON:  We -- we provide Your --
19           THE COURT:  Where -- where is it in this?
20   I'll look at it.  Where is it?
21           MR. CLAYTON:  Sure.  What I would suggest is
22   you look at the statement of material facts that we've
23   submitted.
24           MR. THOMAS:  I would ob- -- I -- I don't want
25   to interrupt.  I just want to say I think it would be

---

13

1   best because of the various interpretations that I
2   think both sides have had, that it would best to just
3   listen to the Judge's direct.
4            THE COURT:  All right.  I -- I -- yes, if --
5   if it's a transcript, let me see what --
6            MR. THOMAS:  Right.
7            THE COURT:  -- wait.  Where -- where in all
8   this is the transcript?
9            MR. CLAYTON:  Sure.  If you turn in just a
10   few pages to that packet in front of the Court --
11           THE COURT:  This?
12           MR. CLAYTON:  Yes.
13           THE COURT:  All right.
14           MR. CLAYTON:  You'll see included that a
15   statement of material facts, which presented in
16   chronological order --
17           THE COURT:  Right.
18           MR. CLAYTON:  -- all the pertinent facts in
19   this matter.
20           THE COURT:  Yes.
21           MR. CLAYTON:  And at paragraph 20 is a -- a
22   recitation of the findings of fact --
23           THE COURT:  All right.
24           MR. CLAYTON:  -- and conclusions of law of
25   the Bankruptcy Court.

**14**

1    THE COURT:  All right.  Let me read it.  It's
2    20.  After -- after hear -- after a hearing of evidence
3    regarding the matter, the Bankruptcy Court issues an
4    oral opinion from the bench, articulating its
5    decisions.
6          MR. CLAYTON:  Correct.
7          THE COURT:  CCP-11-K at page 110 to 116.
8    Among other holdings, the Court made the following
9    findings and rulings:
10         A. Pope did not notify Brown or its counsel
11   at the -- at the time of initially filing the
12   bankruptcy;
13         B. Brown and his counsel did not learn of the
14   bankruptcy's filing until approximately September 29th,
15   2017;
16         C. Pope continued to litigate in the State
17   action as if no bankruptcy had been filed, including
18   taking Brown's deposition and making other discovery
19   demands;
20         D. Pope's failure to appear at the
21   arbitration hearing was probably inexcusable, to the
22   extent she relies on scheduling complications or
23   snafus;
24         E.  At the time of the arbit- -- arbital
25   award -- why do you both refer to it as an arbitral

**15**

1    award?  It's an arbitration award.  Am I using the
2    wrong language all these years?  Where do you get
3    arbitral award?
4          It's a -- it's a -- it's a -- it's a picayune
5    point, but I -- I remember reading it in the break.
6    All right.
7          At the time of the arbitration award on
8    9/11/17, Brown and his counsel had no knowledge
9    regarding the bankruptcy case.
10         F.  The bankruptcy estate is annulled because
11   of the con- -- oh.  That's -- that's -- all right.
12   Fine.  All right.
13         Well, there are some factual findings.  All
14   right.  Let's go -- where is page 110 to 116 in all of
15   this?  We -- we -- are we in any --
16         MR. CLAYTON:  In Exhibit -- in Exhibit K,
17   Your Honor --
18         THE COURT:  Yes.
19         MR. CLAYTON:  -- is a transcript of the
20   hearing before the Bankruptcy Court.
21         THE COURT:  All right.  Right.  Hold on.
22         MR. CLAYTON:  And page 110 is where the
23   actual --
24         THE COURT:  Yes.  But my pages are -- are not
25   numbered.  Oh, here it is.  They -- they numbered on

the side.
All right. All right. Beginning on page
110, I'm reading now from the Bankruptcy -- who -- who
was the Bankruptcy Judge? I ought to refer to him or
her by name.
MR. CLAYTON: Chief Judge Frank of the
Bankruptcy Court for the District of -- Eastern
District of Pennsylvania.
THE COURT: Chief Judge who?
MR. CLAYTON: Frank.
THE COURT: Frank.
MR. CLAYTON: Eric Frank, Your Honor.
THE COURT: All right. Chief Judge Frank.
At the time the bankruptcy was filed, the debtor did
not schedule Mr. Brown or his counsel in his bankruptcy
schedules, and I find it as a fact, based on the
evidence presented, that Mr. Brown and counsel were not
included in the mailing matrix used to give notice of
the bankruptcy filing, nor did debtor's counsel provide
notice to Mr. Brown or counsel by any other means,
other than the notice that goes out from the Court of
the bankruptcy filing and the scheduling of the meeting
of creditors.
As a result, the creditor in this case had no
knowledge that the debtor had commenced a bankruptcy

case and Mr. Brown and counsel did not learn of the
bankruptcy filed until approximately September 29th,
2017.
Meanwhile, at the time the debtor's --
meanwhile, at the time, debtor's behest the arbitration
proceeding continued to be litigated as if no
bankruptcy had been filed. The debtor proceeded to
take discovery, including the deposition of Mr. Brown,
and to demand that other types of discovery requests be
provided and supplemented.
On the day the arbitration hearing was
scheduled, September 11th, 2017, due to what appears to
me to be an independent snafu, and a complication in
the schedule of debtor's counsel, which was probably
inexcusable, the debtor and counsel did not attend the
arbitration hearing.
The arbitration hearing went forward and
resulted in the entry of an arbitration award of
approximately $723,000 at the time of the arbitration
hearing and the entry of the award on September 11th,
2017.
To reiterate, Mr. Brown and counsel had no
knowledge that the debtor had commenced a bankruptcy
case.
All right. I -- I have a question, before I

1    forget it.  What types of -- Judge Franks says, "The
2    debtor proceeded to take discovery, including the
3    deposition of Mr. Brown and to demand that other types
4    of discovery requests be provided and supplemented."
5         Can you be specific about that, Mr. Clayton?
6    When -- when did this dep take place and what other
7    discovery requests were done -- were made and when were
8    the discovery requests served on you?
9         MR. CLAYTON:  I can, Your Honor.
10         THE COURT:  All right.
11         MR. THOMAS:  If I may, Your Honor, the
12    deposition took place July 27th and there was -- at
13    that deposition there were some further requests
14    requested and it was simply follow-up to that.
15         THE COURT:  Right.
16         MR. THOMAS:  There's no substantial further
17    requests made, only based off of that specific
18    deposition.
19         THE COURT:  All right.  All right, but --
20         MR. THOMAS:  So it was July 27th.
21         THE COURT:  All right.  Your turn, Mr. --
22         MR. CLAYTON:  Your Honor, all -- all -- to
23    ans- -- I wanted to answer that question, specifically
24    read and extemporizing and it's contained in paragraph
25    5 of our statement of material facts, which sets forth

1    --
2         THE COURT:  Hold on, hold on, hold on, hold
3    on.  For example, Pope depo- -- all right -- Pope
4    deposed Brown on July 27th, submitted discovery on
5    August 10th, repeatedly threatened to bring various
6    discovery motions thereafter, absent compliance with
7    their sundry demands, filed a demand for a trial de
8    novo and moved for summary judgment.
9         All right.  But the only definite date there
10    looks -- the only definite dates are July 27th and
11    August 10th.  When -- when -- when did --
12         MR. CLAYTON:  No, Your Honor.
13         THE COURT:  -- what was the date that Ms.
14    Pope filed for bankruptcy?
15         MR. THOMAS:  July 6th, 2017.
16         THE COURT:  All right.
17         MR. THOMAS:  And -- and, by the way, Your
18    Honor, just to clarify, I don't view these as issues
19    that are for this Court to find.  These are factual
20    findings of the Bankruptcy Court which are binding on
21    -- on -- by collateral estoppel and also the supremacy
22    clause on the defendant in this case and on the State
23    Court.
24         THE COURT:  Not quite.
25         MR. CLAYTON:  Yes.  I think --

1        THE COURT:  Not quite.  The -- the -- the --
2    there are collateral estoppel concerns, I agree with
3    you.  But the issue concerning whether or not there's
4    sufficient good cause to relax under the arbitration
5    rule itself, 4:21A-6, subsection F, which requires good
6    cause to, in essence, excuse Ms. -- Ms. Pope's
7    nonappearance at the arbitration is for me to decide.
8        Having said that, I agree with you that the
9    Chief Judge -- the Chief Judge's comments on the record
10   are not to be ignored.
11       But I did want to -- I did -- all right.  So
12   the Bankruptcy Petition was on July the 6th.
13       MR. THOMAS:  To be completely clear, Your
14   Honor --
15       THE COURT:  Yes.
16       MR. THOMAS:  -- the Bankruptcy Judge also
17   stated that he would not be making substantive findings
18   in this matter.
19       THE COURT:  I assumed that.  I'll be making
20   those findings in a second.
21       MR. THOMAS:  Right.  Okay.
22       THE COURT:  But just one thing.  The
23   Bankruptcy Petition was July 6th.  Now, I'm not a
24   bankruptcy expert.  Does the bankruptcy stay begin on
25   July 6th?

21

1        MR. THOMAS:  Yes, Your Honor.
2        THE COURT:  All right.  Well, Mr. Thomas, why
3    are you -- if the bankruptcy is July the 6th, why are
4    you taking depositions in -- on July 27th and doing
5    something else on August 10th and serving written
6    discovery on August 10th.
7        MR. THOMAS:  Well, August 10th, it was an e-
8    mail.  We're basically requesting follow-up from the
9    deposition.  So I wouldn't consider that a substantive
10   request.  It was simply an e-mail asking for further
11   followup.
12       But the deposition had been scheduled.  There
13   had been difficulties scheduling it for months, as I
14   stated previously, in front of the Bankruptcy Judge.
15   And it was because of that that once it was finally
16   scheduled, it had literally taken months back and forth
17   to try and set up.  That's why we moved forward with
18   it.
19       In terms of -- yes.  In terms of the
20   difficulties with the scheduling, I don't think
21   anyone's going to contest that, but I do -- that's why
22   we moved forward with it.  There was no furthering of
23   the pleadings.  There was simply a request for
24   discovery.  There was nothing else actually
25   substantially done with the Court, other than by Mr.

1   Clayton after that time.
2         THE COURT:  Well, what is your ver- -- just
3   so I'm clear.  What is your version as to how Mr.
4   Clayton was notified of Ms. Pope's bankruptcy petition?
5   What -- what's your version on that?
6         MR. THOMAS:  The initial paperwork that was
7   actually submitted July 6th -- there's no contesting
8   that it wasn't in that because that was actually a --
9   what I would call a skeletal petition.  So it was a
10  partial petition.
11        THE COURT:  Uh-huh.  All right.
12        MR. THOMAS:  There was subsequent paperwork
13  sent after that and I don't have the date in front of
14  me, where it included a substantial amount of
15  creditors.  It included all parties and, like I said
16  previously -- I mean,- he would have been included in
17  that particular matrix.  It was our position that they
18  were notified at that time, once those supplements were
19  made.
20        THE COURT:  And I -- I'm sorry.  At what
21  time?
22        MR. THOMAS:  That it would have been our
23  position that they would have been notified when all of
24  that paperwork was sent out.
25        THE COURT:  But when -- when was that?

23

1         MR. THOMAS:  I -- I don't have that
2   particular date in front of me for when that -- the
3   supplements were made.
4         THE COURT:  All right.  Well, it's obvious --
5   I mean, Mr. Clayton --
6         MR. THOMAS:  Right.
7         THE COURT:  -- is -- is representing, and
8   I'll let him speak for himself, that as of September
9   11th, 2017, he had no idea that Ms. Pope was in
10  bankruptcy.  Is that -- is that your representation,
11  Mr. Clayton?
12        MR. CLAYTON:  That's entirely correct, Your
13  Honor.
14        THE COURT:  All right.
15        MR. CLAYTON:  And, again, we spent an entire
16  --
17        THE COURT:  All right.  I'm ready to resolve
18  this particular issue with regard to the non-
19  appearances.  This is an easy issue.
20        The -- putting aside the Chief Judge's
21  comments and -- and the findings, there's no question
22  that the formal -- the formal petition was not served
23  on July 6th on -- on Mr. Clayton and the discovery, and
24  that's -- if anything, I have to tell you, Mr. Thomas,
25  I don't understand that.  I don't know how much

FILED, Case 18-17480, Division Doc: 147-22 Filed, 06/07/2017, Entered 06/07/19 15:50:24 Desc Main
Document Page 220 of 282

24

1  Bankruptcy work you do, but the stay, I presume and
2  I'll let you respond to it, the stay precludes the
3  discovery deposition.  Am I wrong about that or -- or
4  -- or -- do you have a different --
5          MR. THOMAS:  I've actually seen both
6  arguments and I understand, generally speaking, a stay
7  would stay everything.  The one interpretation that
8  I've read was -- and I spoke with an attorney about was
9  as long as there's nothing occurring to move forward a
10 case with the actual Court, filings, things like that,
11 discovery can proceed.  I don't have case law to back
12 that up, but that's why we proceeded with the
13 deposition, Your Honor.
14         THE COURT:  Right.  All right.  Well -- all
15 right, well, I -- I -- I'm trying to be fair here --
16         MR. THOMAS:  Right.  I understand that.
17         THE COURT:  -- to you, but I would -- I -- I
18 -- I would -- my assumption is, is that discovery
19 depositions of people who just filed for bankruptcy
20 can't go forward.  I could be wrong about that, but I
21 don't find good cause here in regard to the failure to
22 appear under 4:21A-6F.  I mean, the Chief Judge's
23 comments can't simply be ignored.  I -- I -- I don't
24 think I'm bound by them in any strict sense.  But let
25 me just revisit them again.  It was section K?  Which

25

1  section was it?
2          MR. CLAYTON:  It the -- the summary is
3  paragraph 20 of my statement of material facts, Your
4  Honor.
5          THE COURT:  I want to go to the actual
6  comments.  Was that -- was that Section K?
7          MR. CLAYTON:  The actual comments is Section
8  K, beginning at page 110.
9          THE COURT:  All right.
10         MR. CLAYTON:  The Court issued -- it would be
11 --
12         THE COURT:  Well, the -- the Court -- I
13 understand -- but I -- I already read once in to the
14 record and I'm not going to put mustard into the
15 woolens, but the Chief -- but the Bankruptcy Chief
16 Judge's comments are -- are injurious to Ms. Pope's
17 contention now that there was good cause not to appear
18 at the ar- -- at -- at -- at -- at the arbitration.
19         There's no -- by the way, if -- if -- if --
20 if Ms. Pope has no problem with having her attorney
21 take a discovery deposition three weeks after she filed
22 for the petition for bankruptcy, at the very minimum,
23 she should have appeared at the arbitration proceeding.
24 At the very minimum, the Arbitration Administrator
25 should have been contacted and said, look, we have an

26

1    issue on our hand.  One of the litigants is in
2    bankruptcy.  Should we proceed?  And one of the
3    attorneys is concerned, should we proceed to the
4    arbitration?  But none of that was done here.
5            So I find that there's not a sufficient
6    showing of good cause.  So that strips Ms. Pope of her
7    right to file for a trial de novo.  So where does that
8    leave us at this point now?
9            MR. THOMAS:  Well, Your Honor -- I mean, I
10   would, as we stated, just to clarify the record.
11   September 27th keeps getting referenced.  It's actually
12   September 24th is when the trial de novo request was
13   submitted.  So that way, there's no question if it was
14   -- as to the date.
15           THE COURT:  Yes.  I'll give you the benefit
16   of the doubt in regards to the time.
17           MR. THOMAS:  That's fine.  I mean --
18           THE COURT:  But -- but the more important
19   rule here is that you didn't -- forget about whether or
20   not you filed the request for a trial de novo on the
21   29th day or the 31st day, whatever it is, is that the
22   Rule strips you of your right to file for a trial de
23   novo.
24           MR. THOMAS:  And that's where we disagreed --
25           THE COURT:  Right.

27

1            MR. THOMAS:  -- in terms of the law with
2    opposing counsel and with Your Honor, that's why we
3    made in the original opposition to his motion, number
4    one, the case had actually been dismissed in --
5    December 15th.  But we'll get to that -- or after
6    December 15th, but we'll get to that in a minute.  But
7    our argument was that --
8            THE COURT:  Well, we're going to deal with
9    that -- well, let's deal with -- hold on.  We'll deal
10   with -- I'll deal it sequentially.
11           MR. THOMAS:  Right.
12           THE COURT:  So where we stand now is there's
13   an arbitration award, $723,000.
14           MR. THOMAS:  Right.
15           THE COURT:  All right?  Was there a motion
16   made to confirm the arbitration award?
17           MR. THOMAS:  Well, hold on.  Let me actually
18   -- if I could address the issue of the trial de novo.
19           THE COURT:  Sure.
20           MR. THOMAS:  There was -- after the trial de
21   novo notice had been submitted, there was then your
22   Order the day after September 25th, which is why this
23   is important, it was signed September 25th and then
24   docketed the 29th.  And then several days later --
25           THE COURT:  Well, we get to the reason --

1   what -- what Order are you referring to?  I don't -- it
2   has my name on it?
3               MR. THOMAS:  Yes, Your Honor.
4               THE COURT:  I don't --
5               MR. THOMAS:  There was an Order, apparently,
6   from yourself and there's -- I'll just read the
7   deficiency notice.  There was a defici- -- I'm sorry --
8   deficiency notice October 6th, well after our filing
9   and actually after your Order that says, request for de
10  novo trial -- other.  I'm sorry.  Deficiency notice,
11  re-request for de novo trial.  The Court has entered an
12  Order striking the filed answer in this matter.
13  Therefore, the trial de novo is rejected.
14              THE COURT:  All right.
15              MR. THOMAS:  That Order was actually
16  submitted after we submitted the request for trial de
17  novo and that deficiency notice was actually submitted
18  well after both were submitted, along with a few other
19  documents.
20              So we would posit that that deficiency or the
21  reason for denying the -- at least, on the docket, for
22  -- the request trial de novo was improper because --
23              THE COURT:  Yeah.  But I'm -- I'm rejecting
24  that argument because under the best case scenario --
25  well, first of all, sequentially, I don't know how --

1   how it's supposed to work.  When a party doesn't show
2   at the arbitration, presumably the Superior Court can
3   send out that day notice to all sides, saying, by the
4   way, assuming it's the defendant that didn't appear at
5   the arbitration -- the defendant's ability to file for
6   trial de novo is by the boards.  We're stripping him or
7   her it -- of it.  So don't even try it.  We probably
8   don't do that.
9               Instead, what happens is is that if a non-
10  showing party files a request for a trial de novo --
11  and sometimes they may not.  They may be -- actually be
12  happy with the arbitration award.  Had the arbitration
13  been a no cause, my guess is you would have been
14  perfectly happy with it and -- and it would have been
15  Mr. Clayton who would have filed for a trial de novo.
16              But, my guess is, and it's just a guess, that
17  the deficiency notice is only in response when the non-
18  showing party files a request for a trial de novo.
19  That precipitates the deficiency notice by the Superior
20  Court.  So that's -- that's my guess --
21              MR. THOMAS:  Right.
22              THE COURT:  -- as to what happened.  But it
23  wouldn't even matter.  Suppose we just ignored it?
24  Suppose the Superior Court didn't even send out any
25  deficiency notice?

1          MR. THOMAS:  Okay.
2          THE COURT:  And -- and -- and the rubber hits
3     the road then when Mr. Clayton files a Motion to
4     Confirm the arbitration award and enter judgment.
5     Well, when did that happen, Mr. Clayton?
6          MR. CLAYTON:  Your -- if I may, Your Honor,
7     just to back up a little bit.
8          THE COURT:  Oh, all right.
9          MR. CLAYTON:  The rubber hits the road even
10    before that because the rules provide a non-appearing
11    party does not have the right to submit a de novo
12    demand.
13         THE COURT:  Right.
14         MR. CLAYTON:  So the rules make that clear.
15    And what the non-appearing party has to do --
16         THE COURT:  Within 20 days.  Right?  I agree
17    with that.
18         MR. CLAYTON:  Within 20 days.  It was filed,
19    I think --
20         THE COURT:  But within 20 days, counsel has
21    to -- has to litigate the issue and that wasn't done in
22    this case.
23         MR. CLAYTON:  It -- it -- it was never done.
24         MR. THOMAS:  Well --
25         MR. CLAYTON:  So I -- I think that the

31

1     earlier ruling that there's not been a sufficient
2     showing of good cause pretty much disposes of this --
3          THE COURT:  Yes.  But let -- but let me ask
4     you this.  Let me -- I -- I assume Mr. Brown wants to
5     -- Mr. Thomas wants to tell me that he did file
6     something within 20 days of getting the deficiency
7     notice.  But let me -- let me and just -- Mr. Thomas,
8     did you file anything within 20 days of getting the
9     deficiency notice?
10         MR. THOMAS:  Yes, Your Honor.
11         THE COURT:  What did you file?
12         MR. THOMAS:  We specifically re-filed a
13    request for a trial de novo.
14         MR. CLAYTON:  Again, Your Honor --
15         MR. THOMAS:  This --
16         THE COURT:  But did you file -- the Rule --
17    just -- just so I'm clear, the Rule requires -- here.
18    Relief -- I'm reading now from 4:21A-6F.
19         Relief from any Order entered pursuant to
20    this rule shall be granted on -- only on motions
21    showing good cause, which motion shall have been filed
22    within 20 days of the date of service on the nonparty
23    by the appearing party.
24         All right.  Well, if you're claiming that it
25    wasn't done within 20 days, Mr. Clayton, what -- what

do you claim is the triggering date for the 20 days?
          MR. CLAYTON:  The -- and these are not issues
of dispute, Your Honor.
          THE COURT:  Right.
          MR. CLAYTON:  These are record facts.
          THE COURT:  Uh-huh.
          MR. CLAYTON:  Arbitration hearing, September
11th.
          THE COURT:  Right.
          MR. CLAYTON:  De novo demand, September 24th.
Deficiency notice, October 19th.  Good cause motion,
never.  Never been filed to this day has been -- there
been a good cause motion.
          THE COURT:  All right.
          MR. CLAYTON:  So the time --
          THE COURT:  But what -- what --
          MR. CLAYTON:  -- passed after 20 days and it
-- and -- and -- and it lapsed.  They're --
          THE COURT:  Right.  But let me ask you, Mr.
Thomas.  When did you file something to address the
fir- -- when is the first time you filed something to
address the issue of good cause?
          MR. THOMAS:  Well, the trial de novo, and
what was submitted was pursuant to 4:21A-6B1 and 6BC.
That specifically said that we're permitted to submit a

trial de novo.  That within that 20 days, it was
submitted, so that was timely.
          And defendants were not seeking -- I want to
be clear.  That specific item was October 2nd was when
I believe that would be considered the first time we
submitted anything regarding the good -- good faith.
          THE COURT:  Right.
          MR. THOMAS:  So October 2nd was the first
time we submitted paperwork regarding that.  It would
have been the Notice of Bankruptcy, as well as what the
good faith reasons were.
          THE COURT:  All right.  So you're saying
October 2nd.
          MR. THOMAS:  Right.
          THE COURT:  Was -- when you say -- what --
what -- what does the record ind- -- when -- when --
when did we receive that?  Do we have --
          MR. THOMAS:  October 2nd when it was docketed
and --
          THE COURT:  Yes.  You have -- you have a copy
marked filed October 2nd?
          MR. THOMAS:  I have a -- I'm looking at the
docket, Your Honor, and it was filed October 2nd,
received October 2nd was the entry date, Your Honor.
          THE COURT:  All right.

34

1      MR. CLAYTON:  And --
2      MR. THOMAS:  That was when the letter
3  memorandum was submitted.
4      THE COURT:  All right.  All right.  So if I
5  gave you the benefit of all favorable inferences, 20
6  days before October 2nd is what?  September what?
7  Anybody know?  Well, there are 30 days in October.  So
8  it's ball park September 13th, give or take.  Right?
9      MR. THOMAS:  Sure.  Or the 12th.  Yes.  Yes.
10      THE COURT:  All right.  When -- when would
11  have been the fir- -- when would have been, Mr.
12  Clayton, that Mr. Thomas was served?
13      MR. CLAYTON:  September 11th.  He was ser --
14      THE COURT:  He was served -- he was served
15  with the arbitration award September 11th?
16      MR. CLAYTON:  That's correct.
17      THE COURT:  How was he served?  What -- what
18  was the mechanism?
19      MR. CLAYTON:  He was served via eCourts and
20  also by an e-mail from me on that very day.  In fact,
21  he --
22      THE COURT:  All right.  Well, Mr. --
23      MR. CLAYTON:  -- responded that very day with
24  a grumpy e-mail.
25      THE COURT:  All right.  Well, Mr. Clayton,

35

1  the problem is if the 20 days, if you add that on to
2  September 11th, that takes you before October 2nd.
3  Does it?
4      MR. CLAYTON:  There's -- there's --
5      MR. THOMAS:  And that's the 2nd?
6      THE COURT:  I -- I -- I assume it does.
7  Don't -- I --
8      MR. CLAYTON:  There's -- there's a --
9      MR. THOMAS:  I -- I believe you're correct.
10      THE COURT:  All right.
11      MR. THOMAS:  And, like I said, the request
12  for de novo and Mr. Clayton didn't oppose the request
13  and only brought up this fact well after the fact, the
14  request was submitted, but --
15      THE COURT:  All right.  Well, here -- here --
16  but here's the bottom line.  I'm going to give you a
17  chance to speak, Mr. Clayton, in a second.  I -- I went
18  loose and the -- the 20 day rule is not, I assume, non-
19  relaxable and if it were a day or two late, I wouldn't
20  lose any sleep over it.
21      So, again, I'm focusing on the substance of
22  the matter, was that there was no excusable reason not
23  to show up at the arbitration hearing and that if -- if
24  -- if either side -- you know, it would have been Ms.
25  Pope's side, since she was the only one aware of the

1  bankruptcy, had a concern that should have been
2  addressed by either me or the Arbitration Administrator
3  days in advance of the arbitration hearing.
4          All right.  So I -- I -- I cut you off, Mr.
5  Clayton.  I'll let you respond to that, if you want,
6  but I do want to hear from you as to when it is that
7  you filed your Motion to Confirm the arbitration award.
8          MR. CLAYTON:  We filed, actually, two motions
9  to confirm the arbitration award, Your Honor --
10          THE COURT:  Uh-huh.
11          MR. CLAYTON:  -- and -- and I'm -- I'm
12 working from memory on the first one.  I believe it was
13 on October 30th that we filed our Motion to Confirm the
14 arbitration award because we were concerned about the
15 running of the 50 days.
16          THE COURT:  All right.
17          MR. CLAYTON:  And we wanted to protect the
18 record.  We knew there was a bankruptcy at that point.
19          THE COURT:  Yes.
20          MR. CLAYTON:  But we wanted to make sure that
21 the record was protected in State Court --
22          THE COURT:  Right.
23          MR. CLAYTON:  -- regardless of how the
24 bankruptcy stay was adjudicated and so we filed within
25 that 50 day window.

37

1          THE COURT:  All right.  So by the time -- all
2  right -- so -- all right, so, by -- by the time you
3  filed to confirm the arbitration award at that point
4  you had been notified of the bankruptcy?
5          MR. CLAYTON:  Yes.
6          THE COURT:  All right.
7          MR. CLAYTON:  By the time -- and -- and we
8  notified --
9          THE COURT:  All right.  All right.  When you
10 filed your Motion to Confirm the arbitration award what
11 was the result?
12          MR. CLAYTON:  There were two Motions to
13 Confirm the arbitration award.
14          THE COURT:  Yes.
15          MR. CLAYTON:  On December 14th, Your Honor
16 issued an opinion on the record saying according to the
17 Motion to Confirm, there is a -- a bankruptcy in place
18 and, in my view, I can't do anything when a bankruptcy
19 is in place, and so I'm going to stay this matter and
20 not decide this and I think the parties should go to
21 the Bankruptcy Judge --
22          THE COURT:  Fine.  Right.
23          MR. CLAYTON:  -- and get guidance from that
24 Court.
25          THE COURT:  Right.

**38**

```
1          MR. CLAYTON:  And that's what we were doing
2     at -- at that very same time.
3          THE COURT:  Right.
4          MR. CLAYTON:  And once the Bankruptcy Court
5     permitted us to proceed, we filed a second Motion to
6     Confirm the arbitral award on January 2nd, again,
7     timely, and at that point the stay had been lifted and
8     it was brought before Your Honor.
9          THE COURT:  Right.
10         MR. CLAYTON:  We won that motion and then Mr.
11    Thomas filed a Motion for Reconsideration.
12         THE COURT:  When you say you won it, was
13    there opposition to the motion?
14         MR. CLAYTON:  There was opposition filed by
15    eCourts.
16         THE COURT:  Right.
17         MR. CLAYTON:  Not served by paper.
18         THE COURT:  Right.
19         MR. CLAYTON:  And Your Honor denied the
20    motion for whatever reason.  And the Motion for
21    Reconsideration was filed, again, untimely, and beyond
22    the 20 days mandated --
23         THE COURT:  Hold on.  I -- hold on.  The
24    second --
25         MR. CLAYTON:  Sure.
```

**39**

```
1          THE COURT:  Your second Motion to Confirm the
2     arbitration award after the Bankruptcy Court lifted the
3     stay, that was granted or denied by me?
4          MR. CLAYTON:  It was granted, Your Honor.
5          THE COURT:  All right.  And that's the -- Mr.
6     Thomas, that's what you're seeking to reconsider?
7     That's the Order?
8          MR. THOMAS:  Well, let me clarify the facts a
9     little --
10         THE COURT:  All right.
11         MR. THOMAS:  -- because opposing counsel is
12    kind of hazing over a lot of facts.
13         Number one, December 15th, there was
14    specifically an Order denying his motion.  So that's
15    number one.  Number two, there was --
16         THE COURT:  Yes.  But -- but it was just
17    represented and I -- I -- I -- I can tell you, I have
18    no recollection of any of this stuff.  But I know what
19    -- I've been doing this now for almost seventeen years
20    and a lot of it's repetitive.  If there was any hint
21    that the litigant -- one of the litigants was in
22    bankruptcy, I would have denied the motion without
23    prejudice.  I would have put on the record get a
24    clarification from the Bankruptcy Judge that there is
25    no stay that prevents this.  That's how I handle all --
```

```
 1    handle it all the time.  All right?
 2            MR. THOMAS:  Right.  That's fine.  I mean,
 3    but again, so then December 27th, there was a [sic]
 4    Order dismissing the case, as you're well aware.
 5    Opposing counsel then --
 6            THE COURT:  Yes.  But that Order dismissing
 7    the case, where did that come from?
 8            MR. THOMAS:  It was on the docket.  We
 9    received notice of it, just like opposing counsel did.
10            THE COURT:  Was it an -- was it an Order
11    signed by me or was it an administrative notice of
12    dismissal?
13            MR. THOMAS:  I -- I don't know the answer to
14    that question.
15            THE COURT:  Because here's -- I know that I
16    send them out in arbitrations if nobody does anything
17    in 50 days.
18            MR. THOMAS:  Right.
19            THE COURT:  Right?  Well, that was -- that
20    was done by mistake.  Obviously, we felt it wasn't --
21            MR. THOMAS:  No.
22            THE COURT:  -- within 50 days -- the Motion
23    to Confirm an arbitration award.  So it wasn't
24    something signed by me.  It was an administrative
25    notice of dismissal to clear the case on the books.
```

```
 1            MR. CLAYTON:  That's correct.
 2            MR. THOMAS:  Okay.  I -- well, nonetheless --
 3            THE COURT:  All right.  All right.
 4            MR. THOMAS:  -- so opposing counsel then
 5    submitted a new motion January 2nd --
 6            THE COURT:  Right.
 7            MR. THOMAS:  -- which was essentially, the
 8    exact same motion.
 9            THE COURT:  All right.  And, I -- I -- I mean
10    -- here's what happened.  I granted it because I didn't
11    consider your opposition, which is why I granted your
12    Motion for Reconsideration that apparently is what's
13    the basis to me, because you didn't hard copy your
14    opposition and the way that this Vicinage handles that
15    is that if it's opposition that's not hard copied, we
16    grant the motion, but we basically tell you that if
17    you're unhappy with it, file a Motion for
18    Reconsideration, which is what you did.
19            MR. THOMAS:  Well, frankly, Your Honor, it's
20    not that we didn't hard copy the opposition.  Opposing
21    counsel and myself have been sending electronic
22    everything to each other the whole time.  That's never
23    been an issue.  So he received notice of the
24    opposition.
25            I think that your reasoning was that the
```

1    opposition had not been hard copied to Your Honor.
2           THE COURT:  Yes.  That's correct.
3           MR. THOMAS:  On Monday, we received notice of
4    it before that hearing.  We made sure that you had it
5    by that Wednesday.  So it was --
6           THE COURT:  Yes.  But I -- I don't -- yes,
7    but I -- have to understand something.  This is not the
8    only motion that I'm handling.
9           MR. THOMAS:  Right.  I understand that.  I'm
10   just --
11           THE COURT:  All right.  So, but the -- the
12   point is, when I get the hard copy on the Wednesday
13   before the Friday, if the hard copy is one page and
14   it's a simple issue, I'm not going to stand on ceremony
15   and say it's too late.  But when the opposition is to
16   try to disentangle this fiasco, right --
17           MR. THOMAS:  Right.
18           THE COURT:  -- and I don't mean that
19   pejoratively, but I've already spent, even this
20   morning, a good -- when did I start this motion?  What
21   time?  It seems like a long time, but maybe I'm
22   overstating it.
23           MR. THOMAS:  So -- I -- I mean, I understand
24   Your Honor's posi --
25           THE COURT:  All right.  So that -- that --

43

1    but nobody's prejudiced.
2           MR. THOMAS:  Right.
3           THE COURT:  I want everybody to understand,
4   it's --
5           MR. THOMAS:  It -- right.
6           THE COURT:  -- a minor matter and so I'll be
7   dealing with the matter now on the merits on your
8   Motion for Reconsideration.  All right.
9           MR. THOMAS:  Right.  No, I understand.  I
10   mean, I'm just trying to point out why that was ruled
11   the way it was, because --
12           THE COURT:  All right.  Well, that's --
13   that's the result.  I'm hoping --
14           MR. THOMAS:  We'd actually been told that --
15   I mean, even though opposing counsel didn't submit
16   paperwork previously and it was adjourned, we had
17   requested the same courtesy.  We were denied it, saying
18   that if -- unless opposing agrees -- opposing counsel
19   did not agree, so it moved forward as it was.  But
20   nonetheless --
21           THE COURT:  All right.  But be --be that --
22   yes.  But, just to -- I'm a little -- I'm always
23   concerned about consistency.  My basic policy is -- is
24   that where the problem is there was no hard copy of
25   something.  If both attorneys agree to simply carry the

FILED, Case: 18-17430 Division: DC-147 22 Filed: 06/07/19, Entered: 06/07/19 15:50:24 Desc Main
Document       Page 230 of 282

44

1  motion a cycle so that that deficiency needs to be
2  cured, I'm not going to stand in your way.
3          If one side objects, I don't have the time to
4  get you both on the phone to find out what the
5  objection is and to -- and -- and -- and to disentangle
6  what -- what the objection is.  So, basically, the
7  motion is car- -- assuming the deficiency is the
8  opposition, the motion is kept on the return date and
9  you get the Order and the Order, as you probably saw,
10 has the stuff pasted in that says opposition not
11 considered due to lack of conformity with the Notice to
12 the Bar dated June 28th, 2017.
13         MR. THOMAS:  Right.  Okay.
14         THE COURT:  File a Motion for
15 Reconsideration, which was done.  So it all leads to
16 the same decision, is that I've heard the Motion for
17 Reconsideration on the merits.
18         MR. THOMAS:  Right.
19         THE COURT:  There's been oral argument and
20 I'm denying the Motion for Reconsideration.
21         MR. THOMAS:  Okay.
22         THE COURT:  So -- I mean -- make sure I have
23 the Order so you can -- if -- if anybody wants to
24 appeal that, today is the date that I'm denying the
25 Motion for Reconsideration.

45

1          MR. THOMAS:  All right.  So we'll use -- if
2  needed, we will use this date as the date.  I
3  appreciate that.
4          THE COURT:  Yes.  Let me just make sure --
5  normally, in the past, I would make sure that you both
6  had copies of that.
7          MR. CLAYTON:  Your Honor, I --
8          THE COURT:  Yes?
9          MR. CLAYTON:  I -- I submitted a proposed
10 Form of Order and I have copies today.
11         THE COURT:  (Inaudible).
12         MR. CLAYTON:  It's the same one I submitted
13 previously.
14         THE COURT:  All right.  I'd give you co -- I
15 -- I'd have my Law Clerk give you copies.  We'll be
16 taking a break soon, but under this eCourts regime, we
17 kind of --
18         MR. THOMAS:  So we would disagree with --
19         THE COURT:  Well, we'll deal with -- hold on.
20 Let me make sure I have it in front of me.  Hold on,
21 just a second.
22         MR. THOMAS:  Oh, I'm sorry.  I thought you
23 had it in front of you.
24         LAW CLERK:  It's right here, Your Honor.  I'm
25 sorry.

FILED, Case 18-17430-cdf Division Doc 147-7 22 Filed, 06/07/19 17, Entered 06/07/19 15:50:24   Desc Main
Document     Page 231 of 282

46

1    MR. THOMAS:  We have concerns with the
2 language after the word denied.
3    THE COURT:  No.  I see what you're saying.
4 I'm -- all right.  Nice try, Mr. -- Mr. Clayton.  But
5 first of all, whenever I'm denying a Motion for
6 Reconsideration, the Order I sign denying the Motion
7 for Reconsideration just simply indicates the Motion
8 for Reconsideration is denied.  Courts generally don't
9 put the reasons for the denials of a Motion for
10 Reconsideration in the Order itself.  Right?  With a
11 few exceptions.
12    I -- the reason why -- if I'm denying a
13 motion because one side hasn't conformed with the A --
14 with the -- the Supreme Court's notice to the Bar
15 concerning -- you know, the hard copy, I want the
16 lawyer to know that it was purely a procedural hiccup
17 and I didn't decide the motion on the merits.  All
18 right?
19    Otherwise, the lawyer may say, well, my
20 motion was denied, and they would think that I denied
21 it on the merits rather than for the very simple reason
22 was that the motion was never hard copied.  So I do
23 make an exception when it's an eCourts type of
24 situation.
25    Secondly, I'm not -- I am not adopting a --

1 whole scale all the comments of the Bankruptcy Court
2 Judge.  Although, I have to tell you my reasons are
3 virtually identical.  But it -- it -- it's because I've
4 independently assessed the facts in the case and come
5 to the conclusion that while -- while I don't think Mr.
6 Thomas somehow tried to mastermind some grand strategy
7 in not showing up at the arbitration, I felt that the
8 reasons he proffered don't constitute good cause.  All
9 right?  It's really the -- quite that -- really that
10 simple.
11    MR. THOMAS:  Okay.  All right.  Understood,
12 Your Honor.
13    THE COURT:  All right.  So I'm deleting that
14 -- is that your objection to the stuff where it says --
15    MR. THOMAS:  Yes.  Anything after the word
16 denied, Your Honor.
17    THE COURT:  Yes.  All right.  I'm denying the
18 Motion for Reconsideration.  It's that simple.
19    MR. THOMAS:  Okay.  All right.  Thank you,
20 Your Honor.
21    THE COURT:  All right, fellas.  Have a good
22 weekend.
23    MR. THOMAS:  Thanks.  You too, Your Honor.
24    MR. CLAYTON:  Take care.
25    THE COURT:  All right.

1               CERTIFICATION
2
3          I, Rebecca Y. Natal, the assigned
4     transcriber, do hereby certify the foregoing transcript
5     of proceedings, Digitally Recorded, Index Number
6     9:47:18 to 10:23:47 is prepared in full compliance with
7     the current Transcript Format for Judicial Proceedings
8     and is a true and accurate compressed transcript of the
9     proceedings as recorded.
10
11
12    July 24, 2018
13
14
15
16
17    Rebecca Y. Natal AD/T 557
18
19    AUTOMATED TRANSCRIPTION SERVICES
20    Laurel Springs, NJ
21
22
23
24
25

| | | |
|---|---|---|
| **MARTIN BROWN** | : | **SUPERIOR COURT OF NEW JERSEY** |
| | : | **CAMDEN COUNTY** |
| and | : | **LAW DIVISION** |
| | : | |
| **BROWN AND THOMAS, LLC** | : | Civil Action L-2368-16 |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| **SHARONN THOMAS POPE** | : | |
| | : | |
| Defendant | : | |
| | : | |

## ORDER

This matter having been brought before the Court on the application of Sharonn Thomas Pope ("Pope") by way of Motion to Reconsider this Court's Final Judgment Order dated January 19, 2018, as and against Martin Brown and Brown and Thomas LLC (collectively, "Brown"), and the Court having considered the matter, and any response thereto, and for good cause appearing, IT IS, on this _____16_____ day of ____March____, 2018, ORDERED THAT Pope's Motion is hereby DENIED. ~~In so holding, the Court explicitly adopts the facts and reasons advanced by Brown in connection with the instant motion and his prior motion to confirm arbitral award and enter judgment thereon, and further affirms its order dated January 19, 2018 on said grounds.~~

BY THE COURT:

_____
J. Michael J. Kassel, J.S.C.

A 200    3/16/18

# OPERATING AGREEMENT
# FOR

Brown and Thomas, LLC

THE UNDERSIGNED, as members of the Company do hereby enter into this Operating Agreement for the above-named, Limited Liability Company, hereinafter referred to as the "Company."

## I
## CONTRACT

This Operating Agreement is a contract between its parties and is enforceable by the Company against any member who violates its terms. All members, past, present and future must sign this Operating Agreement as a condition of membership.

## II
## OFFICE

The principal office of the Company is located at 49 Gray Pebble Circle, Sicklerville,

New Jersey, 08081

The Company may have such other offices, either within or without the state as the members may designate or as the business of the Company may require. The registered office of the Company required by the laws of the State of New Jersey to be maintained in the state may be, but need not be, identical with the principal office, and may be changed from time to time by the members.

## III
## PURPOSE

The purpose for which the Company is organized is the conduct of all lawful business purposes except that of banking or insurance.[1]

---

[1] For California LLCs, this provision should be replaced with "The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act."

©2006 by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com   800.222.0510

## IV
## DURATION OF THE COMPANY

The Company shall commence immediately, upon the signing of this Operating Agreement, and shall continue pursuant to the term specified in the documents filed with the state unless terminated sooner by operation of law or by agreement among the members.

## V
## CAPITAL CONTRIBUTIONS

The undersigned members agree to share in all post-formation capital contributions, profits, and surplus of the Company according to the percentage of their membership.  Each member owns an undivided interest in the business and Company as follows:

| Member | Percentage Membership |
|---|---|
| Martin S. Brown | 50% |
| Sharonn Thomas | 50% |
| | |
| | |
| | |

## VI
## ADDITIONAL CAPITAL CONTRIBUTIONS

The members may contribute in proportionate amounts any additional capital deemed necessary for the operation of the Company, provided, however, that in the event that any member deems it advisable to refuse or fails to contribute such member's share of any or all of the additional capital, then the other members or any one of them may contribute the additional capital not paid in by such refusing member and shall receive therefor an increase in the entire Company in direct proportion to the said additional capital contributed.  Unless otherwise agreed, the right to make up additional capital contributions of a refusing member shall be available in the same order as the right to purchase in the case of withdrawal or death of a member, as set forth in paragraphs XV and XVI.

©2006 by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com    800.222.0510

## VII
## DIVISION OF PROFITS AND LOSSES

Each of the members shall own an interest in the Company as set forth in paragraph V, entitled "Capital Contributions," except as the same may hereafter vary or change as provided in paragraph VI, entitled "Additional Capital Contributions." All profits and losses of the Company enterprise shall be shared by each of said members according to the percentage of interest each member owns. A separate capital account shall be maintained for each member. No member shall make any withdrawals from capital without prior approval of the Company. If the capital account of the member becomes impaired, his share of subsequent Company profits shall be first credited to his capital account until that account has been restored.

## VIII
## RIGHTS AND DUTIES OF THE PARTIES

The entity is to be member managed. Company decisions and actions shall be decided by a majority in the interest of its members, at meetings regularly called with notice to all members. For purposes of determining a "majority in interest," a member's interest will be such member's interest in profits and losses as set forth in paragraphs V & VI, and a majority will mean more than fifty percent (50%).

## IX
## COSTS AND EXPENSES

Except as herein provided no member shall be separately compensated on a salaried basis for service performed in carrying out the operation of the Company. No salaries or individual compensation shall be otherwise payable, without consent of the Company, for the normal management, although the Company may from time to time employ one or more managers or other representatives at a designated salary.

## X
## MANAGEMENT DUTIES AND RESTRICTIONS

No member shall, without the consent of the other _____ one _____ members, endorse any note or act as an accommodation party, or otherwise become surety for any person in any transaction involved in the Company. Without the consent of the Company, no member shall on behalf of the Company borrow or lend money, or make, deliver or accept any commercial paper, or execute any mortgage, security agreement, bond or lease, or purchase or contract to purchase, or sell or contract to

©2006 by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com   800.222.0510

sell any property for or of the Company. No member shall, except with the consent of the other members, mortgage, grant a security interest in its share in the Company capital assets or property, or do any act detrimental to the best interests of the Company or which would make it impossible to carry on the ordinary purpose of the Company.

## XI
## BANKING

All funds of the Company shall be deposited in its name in such checking account or accounts as shall be designated by the members. All withdrawals therefrom are to be made upon checks which must be signed by the person designated by the members.

## XII
## BOOKS

The Company books shall be maintained at the Company offices, to be retained by the entity, and each member shall have access thereto. The books shall be kept on a calendar year basis, and shall be closed and balanced at the end of each fiscal year. Each of the parties to this Operating Agreement hereby covenants and agrees to cause all known business transactions pertaining to the purpose of the Company, to be entered properly and completely into said book. The Company will furnish annual financial statements to the members, and prepare tax returns in a timely manner.

## XIII
## INSURANCE

The Company shall carry liability insurance in such amounts as are deemed appropriate by the members.

## XIV
## VOLUNTARY TERMINATION

If the Company is dissolved, the members shall proceed with reasonable promptness to liquidate the Company. The assets of the Company shall be distributed in the following order:

A. To pay or provide for the payment of all Company liabilities to creditors other than members, and liquidating expenses and obligations;

B. To pay debts owing to members other than for capital and profits;

C. To pay debts owing to members in respect to capital; and

D. To pay debts owing to members in respect to profits.

LPMOSFD
Rev. 9/06   P9/06

©2006 by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com   800.222.0510

## XV
## WITHDRAWAL OF MEMBER BY SALE

Any member who shall be desirous of selling their share and interest in the Company shall give to [the Company] [the other members] the right of first refusal to purchase said share and interest at the same price as being offered by a bona fide and qualified buyer.

All members electing to purchase (other than the selling member), and having the right to purchase, may purchase that percentage of share(s) being sold. The number of shares that can be purchased is calculated by dividing the member's respective percentage of the Company by the total percentage of shares of all members electing to purchase.

The unanimous consent of all members is required for a member to sell their share to a non-member or for an assignee of a member's share to become a member.

## XVI
## DEATH OF A MEMBER

In the event of the death of a member, then the deceased's heir or heirs shall be entitled to succeed to the economic share and interest of the deceased member. This provision however, is subject to the controlling statute(s) and/or Court Rule(s) of the specific state's treatment of an heir's succeeding to the economic share and interest in a professional organization of the deceased member. The Company may, upon unanimous consent of the remaining members, as soon as practicable, provide a document by which the remaining members personally affirm and accept all the terms, conditions and provisions of this Operating Agreement binding themselves to continue the same business in writing.

## XVII
## DISTRIBUTION

Prior to dissolution and at least annually as income has been received by the Company, accounts determined and tax returns filed, the members shall determine funds available for distribution. Upon liquidation, a reasonable reserve as mutually determined in amount shall be established to cover follow-on or subsequent complaint and warranty requirements, if any. Liquidation of the Company need not be delayed provided that such amounts are properly escrowed and arrangements made for performance of such services as may be required in the interest of the Company. Escrows, reserves or liquidating

LPMOSFD
Rev. 9/06   P9/06

- 19 -

A 205

©2006 by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com   800.222.0510

accounts may be established as escrows or otherwise, which activity need not unduly delay the termination of the Company for all other purposes.

## XVIII
## CAPITAL ACCOUNTS - INCOME AND CREDITS OF MEMBER

The Company is required to maintain for each member a capital account which reflects that member's separate distributive share, whether or not distributed, of each class or item of Company income, gain, loss, deduction, or credit described in IRS sections 702 and 704. If it is determined that a member's allocation of income, gain, loss, deduction, or credit does not have substantial economic effect then his distributive share of such income, gain, loss, deduction, or credit shall be determined in accordance with his interest in the entity. Any special allocations of income, gain, loss or deduction for each member are to be specified in an exhibit to this Operating Agreement. Upon liquidation, members must restore any deficits in offset provisions of the IRS Code that specifically allocates later income to members with negative capital accounts.

## XIX
## AMENDMENT OF OPERATING AGREEMENT

This Operating Agreement may be altered, amended or repealed and a new Operating Agreement may be adopted only by a __100__ % vote of the membership at any annual, regular or special meeting of the members.

## XX
## VIOLATION OF THIS OPERATING AGREEMENT

Any member who shall violate any of the terms, conditions, and provisions of this Operating Agreement shall keep and save harmless the Company property and shall also indemnify the other members from any and all claims, demands and actions of every kind and nature whatsoever which may arise out of or by reason of such violation of any terms and conditions of this Operating Agreement.

## XXI
## COUNTERPARTS

This Operating Agreement may be executed with counterparts, all of which shall be deemed to be one and the same instrument, and it shall be sufficient for each party to have executed at least one, but not necessarily the same, counterpart.

LPMOSFD
Rev. 9/06  P9/06

©2006 by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com  800.222.0510

IN WITNESS WHEREOF, the parties have hereunto set their hands effective this _____

day of _____, 2006 _____,

Signed:

_____ , Member
MARTIN S. BROWN

_____ , Member
SHARONN THOMAS

_____ , Member

©2006 by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com   800.222.0510

## LLC Operating Agreement

This is a Limited Liability Company Operating Agreement (the "Agreement") made on November 05, 2011. The Members in this agreement are as follows:

> Martin S. Brown,Sr.
> Sharonn Thomas Pope

The Members to this Agreement agree to the following:

### Name:

This Limited Liability Company will be known as Brown and Thomas, LLC (the "LLC").

### The LLC:

a)  The Members have formed a Limited Liability Company.

b)  The terms and conditions of their LLC will be outlined in this Agreement.

c)  If the Agreement is executed, the LLC Operating Agreement will be in effect on November 05, 2011.

d)  The LLC will only be terminated as outlined in this Agreement.

e)  The LLC's primary place of business will be 2105 Voorhees Town Center, Voorhees, New Jersey, 08043.

f)  The LLC will be governed under the laws of the state of New Jersey.

g)  The LLC's primary purpose is Real Estate Brokerage.

### Contributions:

The Members will make an initial contribution to the LLC as follows:
> Martin S. Brown,Sr. :  Basd on percentage of membership
> Sharonn Thomas Pope  Based on percentage of membership

Contributions will be submitted no later than November 30, 2006. All capital contributions are final unless all Members give written consent of withdrawal. All contributions will be deposited into Buniness operating account

**Interest:**

The Members' ownership interest in the LLC will be as follows:
Martin S. Brown,Sr. : 51%
Sharonn Thomas Pope : 49%

**Costs:**

The Members will share costs according to the following percentages:
Martin S. Brown,Sr. : 51%
Sharonn Thomas Pope : 49%

**Profits:**

The Members will share the net profits of the LLC according to the following percentages:
Martin S. Brown,Sr. : 51%
Sharonn Thomas Pope : 49%

- The Members' profit allocation will be accounted by Martin S. Brown,Sr according to the above percentages after the costs of the LLC have been paid or calculated according to the above cost percentages.

- Profit allocations will be distributed as decided by majority vote

- Each member must receive 0% of their profit allocation each year from the LLC, although percentages greater than the above listed may be distributed according to a member vote.

- The members are not allowed to withdraw from their profit allocation at any time.

- Not all members will receive enough funds from the LLC to cover their income taxes for total profit allocation by the LLC.

**Members and Managers:**

- The liability of the Members is limited according to the Limited Liability statutes for the state of New Jersey.

- No Member shall be an agent of any other Member by reason of being a Member of the Company.

- All Members of the LLC, by majority vote of Member interest, will maintain 1 Manager(s) Martin S. Brown,Sr to be reelected every 60 years. All Members will vote in each election.

- Members that are not elected as Managers shall not have any control or vote in the operation

of the Company's affairs and shall have no power to bind the Company.

- The Managers' authority will be defined by the following unless otherwise stated in the Agreement: All decisions for contract or otherwise will be made based on a majority vote of percent of ownership. Each Manager will have the authority based on their percent ownership outlined above in the Agreement.

### Accounting:

- All accounts related to the LLC, including contribution and distribution accounts will be audited upon a majority vote of the Members.

- All Members will maintain a joint contribution account. All Members will maintain a joint distribution account. Members will keep accurate and complete books of account for all accounts related to the LLC.

- Accounting records will be kept on a cash basis.

- All financial records including tax returns and financial statements will be held at the LLC's primary business address and will be accessible to all members.

- The fiscal year will be complete on the last day of December of each year. All Members will present their position on the state of the LLC within two weeks of the completion of each fiscal year.

- The following Members will be able to sign checks from any joint Member account:
  Martin S. Brown, Sr.

### New Members:

The LLC will amend this agreement to include new Members upon the written and unanimous vote of all Members.

The name of the LLC may be amended if a new Member is added to the LLC upon the written and unanimous vote of all Members.

**Withdrawal or Death:**

The Members hereby reserve the right to withdraw from the LLC at any time. Should a Member withdraw from the LLC because of choice or death, the remaining Members will have the option to buy out the remaining shares of the LLC. Should the Members agree to buy out the shares, the shares will be bought in equal amounts by all Members. The Members agree to hire an outside firm to assess the value of the remaining shares. The Members will have 60 days to decide if they want to buy the remaining shares together and disperse them equally. If all Members do not agree to buy the shares, individual Members will then have the right to buy the shares individually. If more than one Member requests to buy the remaining shares, the shares will be split equally among those Members wishing to purchase the shares. If all Members agree by unanimous vote, the LLC may choose to allow a non-Member to buy the shares thereby replacing the previous Member.Upon Death of member Sharonn Thomas Pope $100,000 dollars to be provide to Bria Pope or her Guardian if she is a minor at the time of death. These monies are to come from the Life insurace LLC policy in place. The 49% shares are to be divided evenly among the children of Sharonn Thomas Pope and Martin S. Brown,Sr.- Bria Pope, Martin S. Brown,Jr., Marcell A. Brown and Martina B. Brown. If policy is not paid by insurace company upon death of Sharonn Thomas Pope-49% of ownership all shares become the ownership of the children- and no monies are due to Bria Pope and or the remaining family members. Upon the Death of Martin S. Brown,Sr, 100,000 dollars will be provided to Sharonn Thomas Pope. These monies are to come from the Life insurace LLC policy in place. If policy is not paid by the insurace company upon the death of Martin S. Brown,Sr. no monies are due to Sharonn Thomas Pope. The shares will remain as the percentage of ownership of the LLC at the time of death. The Shares owned by Martin S. Brown Sr

51% of owership are to be divided equally among his children that are alive and Bria Pope. Martin S. Brown Jr, Marcell A. Brown and Martina B. Brown. Sharonn Thomas Pope has the first option to buy the remaining shares

at the market price if any of Martin S. Brown,Sr. dependents and or Bria Pope decided to sell their shares of ownership in the company.

If no individual Member(s) finalize a purchase agreement by 60 days, the LLC will be dissolved.

The name of the LLC may be amended upon the written and unanimous vote of all Members if a Member is successfully bought out.

**Dissolution:**

Should the LLC be dissolved by majority vote or otherwise, the LLC will be liquidated, and the debts will be paid. All remaining funds after debts have been paid will be distributed based on the percentage of ownership interest outlined in this Agreement.

**Amendments:**

- Amendments may be made hereto upon the unanimous and written consent of all Members.

- Amendments must be expressly written and have the original signatures of all Members.

**Settling Disputes:**

All Members agree to enter into mediation before filing suit against any other Member or the LLC for any dispute arising from this Agreement or LLC. Members agree to attend one session of mediation before filing suit. If any Member does not attend mediation, or the dispute is not settled after one session of mediation, the Members are free to file suit. Any law suits will be under the jurisdiction of the state of New Jersey.

All Members signed hereto agree to the above stated Agreement.

Signed this _17_ day of _November_ , 20_11_

Signature: _____
                Martin S. Brown, Sr.

Si_____
                Sharonn Thomas Pope

© This is a RocketLawyer.com Legal Document ©
A 212

# MARLENE BELL REPORTING, INC.

*BROWN & POPE v.*
*SHARONN THOMAS POPE*

*MARTIN BROWN*
*July 27, 2017*

*MARLENE BELL REPORTING, INC.*

*123 South Broad Street*

*Suite 1310*

*Philadelphia, Pennsylvania 19109*

*(215) 735-0422 * (856) 985-0055*

Original File 072717ku.txt
Min-U-Script® with Word Index

**Page 1**

```
 1      ------------------------------------
 2      IN THE SUPERIOR COURT OF NEW JERSEY
        LAW DIVISION: CAMDEN COUNTY
 3          NO. CAM-L-2368-16
        ------------------------------------
 4
 5   ----------------------------
     BROWN & POPE                )
 6                               )
             Plaintiff,          )
 7                               )
       - vs -                    )
 8                               )
     SHARONN THOMAS POPE         )
 9                               )
             Defendant           )
10   ----------------------------
11
12
13          ------------------------------
14          THURSDAY, JULY 27, 2017
            ------------------------------
15
16          Deposition of MARTIN BROWN, held at
17   309 Fellowship Road, Suite 200, Mt. Laurel,
18   New Jersey, commencing at 12:40 p.m., on the
19   above date, before Karen M. Unghire, Court
20   Reporter and Notary Public.
21                    - - -
22          MARLENE BELL REPORTING, INC.
23        123 South Broad Street, Suite 1310
          Philadelphia, Pennsylvania  19109
24               (215)735-0422
              mbreportinginc@aol.com
25
```

**Page 2**

```
 1   A P P E A R A N C E S
 2
 3   CLAYTON COMMERCIAL LITIGATION, LLC
     BY:  E. McCORD CLAYTON, ESQUIRE
 4   Two Penn Center, Suite 920
     1500 John F. Kennedy Boulevard
 5   Philadelphia, PA  19102
     267-242-3943
 6   cord@claytonlit.com
     --Representing the Plaintiff
 7
 8
 9   JOSHUA L. THOMAS, ESQUIRE
     1110 Pocopson Road
10   Pocopson, PA  19366
     215-806-1733
11   JoshuaThomas@gmail.com
     --Representing the Defendant
12
13   ALSO PRESENT:  SHARONN THOMAS POPE
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1               I N D E X
 2   WITNESS                              PAGE
 3   MARTIN BROWN
 4    BY MR. THOMAS                          4
 5
 6
 7           E X H I B I T S
 8   I.D.                                 PAGE
 9   Exhibit A     E-mail, 4/22/16           5
10   Exhibit B     Statement of Account      8
11   Exhibit C     Amortization Table       18
12   Exhibit D     E-mail Chain             26
13   Exhibit E     Contractor Agreement     30
14   Exhibit F     LLC Operating Agreement  35
15   Exhibit G     Schedule K-1             43
16   Exhibit H     Invoice, 7/21/17         55
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              ---
 2        P R O C E E D I N G S
 3              ---
 4       MARTIN BROWN, having been duly
 5   sworn, was examined and testified as
 6   follows:
 7              ---
 8        E X A M I N A T I O N
 9              ---
10   BY MR. THOMAS:
11       Q.   Can you state your full name for the
12   record.
13       A.   Martin Brown.
14       Q.   I'll do a slightly abbreviated version.
15   You're not under any medication or for any reason
16   can't answer the questions truthfully and
17   completely, today?
18       A.   No.
19       Q.   What do you do for a living,
20   Mr. Brown?
21       A.   I'm a real estate broker.
22       Q.   And where do you currently work?
23       A.   Brown Realtors, in Voorhees.
24       Q.   And how long have you been in that
25   profession?
```

Page 5

1    A.    This is year 22.
2    Q.    And you mentioned the business name.
3  How long has it been under that name?
4          MR. CLAYTON: Objection. Vague
5    and ambiguous.
6          MR. THOMAS: I think we're all
7    aware that there was a recent name change.
8  BY MR. THOMAS:
9    Q.    Do you know about when that occurred?
10   A.    I don't know the exact date. It's
11 been some months.
12   Q.    So a year, a few months, just
13 generally?
14   A.    After April of last year. So I don't
15 know if it was May or June.
16   Q.    All right. Thank you. And then you
17 mentioned April of last year.
18         MR. THOMAS: I'll start with, I guess
19   we'll call this one Exhibit A.
20             - - -
21         (E-mail with attached letter dated
22    4/22/16 received and marked for
23    identification as Deposition Exhibit A)
24             - - -
25 BY MR. THOMAS:

Page 6

1    Q.    So can you tell me what Exhibit A looks
2  like to you?
3    A.    So this looks like the e-mail I got,
4  where it requested to dissolve the partnership.
5    Q.    And it's a two-page exhibit. Page 2,
6  is that the letter that was attached or at least
7  looks like the letter that was attached?
8    A.    I believe so.
9    Q.    And when you received this -- I'll take
10 a step back. The e-mail is to soldmartin@aol.com.
11 That was your e-mail at the time?
12   A.    Correct.
13   Q.    Once you received this e-mail, what did
14 you do after that?
15   A.    I'm not sure what you're asking.
16   Q.    I'll rephrase. I know, because I sent
17 the e-mail, that there was no direct response.
18 Did you contact your attorney? Did you contact
19 Ms. Pope? What was your, I guess, reaction after
20 you received this e-mail?
21   A.    Hard to answer. I know it was maybe
22 late on a Sunday night or something I saw this
23 e-mail. I'm not sure what I did.
24   Q.    So just to confirm, though, I know that
25 the letter asks for a set of paperwork, or at least

Page 7

1  I guess we would call it an accounting, a statement
2  of account, within seven days. I think we're all in
3  agreement that by April 29th, there was not a
4  statement of account sent to me or anybody else. Is
5  that accurate?
6          I'll refer to the third line from the
7  bottom -- the fourth line, actually. It's asking
8  you to furnish my client with a complete statement
9  of account, in writing, of all money owed to my
10 client, within seven days of today's notice.
11         I assume that was not sent or anything
12 along those lines was not sent at that time?
13   A.    On that day, I know it wasn't sent,
14 no.
15   Q.    And then do you remember ever sending a
16 complete accounting to my client of what she was
17 owed?
18   A.    I remember sending to your client an
19 e-mail asking for an accounting of all business that
20 she may or may not be owed money on, so I could give
21 her an accurate account.
22   Q.    So in response, what you're saying is
23 you sent my e-mail request, would that be fair to
24 say?
25   A.    I sent a request to your client.

Page 8

1          MR. THOMAS: Exhibit B.
2              - - -
3          (Statement of Account received
4    and marked for identification as Deposition
5    Exhibit B)
6              - - -
7  BY MR. THOMAS:
8    Q.    And Exhibit B actually comes from your
9  attorney. I don't think it has an exhibit number,
10 instead it has Bates stamps on the bottom. So if
11 it's okay with you, we'll refer to the Bates stamps
12 for any page references we need.
13         Do you see what I'm talking about when
14 I say Bates stamp on the bottom right-hand corner?
15   A.    I have no idea what a Bates stamp is.
16   Q.    Do you see where it says, on the first
17 page, MB, some zeros and then the number 95?
18   A.    Yes, I do.
19   Q.    So those are what I'll call Bates
20 stamps, from here on out.
21   A.    Okay.
22   Q.    In essence, those just number the pages
23 as part of a group of paperwork. So I guess this is
24 approximately 12 pages, and it's a list of
25 properties. Does this look familiar to you?

Page 9

1    A.    It looks like a report generated from
2    properties from 2006 to 2017.
3    Q.    And there are names.  The first line
4    has the number 131 and then a name.  Can you give me
5    who that person is, the name listed there?
6    A.    Darnell King.
7    Q.    And then about a third of the way down
8    the page, there is a name next to the number 101.
9    Can you give me that name, as well?
10   A.    That's Sharonn Thomas.
11   Q.    And then I'll give you time to look
12   through, but if you can, can you look through and
13   tell me if there are any other names listed in these
14   transactions or this set of papers?
15   A.    No, doesn't appear so.
16   Q.    I guess the next question I would ask
17   then is from 2006 to 2017, did you have any other
18   agents working at Brown and Pope Realtors, during
19   that time?
20   A.    Absolutely.
21   Q.    Can you say their names for the record,
22   who else you had working at that time?
23   A.    From 2006 to 2017?
24   Q.    Specifically in reference to agents or
25   realtors, as many as you can remember.

Page 10

1    A.    There's a lot of folks.
2    Q.    I'll say this, to save us a little
3    time, here.  Within the next 10 days, can you give
4    as complete a list as possible to your attorney, to
5    submit over to us, for all those people?
6    A.    Who worked for?
7    Q.    Brown and Pope during that time.
8    A.    From 2006 to '17?
9    Q.    Yes.  Specifically, the realtors who
10   would have been working at that time.
11        MR. CLAYTON: We'll take that
12        request under advisement, but I don't know
13        whether we'll meet it or not.  You should
14        ask the witness any questions that you want
15        to have answered, today.
16        MR. THOMAS: Sure.  Again,
17        we're going to say for the record, we are
18        requesting a list of realtors from 2006 to
19        2017, as part of a supplemental discovery
20        request.
21        MR. CLAYTON: Like I say, we'll
22        take that request under advisement, but if
23        you want to serve written discovery, that's
24        what you should do.  In the meantime, the
25        witness is here to answer your deposition

Page 11

1    questions.
2        MR. THOMAS: We submitted that,
3        but I appreciate the input.
4    BY MR. THOMAS:
5    Q.    So what I would say is during that
6    time, even without knowing the full extent of the
7    names, you did have other realtors working at the
8    firm, at that time?
9    A.    Absolutely.
10   Q.    Approximately, do you know around the
11   number, if you can estimate?
12   A.    From 2006 to 2017?
13   Q.    Yes.  I know it's a long time.
14   A.    Maybe 10 or 12 realtors.
15   Q.    And then during that time -- and I know
16   it might change for some of them.  Generally, what
17   was the percentage of the commission that you,
18   personally, got during that time, for those
19   realtors?
20   A.    They all have individual contracts.
21   Q.    Was there a general number you would
22   use?
23   A.    No.
24   Q.    Was there a range then, like 1 to 50, 1
25   to 10, a range for the percentage, you would be able

Page 12

1    to use?
2    A.    No.
3    Q.    Do you remember, during that time, what
4    the percent of the commission for Ms. Pope was, that
5    you received?
6    A.    If it's isolated down to company REO
7    business that I introduced to anybody in the office,
8    they received 40 percent.
9    Q.    So that's, 40 percent is what your take
10   would be?
11   A.    No, 40 percent is what the agent got
12   of the gross commission.
13   Q.    So you would get 60 percent?
14   A.    Correct.
15   Q.    And that was limited to REO property?
16   A.    Yes.
17   Q.    Do you believe that Ms. Thomas or
18   Ms. Pope, did her numbers fit into the same range?
19   A.    At some point, for REO properties,
20   yes.
21   Q.    Was there any time while she was
22   working at Brown and Pope that it was around 33
23   percent?
24   A.    I believe that everybody that was
25   doing REOs was somewhere at 30 percent.  She did get

1  a third for H.U.D. properties, the client?  When I
2  had H.U.D. in multiple states, she got a third.
3      Q.    And then when you received the
4  commissions, your 60 percent of those REOs, just
5  generally speaking, was that just immediately a
6  check written out to you, or how did you receive
7  those funds?
8      A.    Well, I'd receive the whole funds and
9  paid the agents.
10     Q.    So you got the initial amount and then
11 the agent would get paid their 40 percent?
12     A.    That's correct.
13     Q.    So when you received that 60 percent,
14 did you keep an accounting of how much you received
15 for each specific property?  Did you keep it
16 monthly?  Or how did you keep that account?
17     A.    Yeah, every property is put into a
18 system.
19     Q.    When you say a system, I don't know
20 what that means.
21     A.    Lone Wolf is the real estate system
22 that I use.
23     Q.    So did you use the same system
24 throughout the entire timeframe of '06 to '17?
25     A.    Yes.  That's where these reports are.

1      Q.    And in terms of those records, I know
2  that -- and we'll get into this in a little bit, but
3  I know that there were tax forms submitted.
4          Did you use the Lone Wolf records to
5  do your taxes for your income that year or did you
6  transcribe them into another form?  Or how did that
7  actually occur?
8      A.    No.  Lone Wolf are the reports that
9  were given to my CPA each year.
10     Q.    So he received it directly from the
11 program and did you print it out and send it to him?
12     A.    Well, I had to print it out and send
13 it to him.
14     Q.    And that was -- for now, let's keep it
15 limited to 2011 to 2015.  Did you have the same CPA
16 during that timeframe?
17     A.    Yes.
18     Q.    And do you remember what the CPA's name
19 is?
20     A.    Yes, Vince Malovich.
21     Q.    Can you spell, as best as you can, the
22 last name?
23     A.    I don't know how to spell his last
24 name.
25     Q.    But it's Malovich?

1      A.    Yeah, Malovich.
2      Q.    And then in terms of that 60 percent,
3  did you share it with anyone else in the company,
4  such as another partner or anyone else who was part
5  of the company, at that time?
6      A.    No.
7      Q.    So you got the 60 percent and then it
8  was generally just used for expenses?  Or what was
9  it actually used for during that time?
10     A.    Yeah, bills or whatever.
11     Q.    And your personal take after that, how
12 did you calculate what you would be receiving after
13 that point?
14     A.    It would depend after the bills were
15 paid.
16     Q.    And then did you use Lone Wolf to
17 accommodate for the bills, or how was that
18 actually --
19     A.    Everything is on Lone Wolf.
20     Q.    Let's change gears for one moment.
21 When the company first started, Brown and Pope that
22 is, how was capital, I guess accrued?  How much do
23 you remember you contributed versus how much Ms.
24 Pope contributed?
25     MR. CLAYTON: Objection.

1      assumes facts not in evidence.  Calls for
2      speculation.
3  BY MR. THOMAS:
4      Q.    You can answer the question.
5      A.    I don't remember the figures.
6      Q.    When it was initially created, did you
7  contribute any capital?
8      A.    Yes.
9      Q.    Do you remember, roughly, how much?
10     A.    No.
11     Q.    Would there be, in the Lone Wolf system
12 or any other system that you have, a number for how
13 much capital was actually contributed?
14     A.    I don't know.  Probably not.
15     Q.    When Brown and Pope was created, what
16 type of entity was it?
17     A.    An LLC.
18     Q.    Do you have the origination paperwork
19 from that LLC?
20     A.    The origination paper?  I have the LLC
21 agreements, yes.
22     MR. THOMAS: I'm going to make
23     an official request for a copy of the LLC
24     agreement.  Same as with the other one,
25     consider it a new discovery request.

Page 17

1    **MR. CLAYTON:** Sir, here's what
2  I'd suggest.  To the extent you're making
3  requests today, please put them in a
4  confirming letter to follow the deposition,
5  and we'll take it under advisement.  But
6  this is a deposition, it's not a written
7  discovery request forum.
8    You've had an opportunity and will
9  have opportunities to submit written
10  discovery, if you want to do that.
11    **MR. THOMAS:** We will be.  We'll
12  be submitting supplemental, based on this,
13  but I'm stating for the record, as well as
14  if need be, we'll be submitting
15  supplemental requests, but we're asking on
16  the record for an LLC agreement.
17    As part of this deposition, we did ask
18  for supporting documents and received very
19  little, if any.  So again, we're asking
20  for the LLC agreement from the origination.
21  **BY MR. THOMAS:**
22    Q.    So do you remember, at any time after
23  the entity was created, how capital was collected
24  up?  Or I guess put another way, did you contribute
25  your own personal capital after the entity was

Page 18

1  created?
2    **A.    Yes.**
3    Q.    Do you remember, approximately, how
4  much?
5    **A.    No idea.**
6    Q.    Do you remember capital being inputted
7  from Ms. Pope, during that time?
8    **A.    I really don't know.  We had an office
9  custom built and all kinds of stuff going on.  So I
10  really don't know what the numbers were.**
11    **MR. THOMAS:** I'm going to submit this
12  as Exhibit C.
13    - - -
14    (Amortization Table received
15    and marked for identification as Deposition
16    Exhibit C)
17    - - -
18  **BY MR. THOMAS:**
19    Q.    There was a lien or a loan taken out,
20  it looks like, based on the amortization table, on
21  page 2, in approximately 2009, for $30,000.  There
22  were some payments that were made by you,
23  personally, on this loan.  Do you remember how much
24  you personally paid on this loan, from 2009 until
25  Ms. Pope left?

Page 19

1    **MR. CLAYTON:** Objection.
2    foundation, speculation, and assumes facts
3    not in evidence.
4  **BY MR. THOMAS:**
5    Q.    And you can still answer the question.
6    **A.    I don't remember a $30,000 loan.  I
7  thought the figures were more of -- the $30,000 may
8  have been what was owed, with the interest, over the
9  time.  The $30,000 figure I don't recollect.**
10    Q.    Do you remember what the amount was,
11  based on your personal knowledge, how much it was
12  for?
13    **A.    No, I don't remember.**
14    Q.    Because it says here total loan amount
15  of $51,720, and I assume that includes the interest,
16  but does that number sound familiar to you?
17    **MR. CLAYTON:** Objection.  Asked
18    and answered.  Foundation, speculation,
19    assumes facts not in evidence.
20  **BY MR. THOMAS:**
21    Q.    And you can still answer the question.
22    **A.    No, I don't remember the numbers.**
23    Q.    It says there are 86 payments made as
24  of May 30th, 2016.  We're agreeing that you made
25  some of those payments.

Page 20

1    Do you remember, out of those 86, how
2  many were made by you?
3    **MR. CLAYTON:** Same objections.
4  **BY MR. THOMAS:**
5    Q.    And you can still answer the question.
6    **A.    No idea.**
7    Q.    I guess we'll take a step back.  Do you
8  remember making payments on this loan?
9    **A.    Yes.**
10    Q.    And do you remember when you stopped
11  making those payments?
12    **A.    No idea.**
13    Q.    Did you stop making them before
14  Ms. Pope left the firm or did you stop making them
15  when she left?
16    **A.    I don't know the answer to that.**
17    Q.    There were payments made, and there
18  were payments made throughout 2016.  When you made
19  those payments, did you usually pay them out of the
20  firm's account or out of your personal account?
21    **MR. CLAYTON:** Objection.
22    foundation, speculation, and assumes facts
23    not in evidence.
24  **BY MR. THOMAS:**
25    Q.    And you can still answer the question.

1     A.    The payments were made out of the
2  operations account.
3     Q.    And did you keep an expense report for
4  those payments?
5     A.    No.
6     Q.    So was it just considered normal
7  operating expenses?
8     A.    If there was money to pay the
9  payments, they were paid.  If not, they weren't
10 paid.
11    Q.    And then did you ever send any evidence
12 that it was paid, to Ms. Pope?  Or did she see that
13 it was being paid during that time?  Or did you just
14 tell her, word of mouth, that, hey, we made the
15 payment this month?
16           MR. CLAYTON: Objection.  Compound,
17 confusing, foundation and speculation.
18 BY MR. THOMAS:
19    Q.    You can answer the question.
20    A.    No, I just paid them when the money
21 was there for payment.
22    Q.    And then did you tell Ms. Pope that you
23 paid it?
24    A.    No.
25    Q.    Did you receive -- I guess this is more

1  of a practical question.  How did you know how much
2  to pay each month?
3     A.    The payment was the same.  I had a
4  piece of paper with the payment amount on it.
5     Q.    What was the payment amount?
6     A.    I don't remember the amount.
7     Q.    But you remember it was the same every
8  single month?
9     A.    Yeah.
10    Q.    Do you remember, roughly, was it a
11 thousand dollars, $500, what the payment was?
12    A.    I don't remember if it was
13 three-something or four-something.  I don't remember
14 the figure.
15    Q.    But you do remember paying around 3- to
16 $400 when the money was available?
17    A.    I believe so.
18    Q.    Before we do the next document, I'm
19 just going to ask you a few questions.
20           Do you remember, approximately, when
21 the Wells Fargo relationship was created?
22    A.    It's been 15 years or so.
23    Q.    And so do you remember, approximately,
24 how it was created?
25    A.    It was created through a proposal

1  application process.
2     Q.    Do you remember who crafted that
3  proposal?
4     A.    It would have been me.
5     Q.    Do you remember a, I guess, community
6  development business proposal that Ms. Pope
7  submitted, I believe at your behest, to Wells Fargo?
8     A.    That had nothing to do with REO
9  accounts.
10    Q.    Well, why don't you tell me what it had
11 to do with.
12    A.    In my recollection, that was some kind
13 of company she was developing, a nonprofit company,
14 to do mortgage counseling and to get a grant from
15 Wells Fargo to do that mortgage counseling.
16    Q.    And then do you remember that Wells
17 Fargo ever paid Brown and Pope any amount for that?
18    A.    No, I don't remember.
19    Q.    If I would say that there was
20 approximately $10,000 from Wells Fargo, written to
21 Brown and Pope, in relation to the business
22 proposal, does that sound reasonable?
23           MR. CLAYTON: Objection.
24 Foundation, speculation.
25 BY MR. THOMAS:

1     Q.    You can still answer the question.
2     A.    I don't remember it, but possible.
3     Q.    And then if there was, based on the
4  relationship that Brown and Pope had, if Wells Fargo
5  were to write any funds, would it be going to Ms.
6  Pope, directly, or would it be going to Brown and
7  Pope, directly?
8           MR. CLAYTON: Same objections.
9  BY MR. THOMAS:
10    Q.    You can answer the question.
11    A.    I don't know where.  I didn't really
12 handle that.  She did.
13    Q.    Generally speaking, when Wells Fargo
14 paid Brown and Pope for services, how did those
15 payments, how were they received?
16    A.    Brown and Pope for services?  If we're
17 talking about the same thing, that was a nonprofit
18 entity of Wells Fargo, that had nothing to do with
19 REOs.  So I don't know what services.  That's a
20 totally different thing.
21    Q.    We'll jump into the REOs.  Why don't
22 you tell me how the REO relationship with Wells
23 Fargo worked.
24    A.    Oh, that's what I said.  It's from a
25 proposal application process.

Page 25

```
 1    Q.    And then what did you actually do for
 2  Wells Fargo?  Or what did the firm do for Wells
 3  Fargo?
 4    A.    We did any and everything involved in
 5  the management of a property, from start to when the
 6  property sold.
 7    Q.    And then you, personally, what did you
 8  handle from that component?  Or were you more of an
 9  overseeing entity, in terms of the Wells Fargo
10  management or sales?
11    A.    Well, when it started out, you know, I
12  did everything with a personal assistant.
13    Q.    And then when Ms. Pope became involved
14  with that process, how did those -- I guess, how did
15  that shift?  What did you shift to her or how did
16  those responsibilities change?
17    A.    So at some juncture, upper management
18  at Wells Fargo reached out to me and asked me if I
19  had any other REO agents that could do this work.
20    MR. THOMAS: Let's go on to
21  Exhibit D, because I think that's directly
22  on point, now.
23         - - -
24    (E-mail chain received and
25    marked for identification as Deposition
```

Page 26

```
 1  Exhibit D)
 2         - - -
 3    MR. THOMAS: I'm going to say
 4  for the record, Exhibit D was actually
 5  used in the previous deposition.  So I'm
 6  simply putting the Exhibit D sticker over
 7  where the previous deposition sticker was,
 8  just for clarity sake, but I'll show what
 9  I'm talking about.
10  BY MR. THOMAS:
11    Q.    So you've had a chance to look at this
12  chain of e-mails.  Are you familiar with what this
13  is?
14    A.    Yes.
15    Q.    You, personally, sent the e-mail to a
16  Mr. Michael Shiflet.  You were the one that sent him
17  the e-mail on the first page, dated July 17th.  Was
18  that you who sent that e-mail from
19  soldmartin@aol.com?
20    A.    The first page has an e-mail from
21  Sharonn.
22    Q.    Correct.  And then after that, the
23  second half of the first page has an e-mail from
24  Brown and Pope Realtors.  So that second e-mail,
25  that was from you?
```

Page 27

```
 1    A.    Yep.
 2    Q.    And what was, I guess for lack of a
 3  better term, your intent behind sending the e-mail?
 4    A.    I was setting up accounts for agents
 5  in the office.
 6    Q.    Did you send any e-mails for any other
 7  agents or was it only sent for Ms. Pope?
 8    A.    No, several agents.
 9    Q.    Do you know who those other agents
10  were, at that time?
11    A.    Renee Burton, Kim Thomas, Darnell
12  King.
13    Q.    Did it include a Monica Dillard?
14    A.    Monica Dillard, yeah.
15    Q.    A Ms. Butcher-Jallah?
16    A.    That's correct.
17    Q.    And what was, I guess, the purpose for
18  setting up these agents?
19    A.    The purpose was to grow the business.
20    Q.    And when you say grow the business, can
21  you elaborate a little more?
22    A.    The more properties, the more income.
23    Q.    Okay.  So I guess it's a little more.
24  In terms of I guess 2014, what percentage of the
25  business was with Wells Fargo, when these e-mails
```

Page 28

```
 1  were sent?
 2    A.    What percentage of my personal
 3  business was with Wells Fargo?
 4    Q.    Brown and Pope and your personal, if it
 5  changes.
 6    A.    I mean, so I was the only one with an
 7  account with Wells Fargo, so that was my personal
 8  business.
 9    Q.    And it became part of Brown and Pope
10  when you were setting up additional, I guess point
11  people?  Or what was the thought process of setting
12  up additional people with Wells Fargo?
13    A.    To increase my income.
14    Q.    Fair enough.  Was it also to try and
15  build up Brown and Pope, as well, or was it just
16  your personal income?
17    A.    I mean, I guess, inherently, the
18  perception of the volume, by signs, but you know,
19  it's a hundred percent commission.  Just like when I
20  worked for other companies, I had teams and it was
21  to build my income.
22    Q.    That makes sense.  It's reasonable.
23  And then based off of I guess the addition of these
24  people, do you know approximately how much your
25  income increased during that time?
```

Page 29

1   A.   No, I don't.
2   Q.   Do you know a percentage increase?
3   A.   No.
4   Q.   Would it be fair to say that because of
5   these additional people working with Wells Fargo,
6   though, your income increased?
7   A.   Yes.
8   Q.   And was there any time that this
9   relationship with Wells Fargo changed or it
10  decreased?
11  A.   **Well, the business fluctuates.**
12  Q.   I'll just go ask the question as
13  directly as I can. Do you remember, at any given
14  time, when the business with Wells Fargo was not
15  going well or if they eventually chose to leave?
16  A.   **If they eventually chose to leave? So**
17  **they didn't choose to leave my company. They can**
18  **make an individual decision based on scoring,**
19  **When inventory gets low, to remove agents without**
20  **the highest score. It happened all the time.**
21  Q.   And did it happen in this case?
22  A.   **My account was removed in the scoring**
23  **process, at some point.**
24  Q.   Do you remember, approximately, when
25  that was?

Page 30

1   A.   **No, I don't remember.**
2   Q.   How did you learn that your account was
3   removed?
4   A.   **E-mail.**
5   Q.   Do you remember approximately when?
6   A.   **No, I don't.**
7   Q.   How did you tell the other members of
8   Brown and Pope about the fact your account was
9   removed? Or did you tell?
10  A.   **There was no reason to.**
11  Q.   So did you ever tell them, or no?
12  A.   **Not that I'm aware of, no.**
13  Q.   All right. Fair enough. That's
14  direct. Let's shift gears, slightly.
15       MR. THOMAS: I'm going to call
16  this Exhibit E. It's the same as before.
17  Exhibit E was used in the previous
18  deposition. So I'm just going to put a new
19  sticker over where the other one was, but
20  it's the same exhibit.
21       - - -
22       (Independent Contractor
23  Agreement received and marked for
24  identification as Deposition Exhibit E)
25       - - -

Page 31

1   BY MR. THOMAS:
2   Q.   Do you know what this Exhibit E is?
3   A.   **It looks like the independent**
4   **contractor agreement.**
5   Q.   Do you remember signing it and when it
6   was created?
7   A.   **I don't see a date when I signed it.**
8   Q.   Did you sign the independent contractor
9   agreement?
10  A.   **That is my signature.**
11  Q.   What is?
12  A.   **On the last page, the signature page.**
13  Q.   I believe you're talking about --
14  A.   **It would be 014.**
15  Q.   So that's your signature, where I guess
16  it says Brown and Thomas, LLC, d/b/a, your signature
17  is below that section?
18  A.   **Yeah, where it says by Martin, right.**
19  Q.   Oh, so that's just your signature right
20  there?
21  A.   **Yeah.**
22  Q.   What is the -- and I just can't read
23  it.
24  A.   **Broker.**
25  Q.   So you were a broker, at that time?

Page 32

1   A.   **Correct.**
2   Q.   Are you still, currently a broker?
3   A.   **Correct.**
4   Q.   And to the right of your signature,
5   that looks like it's a handwritten description.
6   Is it normal for the contractor to print their name
7   or would there usually be a signature there?
8   A.   **Should have signed it. But it's**
9   **signed, the other documents. The addendums are**
10  **signed by her. Addendum A, the credit card addendum**
11  **is signed by her. So the other parts of the**
12  **contract have signatures.**
13  Q.   Did you sign any of the other parts of
14  the contract?
15  A.   **No.**
16  Q.   Just so we're clear, so the only part
17  of the contract that you signed was the one where
18  she printed her name?
19  A.   **Correct.**
20  Q.   On page, I guess MB16, what is that
21  addendum? I guess I should say what is that
22  document?
23  A.   **This is an addendum of the agreed upon**
24  **commissions for wholesale business, for retail**
25  **business.**

Page 33

1    Q.    And based on your understanding of that
2  document, what was Ms. Thomas, Ms. Pope entitled to
3  for her commissions, based on this document?
4    A.    For retail business, she's entitled to
5  whatever the document says.  She was paid $1,250 a
6  month, and she received a commission, minus the
7  other things that are described at the top of the
8  Addendum A.
9    Q.    I guess that's my question.  So the
10 commission percentage, what would she be entitled
11 to?
12         MR. CLAYTON: Objection.  Asked
13   and answered.
14 BY MR. THOMAS:
15   Q.    You can still answer.  The actual
16 percentage of commission, though, what would she be
17 entitled to?
18         MR. CLAYTON: Same objection.
19 BY MR. THOMAS:
20   Q.    You can still answer the question.
21   A.    So on retail business, she's entitled
22 to what the agreement says.
23   Q.    So this specific agreement, this
24 independent contractor agreement, my understanding
25 is she would be entitled to a hundred percent of the

Page 34

1  commissions, based on this specific agreement.
2  Would that be accurate?
3    A.    Minus the other fees at the top of the
4  agreement.
5    Q.    That's fair.  So it would be a hundred
6  percent minus, I guess, the $1,250 a month at home?
7    A.    No, at the top of the agreement
8  there's other fees.
9    Q.    Can you tell me exactly what you're
10 referencing, just for clarity?
11   A.    The top of the agreement, 5 percent
12 brokerage fee, .009 insurance administration fee,
13 $50 transaction fee for each side, buyer and seller,
14 $40 per closed transaction.  So all those fees.
15   Q.    So in essence, it's a hundred percent,
16 minus those fees?
17   A.    Right.  For retail business, yes.
18   Q.    Just so I'm a hundred percent clear,
19 because I was actually a little confused, this says
20 realty executives will collect no less than a
21 hundred percent of the total commissions towards
22 outstanding bills that are one to 30 days past due.
23 What is that referencing?
24   A.    So what that meant was, is that I
25 could have taken a hundred percent of her commission

Page 35

1  every time, to pay her bill.
2    Q.    And in terms of that bill, how did
3  Ms. Thomas know what that bill was or what her
4  outstanding balance was?
5    A.    On a monthly basis, she received a
6  copy of her bill.
7    Q.    So you're saying at the time, there was
8  a monthly bill sent out to Ms. Thomas that said this
9  is what your current balance is?
10   A.    That's correct.
11        MR. THOMAS: The next one, it's
12   going to be two documents, but they're both
13   Exhibit F.
14                 - - -
15        (LLC Operating Agreement
16   received and marked for identification as
17   Deposition Exhibit F)
18                 - - -
19 BY MR. THOMAS:
20   Q.    So you've had a chance to check out the
21 two exhibits.  Do you know what these two exhibits
22 are?
23   A.    They both say operating agreement.
24   Q.    I guess in terms of the dates, let's
25 start with I guess page 1 of this exhibit.

Page 36

1        MR. CLAYTON: You're marking.
2   both of these as Exhibit F, together?
3        MR. THOMAS: Yes.
4        MR. CLAYTON: Which is page 1?
5        MR. THOMAS: So page 1 would
6   be the one that does not have the previous
7   exhibit number on it.
8        MR. CLAYTON: Got it.
9        MR. THOMAS: Of the LLC
10   agreement.
11 BY MR. THOMAS:
12   Q.    So for page 1 of this LLC agreement,
13 what date was it actually originally made, at the
14 top?
15   A.    It says November 5th.
16   Q.    And the other one, since you have them
17 both side to side, it makes it very easy, what date
18 was that one created?
19   A.    November 5th.
20   Q.    And what year for both?
21   A.    2011.
22   Q.    So in essence, these should be the same
23 document; is that accurate?
24        MR. CLAYTON: Objection.
25   foundation, speculation.

Page 37

1    MR. THOMAS: Let me rephrase
2    the question.
3    BY MR. THOMAS:
4    Q.    Did you create two separate LLC
5    operating agreements on November 5th or did you
6    create just one?
7    A.    The only one I'm familiar with is this
8    one here.
9    Q.    So when you say this one --
10    A.    The one that's dated.  They're both
11    dated the same date.
12    Q.    So let's just make this easy.  So the
13    one that you're referencing was the one that was on
14    top, was the first one.  And just to distinguish, it
15    has the signature page dated November 17th, 2011; is
16    that correct?
17    A.    Yes.
18    Q.    And then the second one, which I'll
19    just call the second one, has a signature page,
20    November 5th, 2011?
21    A.    Yes.
22    Q.    So for the first one, you're saying
23    you're only familiar with the first one; is that
24    correct?
25    A.    Yes, this one is the only one I

Page 38

1    recollect.
2    Q.    And then in terms of the signature
3    page, is it fair to say -- and I know that this is a
4    copy, but is it fair to say that this one was signed
5    with blue ink, even though right now it's black ink?
6    MR. CLAYTON: Objection.
7    Foundation.
8    MR. THOMAS: Yeah, scratch
9    that.
10    BY MR. THOMAS:
11    Q.    When you say you're only familiar with
12    this, what do you mean?
13    A.    So I know that when I made changes to
14    the operating agreement, that I also did long
15    paragraphs in the withdraw or death section.  So
16    that's why I recall that this would be the one.
17    Q.    Why did you make the updates, for what
18    purpose?
19    A.    Well, the updates were made because
20    the Real Estate Commission in Connecticut required
21    that the broker have the majority ownership of the
22    company.  That's why.
23    Q.    And you're saying that Commission, you
24    still had to follow those rules, even though you
25    were not in Connecticut; is that correct?

Page 39

1    A.    Absolutely.
2    Q.    Did you do much business in
3    Connecticut?
4    A.    No.  The office failed, so we closed
5    it.
6    Q.    At the time that this operating
7    agreement was signed, what state or states were you
8    planning on working in?
9    A.    I mean, I had licenses in New Jersey,
10    PA, Delaware, New York, Maryland, and Connecticut
11    being the last one.
12    Q.    And I guess at the time that you had
13    created this LLC, did you have a specific area
14    you were looking to try and do work in, such as just
15    New Jersey, or were you looking to try to work in
16    all of those states?
17    A.    When I created this operating
18    agreement?
19    Q.    Yes.
20    A.    Well, the adjustments for the
21    operating agreement was because of the requirement
22    of the Connecticut Real Estate Commission to make
23    adjustments to the operating agreement.
24    Q.    And what specific adjustments are you
25    referencing?

Page 40

1    A.    Well, the biggest adjustment was that
2    I had to have the majority share, own the majority
3    share of the company.
4    Q.    If you look at withdraw of death, for
5    both of those agreements, I believe it's the fourth
6    page for both, it appears with the lengthier
7    component, that there were some significant changes,
8    but they did not actually change the 49 percent.
9    Do you remember or do you recall -- or
10    you can certainly review -- what those specific
11    changes were to the withdraw of death section, in I
12    guess the first version, the longer version?
13    MR. CLAYTON: Objection.
14    Compound and confusing.
15    BY MR. THOMAS:
16    Q.    You can answer the question.
17    A.    Well, whatever you see there is what
18    was changed.
19    Q.    When did you make the change?
20    MR. CLAYTON: Objection.
21    Assumes facts not in evidence.  Speculation
22    and foundation.
23    BY MR. THOMAS:
24    Q.    You can still answer the question.
25    A.    Whatever the date of this agreement

Page 41

1   was, is when the change was made.
2       Q.    So November 5th the change was made?
3       A.    Correct.
4       Q.    And then this part, the second version
5   was made November 17th; is that correct?
6       A.    No, it was signed on November 17th.
7       Q.    And the other one has a signature page
8   that's attached as, I believe November 5th; is that
9   correct?
10      A.    Yes, that's what it says.
11      Q.    Why are there two -- in your opinion,
12  why are there two different signature pages?
13      A.    I have no idea.
14      Q.    Do you remember signing the second copy
15  on November 5th?
16      A.    That's my signature, absolutely.
17      Q.    The signature page on November 5th, for
18  the second version, would you have signed it and
19  then go back and make changes, afterwards?
20          MR. CLAYTON: Objection.
21      Foundation and speculation.
22          THE WITNESS: No.
23  BY MR. THOMAS:
24      Q.    So the changes that you made to the
25  November 17th version, those were made before you

Page 42

1   went and signed; is that correct?
2           MR. CLAYTON: Same objections.
3   BY MR. THOMAS:
4       Q.    You can answer.  I guess what I'm
5   trying to get to the bottom of is that second
6   version that has the November 5th signature page,
7   was it signed on November 5th, if you still had to
8   make changes?
9       A.    I have no idea, but it's signed and
10  it's signed by both parties, and then so was this
11  one.  And they're different dates; right?
12      Q.    Do you remember signing the one dated
13  November 5th?
14      A.    That's my signature.
15      Q.    And I'll note that's not directly a yes
16  or a no, but you're stating that that is your
17  signature?
18      A.    Correct.
19      Q.    Just to confirm for the record, the
20  version that's dated November 5th, that cover page,
21  that has the crossed out Exhibit 3 on it; is that
22  correct?
23      A.    Yes.
24      Q.    That was submitted by your attorney at
25  the previous deposition.  Do you remember the

Page 43

1   previous deposition?  I believe you attended.
2       A.    Yeah.  I was there, yeah.
3           MR. THOMAS: I'm going to give
4       you what can be labeled as Exhibit G.
5               - - -
6           (2011 Schedule K-1 received and
7       marked for identification as Deposition
8       Exhibit G)
9   BY MR. THOMAS:
10      Q.    Exhibit G, are you familiar with these
11  documents?
12      A.    Yes.
13      Q.    What are they?
14      A.    It's called a K-1.  It's from the
15  business tax returns.  It's Sharonn's report of the
16  write-off for company losses each year.
17      Q.    Did you have one for yourself, as well?
18      A.    Yes.
19      Q.    Same as before -- and I already know
20  what your attorney is going to object to, but we're
21  going to be requesting a copy of your write-off, as
22  well, for the tax years 2011 to 2015, for review, as
23  part of discovery.
24          MR. CLAYTON: So, as before, I
25      would suggest that you put all of these

Page 44

1       supplemental requests into a confirming
2       letter, and we'll take it under advisement.
3       And to the extent you're making documentary
4       requests, I suggest you put them into
5       document requests, if you want them to be
6       considered as such.
7           MR. THOMAS: Understood.  And
8       I'm going to say, just as before, we're
9       going to continue this request, and we will
10      be submitting a request of all of these, in
11      writing, to you.
12  BY MR. THOMAS:
13      Q.    So how were these, I guess losses, how
14  were these numbers calculated?
15      A.    Reports are sent to the CPA, and
16  that's what happens.
17      Q.    What reports are sent to the CPA?
18      A.    Out of Lone Wolf, there's
19  end-of-the-year reports, they're sent to the CPA and
20  he does the taxes.
21      Q.    Does Ms. Pope have to sign off on
22  these, since it's her name on them?
23      A.    Probably somewhere along the line, in
24  the beginning, he had her signature.
25      Q.    So each year, 2011 through 2015, did

1  she have to sign the new forms?
2      A.    I don't believe either one of us
3  signed new forms.
4      Q.    So who actually signed the tax return
5  when it was submitted to the IRS?
6          MR. CLAYTON: Objection. Vague
7      and ambiguous.
8  BY MR. THOMAS:
9      Q.    Who signed the tax return, each of
10 these years when it was submitted to the IRS?
11         MR. CLAYTON: Same objection.
12 BY MR. THOMAS:
13     Q.    You can answer the question.
14     A.    We each had our own tax returns. This
15 is just an addition to the tax return.
16     Q.    For these partner's share of income and
17 deduction items, did Brown and Pope submit a tax
18 return?
19     A.    No.
20     Q.    So it was only submitted as a
21 supplement to each individual's tax return?
22     A.    That's correct.
23     Q.    So these Schedule K-1 forms were only
24 to be used for a personal tax return?
25     A.    Correct.

1      Q.    And so during this entire timeframe,
2  '11 through '15, there was no tax return submitted
3  by the entity; is that correct?
4      A.    No, I don't think that's correct.
5      Q.    It does have its own EIN number; is
6  that correct?
7      A.    Right. So there was a business tax
8  return every year, I believe, for the entity, as
9  well.
10     Q.    Let me take a step back. You're saying
11 that these K-1s were specific only to
12 Ms. Sharonn Thomas Pope?
13     A.    The one you have in your hand, yes.
14     Q.    I have from 2011 -- and you can tell me
15 if you don't. I have '11, '12, '13, '14 and '15.
16     A.    Correct.
17     Q.    During those years, what was the
18 partner's share being reported during those five
19 years?
20     A.    50 percent.
21     Q.    Does that reflect all of the agreements
22 that were signed and in effect during that time?
23         MR. CLAYTON: Objection. Calls
24     for a legal conclusion, foundation.
25         MR. THOMAS: It's a very purely

1      factual question.
2  BY MR. THOMAS:
3      Q.    Every single agreement that controlled
4  during that time, did it reflect 50 percent
5  ownership?
6          MR. CLAYTON: Same objections.
7  BY MR. THOMAS:
8      Q.    You can answer the question.
9      A.    I never changed the benefit to her by
10 one percent.
11     Q.    What was the purpose for having
12 yourself at 51 percent, on the agreements?
13     A.    Because the Real Estate Commission of
14 Connecticut required it.
15     Q.    During the entire time that Ms. Pope
16 was active in the firm, was there ever a single real
17 estate anything that was either bought or sold or
18 dealt with through Connecticut?
19     A.    Yes. There was a couple transactions,
20 yes.
21     Q.    Do you remember the timeframe for those
22 or when those occurred?
23     A.    No.
24     Q.    But you're stating that there were at
25 least one or two that occurred through Connecticut?

1      A.    I believe so, yes.
2      Q.    In what state or states did the vast
3  majority of the work occur?
4      A.    It depends on what years.
5      Q.    Would it be fair to say most years the
6  vast majority of them were in New Jersey?
7      A.    No. Some years the vast majority of
8  them were in Maryland.
9      Q.    Nonetheless, during that entire 2011 to
10 2015, the IRS paperwork that was submitted always
11 said that she was a 50 percent shareholder; is that
12 correct?
13     A.    The K-1, yes.
14     Q.    Is there any other paperwork that
15 exists, that you're aware of, that specifically
16 stated she was a 50 percent owner?
17     A.    The original operating agreement.
18     Q.    And since that original operating
19 agreement, was she considered a 50 percent owner in
20 any other documents since then, besides these K-1s?
21     A.    I'm confused with your question.
22     Q.    These say from 2011 to 2015 she's a 50
23 percent owner; is that correct?
24     A.    Those were the only K-1s that were
25 retrievable from the accountant on record. It's

FILED, Case 18-17430-division: Doc 147-22 Filed 06/07/19, Entered 06/07/19 15:50:24 Desc Main
BROWN & POPE v.
SHARONN THOMAS POPE
Document Page 259 of 282
MARTIN BROWN
July 27, 2017

Page 49

1  been the same since we opened.
2      Q.    When you say it's been the same, you're
3  saying that she's been considered, as reported to
4  the IRS, as a 50 percent shareholder?
5          MR. CLAYTON: Objection.
6      Foundation.  Calls for a legal conclusion.
7          MR. THOMAS: I will point out
8      he answered the question.
9  BY MR. THOMAS:
10     Q.    But you can answer that question again,
11 if you'd like.
12         So again, on the documents submitted
13 to the IRS, it was reported that Ms. Sharonn Thomas
14 Pope was a 50 percent partner; is that correct?
15         MR. CLAYTON: Same objections.
16 BY MR. THOMAS:
17     Q.    You can still answer the question.
18     A.    I never changed the benefit to her by
19 a couple percent on a loss of taxes.
20     Q.    So just to confirm, that would be a yes
21 then, that these documents all reflect -- and we can
22 go through each one, if you'd like, but these
23 documents all reflect that she's a 50 percent owner;
24 is that correct?
25         MR. CLAYTON: Same objection.

Page 50

1      legal conclusion and asked and answered.
2  BY MR. THOMAS:
3      Q.    And you can answer yes or no.
4      A.    Okay.  So I answered.
5      Q.    And that answer is yes or no?
6          MR. CLAYTON: Same objections.
7      He's answered the question.  At this point,
8      you're just arguing with him and you're
9      asking him to make legal conclusions that
10     he's not competent to make.
11 BY MR. THOMAS:
12     Q.    Okay.  I'll go through each one, since
13 your attorney wants me to.
14         In 2011, part J of the Schedule K-1,
15 what is part J?
16     A.    Number one, I'm not an accountant.  So
17 I can't really interpret these forms for you.
18     Q.    That's okay.  The numbers, in part 2,
19 where it says information about the partner, there's
20 a paragraph J.  What does it specifically say?
21         MR. CLAYTON: Mr. Thomas, you're not
22     listening to the witness.
23         MR. THOMAS: If I may, you're
24     not here to testify.
25         MR. CLAYTON: He's just

Page 51

1  explained that he doesn't understand this,
2  and that's the basis for my foundation
3  objection.
4          MR. THOMAS: And I'm going to
5      say you're not here to testify, sir, with all
6      due respect.  He can answer the questions
7      himself.  If he's not sure, I can
8      clarify for him.
9          MR. CLAYTON: You're asking him
10     to speculate, you're asking him for legal
11     conclusions, as to which he has no
12     foundation, and you're wasting time, given
13     that the documents have already been marked
14     as an exhibit.  But with those objections,
15     it's your deposition.
16         MR. THOMAS: Respectfully, they
17     are marked as an exhibit.
18         MR. CLAYTON: Yes, that's my
19     point.
20         MR. THOMAS: And I'm simply
21     asking his interpretation of the documents
22     that he submitted to the IRS or, through his
23     accountant, submitted.
24 BY MR. THOMAS:
25     Q.    So just to clarify -- and we can try it

Page 52

1  once more to "save time."
2          On each K-1, every single one is
3  marked as a 50 percent partner; is that correct?
4          MR. CLAYTON: Objection.  It
5      mischaracterizes the evidence, which
6      describes the partner's share of the
7      profit, loss and capital.
8          MR. THOMAS: I'm going to say
9      once again, with all due respect, you're not
10     here to testify.  Your client is.
11         MR. CLAYTON: You're
12     mischaracterizing the evidence.  I'm making
13     an objection on that basis.
14         MR. THOMAS: That's not an
15     actual objection.
16         MR. CLAYTON: It is.
17         MR. THOMAS: I'd like to see
18     the New Jersey rules that say that's an
19     objection.
20 BY MR. THOMAS:
21     Q.    But nonetheless, what is your
22 understanding of the partner's share, based on these
23 documents?
24     A.    The section says --
25         MR. CLAYTON: Same objections.

FILED, Case 1:18-17430-tde/division 01-0c147-22 Filed, 06/07/19, Entered 06/07/19 15:50:24   Desc Main
BROWN & POPE v.                                Document       Page 260 of 282                    MARTIN BROWN
SHARONN THOMAS POPE                                                                              July 27, 2017

Page 53

1    THE WITNESS: Profit, loss and
2    capital. They all say 50 percent.
3  BY MR. THOMAS:
4    Q.   Okay. Thank you. And that's the same
5  for all, from 2011 to 2015?
6    A.   In that section, that's what they all
7  say.
8    Q.   Thank you. Do you currently, still
9  have either Wells Fargo or Fannie Mae as a client to
10 your current real estate entity?
11   MR. CLAYTON: Objection. Vague
12   and ambiguous.
13 BY MR. THOMAS:
14   Q.   You can answer the question.
15   A.   My company still has a Wells Fargo
16 account, yes.
17   Q.   That Wells Fargo account, is it of the
18 same nature as it was prior to Ms. Pope Thomas
19 leaving?
20   MR. CLAYTON: Same objection.
21   THE WITNESS: I'm not sure of
22   that question.
23   MR. THOMAS: It can't be the
24   same objection.
25   MR. CLAYTON: It's vague and

Page 54

1    ambiguous. He didn't understand the
2    question, either. It is the same objection.
3  BY MR. THOMAS:
4    Q.   The Wells Fargo account you currently
5  have, what type of work do you do?
6    A.   It's an agent in my office that does
7  the exact same REO work for that account.
8    Q.   That agent in your office that does the
9  exact same REO work, as you just said, have they
10 been doing that work since Ms. Pope left?
11   A.   Yes.
12   Q.   Did they do that work prior to
13 Ms. Pope leaving?
14   A.   Yes.
15   Q.   Fannie Mae, same question. So you
16 still have Fannie Mae as a client?
17   A.   No.
18   MR. CLAYTON: Same objections.
19   Vague and ambiguous.
20   MR. THOMAS: It's very clear
21   and your client answered it with a very clear
22   yes. I think he understood the
23   question.
24   THE WITNESS: I said no.
25 BY MR. THOMAS:

Page 55

1    Q.   I'm sorry. You said no, but you
2  still answered the question.
3    So Fannie Mae, do you remember
4  approximately what year they left as a client?
5    A.   I don't have the exact doc, but maybe
6  June of last year.
7    Q.   June of 2016?
8    A.   I believe it was 30 days or so after
9  Sharonn Thomas left the office.
10   Q.   I'm sorry, I skipped this part, but the
11 individual who still has the Wells Fargo account, in
12 your firm, are they a broker?
13   A.   No, they're an agent in my office.
14   MR. THOMAS: Last set of documents,
15   and this can be marked as Exhibit H.
16   - - -
17   (Invoices received and marked
18   for identification as Deposition Exhibit H)
19   - - -
20 BY MR. THOMAS:
21   Q.   Are you familiar with this Exhibit?
22   A.   Yes.
23   Q.   What is it?
24   A.   This is my current legal fees for
25 this.

Page 56

1    Q.   How do you usually receive this
2  information, on a monthly basis, on a quarterly
3  basis? How are these fees usually submitted to you?
4    A.   Everything is done electronically.
5    Q.   What's the rate that you usually
6  receive these bills?
7    A.   I don't know.
8    Q.   Do you usually pay monthly, do you pay
9  quarterly? How are the payments made?
10   A.   No. My retainer agreement is based on
11 a two-fold system, contingency agreement and fees
12 and costs.
13   Q.   Have you reviewed those bills
14 thoroughly, since they've been sent to you?
15   A.   Yes.
16   Q.   Was there ever any part that you
17 personally disagreed with?
18   A.   No.
19   Q.   Are you aware of any specific point
20 where your attorney communicated with you in these
21 bills?
22   Oh, here we go. Such as May 18, 2016,
23 do you acknowledge that was a charge for
24 communicating with you?
25   A.   Yes.

1    Q.    Did you speak with your attorney on
2  that day, that you remember?
3    A.    Yes.
4    Q.    How did you speak with your attorney
5  that day?  It says conferred.  That's why I'm
6  asking.
7    A.    Well, we either talked over the phone,
8  with documents over a computer, or I met with him in
9  his office.
10   Q.    Are you saying you're not sure on that
11 day or you're saying that that was generally how
12 those --
13   A.    Yeah, I don't know if that was a phone
14 conversation or the day I met in his office.
15   Q.    So you're aware of all of these bills
16 and you have not contested any of the charges
17 that have been incurred?
18   A.    That's correct.
19   Q.    Has it been discussed that if this case
20 were to be dismissed, how these bills would be paid?
21        MR. CLAYTON: Pause there.
22        MR. THOMAS: I will rephrase it
23   so it doesn't fall under attorney/client
24   privilege.
25        MR. CLAYTON: Thank you.

1        MR. THOMAS: Because I assume
2    that's what your concern is, even though
3    you didn't object.
4        MR. CLAYTON: I was making up
5    my mind, but I think that you solved my
6    problem.  Please rephrase.
7  BY MR. THOMAS:
8    Q.    You mentioned an agreement, and I don't
9  want to know the terms of that agreement.  Let me
10 just make that clear.  I don't want to know those
11 terms.
12        As part of discussions for settlement,
13 if this case were settled and dismissed, was there
14 an agreement that the bills would be paid after
15 that?
16        MR. CLAYTON: Objection, on the
17   grounds of attorney/client privilege,
18   and instruct the witness not to answer.
19        MR. THOMAS: I'm actually not
20   going to say you can answer that question,
21   but let me limit it to this.
22 BY MR. THOMAS:
23   Q.    It's your understanding that these
24 bills are all fair bills that have been incurred by
25 your attorney, that have been sent to you; is that

1  correct?
2    A.    Correct.
3    Q.    And it's your understanding that these
4  bills should all be paid in a timely manner; is that
5  correct?
6    A.    They should be paid as agreed upon in
7  my retainer agreement.
8    Q.    Page 151, actually, just a quick
9  question there, last page.  Ignoring the balance due
10 for the moment, what does the very small text say at
11 the bottom of that page, next to balance due?
12   A.    You're talking about where it says
13 "attached is the monthly invoice"?
14   Q.    Yes.
15   A.    "Please make payment upon receipt."
16   Q.    What is your understanding of that
17 phrase?
18   A.    I have no understanding of that
19 phrase.
20   Q.    Neither do I.
21        MR. THOMAS: If we may take
22   about two minutes to pause, I'm going to
23   confer with my client, but I believe we may
24   be finished.
25              - - -

1        (At this point, a short recess
2    was taken, after which time the deposition
3    resumed.)
4              - - -
5  BY MR. THOMAS:
6    Q.    Two quick follow-ups.  You mentioned
7  that the new, I guess Brown Realtors, do you
8  remember what date, approximately, that was actually
9  created?
10        MR. CLAYTON: Objection.  Foundation
11   and assumes facts not in evidence.
12 BY MR. THOMAS:
13   Q.    You can answer the question.
14        MR. CLAYTON: Also vague.
15        THE WITNESS: Somewhere after
16   this e-mail saying that she wanted nothing
17   else to do with the company, it was done.
18 BY MR. THOMAS:
19   Q.    Was it after the Complaint was filed?
20   A.    It was some date after I received a
21 letter saying she is no longer involved in the
22 company.
23   Q.    Just for clarification purposes then,
24 when the Complaint was filed, was Brown and Pope
25 still in existence or was Brown Realtors created, as

Page 61

1  well?

2      MR. CLAYTON: Same objections.

3  legal conclusions, foundation and assumes

4  facts not in evidence. Also asked and

5  answered and speculation.

6  BY MR. THOMAS:

7  Q.    You can answer the question.

8  A.    **Yeah. My only recollection is some**

9  **date after the partner said she wanted nothing to do**

10 **with the company anymore.**

11 Q.    And based on your estimate, since this

12 has come up a few times, the hard, physical

13 possessions in the office, such as furniture,

14 computers and any other office materials, if you

15 were told to put a value on them, what would your

16 best estimate be?

17     MR. CLAYTON: Objection. Calls for

18 speculation. Lack of foundation.

19 BY MR. THOMAS:

20 Q.    You can still answer the question.

21 A.    **$1,500.**

22 Q.    And was it $1,500 at the time that

23 Ms. Thomas Pope left or is it $1,500 now?

24 A.    **Same.**

25     MR. THOMAS: I think we're

Page 62

1  done, actually. Okay.

2      MR. CLAYTON: Let me have a

3  minute with my client, actually.

4      - - -

5      (At this point, a short recess

6  was taken, after which time the deposition

7  resumed.)

8      - - -

9      MR. CLAYTON: I have no

10 questions, at this time. I would like to

11 reserve the right for the witness to read

12 and sign the deposition.

13     And with that, the deposition

14 is concluded. Thank you, all.

15     MR. THOMAS: Thank, you very

16 much.

17     - - -

18     (DEPOSITION CONCLUDED - 2:06 P.M.)

19     - - -

20

21

22

23

24

25

Page 63

1          C E R T I F I C A T E

2

3

4      I, KAREN M. UNGHIRE, Court Reporter -

5  Notary Public, do hereby certify that the

6  proceedings, evidence, and objections noted are

7  contained fully and accurately in the notes taken by

8  me of the preceding deposition, and that this copy

9  is a correct transcript of the same.

10

11

12

13

14

15

16

17     _____

18     KAREN M. UNGHIRE
       COURT REPORTER - NOTARY PUBLIC

19

20

21

22

23

24

25

Page 64

1         E R R A T A  S H E E T

2

3      I, MARTIN BROWN, hereby acknowledge that I

4  have read the foregoing deposition dated July 27,

5  2017, and that the same is a true and correct

6  transcription of the answers given by me to the

7  questions propounded, except for the changes, if

8  any, noted on the Errata Sheet.

9

10     --------------------------
       MARTIN BROWN

11

12 PAGE    LINE      DESCRIPTION CORRECTION

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

FILED, Case 18-17434 edivision Doc 47 22-Filed 06/07/19, Entered 06/07/19 15:50:24 Desc Main
BROWN & POPE V.
SHARONN THOMAS POPE
Document        Page 263 of 282
MARTIN BROWN
July 27, 2017

## $

**$1,250 (2)**
33:5;34:6
**$1,500 (3)**
61:21,22,23
**$10,000 (1)**
23:20
**$30,000 (4)**
18:21;19:6,7,9
**$40 (1)**
34:14
**$400 (1)**
22:16
**$50 (1)**
34:13
**$500 (1)**
22:11
**$51,720 (1)**
19:15

## A

**abbreviated (1)**
4:14
**able (1)**
11:25
**Absolutely (4)**
9:20;11:9;39:1;
41:16
**accommodate (1)**
15:17
**account (18)**
7:2,4,9,21;8:3;13:16;
20:20,20;21:2;28:7;
29:22;30:2,8;53:16,17;
54:4,7;55:11
**accountant (3)**
48:25;50:16;51:23
**accounting (4)**
7:1,16,19;13:14
**accounts (2)**
23:9;27:4
**accrued (1)**
15:22
**accurate (4)**
7:5,21;34:2;36:23
**acknowledge (1)**
56:23
**active (1)**
47:16
**actual (2)**
33:15;52:15
**actually (17)**
7:7;8:8;14:7;15:9,
18;16:13;25:1;26:4;
34:19;36:13;40:8;45:4;
58:19;59:8;60:8;62:1,3
**Addendum (5)**
32:10,10,21,23;33:8
**addendums (1)**
32:9

**addition (2)**
28:23;45:15
**additional (1)**
28:10,12;29:5
**adjustment (1)**
40:1
**adjustments (3)**
39:20,23,24
**administration (1)**
34:12
**advisement (4)**
10:12,22;17:5;44:2
**afterwards (1)**
41:19
**Again (5)**
10:16;17:19;49:10,
12;52:9
**agent (5)**
12:11;13:11;54:6,8;
55:13
**agents (10)**
9:18,24;13:9;25:19;
27:4,7,8,9,18;29:19
**agreed (2)**
32:23;59:6
**agreeing (1)**
19:24
**agreement (33)**
7:3;16:24;17:16,20;
30:23;31:4,9;33:22,23,
24;34:1,4,7,11;35:15,
23;36:10,12;38:14;
39:7,18,21,23;40:25;
47:3;48:17,19;56:10,
11;58:8,9,14;59:7
**agreements (5)**
16:21;37:5;40:5;
46:21;47:12
**along (2)**
7:12;44:23
**always (1)**
48:10
**ambiguous (5)**
5:5;45:7;53:12;54:1,
19
**Amortization (2)**
18:14,20
**amount (7)**
13:10;19:10,14;22:4,
5,6;23:17
**answered (10)**
10:15;19:18;33:13;
49:8;50:1,4,7;54:21;
55:2;61:5
**anymore (1)**
61:10
**appear (1)**
9:15
**appears (1)**
40:6
**application (2)**
23:1;24:25
**appreciate (1)**

11:3
**approximately (12)**
8:24;11:10;18:3,21;
22:20,23;23:20;28:24;
29:24;30:5;55:4;60:8
**April (3)**
5:14,17;7:3
**area (1)**
39:13
**arguing (1)**
50:8
**around (3)**
11:10;12:22;22:15
**assistant (1)**
25:12
**assume (3)**
7:11;19:15;58:1
**assumes (7)**
16:1;19:2,19;20:22;
40:21;60:11;61:3
**attached (5)**
5:21;6:6,7;41:8;
59:13
**attended (1)**
43:1
**attorney (10)**
6:18;8:9;10:4;42:24;
43:20;50:13;56:20;
57:1,4;58:25
**attorney/client (2)**
57:23;58:17
**available (1)**
22:16
**aware (5)**
5:7;30:12;48:15;
56:19;57:15

## B

**back (4)**
6:10;20:7;41:19;
46:10
**balance (4)**
35:4,9;59:9,11
**based (12)**
17:12;18:20;19:11;
24:3;28:23;29:18;33:1,
3;34:1;52:22;56:10;
61:11
**basis (5)**
35:5;51:2;52:13;
56:2,3
**Bates (5)**
8:10,11,14,15,19
**became (2)**
25:13;28:9
**beginning (1)**
44:24
**behest (1)**
23:7
**behind (1)**
27:3
**below (1)**

31:17
**benefit (2)**
47:9;49:18
**besides (1)**
48:20
**best (2)**
14:21;61:16
**better (1)**
27:3
**biggest (1)**
40:1
**bill (5)**
35:1,2,3,6,8
**bills (13)**
15:10,14,17;34:22;
56:6,13,21;57:15,20;
58:14,24,24;59:4
**bit (1)**
14:2
**black (1)**
38:5
**blue (1)**
38:5
**both (9)**
35:12,23;36:2,17,20;
37:10;40:5,6;42:10
**bottom (5)**
7:7;8:10,14;42:5;
59:11
**bought (1)**
47:17
**broker (6)**
4:21;31:24,25;32:2;
38:21;55:12
**brokerage (1)**
34:12
**BROWN (25)**
4:4,13,20,23;9:18;
10:7;12:22;15:21;
16:15;23:17,21;24:4,6,
14,16;26:24;28:4,9,15;
30:8;31:16;45:17;60:7,
24,25
**build (2)**
28:15,21
**built (1)**
18:9
**Burton (1)**
27:11
**business (20)**
5:2;7:19;12:7;23:6,
21;27:19,20,25;28:3,8;
29:11,14;32:24,25;
33:4,21;34:17;39:2;
43:15;46:7
**Butcher-Jallah (1)**
27:15
**buyer (1)**
34:13

## C

**calculate (1)**

15:12
**calculated (1)**
44:14
**call (5)**
5:19;7:1;8:19;30:15;
37:19
**called (1)**
43:14
**Calls (4)**
16:1;46:23;49:6;
61:17
**Can (47)**
4:11;6:1;9:4,9,12,12,
21,25;10:3;11:11;
14:21,21;16:4;19:5,21;
20:5,25;21:19;24:1,10;
27:20;29:13,17;33:15,
20;34:9;40:10,16,24;
42:4;43:4;45:13;46:14;
47:8;49:10,17,21;50:3;
51:6,7,25;53:14;55:15;
58:20;60:13;61:7,20
**capital (8)**
15:22;16:7,13;17:23,
25;18:6;52:7;53:2
**card (1)**
32:10
**case (3)**
29:21;57:19;58:13
**certainly (1)**
40:10
**chain (2)**
25:24;26:12
**chance (2)**
26:11;35:20
**change (8)**
5:7;11:16;15:20;
25:16;40:8,19;41:1,2
**changed (4)**
29:9;40:18;47:9;
49:18
**changes (7)**
28:5;38:13;40:7,11;
41:19,24;42:8
**charge (1)**
56:23
**charges (1)**
57:16
**check (2)**
13:6;35:20
**choose (1)**
29:17
**chose (2)**
29:15,16
**clarification (1)**
60:23
**clarify (2)**
51:8,25
**clarity (2)**
26:8;34:10
**CLAYTON (54)**
5:4;10:11,21;15:25;
17:1;19:1,17;20:3,21;

21:16;23;23;24:8;
33:12,18;36:1,4,8,24;
38:6;40:13,20;41:20;
42:2;43:24;45:6,11;
46:23;47:6;49:5,15,25;
50:6,21,25;51:9,18;
52:4,11,16,25;53:11,
20,25;54:18;57:21,25;
58:4,16;60:10,14;61:2,
17;62:2,9
**clear (5)**
32:16;34:18;54:20,
21;58:10
**client (13)**
7:8,10,16,18,25;
13:1;52:10;53:9;54:16,
21;55:4;59:23;62:3
**closed (2)**
34:14;39:4
**collect (1)**
34:20
**collected (1)**
17:23
**commission (12)**
11:17;12:4,12;28:19;
33:6,10,16;34:25;
38:20,23;39:22;47:13
**commissions (5)**
13:4;32:24;33:3;
34:1,21
**communicated (1)**
56:20
**communicating (1)**
56:24
**community (1)**
23:5
**companies (1)**
28:20
**company (14)**
12:6;15:3,5,21;
23:13,13;29:17;38:22;
40:3;43:16;53:15;
60:17,22;61:10
**competent (1)**
50:10
**Complaint (2)**
60:19,24
**complete (3)**
7:8,16;10:4
**completely (1)**
4:17
**component (2)**
25:8;40:7
**Compound (2)**
21:16;40:14
**computer (1)**
57:8
**computers (1)**
61:14
**concern (1)**
58:2
**concluded (2)**
62:14,18

**conclusion (3)**
46:24;49:6;50:1
**conclusions (3)**
50:9;51:11;61:3
**confer (1)**
59:23
**conferred (1)**
57:5
**confirm (3)**
6:24;42:19;49:20
**confirming (1)**
17:4;44:1
**confused (1)**
34:19;48:21
**confusing (2)**
21:17;40:14
**Connecticut (8)**
38:20,25;39:3,10,22;
47:14,18,25
**consider (1)**
16:25
**considered (4)**
21:6;44:6;48:19;
49:3
**contact (2)**
6:18,18
**contested (1)**
57:16
**contingency (1)**
56:11
**continue (1)**
44:9
**contract (3)**
32:12,14,17
**Contractor (5)**
30:22;31:4,8;32:6;
33:24
**contracts (1)**
11:20
**contribute (2)**
16:7;17:24
**contributed (3)**
15:23,24;16:13
**controlled (1)**
47:3
**conversation (1)**
57:14
**copy (5)**
16:23;35:6;38:4;
41:14;43:21
**corner (1)**
8:14
**costs (1)**
56:12
**counseling (2)**
23:14,15
**couple (2)**
47:19;49:19
**cover (1)**
42:20
**CPA (5)**
14:9,15;44:15,17,19
**CPA's (1)**

14:18
**crafted (1)**
23:2
**create (2)**
37:4,6
**created (13)**
16:6,15;17:23;18:1;
22:21,24,25;31:6;
36:18;39:13,17;60:9,
25
**credit (1)**
32:10
**crossed (1)**
42:21
**current (1)**
35:9;53:10;55:24
**currently (4)**
4:22;32:2;53:8;54:4
**custom (1)**
18:9

**D**

**d/b/a (1)**
31:16
**Darnell (2)**
9:6;27:11
**date (9)**
5:10;31:7;36:13,17;
37:11;40:25;60:8,20;
61:9
**dated (7)**
5:21;26:17;37:10,11,
15;42:12,20
**dates (2)**
35:24;42:11
**day (5)**
7:13;57:2,5,11,14
**days (5)**
7:2,10;10:3;34:22;
55:8
**dealt (1)**
47:18
**death (3)**
38:15;40:4,11
**decision (1)**
29:18
**decreased (1)**
29:10
**deduction (1)**
45:17
**Delaware (1)**
39:10
**depend (1)**
15:14
**depends (1)**
48:4
**Deposition (23)**
5:23;8:4;10:25;17:4,
6,17;18:15;25:25;26:5,
7;30:18,24;35:17;
42:25;43:1,7;51:15;
55:18;60:2;62:6,12,13,

18
**described (1)**
33:7
**describes (1)**
52:6
**description (1)**
32:5
**developing (1)**
23:13
**development (1)**
23:6
**different (3)**
24:20;41:12;42:11
**Dillard (1)**
27:13,14
**direct (2)**
6:17;30:14
**directly (6)**
14:10;24:6,7;25:21;
29:13;42:15
**disagreed (1)**
56:17
**discovery (6)**
10:19,23;16:25;17:7,
10;43:23
**discussed (1)**
57:19
**discussions (1)**
58:12
**dismissed (2)**
57:20;58:13
**dissolve (1)**
6:4
**distinguish (1)**
37:14
**doc (1)**
55:5
**document (7)**
22:18;32:22;33:2,3,
5;36:23;44:5
**documentary (1)**
44:3
**documents (13)**
17:18;32:9;35:12;
43:11;48:20;49:12,21,
23;51:13,21;52:23;
55:14;57:8
**dollars (1)**
22:11
**done (3)**
56:4;60:17;62:1
**down (2)**
9:7;12:6
**due (5)**
34:22;51:6;52:9;
59:9,11
**duly (1)**
4:4
**during (18)**
9:18;10:7;11:5,15,
18;12:3;14:16,15:9;
18:7;21:13;28:25;46:1,
17,18,22;47:4,15;48:9

**E**

**easy (2)**
36:17;37:12
**effect (1)**
46:22
**EIN (1)**
46:5
**either (5)**
45:2;47:17;53:9;
54:2;57:7
**elaborate (1)**
27:21
**electronically (1)**
56:4
**else (5)**
7:4;9:22;15:3,4;
60:17
**E-mail (20)**
5:21;6:3,10,11,13,17,
20,23;7:19,23;25:24;
26:15,17,18,20,23,24;
27:3;30:4;60:16
**e-mails (3)**
26:12;27:6,25
**end-of-the-year (1)**
44:19
**enough (2)**
28:14;30:13
**entire (4)**
13:24;46:1;47:15;
48:9
**entitled (6)**
33:2,4,10,17,21,25
**entity (8)**
16:16;17:23,25;
24:18;25:9;46:3,8;
53:10
**essence (3)**
8:22;34:15;36:22
**estate (7)**
4:21;13:21;38:20;
39:22;47:13,17;53:10
**estimate (3)**
11:11;61:11,16
**even (4)**
11:6;38:5,24;58:2
**eventually (2)**
29:15,16
**everybody (1)**
12:24
**evidence (10)**
16:1;19:3,19;20:23;
21:11;40:21;52:5,12;
60:11;61:4
**exact (4)**
5:10;54:7,9;55:5
**exactly (1)**
34:9
**examined (1)**
4:5
**executives (1)**

BROWN & POPE V.
SHARONN THOMAS POPE

MARTIN BROWN
July 27, 2017

34:20
**Exhibit (33)**
5:19,23;6:1,5;8:1,5,
8,9;18:12,16;25:21;
26:1,4,6;30:16,17,20,
24;31:2;35:13,17,25;
36:2,7;42:21;43:4,8,
10;51:14,17;55:15,18,
21
**exhibits (2)**
35:21,21
**existence (1)**
60:25
**exists (1)**
48:15
**expense (1)**
21:3
**expenses (2)**
15:8;21:7
**explained (1)**
51:1
**extent (3)**
11:6;17:2;44:3

**F**

**fact (1)**
30:8
**facts (7)**
16:1;19:2,19;20:22;
40:21;60:11;61:4
**factual (1)**
47:1
**failed (1)**
39:4
**fair (9)**
7:23;28:14;29:4;
30:13;34:5;38:3,4;
48:5;58:24
**fall (1)**
57:23
**familiar (8)**
8:25;19:16;26:12;
37:7,23;38:11;43:10;
55:21
**Fannie (4)**
53:9;54:15,16;55:3
**Fargo (25)**
22:21;23:7,15,17,20;
24:4,13,18,23;25:2,3,9,
18;27:25;28:3,7,12;
29:5,9,14;53:9,15,17;
54:4;55:11
**fee (3)**
34:12,12,13
**fees (7)**
34:3,8,14,16;55:24;
56:3,11
**few (3)**
5:12;22:19;61:12
**figure (2)**
19:9;22:14
**figures (2)**

16:5;19:7
**filed (2)**
60:19,24
**finished (1)**
59:24
**firm (5)**
11:8;20:14;25:2;
47:16;55:12
**firm's (1)**
20:20
**first (10)**
8:16;9:3;15:21;
26:17,20,23;37:14,22,
23;40:12
**fit (1)**
12:18
**five (1)**
46:18
**fluctuates (1)**
29:11
**folks (1)**
10:1
**follow (2)**
17:4;38:24
**follows (1)**
4:6
**follow-ups (1)**
60:6
**form (1)**
14:6
**forms (5)**
14:3;45:1,3,23;50:17
**forum (1)**
17:7
**foundation (16)**
19:2,18;20:22;21:17;
23:24;36:25;38:7;
40:22;41:21;46:24;
49:6;51:2,12;60:10;
61:3,18
**four-something (1)**
22:13
**fourth (2)**
7:7;40:5
**full (2)**
4:11;11:6
**funds (3)**
13:7,8;24:5
**furnish (1)**
7:8
**furniture (1)**
61:13

**G**

**gears (2)**
15:20;30:14
**general (1)**
11:21
**generally (6)**
5:13;11:16;13:5;
15:8;24:13;57:11
**generated (1)**

9:1
**gets (1)**
29:19
**given (3)**
14:9;29:13;51:12
**grant (1)**
23:14
**gross (1)**
12:12
**grounds (1)**
58:17
**group (1)**
8:23
**grow (2)**
27:19,20
**guess (30)**
5:18;6:19;7:1;8:23;
9:16;15:22;17:24;20:7;
21:25;23:5;25:14;27:2,
17,23,24;28:10,17,23;
31:15;32:20,21;33:9;
34:6;35:24,25;39:12;
40:12;42:4;44:13;60:7

**H**

**half (1)**
26:23
**hand (1)**
46:13
**handle (2)**
24:12;25:8
**handwritten (1)**
32:5
**happen (1)**
29:21
**happened (1)**
29:20
**happens (1)**
44:16
**Hard (2)**
6:21;61:12
**here's (1)**
17:1
**hey (1)**
21:14
**highest (1)**
29:20
**himself (1)**
51:7
**home (1)**
34:6
**HUD (2)**
13:1,2
**hundred (7)**
28:19;33:25;34:5,15,
18,21,25

**I**

**idea (6)**
8:15;18:5;20:6,12;
41:13;42:9

**identification (8)**
5:23;8:4;18:15;
25:25;30:24;35:16;
43:7;55:18
**Ignoring (1)**
59:9
**immediately (1)**
13:5
**include (1)**
27:13
**includes (1)**
19:15
**income (8)**
14:5;27:22;28:13,16,
21,25;29:6;45:16
**increase (2)**
28:13;29:2
**increased (2)**
28:25;29:6
**incurred (2)**
57:17;58:24
**Independent (4)**
30:22;31:3,8;33:24
**individual (1)**
11:20;29:18;55:11
**individual's (1)**
45:21
**information (2)**
50:19;56:2
**inherently (1)**
28:17
**initial (1)**
13:10
**initially (1)**
16:6
**ink (2)**
38:5,5
**input (1)**
11:3
**inputted (1)**
18:6
**instead (1)**
8:10
**instruct (1)**
58:18
**insurance (1)**
34:12
**intent (1)**
27:3
**interest (2)**
19:8,15
**interpret (1)**
50:17
**interpretation (1)**
51:21
**into (7)**
12:18;13:17;14:2,6;
24:21;44:1,4
**introduced (1)**
12:7
**inventory (1)**
29:19
**invoice (1)**

59:13
**Invoices (1)**
55:17
**involved (3)**
25:4,13;60:21
**IRS (5)**
45:5,10;48:10;49:4,
13;51:22
**isolated (1)**
12:6
**items (1)**
45:17

**J**

**Jersey (4)**
39:9,15;48:6;52:18
**July (1)**
26:17
**jump (1)**
24:21
**juncture (1)**
25:17
**June (3)**
5:15;55:6,7

**K**

**K-1 (6)**
43:6,14;45:23;48:13;
50:14;52:2
**K-1s (3)**
46:11;48:20,24
**keep (5)**
13:14,15,16;14:14;
21:3
**Kim (1)**
27:11
**kind (1)**
23:12
**kinds (1)**
18:9
**King (2)**
9:6;27:12
**knowing (1)**
11:6
**knowledge (1)**
19:11

**L**

**labeled (1)**
43:4
**lack (2)**
27:2;61:18
**last (7)**
5:14,17;14:22,23;
31:12;39:11;55:6,14;
59:9
**late (1)**
6:22
**learn (1)**
30:2

**least (3)**
  6:6,25;47:25
**leave (3)**
  29:15,16,17
**leaving (2)**
  53:19;54:13
**left (7)**
  18:25;20:14,15;
  54:10;55:4,9;61:23
**legal (7)**
  46:24;49:6;50:1,9;
  51:10;55:24;61:3
**lengthier (1)**
  40:6
**less (1)**
  34:20
**letter (7)**
  5:21;6:6,7,25;17:4;
  44:2;60:21
**licenses (1)**
  39:9
**lien (1)**
  18:19
**limit (1)**
  58:21
**limited (2)**
  12:15;14:15
**line (4)**
  7:6,7;9:3;44:23
**lines (1)**
  7:12
**list (3)**
  8:24;10:4,18
**listed (2)**
  9:5,13
**listening (1)**
  50:22
**little (6)**
  10:2;14:2;17:19;
  27:21,23;34:19
**living (1)**
  4:19
**LLC (12)**
  16:17,19,20,23;
  17:16,20;31:16;35:15;
  36:9,12;37:4;39:13
**loan (6)**
  18:19,23,24;19:6,14;
  20:8
**Lone (7)**
  13:21;14:4,8;15:16,
  19;16:11;44:18
**long (4)**
  4:24;5:3;11:13;
  38:14
**longer (2)**
  40:12;60:21
**look (5)**
  8:25;9:11,12;26:11;
  40:4
**looking (2)**
  39:14,15
**looks (7)**

**6:1,3;7:9:1;18:20;**
  31:3;32:5
**loss (3)**
  49:19;52:7;53:1
**losses (2)**
  43:16;44:13
**lot (1)**
  10:1
**low (1)**
  29:19

**M**

**Mae (4)**
  53:9;54:15,16;55:3
**majority (6)**
  38:21;40:2,2;48:3,6,
  7
**makes (2)**
  28:22;36:17
**making (8)**
  17:2;20:8,11,13,14;
  44:3;52:12;58:4
**Malovich (3)**
  14:20,25;15:1
**management (3)**
  25:5,10,17
**manner (1)**
  59:4
**many (2)**
  9:25;20:2
**marked (12)**
  5:22;8:4;18:15;
  25:25;30:23;35:16;
  43:7;51:13,17;52:3;
  55:15,17
**marking (1)**
  36:1
**MARTIN (3)**
  4:4,13;31:18
**Maryland (2)**
  39:10;48:8
**materials (1)**
  61:14
**May (9)**
  5:15;7:20,20;19:7,
  24;50:23;56:22;59:21,
  23
**maybe (3)**
  6:21;11:14;55:5
**MB (1)**
  8:17
**MB16 (1)**
  32:20
**mean (4)**
  28:6,17;38:12;39:9
**means (1)**
  13:20
**meant (1)**
  34:24
**meantime (1)**
  10:24
**medication (1)**

**4:15**
**meet (1)**
  10:13
**members (1)**
  30:7
**mentioned (4)**
  5:2,17;58:8;60:6
**met (2)**
  57:8,14
**Michael (1)**
  26:16
**might (1)**
  11:16
**mind (1)**
  58:5
**minus (4)**
  33:6;34:3,6,16
**minute (1)**
  62:3
**minutes (1)**
  59:22
**mischaracterizes (1)**
  52:5
**mischaracterizing (1)**
  52:12
**moment (2)**
  15:20;59:10
**money (5)**
  7:9,20;21:8,20;22:16
**Monica (2)**
  27:13,14
**month (5)**
  21:15;22:2,8;33:6;
  34:6
**monthly (6)**
  13:16;35:5,8;56:2,8;
  59:13
**months (2)**
  5:11,12
**more (8)**
  19:7;21:25;25:8;
  27:21,22,22,23;52:1
**mortgage (2)**
  23:14,15
**most (1)**
  48:5
**mouth (1)**
  21:14
**much (12)**
  13:14;15:22,23;16:9,
  13;18:4,23;19:11;22:1;
  28:24;39:2;62:16
**multiple (1)**
  13:2

**N**

**name (14)**
  4:11;5:2,3,7;9:4,5,8,
  9;14:18,22,24;32:6,18;
  44:22
**names (4)**
  9:3,13,21;11:7

**nature (1)**
  53:18
**need (2)**
  8:12;17:14
**Neither (1)**
  59:20
**new (10)**
  16:25;30:18;39:9,10,
  15;45:1,3;48:6;52:18;
  60:7
**next (6)**
  9:8,16;10:3;22:18;
  35:11;59:11
**night (1)**
  6:22
**Nonetheless (2)**
  48:9;52:21
**nonprofit (2)**
  23:13;24:17
**normal (2)**
  21:6;32:6
**note (1)**
  42:15
**notice (1)**
  7:10
**November (16)**
  36:15,19;37:5,15,20;
  41:2,5,6,8,15,17,25;
  42:6,7,13,20
**number (12)**
  8:9,17,22;9:4,8;
  11:11,21;16:12;19:16;
  36:7;46:5;50:16
**numbers (5)**
  12:18;18:10;19:22;
  44:14;50:18

**O**

**object (2)**
  43:20;58:3
**Objection (31)**
  5:4;15:25;19:1,17;
  20:21;21:16;23:23;
  33:12,18;36:24;38:6;
  40:13,20;41:20;45:6,
  11;46:23;49:5,25;51:3;
  52:4,13,15,19;53:11,
  20,24;54:2;58:16;
  60:10;61:17
**objections (10)**
  20:3;24:8;42:2;47:6;
  49:15;50:6;51:14;
  52:25;54:18;61:2
**occur (2)**
  14:7;48:3
**occurred (3)**
  5:9;47:22,25
**off (2)**
  28:23;44:21
**office (12)**
  12:7;18:8;27:5;39:4;
  54:6,8;55:9,13;57:9,

**14;61:13,14**
**official (1)**
  16:23
**Once (2)**
  6:13;52:1,9
**one (41)**
  5:19;15:20;16:24;
  26:16;28:6;30:19;
  32:17;34:22;35:11;
  36:6,16,18;37:6,7,8,9,
  10,13,13,14,18,19,22,
  23,25,25;38:4,16;
  39:11;41:7;42:11,12;
  43:17;45:2;46:13;
  47:10,25;49:22;50:12,
  16;52:2
**only (12)**
  27:7;28:6;32:16;
  37:7,23,25;38:11;
  45:20,23;46:11;48:24;
  61:8
**opened (1)**
  49:1
**operating (11)**
  21:7;35:15,23;37:5;
  38:14;39:6,17,21,23;
  48:17,18
**operations (1)**
  21:2
**opinion (1)**
  41:11
**opportunities (1)**
  17:9
**opportunity (1)**
  17:8
**original (2)**
  48:17,18
**originally (1)**
  36:13
**origination (3)**
  16:18,20;17:20
**out (16)**
  8:20;13:6;14:11,12;
  18:19;20:1,19,20;21:1;
  25:11,18;35:8,20;
  42:21;44:18;49:7
**outstanding (2)**
  34:22;35:4
**over (6)**
  10:5;19:8;26:6;
  30:19;57:7,8
**overseeing (1)**
  25:9
**owed (4)**
  7:9,17,20;19:8
**own (4)**
  17:25;40:2;45:14;
  46:5
**owner (5)**
  48:16,19,23;49:23
**ownership (2)**
  38:21;47:5

FILED, Case 18-17430, Division Doc 147, 22 Filed 06/07/19, Entered 06/07/19 15:50:24 Desc Main
Document Page 267 of 282

BROWN & POPE V.
SHARONN THOMAS POPE

MARTIN BROWN
July 27, 2017

## P

**PA (1)**
39:10
**Page (26)**
6:5;8:12,17;9:8;
18:21;26:17,20,23;
31:12,12;32:20;35:25;
36:4,5,12;37:15,19;
38:3;40:6;41:7,17;
42:6,20;59:8,9,11
**pages (3)**
8:22,24;41:12
**paid (17)**
13:9,11;15:15;18:24;
21:9,10,12,13,20,23;
23:17;24:14;33:5;
57:20;58:14;59:4,6
**paper (2)**
16:20;22:4
**papers (1)**
9:14
**paperwork (5)**
6:25;8:23;16:18;
48:10,14
**paragraph (1)**
50:20
**paragraphs (1)**
38:15
**part (14)**
8:23;10:19;15:4;
17:17;28:9;32:16;41:4;
43:23;50:14,15,18;
55:10;56:16;58:12
**parties (1)**
42:10
**partner (5)**
15:4;49:14;50:19;
52:3;61:9
**partner's (4)**
45:16;46:18;52:6,22
**partnership (1)**
6:4
**parts (2)**
32:11,13
**past (1)**
34:22
**Pause (1)**
57:21;59:22
**pay (6)**
20:19;21:8;22:2;
35:1;56:8,8
**paying (1)**
22:15
**payment (7)**
21:15,21;22:3,4,5,
11;59:15
**payments (13)**
18:22;19:23,25;20:8,
11,17,18,19;21:1,4,9;
24:15;56:9
**people (5)**

10:5;28:11,12,24;
29:5
**per (1)**
34:14
**percent (35)**
12:4,8,9,11,13,23,25;
13:4,11,13;15:2,7;
28:19;33:25;34:6,11,
15,18,21,25;40:8;
46:20;47:4,10,12;
48:11,16,19,23;49:4,
14,19,23;52:3;53:2
**percentage (7)**
11:17,25;27:24;28:2;
29:2;33:10,16
**perception (1)**
28:18
**person (1)**
9:5
**personal (10)**
15:11;17:25;19:11;
20:20;25:12;28:2,4,7,
16;45:24
**personally (6)**
11:18;18:23,24;25:7;
26:15;56:17
**phone (2)**
57:7,13
**phrase (2)**
59:17,19
**physical (1)**
61:12
**piece (1)**
22:4
**planning (1)**
39:8
**please (3)**
17:3;58:6;59:15
**PM (1)**
62:18
**point (11)**
12:19;15:13;25:22;
28:10;29:23;49:7;50:7;
51:19;56:19;60:1;62:5
**Pope (40)**
6:19;9:18;10:7;12:4,
18,22;15:21,24;16:15;
18:7;25:20:14;21:12,
22;23:6,17,21;24:4,6,7,
14,16;25:13;26:24;
27:7;28:4,9,15;30:8;
33:2;44:21;45:17;
46:12;47:15;49:14;
53:18;54:10,13;60:24;
61:23
**possessions (1)**
61:13
**possible (2)**
10:4;24:2
**practical (1)**
22:1
**previous (6)**
26:5,7;30:17;36:6;

42:25;43:1
**print (3)**
14:11,12;32:6
**printed (1)**
32:18
**prior (2)**
53:18;54:12
**privilege (2)**
57:24;58:17
**Probably (2)**
16:14;44:23
**problem (1)**
58:6
**process (5)**
23:1;24:25;25:14;
28:11;29:23
**profession (1)**
4:25
**profit (2)**
52:7;53:1
**program (1)**
14:11
**properties (5)**
8:25;9:2;12:19;13:1;
27:22
**property (5)**
12:15;13:15,17;25:5,
6
**proposal (5)**
22:25;23:3,6,22;
24:25
**purely (1)**
46:25
**purpose (4)**
27:17,19;38:18;
47:11
**purposes (1)**
60:23
**put (7)**
13:17;17:3,24;30:18;
43:25;44:4;61:15
**putting (1)**
26:6

## Q

**quarterly (2)**
56:2,9
**quick (2)**
59:8;60:6

## R

**range (3)**
11:24,25;12:18
**rate (1)**
56:5
**reached (1)**
25:18
**reaction (1)**
6:19
**read (2)**
31:22;62:11

**real (7)**
4:21;13:21;38:20;
39:22;47:13,16;53:10
**really (4)**
18:8;10;24:11;50:17
**Realtors (11)**
4:23;9:18,25;10:9,
18;11:7,14,19;26:24;
60:7,25
**realty (1)**
34:20
**reason (2)**
4:15;30:10
**reasonable (2)**
23:22;28:22
**recall (2)**
38:16;40:9
**receipt (1)**
59:15
**receive (5)**
13:6,8;21:25;56:1,6
**received (22)**
5:22;6:9,13,20;8:3;
12:5,8;13:3,13,14;
14:10;17:18;18:14;
24:15;25:24;30:23;
33:6;35:5,16;43:6;
55:17;60:20
**receiving (1)**
15:12
**recent (1)**
5:7
**recess (2)**
60:1;62:5
**recollect (2)**
19:9;38:1
**recollection (2)**
23:12;61:8
**record (7)**
4:12;9:21;10:17;
17:13,16;26:4;42:19;
48:25
**records (2)**
14:1,4
**refer (2)**
7:6;8:11
**reference (1)**
9:24
**references (1)**
8:12
**referencing (4)**
34:10,23;37:13;
39:25
**reflect (4)**
46:21;47:4;49:21,23
**relation (1)**
23:21
**relationship (4)**
22:21;24:4,22;29:9
**remember (45)**
7:15,18;9:25;12:3;
14:18;15:23;16:5,9;
17:22;18:3,6,23;19:6,

10,13,22;20:1,8,10;
22:6,7,10,12,13,15,20,
23;23:2,5,16,18;24:2;
29:13,24;30:1,5;31:5;
40:9;41:14;42:12,25;
47:21;55:3;57:2;60:8
**remove (1)**
29:19
**removed (3)**
29:22;30:3,9
**Renee (1)**
27:11
**REO (8)**
12:6,15,19;23:8;
24:22;25:19;54:7,9
**REOs (4)**
12:25;13:4;24:19,21
**rephrase (4)**
6:16;37:1;57:22;
58:6
**report (3)**
9:1;21:3;43:15
**reported (2)**
46:18;49:3,13
**reports (5)**
13:25;14:8;44:15,17,
19
**request (10)**
7:23,25;10:12,20,22;
16:23,25;17:7;44:9,10
**requested (1)**
6:4
**requesting (2)**
10:18;43:21
**requests (5)**
17:3,15;44:1,4,5
**required (2)**
38:20;47:14
**requirement (1)**
39:21
**reserve (1)**
62:11
**respect (2)**
51:6;52:9
**Respectfully (1)**
51:16
**response (2)**
6:17;7:22
**responsibilities (1)**
25:16
**resumed (1)**
60:3;62:7
**retail (4)**
32:24;33:4,21;34:17
**retainer (2)**
56:10;59:7
**retrievable (1)**
48:25
**return (8)**
45:4,9,15,18,21,24;
46:2,8
**returns (2)**
43:15;45:14

FILED, Case 18-17434, Document 147-22, Filed 06/07/19, Entered 06/07/19 15:50:24 Desc Main
BROWN & POPE v.
SHARONN THOMAS POPE
Document Page 268 of 282
MARTIN BROWN
July 27, 2017

**review (1)**
40:10;43:22

**reviewed (1)**
56:13

**right (10)**
5:16;30:13;31:18,19;
32:4;34:17;38:5;42:11;
46:7;62:11

**right-hand (1)**
8:14

**roughly (2)**
16:9;22:10

**rules (2)**
38:24;52:18

## S

**sake (1)**
26:8

**sales (1)**
25:10

**same (35)**
12:18;13:23;14:15;
16:24;20:3;22:3,7;
24:8,17;30:16,20;
33:18;36:22;37:11;
42:2;43:19;45:11;47:6;
49:1,2,15,25;50:6;
52:25;53:4,18,20,24;
54:2,7,9,15,18;61:2,24

**save (2)**
10:2;52:1

**saw (1)**
6:22

**saying (10)**
7:22;35:7;37:22;
38:23;46:10;49:3;
57:10,11;60:16,21

**Schedule (3)**
43:6;45:23;50:14

**score (1)**
29:20

**scoring (2)**
29:18,22

**scratch (1)**
38:8

**second (8)**
26:23,24;37:18,19;
41:4,14,18;42:5

**section (5)**
31:17;38:15;40:11;
52:24;53:6

**seller (1)**
34:13

**send (4)**
14:11,12;21:11;27:6

**sending (3)**
7:15,18;27:3

**sense (1)**
28:22

**sent (18)**
6:16;7:4,11,12,13,23,
25;26:15,16,18;27:7;

**review (1)**
28:1;35:8;44:15,17,19;
56:14;58:25

**separate (1)**
37:4

**serve (1)**
10:23

**services (3)**
24:14,16,19

**set (3)**
6:25;9:14;55:14

**setting (1)**
27:4,18;28:10,11

**settled (1)**
58:13

**settlement (1)**
58:12

**seven (2)**
7:2,10

**several (1)**
27:8

**share (7)**
15:3;40:2,3;45:16;
46:18;52:6,22

**shareholder (1)**
48:11;49:4

**Sharonn (5)**
9:10;26:21;46:12;
49:13;55:9

**Sharonn's (1)**
43:15

**Shiflet (1)**
26:16

**shift (3)**
25:15,15;30:14

**short (2)**
60:1;62:5

**show (1)**
26:8

**side (3)**
34:13;36:17,17

**sign (5)**
31:8;32:13;44:21;
45:1;62:12

**signature (18)**
31:10,12,15,16,19;
32:4,7;37:15,19;38:2;
41:7,12,16,17;42:6,14,
17;44:24

**signatures (1)**
32:12

**signed (18)**
31:7;32:8,9,10,11,
17;38:4;39:7;41:6,18;
42:1,7,9,10;45:3,4,9;
46:22

**significant (1)**
40:7

**signing (3)**
31:5;41:14;42:12

**signs (1)**
28:18

**simply (2)**
26:6;51:20

**single (4)**
22:8;47:3,16;52:2

**skipped (1)**
55:10

**slightly (2)**
4:14;30:14

**small (1)**
59:10

**sold (2)**
25:6;47:17

**soldmartin@aolcom (2)**
6:10;26:19

**solved (1)**
58:5

**somewhere (3)**
12:25;44:23;60:15

**sorry (2)**
55:1,10

**sound (2)**
19:16;23:22

**speak (2)**
57:1,4

**speaking (2)**
13:5;24:13

**specific (8)**
13:15;33:23;34:1;
39:13,24;40:10;46:11;
56:19

**Specifically (4)**
9:24;10:9;48:15;
50:20

**speculate (1)**
51:10

**speculation (11)**
16:2;19:2,18;20:22;
21:17;23:24;36:25;
40:21;41:21;61:5,18

**spell (2)**
14:21,23

**stamp (2)**
8:14,15

**stamps (3)**
8:10,11,20

**start (3)**
5:18;25:5;35:25

**started (2)**
15:21;25:11

**state (3)**
4:11;39:7;48:2

**stated (1)**
48:16

**statement (4)**
7:1,4,8;8:3

**states (4)**
13:2;39:7,16;48:2

**stating (3)**
17:13;42:16;47:24

**step (3)**
6:10;20:7;46:10

**sticker (3)**
26:6,7;30:19

**still (19)**
19:5;21;20:5,25;

**24:1;32:2;33:15,20;**
38:24;40:24;42:7;
49:17;53:8,15;54:16;
55:2,11;60:25;61:20

**stop (2)**
20:13,14

**stopped (1)**
20:10

**stuff (1)**
18:9

**submit (4)**
10:5;17:9;18:11;
45:17

**submitted (13)**
11:2;14:3;23:7;
42:24;45:5,10,20;46:2;
48:10;49:12;51:22,23;
56:3

**submitting (3)**
17:12,14;44:10

**suggest (3)**
17:2;43:25;44:4

**Sunday (1)**
6:22

**supplement (1)**
45:21

**supplemental (4)**
10:19;17:12,15;44:1

**supporting (1)**
17:18

**sure (6)**
6:15,23;10:16;51:7;
53:21;57:10

**sworn (1)**
4:5

**system (7)**
13:18,19,21,23;
16:11,12;56:11

## T

**Table (2)**
18:14,20

**talked (1)**
57:7

**talking (5)**
8:13;24:17;26:9;
31:13;59:12

**tax (12)**
14:3;43:15,22;45:4,
9,14,15,17,21,24;46:2,
7

**taxes (3)**
14:5;44:20;49:19

**teams (1)**
28:20

**term (1)**
27:3

**terms (9)**
14:1;15:2;25:9;
27:24;35:2,24;38:2;
58:9,11

**testified (1)**

**4:5**

**testify (3)**
50:24;51:5;52:10

**third (4)**
7:6;9:7;13:1,2

**THOMAS (101)**
4:10;5:6,8,18,25;8:1,
7;9:10;10:16;11:2,4;
12:17;16:3,22;17:11,
21;18:11,18;19:4,20;
20:4,24;21:18;23:25;
24:9;25:20;26:3,10;
27:11;30:15;31:1,16;
33:2,14,19;35:3,8,11,
19;36:3,5,9,11;37:1,3;
38:8,10;40:15,23;
41:23;42:3;43:3,9;
44:7,12;45:8,12;46:12,
25;47:2,7;49:7,9,13,16;
50:2,11,21,23;51:4,16,
20,24;52:8,14,17,20;
53:3,13,18,23;54:3,20,
25;55:9,14,20;57:22;
58:1,7,19,22;59:21;
60:5,12,18;61:6,19,23,
25;62:15

**thoroughly (1)**
56:14

**though (6)**
6:24;29:6;33:16;
38:5,24;58:2

**thought (2)**
19:7;28:11

**thousand (1)**
22:11

**three-something (1)**
22:13

**throughout (1)**
13:24;20:18

**timeframe (4)**
13:24;14:16;46:1;
47:21

**timely (1)**
59:4

**times (1)**
61:12

**today (3)**
4:17;10:15;17:3

**today's (1)**
7:10

**together (1)**
36:2

**told (1)**
61:15

**top (6)**
33:7;34:3,7,11;
36:14;37:14

**total (2)**
19:14;34:21

**totally (1)**
24:20

**towards (1)**
34:21

FILED, Case 18-17430 division D Doc 147 22 Filed 06/07/19, Entered 06/07/19 15:50:24 Desc Main
Document Page 269 of 282

BROWN & POPE v.
SHARONN THOMAS POPE

MARTIN BROWN
July 27, 2017

transaction (2)
34:13,14
transactions (2)
9:14;47:19
transcribe (1)
14:6
truthfully (1)
4:16
try (4)
28:14;39:14,15;
51:25
trying (1)
42:5
two (9)
35:12,21,21;37:4;
41:11,12;47:25;59:22;
60:6
two-fold (1)
56:11
two-page (1)
6:5
type (2)
16:16;54:5

**U**

under (7)
4:15;5:3;10:12,22;
17:5;44:2;57:23
Understood (2)
44:7;54:22
up (8)
17:24;27:4,18;28:10,
12,15;58:4;61:12
updates (2)
38:17,19
upon (3)
32:23;59:6,15
upper (1)
25:17
use (6)
11:22;12:1;13:22,23;
14:4;15:16
used (5)
15:8,9;26:5;30:17;
45:24
usually (6)
20:19;32:7;56:1,3,5,
8

**V**

Vague (6)
5:4;45:6;53:11,25;
54:19;60:14
value (1)
61:15
vast (3)
48:2,6,7
version (8)
4:14;40:12,12;41:4,
18,25;42:6,20
versus (1)

15:23
Vince (1)
14:20
volume (1)
28:18
Voorhees (1)
4:23

**W**

wants (1)
50:13
wasting (1)
51:12
way (2)
9:7;17:24
Wells (25)
22:21;23:7,15,16,20;
24:4,13,18,22;25:2,2,9,
18;27:25;28:3,7,12;
29:5,9,14;53:9,15,17;
54:4;55:11
weren't (1)
21:9
What's (1)
56:5
whole (1)
13:8
wholesale (1)
32:24
withdraw (3)
38:15;40:4,11
within (3)
7:2,10;10:3
without (2)
11:6;29:19
witness (10)
10:14,25;41:22;
50:22;53:1,21;54:24;
58:18;60:15;62:11
Wolf (7)
13:21;14:4,8;15:16,
19;16:11;44:18
word (1)
21:14
work (10)
4:22;25:19;39:14,15;
48:3;54:5,7,9,10,12
worked (3)
10:6;24:23;28:20
working (7)
9:18,22;10:10;11:7;
12:22;29:5;39:8
write (1)
24:5
write-off (2)
43:16,21
writing (2)
7:9;44:11
written (5)
10:23;13:6;17:6,9;
23:20

**Y**

year (12)
5:1,12,14,17;14:5,9;
36:20;43:16;44:25;
46:8;55:4,6
years (8)
22:22;43:22;45:10;
46:17,19;48:4,5,7
Yep (1)
27:1
York (1)
39:10

**Z**

zeros (1)
8:17

**0**

009 (1)
34:12
014 (1)
31:14
06 (1)
13:24

**1**

1 (6)
11:24,24;35:25;36:4,
5,12
10 (3)
10:3;11:14,25
101 (1)
9:8
11 (2)
46:2,15
12 (3)
8:24;11:14;46:15
13 (1)
46:15
131 (1)
9:4
14 (1)
46:15
15 (3)
22:22;46:2,15
151 (1)
59:8
17 (2)
10:8;13:24
17th (5)
26:17;37:15;41:5,6,
25
18 (1)
56:22

**2**

2 (3)

6:5;18:21;50:18
2:06 (1)
62:18
2006 (6)
9:2,17,23;10:8,18;
11:12
2009 (2)
18:21,24
2011 (12)
14:15;36:21;37:15,
20;43:6,22;44:25;
46:14;48:9,22;50:14;
53:5
2014 (1)
27:24
2015 (6)
14:15;43:22;44:25;
48:10,22;53:5
2016 (4)
19:24;20:18;55:7;
56:22
2017 (5)
9:2,17,23;10:19;
11:12
22 (1)
5:1
29th (1)
7:3

**3**

3 (1)
42:21
3- (1)
22:15
30 (3)
12:25;34:22;55:8
30th (1)
19:24
33 (1)
12:22

**4**

4/22/16 (1)
5:22
40 (4)
12:8,9,11;13:11
49 (1)
40:8

**5**

5 (1)
34:11
50 (12)
11:24;46:20;47:4;
48:11,16,19,22;49:4,
14,23;52:3;53:2
51 (1)
47:12
5th (12)
36:15,19;37:5,20;

41:2,8,15,17;42:6,7,13,
20

**6**

60 (5)
12:13;13:4,13;15:2,7

**8**

86 (2)
19:23;20:1

**9**

95 (1)
8:17

# EXHIBIT B

# SUPERIOR COURT OF NEW JERSEY
## APPELLATE DIVISION

### RICHARD J. HUGHES JUSTICE COMPLEX
P.O. Box 006, Trenton, New Jersey 08625-0006
(609) 815-2950

**JOSEPH H. ORLANDO**
CLERK

**JOHN K. GRANT**
DEPUTY CLERK - CASE PROCESSING

**KAREN M. CARROLL**
DEPUTY CLERK - ADMINISTRATIVE SERVICES



**ELLEN WRY**
DIRECTOR, CENTRAL RESEARCH

**MARIE C. HANLEY**
CHIEF COUNSEL

Date: October 22, 2018

```
JOSHUA L THOMAS & ASSOCIATES - JOSHUA LOUIS THOMAS
225 WILMINGTON-WEST CHESTER PIKE
STE 200
CHADDS FORD, PA 19317

Re:  MARTIN BROWN AND BROWN AND THOMAS, LLC V. SHARONN THOMAS POPE
     Docket No. A-003453-17
```

Dear Joshua Louis Thomas:

  Your brief/appendix, received 10/22/2018, has been reviewed and is deficient in several aspects. For the brief/appendix to be filed, the following noted deficiencies must be corrected within 15 days or the appeal may be subject to dismissal. If you are the respondent you may be suppressed.

X   **Separate legal argument(s) divided under appropriate point headings into separate parts for each point to be argued. The argument(s) should be supported by citing cases, statutes, rules and other authorities. Following each point heading, the place in the record where the opinion or ruling in question is located, or a statement that the issue was not raised below, must be included in parentheses. R.2:6-2(a)(6)**

X   The brief as well as the appendix should be securely fastened, either bound along the left margin or stapled in the upper left-hand corner. Clips, rubber bands, binders and glassine/plastic covers are not permissible. R.2:6-10

X   **The appendix is overlength. Each volume should contain no more than 200 sheets, excluding the table of contents. R.2:6-1(c).**

X   **The appendix to an appeal granting or denying a motion for summary judgment shall include a separate statement of all items/exhibits submitted to the court on the motion and the motion answer and the page number in the appendix of the document next to each item/exhibit. All such items shall be included in the appendix *including the separate statement of material facts***

*as required by* R.4:46-2, except for briefs in support or in opposition to the motion, unless the inclusion of the brief is permitted by rule. R.2:6-1(a)(2); R.2:6-1(a)(1)

X     **The appendix contains documents with confidential personal identifiers that have not been removed. Please resubmit the appendix with the personal identifiers redacted.** R.1:38-7
**Pages 70,71,72,73and74 contain documents that include the employers identification number.**

X     **The stenographic transcript shall be excluded from the appendix and filed separately.** R.2:6-1(a)(1)
**The transcript of 03/16/2018.**

X     **Please submit 3 additional copies of the transcripts dated:**
**03/16/2018.**

X     **Other: Your submission of your brief and appendix by motion order M-563-18 was due on 10/11/2018. Therefore, both are late and a motion to file the brief and appendix as within time is required.**

X     All responding briefs are due 30 days from the receipt of the brief corrections.


        For eCourts Appellate appeals, you must upload an amended brief/appendix within 15 days. Then, you will be advised through an edata communication, that your brief has been approved and when to send the copies. If you have any questions, please contact SUSAN M BROWN, Case Manager, at (609-815-2950 x 52662)

                                JOSEPH H. ORLANDO
                                CLERK


CLAYTON COMMERCIAL LITIGATION LLC - EVERETT MC CORD CLAYTON

# EXHIBIT C

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike, Suite 200
Chadds Ford, PA 19317
Phone: 215-806-1733
Fax: 888-314-8910
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Collateral Account: 145289
Attorney for Appellant

| | |
|---|---|
| MARTIN BROWN AND BROWN AND THOMAS, LLC<br><br>          Plaintiff, Appellee<br><br>          v.<br><br>SHARONN THOMAS POPE<br>          Defendant, Appellant | SUPERIOR COURT OF NEW JERSEY<br>APPELLATE DIVISION<br>DOCKET NO.: A-003453-17<br><br>TRIAL COURT DOCKET NO.:<br>          CAM-L-2368-16<br><br>Trial Judge: Hon. Michael J.<br>Kassel, J.S.C.<br>Camden County Law Division<br><br>          *Civil Action* |

**PLEASE TAKE NOTICE** that the undersigned attorney for Appellant
SHARONN THOMAS POPE  ("Appellant"), will apply to the Clerk,
Appellate Division, as soon as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that Appellant shall rely on the
attachments submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that a proposed form of Order is
submitted herewith in accordance with R. 1:6-2. An original and
two copies of the proposed Order are attached to the moving
papers.

**PLEASE TAKE FURTHER NOTICE that Appellant requests** oral argument
only if opposition is filed.

____/s/ Joshua L. Thomas____
Joshua L. Thomas, Esq.          Dated: March 1, 2019

MARTIN BROWN AND BROWN AND
THOMAS, LLC

        Plaintiff, Appellee

        v.

SHARONN THOMAS POPE
        Defendant, Appellant

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.: A-003453-17

TRIAL COURT DOCKET NO.:
        CAM-L-2368-16

Trial Judge: Hon. Michael J.
Kassel, J.S.C.
Camden County Law Division

        *Civil Action*

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO REINSTATE THE APPEAL

## RELEVANT FACTS AND PROCEDURAL HISTORY

This appeal was filed on or about April 5, 2018. There were a few corrections requested, and they were complied with. Then the order for the briefs was sent out on August 22, 2018. We submitted the first request for extension on September 24, 2018. The briefs and appendix were then submitted October 22, 2018. There was a deficiency letter sent on October 22, 2018 calling for the briefs and appendix to amended within 15 days, on November 6, 2018. The amendments were made, but prior to them being uploaded, Appellant filed for bankruptcy On November 8, 2018. A couple hours after that point, there was an order dismissing the bankruptcy on November 8, 2018. An order granting the automatic stay being annulled was entered in the bankruptcy, permitting us to proceed with the bankruptcy. The briefs and appendix are ready to go at this point with all deficiencies corrected and we request the case be reinstated, so the corrected briefs can be submitted immediately, as no extension will be needed and we simply want to get them filed at this time.

## LEGAL ARGUMENT

A trial court's power to "Vacate interlocutory orders is 'rooted in common law' and 'broadly codified in *Rule* 4:42-2[.]'" Ducey v. Ducey, 35 A.3d 703, 708 (App. Div. 2012). R. 4:49-2 explains that a party may move for rehearing or Vacate of a

judgment or order if that party can demonstrate that the court has overlooked important facts or that the court has otherwise erred in its judgment or decision. <u>R.</u> 4:49-2. A motion for Vacate is within the sound discretion of the trial court. <u>Dover-Chester Associates v. Randolph Tp.</u>, 419 N.J. Super 184, 196 (App. Div. 2011). It is well established that "the trial court has the inherent power to be exercised in its sound discretion, to review, revise, Vacate and modify its interlocutory orders *at any time* prior to the entry of final judgment." <u>Lombardi v. Masso</u>, 207 N.J. 517, 534 (2011) (emphasis in original). Thus, trial court judges wield a great deal of discretion when evaluating motions for Vacate. As the Appellate Division explains, "[a] trial judge has inherent authority to Vacate interlocutory rulings." <u>Borough of Harvey Cedars v. Karan</u>, 40 A.3d 75, 83 (App. Div. 2012). The general rule is that to win a motion for Vacate, the moving party must show that it has good cause to Vacate the order and that Vacate would be in the interest of justice. "Although the rule is expansive, the power to Vacate an interlocutory order should be exercised 'only for good cause shown and in the service of the ultimate goal of substantial justice.'" <u>Lombardi</u>, 207 N.J. at 536.

## **CONCLUSION**

For the foregoing reasons, Appellant respectfully requests
that this court grant Appellant's Motion to reinstate the
appeal.

Dated: March 1, 2019                    ___/s/_____Joshua
Thomas_____

                                Joshua Thomas, Esq.
                                Attorney ID: 003992012

MARTIN BROWN AND BROWN AND
THOMAS, LLC

       Plaintiff, Appellee

       v.

SHARONN THOMAS POPE
       Defendant, Appellant

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.: A-003453-17

TRIAL COURT DOCKET NO.:
       CAM-L-2368-16

Trial Judge: Hon. Michael J.
Kassel, J.S.C.
Camden County Law Division

*Civil Action*

    **THIS MATTER** having been opened to the Court by Appellant on a Motion to Reinstate the Appeal and on notice to Appellee; and the Court having reviewed the moving and responding papers and the arguments of the parties; and for good cause shown,

    **IT IS** on this ____ day of _____, 2019:

    **ORDERED THAT** Appellant's Motion for Vacate shall be and hereby is **GRANTED**; and it is

    **FURTHER ORDERED THAT** Appellant's Brief should be filed as of _____, 2019; and it is

    **FURTHER ORDERED THAT** counsel for Appellant shall serve a true and correct copy of this Order upon all parties to this action within seven (7) days of its receipt hereof.

                  _____

                  Hon.

Joshua Thomas, Esq.
Attorney ID: 003992012
Joshua L. Thomas & Associates, PLLC
225 Wilmington-West Chester Pike
Suite 200
Chadds Ford, PA 19317
Phone:215-806-1733
E-mail: JoshuaLThomas@gmail.com

| | |
|---|---|
| MARTIN BROWN AND BROWN AND THOMAS, LLC <br><br>    Plaintiff, Appellee <br><br>    v. <br><br> SHARONN THOMAS POPE <br>   Defendant, Appellant | SUPERIOR COURT OF NEW JERSEY APPELLATE DIVISION <br> DOCKET NO.: A-003453-17 <br><br> TRIAL COURT DOCKET NO.: <br>   CAM-L-2368-16 <br><br> Trial Judge: Hon. Michael J. Kassel, J.S.C. <br> Camden County Law Division <br><br>    *Civil Action* |

  I hereby certify that on this date, I caused the attached documents to be sent to all parties via e-filing and/or regular mail.


  I hereby certify that the foregoing statements made by me are true and correct to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


       __/s/ Joshua Thomas_____
       Joshua Thomas

# EXHIBIT D

Joshua L. Thomas, Esq.
Joshua L. Thomas & Associates
225 Wilmington-West Chester Pike Ste 200
Chadds Ford, PA 19317
Phone: 215-806-1733
Fax: 888-314-8910
Email: JoshuaLThomas@gmail.com
Atty ID# 003992012
Collateral Account: 145289
Attorney for Sharonn Thomas Pope

IN THE SUPERIOR COURT OF NEW JERSEY

APPELLATE DIVISION DOCKET NO.: A-003453-17

MARTIN BROWN AND BROWN AND THOMAS, LLC
V.
SHARONN THOMAS POPE

NOTICE OF WITHDRAWAL OF APPEAL

Appellant Sharonn Thomas Pope through counsel, hereby withdraws the motion to

reinstate this matter that is currently pending.


Respectfully submitted,


_____/s/ Joshua L. Thomas, Esq. _____
Joshua L. Thomas, Esq.